1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Andrew James McGonigle,       :
individually and on
behalf of others              :
similarly situated,

                              : Case No. 2:24-cv-04293

        Plaintiff,

                              : Judge James L. Graham

        vs.

                              : Magistrate Judge
Value City Furniture,           Chelsey M. Vascura
Inc.,                         :

        Defendant.            :

- - - - -

DEPOSITION OF ANDREW JAMES MCGONIGLE

- - - - -

Taken at Bailey Cavalieri LLC
10 West Broad Street, Ste. 2100
Columbus, OH 43215
July 25, 2025, 9:32 a.m.

- - - - -

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, Ohio 43215
614-444-1000 or 800-635-9071
www.spectrumreporting.com

- - - - -

2

1                    A P P E A R A N C E S

2

    ON BEHALF OF PLAINTIFF:
3
         Perrong Law LLC
4        2657 Mount Carmel Avenue
         Glenside, PA 19038
5        By Andrew R. Perrong, Esq.

6
    ON BEHALF OF DEFENDANT:
7
         Bailey Cavalieri LLC
8        10 West Broad Street, Ste. 2100
         Columbus, OH 43215
9        By Christopher W. Tackett, Esq.
            Graycen M. Wood, Esq.
10

11
    ALSO PRESENT:
12
         Kimberly Sullivan - Summer Associate,
13       Bailey Cavalieri LLC

14

15

16

17

18

19

20

21

22

23

24

3

1                    Friday Morning Session

2                    July 25, 2025, 9:32 a.m.

3                         - - - - -

4              S T I P U L A T I O N S

5                         - - - - -

6          It is stipulated by counsel in attendance that

7       the deposition of Andrew James McGonigle, the

8       Plaintiff herein, called by the Defendant for

9       cross-examination, may be taken at this time by

10      the notary pursuant to notice and agreement of

11      counsel; that said deposition may be reduced to

12      writing in stenotypy by the notary, whose notes

13      may thereafter be transcribed out of the presence

14      of the witness; that proof of the official

15      character and qualification of the notary is

16      waived.

17                         - - - - -

18

19

20

21

22

23

24

4

1                         I N D E X

2   Examination By                                    Page

3   Mr. Tackett - Cross                                  8
    Mr. Perrong - Redirect                             163
4   Mr. Tackett - Recross                              182

5

6   Exhibits                                            Page

7   Exhibit 1a - 10/12/2024 Letter from Heidarpour      146
                 Law Firm to Value City Furniture
8
    Exhibit 1b - Attentive Records                      151
9
    Exhibit 1c - Text Log                               148
10
    Exhibit 2 - Affidavit of Andrew McGonigle           156
11
    Exhibit 4 - Andrew McGonigle DNCR Confirmation      122
12
    Exhibit 7 - Plaintiff Andrew McGonigle's            154
13               Response to Defendant Value City
                 Furniture, Inc.'s First
14               Interrogatories, Requests for
                 Admission, and Requests for
15               Production

16  Exhibit 8 - Plaintiff Andrew McGonigle's             45
                 Amended Response to Defendant
17               Value City Furniture, Inc.'s
                 First Interrogatories and
18               Requests for Production

19  Exhibit 10 - Plaintiff Andrew McGonigle's            39
                 Response to Defendant Value City
20               Furniture, Inc.'s Third Requests
                 for Admission, Interrogatories,
21               and Requests for Production

22  Exhibit 11 - Text Screenshots                       132

23  Exhibit 12 - Zales Stipulation of Dismissal          99

24

5

1                    I N D E X (CONT'D)

2    Exhibits                                    Page

3    Exhibit 13 - Andrew McGonigle Instagram       57
                    andrew.mcgonigle.5680
4
     Exhibit 14 - Call Log                         68
5
     Exhibit 15 - Text Log                        140
6
     Exhibit 16 - Class Action Authorization      111
7
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   (Exhibits attached electronically.)

23

24

6

1              MR. TACKETT:  Can you please swear in

2    the witness.

3              (Witness sworn.)

4              MR. PERRONG:  We'll note for the record

5    that I can't even see the screen and this is part

6    of the problem.  Carolyn Burke --

7              THE REPORTER:  That's me.

8              MR. PERRONG:  -- oh, with Spectrum

9    Reporting.  And I don't even see -- and I will

10    note for the record, I don't even see the screen

11    of this purported corporate representative who is

12    attending as a corporate representative in a Zoom

13    link.  I don't know where they're attending from,

14    what they're attending.

15              And we note that the deposition notice

16    did not state that anybody was going to attend

17    this deposition virtually via Zoom, that any

18    corporate representative was going to attend

19    virtually via Zoom.  There is no corporate

20    representative as of yet.  I have no way of

21    knowing when somebody enters or leaves the room.

22    The record will reflect that I can barely even see

23    the screen.

24              And I reserve the right, if somebody

7

1    does appear, to move to exclude that person under

2    Rule -- and seek a protective order excluding that

3    person under Rule 26(c)(5).

4              MR. TACKETT:  Yes.  So the notice of

5    deposition governs how the deposition of the

6    witness will be conducted, whether it will be in

7    person or by Zoom.  The mechanics and governing

8    rules regarding the notice of deposition have

9    nothing to do with how a corporate representative

10   of one of the parties may attend the deposition.

11             The reporting service offers the option

12   to have a Zoom link so folks can observe via Zoom.

13   We have elected to use that option so that a

14   corporate representative of Value City, obviously

15   a party in this case, can attend the deposition.

16             And there's no basis to exclude that

17   corporate representative from observing the

18   deposition.  The representative will not be asking

19   questions or participating in the deposition in

20   any way.  They are simply passively observing.  So

21   that's our response.

22             With that aside, we'd like to proceed

23   with the deposition.

24             MR. PERRONG:  Yeah.

8

```
 1                        - - - - -
 2                   ANDREW J. MCGONIGLE
 3      being first duly sworn, testifies and says as
 4      follows:
 5                      CROSS-EXAMINATION
 6      BY MR. TACKETT:
 7      Q.         Mr. McGonigle, my name is Chris
 8      Tackett.  I am the lawyer for Value City
 9      Furniture.  We've never met before today, right?
10      A.         No.
11      Q.         Okay.  Can you state your full name for
12      the record?
13      A.         My name is Andrew James McGonigle.
14      Q.         Okay.  And have you ever had your
15      deposition taken before?
16      A.         (Indicates negatively.)
17      Q.         You're shaking your head "no."
18      A.         No.
19      Q.         Okay.  So before we start, I'm going to
20      go through some ground rules, so that way we can
21      make sure that you and I are on the same page.
22      Interestingly enough, the first one on the list is
23      to verbalize your answers out loud and to avoid
24      shaking your head side to side or nodding your
```

1   head up and down, because the court reporter is

2   trying to type up everything that both of us say,

3   okay?

4   A.        Yes.

5   Q.        And then for that same reason, we have

6   to try to not speak at the same time, so please

7   make sure that I'm done asking the question before

8   you start to answer.  Even if you feel like you're

9   just absolutely certain you know what I'm going to

10  ask, just wait for me to finish, okay?

11  A.        Okay.

12  Q.        And throughout this process, I'm going

13  to be asking you questions.  If at any point you

14  don't understand one of my questions, or you'd

15  like me to explain a question, just let me know,

16  and I'll be happy to do so, but if you answer it,

17  I'm going to assume you've understood it, okay?

18  A.        Okay.

19  Q.        Now, you said you've never had your

20  deposition taken before, right?

21  A.        No.

22  Q.        Okay.  Do you understand that you are

23  under oath today just the same as you would be if

24  you were in court in front of a judge?

1   A.        I do.

2   Q.        Okay.  And the court reporter has sworn

3   you in and you're under oath and have sworn to

4   tell the truth, right?

5   A.        Yes.

6   Q.        Okay.  We're going to be at this for at

7   least a few hours today, so if you need to take a

8   break at any point, just let me know, and we can

9   take a break, all right?

10  A.        Okay.

11  Q.        What did you do to prepare for this

12  deposition?

13            MR. PERRONG:  Objection to the extent

14  that it calls for attorney-client information.

15  I'm instructing the witness not to answer with

16  respect to anything that we discussed or that you

17  discussed with any other attorneys.  To the extent

18  that you can just say that we talked, you can say

19  that.

20  A.        We talked.

21  Q.        So you met with your lawyer?

22  A.        Yes.

23  Q.        Okay.  Did you talk to anybody else

24  about the deposition that was not one of your

11

1    lawyers?

2    A.          No.

3    Q.          Okay.  Did you review any documents?

4                MR. PERRONG:  Objection.

5    Attorney-client privilege.  I'm instructing the

6    witness not to answer.

7    Q.          So your counsel has instructed you to

8    not answer.  Are you going to take that advice?

9    You're smiling.  I'm just -- for the record, I'm

10   just confirming that you're not answering on the

11   advice of counsel, right?

12               MR. PERRONG:  You can say "Yes."

13   A.          Yes.

14   Q.          Okay.  Now, after you met with your

15   lawyer, did you go back through your phone or any

16   of your own personal records to refresh your

17   memory on any of the issues in this lawsuit?

18   A.          No, I did not.

19   Q.          Okay.  What year were you born?

20               MR. PERRONG:  Objection to form.

21   Q.          You can answer the question.  Unless

22   he --

23               MR. PERRONG:  Yes, you can answer the

24   question.

12

1    Q.       Unless he instructs you not to answer,

2    I'd ask that you assume that you're supposed to

3    answer the question.

4    A.       1996.

5    Q.       Okay.  And where did you go to high

6    school?

7    A.       Belleview High School.

8    Q.       Where is that at?

9    A.       Belleview, Florida.

10    Q.       Okay.  And what year did you graduate?

11    A.       2015.

12    Q.       Okay.  What is your current home

13    address?

14            MR. PERRONG:  Objection to form.

15            You can answer.

16    A.       Current home address is 660 North

17    Church Lane, Tappahannock, Virginia.

18    Q.       Can you spell the city?

19    A.       T-a-p-p-a-h-a-n-n-o-c-k.

20    Q.       And is that a house or is it an

21    apartment?

22    A.       That's an apartment.

23    Q.       Okay.  Is that in an apartment complex?

24    A.       No.

13

1    Q.       So is it a standalone or is it a

2    duplex?

3    A.       Standalone unit.

4    Q.       Okay.  Who do you rent from?

5              MR. PERRONG:  Objection.

6    A.       I stay with a roommate.

7    Q.       Okay.  Understood.  But if you have an

8    apartment, you and your roommate are renting the

9    place you live from somebody, right?

10    A.       Yes.

11    Q.       Okay.  Is it a company?

12    A.       No.

13    Q.       Okay.  So you're renting from an

14    individual?

15    A.       I'm renting from my roommate.  I pay

16    him half of the rent.

17    Q.       Okay.  You're --

18    A.       Subleasing.

19    Q.       Okay.  Does your roommate reside at

20    that apartment with you?

21    A.       Yes.

22    Q.       I assume so, since you said "roommate,"

23    but, okay.  Who does your roommate rent from?

24    A.       Some guy named Chris.

14

1    Q.        Some guy named Chris.  So it's not --

2    it's not some company like Acme Rentals?

3    A.        No.

4    Q.        Okay.  Do you know Chris's last name?

5    A.        I do not.

6    Q.        Okay.  How long have you lived there?

7    A.        Since, like, last September.

8    Q.        Approximately September of 2024?

9    A.        Yes.

10   Q.        At the time you moved in, had your

11   roommate already been living there?

12   A.        Yes, he did.

13   Q.        Okay.  Did you have to sign a lease or

14   any kind of a legal document?

15   A.        I did not.

16   Q.        Okay.  What is your roommate's name?

17   A.        Tyler Viars.

18   Q.        Can you spell the last name?

19   A.        V-i-a-r-s.

20   Q.        Okay.  And do you know how long your

21   roommate had been living there when you moved in?

22   A.        I don't know an approximate time.

23   Q.        Okay.  And how long have you known

24   Tyler that you're rooming with?

15

1    A.        I mean, I grew up with him.  I went to

2    middle school with him when I was a kid.  That's

3    about the extent of that, really.

4    Q.        So a long time?

5    A.        Yeah.

6    Q.        I'm not sure on the math, but it sounds

7    like more than 10 years you've known this guy,

8    right?

9    A.        Yeah.

10   Q.        Okay.  Do you guys have a landline

11   phone in your apartment?

12   A.        No.

13   Q.        Who is your internet provider there?

14   A.        There is no internet.

15   Q.        Okay.  So what do you do if you need to

16   use the internet?

17   A.        I just use the data on my phone.

18   Q.        So the whole time you've been living

19   there, you guys haven't had internet?

20   A.        No.

21   Q.        Okay.  Where did you live before that?

22   A.        I was staying at a friend's house in

23   Heathsville, Virginia.

24   Q.        Say the name of the city again.

1    A.          Heathsville, Virginia.

2    Q.          What was that address?

3    A.          I don't remember the exact address.  I

4    know it was off Northumberland Highway.

5    Q.          What was the name of the friend?

6    A.          Bobby Rogers.

7    Q.          Was it his home or his parents' home?

8    A.          His home.

9    Q.          Okay.

10               MR. PERRONG:  Objection.

11   Q.          How long did you live there?

12   A.          A couple of months.

13   Q.          Did you pay rent there?

14   A.          Yes.

15   Q.          Okay.  How much was your rent?

16   A.          I was paying him, like, 100 a week.

17   Q.          Was there a landline phone at Bobby's

18   house?

19   A.          No.

20   Q.          Okay.  And I forgot to ask, how much is

21   your rent at 660 North Church?

22   A.          300 a month.

23   Q.          Okay.  And when did you first move into

24   the Heathsville, Virginia place?

17

```
 1   A.          It was sometime in late July or early
 2   August.  One of those months.  I don't remember
 3   exactly.
 4   Q.          And that would have been the year
 5   before, 2023, right?
 6   A.          No.  That was in 2024.
 7   Q.          So still 2024.  You're in Heathsville
 8   for a couple of months and then you moved into the
 9   660 North Church Lane around September of '24,
10   right?
11   A.          Yes.
12   Q.          Okay.  Before you lived in Heathsville,
13   where did you live?
14   A.          I was in Florida.  I just -- I had
15   moved up here to Virginia.
16   Q.          Okay.  Where did you live in Florida?
17   A.          Interlachen.
18   Q.          Can you spell that?
19   A.          I-n-t-e-r-l-a-c-h-e-n.
20   Q.          Okay.  So where did you live in
21   Interlachen, Florida?
22   A.          260 Oakcrest Drive.
23   Q.          It that a house or an apartment?
24   A.          That was a trailer.
```

18

```
1    Q.        Trailer.  And were you renting there?

2    A.        No.

3    Q.        Okay.  Who owned the trailer?

4    A.        My sister's boyfriend.

5    Q.        Okay.  What's his name?

6    A.        David Jackson.

7    Q.        And how long did you live there?

8    A.        I want to say, like, two months.  Two

9    and a half months tops, maybe.

10   Q.        Did they have a landline phone in the

11   trailer?

12   A.        No.

13   Q.        Okay.  Where did you live before that?

14   A.        I was on the road, working for the

15   carnival, so I was kind of all over the place.

16   Q.        Well, when you're on the road, working

17   for the carnival, was there a permanent place

18   where you kept your stuff?

19   A.        It was not a stationary job.  One week

20   you could be in North Carolina, another week you

21   could be in New York, another week you could be in

22   Maryland.  It's not really...

23   Q.        I understand that, but what I'm saying

24   is, like, you know, say you're getting ready to go
```

19

1    out on the road, you pack your bag, and you pack

2    whatever stuff you think you need, and then you

3    have other stuff that you don't need to bring with

4    you, where would you keep that?

5    A.        I would have just left it with whoever

6    I was staying with before working at the carnival.

7    Q.        Okay.  And where were you living before

8    you started working at the carnival?

9    A.        My ex-girlfriend's.

10   Q.        What was that address?

11   A.        9166 West Charring Cross Circle, Lake

12   Mary, Florida.

13   Q.        And after the word "West," what was the

14   word?  That was a -- I lost that a little.

15   A.        Charring.

16   Q.        Like burning something, Charring?

17   A.        Yeah.

18   Q.        Okay.  You said "Cross" after that?

19   A.        Yeah.

20   Q.        Okay.  Charring Cross Circle.  Was that

21   an apartment?

22   A.        That was a house.

23   Q.        Okay.  Did she rent that house?

24   A.        Yes.

20

```
 1    Q.        Okay.  Was it a part of a complex?

 2    A.        No.

 3    Q.        What was your ex-girlfriend's name?

 4    A.        Kate Aubrey.

 5    Q.        And how long did you live at 9166 West

 6    Charring Cross Circle?

 7    A.        A few months.

 8    Q.        And around what month and year was it

 9    when you moved out of there?

10    A.        I want to say either January or

11    February of '23.  I don't fully remember.  It's

12    two years ago almost.

13    Q.        Okay.  Did you guys have a landline

14    phone there?

15    A.        No.

16    Q.        Okay.  Did you guys have internet?

17    A.        She did have internet.

18    Q.        Who was the internet provider?

19    A.        I don't remember.

20              MR. PERRONG:  Objection to form.

21    Q.        Okay.  When -- when you were living

22    there with your ex-girlfriend, was the lease in

23    her name?

24              MR. PERRONG:  Objection to form.
```

1   A.          Yes.

2   Q.          Okay.  Were you listed on the lease?

3   A.          No.

4   Q.          Okay.  Where did you live before you

5   moved in with your girlfriend at West Charring

6   Cross?

7   A.          I was with my mom and her boyfriend.

8   Q.          What was that address?

9   A.          I don't remember that far back, the

10  exact address.

11  Q.          What city and state?

12  A.          Saint Augustine, Florida.

13  Q.          How long did you live there?

14  A.          A couple months.

15  Q.          Was that a house, a trailer, or an

16  apartment?

17  A.          An RV.

18  Q.          RV.  So was the RV parked in some kind

19  of, like, camp lot or what was it?

20  A.          It was on a property that her boyfriend

21  owned -- or boyfriend's boss owned, and he worked

22  for the guy.

23  Q.          Okay.  What was her boyfriend's name?

24  A.          Hugh Burnham.

22

```
 1    Q.        B-u-r --

 2    A.        -- n-h-a-m.

 3    Q.        And you said you only lived there a

 4    couple of months, right?

 5    A.        Yes.

 6    Q.        Where did you live before that?

 7    A.        I don't remember that far back.

 8    Q.        So the place with your girlfriend, you

 9    moved out of there around January or February of

10    '23, and then you say for about two months before

11    that you lived with your mom and her boyfriend, so

12    I'm assuming that's about the end of '22.  And you

13    don't remember where you lived before that; is

14    that right?

15    A.        Not off the top of my head, no.  I

16    mean...

17    Q.        When you were in high school, where did

18    you live?

19    A.        I lived --

20              MR. PERRONG:  Objection to form.

21    A.        -- in Belleview.

22              MR. PERRONG:  You can answer.

23    A.        I lived in Belleview, Florida.

24    Q.        What was your address?
```

23

```
 1   A.         I don't remember the house number, but
 2   it was on Southeast 110th Street.
 3   Q.         And who did you live with?
 4   A.         My mom and my stepdad.
 5   Q.         Okay.  What was your -- what was your
 6   stepdad's name?
 7   A.         David Davis.
 8   Q.         And after you graduated high school,
 9   how long did you stay living with them?
10   A.         For, like, another two years, two or
11   three years, roughly.
12   Q.         And was that in a house or an
13   apartment?
14   A.         We had moved my senior year of high
15   school, so it was in a trailer.
16   Q.         Okay.  And did you guys have a landline
17   phone?
18   A.         They did at one point.  They used it,
19   my mom and stepdad.
20   Q.         What's your mom's name?
21   A.         Karen Cunnigham.
22   Q.         K-a-r-e-n?
23   A.         Yes.
24   Q.         Cunningham, C-u-n-n-i-n-g --
```

24

1    A.          (Indicates negatively.)

2    Q.          How is it spelled?

3    A.          -- i-g-h-a-m.

4    Q.          So when you lived there in Belleview,

5    did folks call you on the landline that your mom

6    and stepdad had?

7                MR. PERRONG:  Objection to form.

8    A.          No.

9    Q.          Did you use that telephone sometimes?

10   A.          The landline was in a trailer, not in

11   Belleview also.  That was in Ocklawaha because we

12   had moved my senior year of high school.

13   Q.          Can you spell Ocklawaha?

14   A.          Yes.  O-c-k-l-a-w-a-h-a.

15   Q.          What was the name of the trailer park?

16   A.          Lake Bryant Mobile Home Park.

17   Q.          What year did you get your first mobile

18   phone?

19                MR. PERRONG:  Objection to form.

20   A.          I don't remember the exact year.

21   Q.          How many years -- let's use high school

22   as kind of a marker in time.  Was it before or

23   after you graduated high school?

24   A.          It was after.

```
 1   Q.        Okay.  And about how many years after
 2   graduating high school?
 3   A.        I want to say like a year --
 4   Q.        Okay.
 5   A.        -- or two, roughly.
 6   Q.        When did you get your first job after
 7   high school?
 8   A.        In 2016 or '17, one of them two years,
 9   I had gotten a job at Walmart as a cart pusher.
10   Q.        And how long did you work at Walmart?
11   A.        I want to say until, like, February or
12   March, maybe January or February or March of 2017
13   or 2018, one of them years.
14   Q.        So about how long did you work there?
15   A.        I don't remember an exact --
16   Q.        More than a year?
17   A.        -- number.
18             MR. PERRONG:  Objection.
19   A.        No.  It was a couple of months.
20   Q.        A couple months?
21   A.        Yes.  I don't fully recollect how many,
22   but a few months.
23   Q.        And what was the pay rate at that job?
24   A.        It was $9 an hour.
```

26

1  Q.        And were you working full time?

2  A.        Yes.

3  Q.        All right.  Where did you work after

4  that?

5  A.        I worked for Allen's Tile Stock and

6  Service Incorporated.

7  Q.        Is that A-l-l-a-n or e-n?

8  A.        A-l-l-e-n.

9  Q.        Allen's Tile Stock and Service?

10  A.        Yes.

11  Q.        Where is that located?

12  A.        In Ocklawaha, Florida.

13  Q.        And how long did you work there?

14  A.        I kind of worked there on and off from

15  2017 and 2018, up until, like, 2023.

16  Q.        What did you do there?

17  A.        I loaded tile, roofing tiles, on roofs

18  for the roofers to screw down and install.

19  Q.        And what was your pay rate at that job?

20  A.        I started out at 1.33 a square.

21  Q.        So they were paying you per piece?

22  A.        Yes.

23  Q.        Were you getting paid under the table?

24  A.        No.  I had a check with taxes written

1    out, pay stub and all.

2    Q.        So I assume they gave you a W-2 then as

3    well?

4              MR. PERRONG:  Objection to form.

5    A.        The payroll company did.

6    Q.        Yeah.  What was the name of that

7    company?

8    A.        Workforce Business Services.

9    Q.        Who was your supervisor at that job?

10   A.        Allen Lee Clark.

11   Q.        Is his name spelled the same as the way

12   the company is spelled?

13   A.        Yes.

14   Q.        Is he the owner of that company?

15   A.        Yeah.

16   Q.        Where did you work next after you

17   worked at Allen's Tile Stock?

18   A.        I was kind of doing day labor jobs, in

19   and out.  I don't remember the exact months,

20   but...

21   Q.        Who were you working for, though?

22   A.        LaborMax.

23   Q.        Is that a temp agency?

24   A.        Yes.  Action Labor.  Labor Finders was

1    another one.  And then Express Employment

2    Professionals.

3    Q.        So when you're making 1.33 a square

4    with Allen's, about how much were you making a

5    week?

6              MR. PERRONG:  Objection to form.

7    A.        Not a whole lot.  Probably anywhere

8    from 3- to 500 a week.

9    Q.        But if they got slow and they didn't

10   have enough jobs, then you weren't making money;

11   is that right?

12             MR. PERRONG:  Objection to form.

13             You can answer.

14   A.        No.  It's not that I wasn't making

15   money, I just wasn't making a lot of money.

16   Q.        Understood.  So that was dependent on

17   how many roofing jobs they had, right?

18   A.        Basically.

19   Q.        Okay.  In terms of the day labor,

20   LaborMax, how much did you make with them?

21   A.        Anywhere from 12 to 14 an hour.

22   Q.        What about Action Labor?

23   A.        Anywhere from 12 to 14 an hour,

24   depending on the job they sent me to.

29

1    Q.         Uh-huh.  What about Labor Finders, the

2    same?

3    A.         Yeah.

4    Q.         And then what about Express Employment?

5    A.         Pretty much the same.

6    Q.         Where were all -- where were those four

7    temp services located?

8    A.         Somewhere in Ocala, Florida, somewhere

9    in Jacksonville, Florida, somewhere in Saint

10   Augustine, Florida, to the best of my

11   recollection.

12   Q.         So where was LaborMax?

13              MR. PERRONG:  Objection to form.

14   A.         They were in Saint Augustine.

15   Q.         Okay.  Where was Action Labor?

16              MR. PERRONG:  Objection to form.

17   A.         In Ocala and Jacksonville.

18   Q.         Okay.  Where was Labor Finders?

19              MR. PERRONG:  Objection to form.

20   A.         Saint Augustine and Ocala.

21   Q.         Where was Express Employment?

22              MR. PERRONG:  Objection to form.

23   A.         Orlando.  Not Orlando.  Lake Mary.

24   Q.         Okay.  What was the name of the

```
 1   carnival service that you worked for?

 2   A.        Dreamland Amusements.

 3   Q.        Say the first part again.

 4   A.        Dreamland Amusements.

 5   Q.        Okay.  And how much did you make with

 6   them?

 7   A.        It depended on the state that we were

 8   in and what their minimum wage was legally that

 9   they were legally required to pay, so it typically

10   went anywhere from 12 to 15 an hour.

11   Q.        And when did you start working with

12   Dreamland?

13   A.        In January or February of '23.

14   Q.        And what was your -- what was your job

15   with that company?

16   A.        I was a ride operator.

17   Q.        Any particular ride or did it rotate?

18   A.        It -- normally just the kiddie rides,

19   the ones with the hydraulic switch.

20   Q.        Okay.  And how long did you do that

21   for?

22   A.        Like I said, it was January or February

23   of '23 when I started, and I worked there up until

24   May.
```

1  Q.        Who was your supervisor?

2  A.        My supervisor was Mike Engel.

3  Q.        Can you spell the last name?

4  A.        E-n-g-e-l.

5  Q.        Same guy the whole time?

6  A.        Well, I had been in blue unit, too, so

7  I had Bob Destefano also as a supervisor.

8  Q.        Destefano?

9  A.        Yeah.

10  Q.        Is it spelled like it sounds?

11  A.        Yeah.

12  Q.        Is it with an F?

13  A.        Yeah.

14  Q.        Okay.

15  A.        I think so.  I'm not 100 percent sure

16  on the spelling.

17  Q.        Which one was your supervisor first?

18  A.        Bob was.

19  Q.        Okay.  And then it switched to Mike at

20  some point?

21  A.        Yes.

22  Q.        And did Dreamland pay you by check with

23  employment taxes and stuff taken out?

24              MR. PERRONG:  Objection --

1    A.        Yes.

2              MR. PERRONG:  -- to form.

3    Q.        And did they provide you a W-2?

4    A.        They did.

5    Q.        You said they did?

6    A.        Yes.

7    Q.        So you left Dreamland in May of 2023,

8    right?

9    A.        Yes.

10   Q.        Where did you work next?

11   A.        I worked for Hitchcock Markets, in

12   Interlachen, Florida.

13   Q.        Can you spell Hitchcock?

14   A.        H-i-t-c-h-k-o-k [sic].  I think that's

15   how it's spelled.

16   Q.        And what did you do there?

17   A.        I -- I was a meat cutter.

18   Q.        You worked in the butcher shop?

19   A.        Yeah.

20   Q.        Okay.  What was the pay rate for that

21   job?

22   A.        It was 12 an hour, I think.  12 or 13.

23   I don't fully remember or recall the exact amount.

24   Q.        Okay.  How long did you work there?

```
 1    A.         I want to say a couple of weeks to a
 2    month, maybe over a month, to my best
 3    recollection.
 4    Q.         Did they pay you?
 5    A.         Yes.
 6    Q.         Okay.  Where did you work after that?
 7    A.         Then I worked for a guy I know, when I
 8    came up to Virginia, working under the table, for
 9    this guy on a crab boat.
10    Q.         What were you doing for him?
11    A.         Helping him repair his boat.  Helping
12    him shake out crab pots, separate the different
13    species of crabs in baskets.
14    Q.         How much did he pay you?
15    A.         Like, 300 a week.
16    Q.         So did you show up every day or was
17    it -- how did that work?
18    A.         Yes.
19    Q.         Did he have a business?
20    A.         He did.
21    Q.         What's the name of the business?
22    A.         Croswell's Seafood.
23    Q.         How do you spell Croswell?
24    A.         C-r-o-s-w-e-l-l.
```

34

```
1    Q.         How long did you work for him?

2    A.         A couple of weeks.

3    Q.         What did you do after that?

4    A.         Maybe a month being the most.

5    Q.         Okay.

6    A.         And then I got a job at the

7    Tappahannock Essex County Animal Shelter, which I

8    currently work at.

9    Q.         It's called Essex County Animal

10   Shelter?

11   A.         Yeah.

12   Q.         And where is that at?

13   A.         In Tappahannock, Virginia.

14   Q.         Can you spell Tappahannock?

15   A.         T-a-p-p-a-h-a-n-n-o-c-k.

16   Q.         And what do you do at the Essex County

17   Animal Shelter?

18   A.         I spray out dog runs, sanitize the

19   runs, squeegee them, dry them, take out dogs, walk

20   them, let them run in the yard, feed, water,

21   sometimes help with transport.

22   Q.         And what is your rate of pay with them?

23   A.         $12 an hour.

24   Q.         So based on the timeline and when you
```

1    stopped working with Crosswell's, it sounds like

2    you started working with Essex County Animal

3    Shelter sometime in 2024, right?

4    A.        Yes.  The hire date was September 13th.

5    Q.        And does Essex County give you a W-2?

6    A.        They do.

7    Q.        Okay.  Who is your supervisor there?

8    A.        Ellen Shifflet.

9    Q.        Can you spell the last name?

10   A.        S-h-i-f-f-l-e-t.

11   Q.        And when you started there in 2024, did

12   you fill out a job application?

13             MR. PERRONG:  Objection to form.

14   A.        I did.

15   Q.        Okay.  And when you filled that out,

16   did you list the 660 North Churchill address as

17   your address?

18             MR. PERRONG:  Objection to form.

19   A.        You're referring to North Church Lane?

20   Q.        Yeah.

21   A.        Yes.

22   Q.        Okay.  And then did you list -- what

23   telephone number did you list as your contact?

24             MR. PERRONG:  Objection to form.

1    A.          804-238-5410.

2    Q.          Now, when you were working with

3    Dreamland, what number would you have given them?

4             MR. PERRONG:  Objection to form.

5    A.          To my best recollection, the last phone

6    number I had on file with them as an employer when

7    I worked for them was 252-518-3959.

8             MR. TACKETT:  We've been going a while.

9    Do you guys want to take a five-minute break?

10            MR. PERRONG:  That's fine.

11            MR. TACKETT:  Okay.

12            (A short recess is taken.)

13   BY MR. TACKETT:

14   Q.          At Essex County, how many hours a week

15   are you working?

16   A.          Anywhere from 32 to just under 40,

17   roughly.

18   Q.          Okay.  So you're not getting any

19   overtime?

20   A.          No.

21   Q.          Okay.  Now, during your time working

22   with Essex County Animal Shelter, have you worked

23   second jobs at any point?

24            MR. PERRONG:  Objection to form.

1   A.          At one point I did work at Advance Auto

2   Parts.

3   Q.          When was that?

4   A.          That was during September or October.

5   Q.          Of '24?

6   A.          Yes.  One of those two months.

7   Q.          It sounds like not for very long?

8   A.          No.  I wasn't getting the hours, and I

9   seemed to just be getting more hours at the

10  shelter, so it was kind of almost at $50 a week or

11  $100 week.  It really wasn't supplementing as

12  extra income, so being that the majority of my

13  income was there, I just kind of let that go.

14  Q.          And by "there," you meant Essex County,

15  right?

16  A.          Yes.

17  Q.          Okay.  Aside from maybe a month with

18  Advance Auto Parts, you weren't working a second

19  job?

20  A.          No.

21  Q.          Okay.  I just want to make sure I

22  understood correctly, you're still working at

23  Essex County as of right now?

24  A.          Yes.

38

1   Q.        Okay.  Now, aside from working for

2   Essex County and also aside from TCPA settlements,

3   do you have any other sources of income in 2025?

4            MR. PERRONG:  Objection to form.

5   A.        I do not.

6   Q.        Okay.  Do you have a bank account?

7   A.        I have two bank accounts.

8   Q.        Okay.  And what banks are those with?

9            MR. PERRONG:  Objection to form.

10  A.        One is with Five Star Credit Union.

11  The other one is with United Bank.

12  Q.        It's called United Bank?

13  A.        Yes.

14  Q.        Where is that at?

15  A.        Tappahannock, Virginia.

16  Q.        Okay.  And how long have you used Five

17  Star Credit Union?

18            MR. PERRONG:  Objection to form.

19  A.        I don't know an exact month, but

20  roughly I'm going to go with since 2022 or 2023,

21  one of those two years.

22  Q.        Okay.  What about United Bank?

23            MR. PERRONG:  Objection to form.

24  A.        I have an account with them opened up.

1    I don't remember the month I opened the account,

2    but since either April or May of 2025.

3    Q.          Okay.  Now, in discovery in this case,

4    you were asked to admit or deny if money from TCPA

5    lawsuits was your largest source of income in

6    2025.

7              MR. PERRONG:  Objection to form.

8    Q.          Do you recall that?

9    A.          I don't recall ever being asked that.

10   Q.          Okay.  Can you turn to Tab 10 in your

11   binder?  Based on the testimony you just gave and

12   looking at your discovery responses, it would

13   sound like settlement money from TCPA lawsuits

14   would be your largest source of income in 2025.

15             MR. PERRONG:  Objection to form.

16   Q.          Would you agree that it would be?

17   A.          I object on the grounds that this seeks

18   information not relevant to the case.

19   Q.          Okay.  I hear you, but you still have

20   to answer the question.

21   A.          Yes.

22             MR. PERRONG:  I think -- well, I think

23   that you need to rephrase -- rephrase the

24   question.  Can you repeat the question just for

40

1     the witness's benefit?

2              MR. TACKETT:  I would be happy to

3     rephrase the question; although, that's not what

4     he said.  He said he objected to the relevance.

5              MR. PERRONG:  Right.  So he answered

6     the question -- or gave a response.

7              MR. TACKETT:  He said "Yes."  I'm happy

8     to clarify to make sure we have a clean record.

9              MR. PERRONG:  Yeah.

10    BY MR. TACKETT:

11    Q.       Would you agree that in 2025, your

12    largest source of income is from TCPA settlements?

13             MR. PERRONG:  Objection to form.

14    A.       Yes.

15    Q.       Okay.  So on this Request for Admission

16    No. 11, this was prepared by your lawyers, right?

17    A.       Yes.

18    Q.       Okay.  So when they said "Deny" on

19    that, that's not correct, right?

20             MR. PERRONG:  Objection to form.

21    A.       Deny what?

22    Q.       They deny that it was your largest

23    source of income.  And based on the answer you

24    just gave, you said it was your largest source of

1    income.

2              MR. PERRONG:  Objection to form.

3    A.         I wouldn't say it's technically my

4    largest source of income.

5    Q.         Please explain.

6    A.         Well, I make a little more than maybe

7    what I made roughly out of settlements within a

8    year, so for this to be my largest source of

9    income this would be my only source of income that

10   pertains to anything that you're referring to in

11   means of settlements.

12   Q.         I don't understand that answer.  So one

13   thing -- I just want to -- I want to remind you

14   that you're under oath and you gave an answer

15   under oath that TCPA settlements were your largest

16   source of income so far this year.

17             Now I see you looking at the answer

18   that's in this discovery document and you're

19   trying to put the two together, but I just want to

20   caution you that you are under oath, and it's okay

21   that during your deposition your answer is

22   different than something your lawyer drafted.

23   What is not okay is giving any kind of false

24   testimony under oath.  So we're here, we're

1    talking about the facts so that way we get a

2    record of the facts, okay?

3                My understanding from discovery

4    responses that your lawyers have given is that

5    you've received $35,000 in TCPA lawsuit

6    settlements this year --

7    A.          I've had so many --

8    Q.          -- and that's not counting the Zales

9    case.  Does that sound about right?

10   A.          You know, from my recollection, I can't

11   give --

12               MR. PERRONG:  Objection.  Hold on.

13   Just objection to form.

14               You can answer.

15   A.          I don't know, you know, an exact

16   number.  I would say anywhere from maybe 25- to

17   35,000 is what I have maybe recovered in

18   settlements, but I don't want to give you an exact

19   number and give you a wrong answer.

20   Q.          I have a list of those from your

21   lawyers, so we can look at them.  I will represent

22   to you, as an officer of the court, that the list

23   that your lawyers gave adds up to $35,000.  Does

24   that sound about right to you?

43

1    A.        That may be right.

2    Q.        Okay.  So far this year, at Essex

3    County Animal Shelter, about how much money have

4    you made?

5              MR. PERRONG:  Objection to form.

6    A.        Anywhere from 25- to maybe 30-,

7    $35,000.  I don't know an exact number.  That's a

8    rough estimate.

9    Q.        You said $12 an hour, right?

10   A.        Yes.

11   Q.        And 32 to 40 hours, right?  Right?

12   A.        Yes.

13   Q.        Okay.  So --

14   A.        It's usually under 40, but...

15   Q.        Okay.  So for the sake of math, to make

16   it really simple, if we take $12 an hour times 40,

17   and we assume you work all 52 weeks of the year

18   and that no taxes come out, it would be $24,960.

19   That's just -- that's just math.  I mean, I just

20   used a calculator.

21   A.        Okay.

22   Q.        Do you see that?

23   A.        Yeah.

24   Q.        Does that sound about right?

44

1    A.        Yeah.

2    Q.        Okay.  So would you agree that your

3    original answer that you've made more income from

4    TCPA settlements than you have from Essex County

5    is correct?

6    A.        Yes, that's correct.

7    Q.        Okay.  So this answer to RFA No. 11

8    should be changed based on your testimony, right?

9              MR. PERRONG:  Objection to form.

10   A.        Yes.

11   Q.        Okay.  So earlier you testified that

12   your current number is 804-238-5410, right?

13   A.        That's correct.

14   Q.        Okay.  Moving forward, I'm going to ask

15   you different questions about that number.  Can we

16   just agree that if I say "the telephone number,"

17   that we're talking about that number unless I say

18   we're talking about a different number?

19   A.        Yes.

20   Q.        Okay.  Now, in this case you have filed

21   a lawsuit against -- you can close the binder,

22   we're not going to use that right now.  You filed

23   a lawsuit against my client, Value City Furniture,

24   relating to text messages that you got at the

45

1   telephone number, right?

2   A.        Yes.

3   Q.        Okay.  Now, right now, do you have any

4   other numbers?

5   A.        I do not.

6   Q.        Okay.  And I'm going to ask you to look

7   at a different tab actually, Tab 8.  And if you

8   could go -- first, do you see it says, "Identify

9   all telephone numbers you have used from

10  January 1, 2022 to present"?

11  A.        Yes.

12  Q.        And then onto the next page, it lists

13  out some different numbers.  Do you see that?

14  A.        Yes.

15  Q.        So it says that since August 5th, 2024,

16  you've used what we're calling the telephone

17  number.  Do you see that?

18  A.        I see that.

19  Q.        Okay.  And then it says that from April

20  to August of 2024, your number had been

21  252-518-3959.  Do you see that?

22  A.        I do.

23  Q.        Okay.  Who was that last number

24  through, the 252?

46

1    A.         That was through the carrier AT&T, from

2    the best of my recollection.

3    Q.         And was that a prepaid number?

4    A.         That was.

5    Q.         Okay.  And why did you only have that

6    number for four months or less?

7    A.         Again, as I said, when I moved to

8    Virginia, I planned on originally keeping that

9    phone and using that number for personal use, but

10   I didn't have good cell service with AT&T, so I

11   decided to switch to Verizon, which gave me better

12   service, which is when I had gotten the 804

13   number, 238-5410, which is what I presently have

14   now.

15   Q.         Okay.  And how much a month were you

16   paying for the 252 number?

17   A.         I was paying about $60 a month.

18   Q.         Okay.  And the 804 number that you're

19   using now, that's $60 a month too, right?

20   A.         50.

21   Q.         50.  Okay.  So it's cheaper.

22   A.         It's went down a little because I've

23   had them for a little while.

24   Q.         Now, it says just above the reference

1    to the 252 number, it says, before that, in 2023,

2    you used a number that was 352-763-0243 with Total

3    Wireless.

4    A.         That's correct.

5    Q.         How long did you use that number, the

6    0243?

7    A.         I don't know an exact time frame, but

8    to the best of my memory, probably a few months,

9    like, out of 2023.

10   Q.         And how much were you paying for that

11   phone?

12   A.         $35 a month.  To the best of my

13   recollection.  It's been two years, so it's kind

14   of hard, you know, to remember exact details.

15   Q.         Why did you stop using that number?

16   A.         I think the phone had gotten damaged.

17   And it was a little cheaper for me to go to

18   Straight Talk, so that's why I had gotten -- or

19   AT&T or whatever, the other carrier I had, so

20   that's why I went with them, because the 252

21   number, there was a guy I worked with at the

22   carnival that sold me the phone and told me I

23   could just get a prepaid card, so I added time on

24   it.

48

1    Q.          Okay.  Now, it says that you got the

2    804 number in August, and that you had the 252

3    number from April to August of 2024, and then that

4    Total Wireless number is talking about 2023.  Did

5    you not have a phone in January to April of 2024?

6    A.          I -- I don't remember exactly whether

7    I, you know, had a phone or not.  Like I said,

8    this was -- January to April of 2024?

9    Q.          Yeah, the first four months of 2024,

10   did you go without a phone?  Because if I went

11   four months without a phone, I would remember

12   that.

13              MR. PERRONG:  Objection to form.

14   A.          Possibly.  There's a possibility I may

15   have.

16   Q.          So you're saying you don't remember if,

17   about a year and a half ago, you had a period of

18   time where you went months without a phone?

19   A.          I think that in January of 2024 --

20   actually, in January of 2024, I had the 804-238

21   number.

22              MR. PERRONG:  Objection to form.

23   A.          No, no.  No, I didn't actually.  Let

24   me -- I had -- I don't remember if I even had a

1    number.

2    Q.          Well --

3    A.          Everything on here is, like, from my

4    best recollection.

5    Q.          I understand that.  But what I'm

6    trying -- and that's what causes me to have these

7    questions, because I'm seeing a gap of four months

8    and it's not -- if the gap was, like, back in '22,

9    then I might understand it more, but what I don't

10   understand is how just last year there's this gap

11   where you're saying -- there's nothing said about

12   what the number might be.  And so my natural

13   question is, did you go through a period of time

14   where you didn't have a phone, you didn't have a

15   cell phone?

16   A.          I think --

17              MR. PERRONG:  Objection to form.  Asked

18   and answered.

19              MR. TACKETT:  It's a trial objection.

20   Q.          Go ahead.

21   A.          I think I may have had a TextNow number

22   maybe, a number that I had ran off WiFi, but I

23   don't remember the exact number.  I mean, it's

24   been over a year almost, so...

50

1    Q.          What is TextNow?

2    A.          TextNow is basically a free texting and

3    calling app you can use with WiFi if you don't

4    have a phone in service, if you need to get ahold

5    of somebody or send a message or whatever the case

6    may be.  If I did contact somebody and I didn't

7    have a number, that would be the only way I could

8    maybe possibly have done so.

9    Q.          Okay.  Do you use TextNow presently?

10   A.          I do not.

11   Q.          Okay.  Now, at the 660 North Church

12   Lane, you don't have WiFi, right?

13   A.          No.

14   Q.          But where you lived before, you had

15   WiFi?

16   A.          I did not have WiFi at Bobby Lee

17   Rogers' house.

18   Q.          Okay.  And when you were living with

19   your sister and David Jackson, did you have WiFi?

20   A.          I did.

21   Q.          You did?

22   A.          Yes.

23   Q.          Okay.  So would you use the TextNow

24   when you were there?

1    A.          If I couldn't afford my phone bill or I

2    hadn't paid it yet, yes, I probably used it.

3    Q.          Okay.  And why did you get rid of the

4    352 number with Total Wireless?

5    A.          I think the phone had just broken.  And

6    I was on the road and I wanted a decent phone, I

7    didn't want to have to spend an arm and a leg, so

8    basically I bought that AT&T phone off of one of

9    the guys I had worked with, which gave me the 252

10   number, so I found that that was just the easiest

11   way to go.  I kind of just -- it was one of them

12   things where I kind of just did it.  I couldn't

13   transfer service since it was a different carrier.

14   Q.          Got it.  Who did you buy the phone off

15   of that you used with AT&T?

16   A.          The guy's name was Gene.  I don't

17   remember his last name.

18   Q.          Gene with a G or a J?

19   A.          G.

20   Q.          Uh-huh.  And when you bought the phone,

21   did it come with service already set up or you had

22   to go take it and set it up?

23   A.          It did not.  I had to get a prepaid

24   card and put time on it.

52

```
 1   Q.        Did you have to do, like, a one-time
 2   activation at a store location?
 3   A.        No.
 4   Q.        You just buy the card and then load
 5   that in?
 6   A.        Yeah.
 7   Q.        What type of phone was that?
 8   A.        It was a regular Android.
 9   Q.        Okay.  And what about the 804, what
10   kind of phone is that?
11   A.        That's an Android.
12   Q.        Okay.
13   A.        Verizon smartphone.
14   Q.        And are there any other numbers that
15   you use right now?
16   A.        There are not.
17   Q.        Okay.  Do you use social media?
18   A.        I do.
19   Q.        Okay.  What types of social media do
20   you use?
21   A.        Facebook.
22   Q.        What do you use Facebook for?
23   A.        I look at stuff on Marketplace
24   occasionally.  I send messages to, you know, a few
```

53

 1    different people that I associate with or choose

 2    to.

 3    Q.       Do you have -- do you have the 804

 4    number listed on your Facebook anywhere?

 5             MR. PERRONG:  Objection to form.

 6    A.       Yeah.

 7    Q.       Yes, you do?

 8    A.       Yeah, I do.

 9    Q.       Are you aware that you have more than

10    15 Facebook pages registered with your name and

11    with your picture on them?

12             MR. PERRONG:  Objection to form.

13    A.       I'm well aware.

14    Q.       Why do you have so many?

15    A.       Well, you know, sometimes I forget my

16    password and I don't remember the login and I'll

17    just create a new one.  If I switch phones, you

18    know, I'll just create a new one if I don't

19    remember the password or I don't have the email to

20    try to recover the password or in any kind of

21    form.

22    Q.       So in the interrogatory response, you

23    remembered five telephone numbers that are listed

24    here, right?

1   A.        Yes.

2             MR. PERRONG:  Objection to form.

3   Q.        Would you agree that you've had several

4   more telephone numbers than that that you just

5   can't remember?

6             MR. PERRONG:  Objection to form.

7   A.        You know, maybe I may have had other

8   numbers than that, but what is documented is to

9   the best of my recollection and on good faith.

10  Q.        Understood.  But you have more than

11  15 Facebook pages and you're saying that the

12  reason you change is because you have different

13  numbers and you can't recover the password, right?

14  A.        That's not what I'm saying.

15  Q.        Well, please --

16            MR. PERRONG:  Objection to form.

17  Q.        Yeah.  Please explain.

18  A.        So a lot of times if I want to recover

19  on Facebook, it will be through an email, not a

20  phone number --

21  Q.        Okay.

22  A.        -- or a password.  I've had a lot of

23  different emails, so if I can't get into that

24  email that's associated with the account, then the

1    only thing I can do is just create a new Facebook.

2    Q.          Okay.  What is your current email

3    address?

4    A.                Andrewmcgonigle714@gmail.com.

5    Q.          And what was your last email address

6    prior to that?

7    A.                To the best of my recollection, it

8    would be mcgonigleandrew38@gmail.com.  The first

9    name might be before the last name if that's not

10   it.  I don't have them all memorized, only the one

11   I currently use.

12   Q.          And since you started making email

13   accounts, how many email accounts would you say

14   you've created?

15   A.                Anywhere from roughly five to seven.  I

16   don't know an exact number.  That's the best of my

17   recollection.

18   Q.          Okay.  What do you use email for?

19   A.                Primarily my social media account, like

20   my Facebook, I'll use it in coexistence with that.

21   Work.  Sometimes I use it for work if I need to

22   print something off.  My insurance on my vehicles,

23   I have to have an email for that, for policy

24   documents.  Primarily work and stuff that would

1    be, you know, I would do in my daily life, in

2    other words.

3    Q.          Yeah.  And you've changed residences so

4    often you need to use email for important things,

5    right?

6    A.          Yes.

7                MR. PERRONG:  Objection to form.

8    Q.          Do you use email for your

9    correspondence with your bank, like statements?

10                MR. PERRONG:  Objection to form.

11    A.          I do.

12    Q.          Okay.  What about, do you use email for

13    correspondence with credit cards?

14                MR. PERRONG:  Objection to form.

15    A.          I have no credit cards.

16    Q.          Smart man.  But with -- you said with

17    work, do you use email?

18                MR. PERRONG:  Objection to form.

19    A.          I wouldn't really say work.  I use it

20    if I need something printed off, I'll send it to a

21    coworker and she'll print it off for me, like, if

22    it's, you know, an insurance policy or something I

23    might need a document for, some kind of document,

24    if it's something important I need, I'll have it

57

1    printed.

2    Q.          If work is going to send you a tax

3    document, will you have them send it to your

4    email?

5               MR. PERRONG:  Objection to form.

6    A.          I get those in the mail.

7    Q.          Okay.  Do you use Instagram?

8    A.          I do not.

9               MR. PERRONG:  Objection to form.

10   Q.          Have you ever had an Instagram account?

11              MR. PERRONG:  Objection to form.

12   A.          I've not ever owned an Instagram

13   account or had one.

14   Q.          I want you to look at Tab 13, and tell

15   me if this helps refresh your memory of an

16   Instagram account that you have had.

17   A.          You know, I don't recall or recollect

18   ever seeing that.  There may have been one, but to

19   the best of my knowledge, I don't recall ever

20   having or seeing an Instagram account in my name.

21   Q.          You would agree that this Instagram

22   account has your name in the call signature,

23   right?

24   A.          Well, that could be a possibility, but

1    to the best of my recollection I don't 100 percent

2    know, so it may or may not be.

3    Q.        Well, it's --

4    A.        But it's a possibility.

5    Q.        It's important that you listen to the

6    question.  I've heard your testimony that you

7    can't remember setting up an Instagram account,

8    but the specific question was, you agree that this

9    account has your name in the call signature here

10   at the top, would you agree?

11             MR. PERRONG:  Objection to form.

12   Q.        Your name is Andrew McGonigle, correct?

13   A.        Yes.  I mean, that's --yeah.

14   Q.        Okay.  Now, the profile picture for

15   this account appears to be a photo of you.  Would

16   you agree that that is a photo of you?

17   A.        Yes.

18   Q.        Okay.  Now, the direct name of the

19   account is andrew.mcgonigle.5680.  Do you see

20   that?

21   A.        Yeah.

22   Q.        Okay.  And now, I believe when you were

23   telling me some of your email addresses, you

24   referenced 5680 in one of the email addresses; is

1    that right?

2              MR. PERRONG:  Objection to form.

3    A.        No.

4    Q.        Okay.

5              MR. PERRONG:  Would the reporter read

6    back and see if he mentioned "5680" in any of his

7    prior testimony.

8              THE REPORTER:  Give me one moment.

9              I don't see it.

10   BY MR. TACKETT:

11   Q.        Okay.  Can you -- you've already gone

12   there.  The second page of Exhibit 13 are the

13   images that are uploaded on the Instagram account

14   that we are looking at.  It looks like you have

15   those in front of you now.  Do you recognize these

16   images?

17             MR. PERRONG:  Objection to form.

18   A.        They look familiar.

19   Q.        Okay.  The first thing is a picture of

20   a truck.  Do you recognize that truck?

21   A.        Yes.

22   Q.        Okay.  Whose truck is that?

23   A.        That was mine.

24   Q.        Okay.  And then there are pictures of

60

1    four selfie photographs.  Do you see those?

2    A.        I do.

3    Q.        Would you agree that those are

4    self-portraits that you took?

5    A.        They are.

6    Q.        Okay.  So with the benefit of looking

7    at these images that are posted on the account, do

8    you believe that these are images that you posted

9    on the account?

10            MR. PERRONG:  Objection to form.

11   A.        Yes.

12   Q.        Okay.  Now, you also --

13   A.        I remember having a Facebook with these

14   photos, but I just -- I don't -- I don't remember

15   ever creating an Instagram of these photos.

16   Q.        Okay.  Do you have any friends that use

17   Instagram?

18            MR. PERRONG:  Objection to form.

19   A.        Not that I, you know, know of, off the

20   top of my head.

21   Q.        Okay.  Well, this account that has your

22   name and pictures has 32 followers and it's

23   following 127 other accounts, but you're saying

24   you don't remember making it?

1    A.          Not to my recollection, I don't.

2    Q.          Okay.  But you remember these images

3    that we've looked at, correct?

4    A.          Yes.

5    Q.          Okay.  I want to ask you about the

6    second post here, where it says, "Make money for

7    free."  Do you see that?

8    A.          I don't recognize that.  I see it, but

9    I don't recall even ever putting that on

10   Facebook --

11   Q.          Okay.  And it looks --

12   A.          -- or social media.

13   Q.          Okay.  And it looks like one of the

14   things that you share and it's like a sweepstakes

15   that you can potentially win money; is that right?

16            MR. PERRONG:  Objection to form.

17   A.          Yes.

18   Q.          Okay.  Have you posted other things

19   like this before, like these sweepstakes posts?

20            MR. PERRONG:  Objection to form.

21   A.          I have not.

22   Q.          Okay.  Did you ever win any money from

23   this?

24            MR. PERRONG:  Objection to form.

62

1   A.          No.

2   Q.          On your Facebook do you ever post or

3   repost any of the marketing things to win free

4   products or anything like that?

5           MR. PERRONG:  Objection to form.

6   A.          I don't recall ever, you know, posting

7   anything like that.  I mean, there's been a few

8   times where if I've seen a sweepstakes, not for my

9   benefit, but maybe for someone else, I would send

10  it to someone else and be like, you should give

11  this a try, but to certain people in Messenger,

12  but I wouldn't, like, just share it on my profile.

13  Q.          Because if you can get something free

14  and all you have to do is repost something or

15  share it to somebody else, that might be worth

16  doing for some people, right?

17          MR. PERRONG:  Objection to form.

18  A.          Yes.

19  Q.          Okay.  And if you -- if you had this

20  today and you reposted it and you got a chance to

21  win free money, would that be something you would

22  do?

23          MR. PERRONG:  Objection to form.

24  A.          No.

```
 1   Q.         Okay.  Do you talk on the phone much,
 2   like voice calls?
 3              MR. PERRONG:  Objection to form.
 4   A.         I do, to certain people.
 5   Q.         Who are the people that you talk on the
 6   phone with?
 7              MR. PERRONG:  Objection to form.
 8   A.         Usually my girlfriend, a few other
 9   friends mainly, which is, like, three or four
10   people.
11   Q.         So you would agree that when it comes
12   to talking on the phone, that's more of a select
13   small group of people that you would talk to?
14   A.         Yes.
15   Q.         Okay.  Like, talking on the phone is
16   more intimate than a text, right?
17              MR. PERRONG:  Objection to form.
18   A.         Yes.
19   Q.         Uh-huh.  Would you agree that you text
20   more often than you talk on the phone?
21              MR. PERRONG:  Objection to form.
22   A.         No.
23   Q.         You send and receive texts less often
24   than talking on the phone?
```

64

1    A.         Well, I probably do text more in the

2    heat of the day, everybody, you know, has stuff

3    they do, they're busy, so I would have to say

4    that, yes, I probably do send text messages maybe

5    a little more than I do have the time to talk on

6    the phone.

7    Q.         Okay.  How often would you say you talk

8    on the phone?  Per day, how often?

9    A.         Maybe 30 minutes, an hour tops,

10   roughly.

11   Q.         How many calls?

12   A.         Anywhere from one or two maybe.

13   Q.         Okay.  And how long, on average, do you

14   usually stay on a phone call?

15   A.         Usually 15 minutes to 30 minutes at

16   most.  I don't try to be on there too, too long.

17   Q.         And when you -- when you have the phone

18   calls, do you use up a set portion of minutes that

19   you have on the 804 phone?

20   A.         I have unlimited calling and texting.

21   Q.         Okay.  So you said that the only people

22   you would really have phone calls with would be

23   your girlfriend and three to four close friends?

24   A.         Yeah.

1    Q.        Okay.  And you agree that it's more

2    personal, more intimate on a phone call, than a

3    text, right?

4              MR. PERRONG:  Objection to form.

5    A.        Yeah.

6    Q.        But if you're in a hurry, you would

7    more likely communicate through a text?

8    A.        Yes.

9    Q.        Okay.  And texting is faster, you said?

10             MR. PERRONG:  Objection to form.

11   A.        In certain circumstances, yes.

12   Q.        How long does it usually take you to

13   read a text?

14   A.        Less than a minute.

15   Q.        Now, I want to -- I'm going to put up

16   an Excel sheet on the screen, Andrew.  We have a

17   production from Verizon that has your actual usage

18   here.  I want to go through it.  It matches your

19   testimony, by the way, so --

20             MR. PERRONG:  And can we get a copy of

21   this?

22             MR. TACKETT:  Yeah, of course.  This

23   will be -- the exhibit will be produced in native

24   form.  You have already an unmodified version of

66

1    this, the only difference is that there's

2    highlighting on this version, so it's a

3    demonstrative exhibit.

4              I want to look at 15 first.

5    BY MR. TACKETT:

6    Q.        So while she's getting it up, let me

7    describe to you what we have, which is 270 days of

8    phone usage, from August 4th, 2024, through

9    May 1st of 2025.

10   A.        Well, I pay my phone bill on

11   August 5th, so August 4th would not be an accurate

12   date, because I got this -- the original number

13   when I bought my first Verizon smartphone, which

14   was on August 5th of 2024, so I don't know where

15   the 4th came from, which I could easily pull back

16   up in records.

17   Q.        That's fine.  We can do that.  If you

18   think the data for August 4th is not your data,

19   then we can -- we can note that for the record.  I

20   still want to look at what Verizon has produced

21   here and go over it with you.

22             From August 4th through May 1st, 2025,

23   we have 270 days.  Now, each row here, do you see

24   here where it says 2?

1    A.        Yeah.

2    Q.        So each row from 2 all the way to the

3    end represents a text message that is sent or

4    received, okay?

5              MR. PERRONG:  Objection to form.

6    Q.        Now, if you follow the production then,

7    row 2 through the end reflects that across 270

8    days, you sent and received a total of 16,301 text

9    messages.  Do you see that where the records end

10   at 16,302?

11   A.        Yes.

12             MR. PERRONG:  Objection to form.

13   Q.        Now, if I divide 16,301 by 270, that

14   shows an average texts sent and received in a day

15   of 60.3.  I can show you the math.  16,301 divided

16   by 270.  Do you see that equals 60.3?

17   A.        Yeah.

18   Q.        Okay.  Now, hearing that number, 60.3,

19   that the records from Verizon show, does that

20   sound about right of what the average texts that

21   go back and forth in a day would be?

22             MR. PERRONG:  Objection to form.

23   A.        Yes.

24             MR. TACKETT:  Now, let's go to 14,

68

1    please.

2    BY MR. TACKETT:

3    Q.        So during the same period, we're now

4    looking at Exhibit 14, which was a call log

5    produced by Verizon of the same time period.

6              MR. PERRONG:  Can you just scroll up

7    for a sec?  Mr. Tackett, can you scroll up?

8    Just -- can you please scroll up?

9              MR. TACKETT:  Yeah, I'm going to go

10   back up to the top, Andrew.  And I'm going to give

11   you a copy of this in native form, so the

12   photograph that you're trying to take with your

13   cell phone will be less useful than the native

14   format document that you're going to get.

15             MR. PERRONG:  Okay.

16             MS. WOOD:  591 is where it starts.

17             MR. TACKETT:  So the reason I was

18   scrolling down, Andrew, is because these records

19   are from May and they're before Mr. McGonigle got

20   the phone, so I'm trying to go to the cell where

21   his usage starts according to Verizon's records.

22   So that starts at cell row 591.

23   BY MR. TACKETT:

24   Q.        Do you see there at 591, it says, "8/5

69

1    number reassigned to McGonigle"?

2              MR. PERRONG:  I mean, that's something

3    that you put in there.

4              MR. TACKETT:  Yeah, I'm asking the

5    witness a question.

6    BY MR. TACKETT:

7    Q.        Do you see that row in this

8    spreadsheet?

9              MR. PERRONG:  I'm going to object to

10   form and further note that this is not the native

11   document that was produced from Verizon.

12   A.        It doesn't look right.

13   Q.        Yes, that's --

14   A.        This number was issued to me on

15   August 5th of 2024.  I've retained that number

16   since.  It was never reassigned.

17   Q.        Okay.  Yes, that line and what it says

18   is something that my office typed in, I'm not

19   trying to hide the ball in any way, shape or form

20   about that.  That is designed to show a clear line

21   of where the calling history for you begins,

22   Mr. McGonigle, which is at row 592.  Do you see

23   where I'm at, 592?

24   A.        Yeah.  Again, though, the 4th, I didn't

1     receive this first phone with that original number

2     of 804-238-5410, until August 5th of 2024, so I

3     don't know where the 4th is coming from here.

4     That's where I'm a little confused.  Because I pay

5     my phone bill on the 5th of every month.

6     Q.          Okay.  Now, this number right here,

7     804-296-7007.  Do you see that?

8     A.          Yes.

9     Q.          Do you recognize that number?

10    A.          Yeah.  That's my girlfriend.

11    Q.          Okay.  And this is a Verizon record

12    that's -- it's on row 592 and it appears to

13    reflect a call from 804-238-5410 to that number we

14    just said which you said is your girlfriend's.  Do

15    you see that?

16               MR. PERRONG:  Objection to form.  This

17    clearly says "Incoming calls."

18               MR. TACKETT:  Thank you for the

19    clarification.

20    BY MR. TACKETT:

21    Q.          It reflects a phone call between those

22    two numbers, do you see that?

23    A.          Yes.

24    Q.          Okay.  Now, if we go from 592, where we

1    have a confirmed phone call between you and your

2    girlfriend, to the end of this data, it ends at

3    row 1,654.  Do you see that?

4    A.        Yes.  I've made phone calls after May.

5    Q.        I'm sure you have.  I don't have those

6    records, so I'm showing you a snapshot in time in

7    creating a factual record that supports the

8    testimony that you've already given that you text

9    a lot more than you call, and so the incoming

10   calls goes from 592 to 1,654.  Now, if we look at

11   the outbound calls, the record starts on

12   August 4th, which shows a call made from

13   804-238-5410 to 804-296-7007.  And you testified

14   that that number is your girlfriend's number,

15   right?

16   A.        Yeah, but I -- I wasn't issued this

17   number until the 5th, so that date ain't right.

18   Q.        If you look in the parentheses, do you

19   see where it says "GMT"?

20   A.        Yes.

21   Q.        Do you know what "GMT" stands for?

22   It's Greenwich Mean Time.

23   A.        Okay.

24   Q.        So likely what's happening is that at

1    that time zone it was still August 4th, but in

2    your time zone it was August 5th, just to help you

3    with your misunderstanding --

4    A.          All right.

5    Q.          -- and confusion of those records.

6    A.          All right.

7    Q.          So we see the outbound calls start at

8    row 2.  And then they end at row 1,608.  Do you

9    see that?

10   A.          I see.

11   Q.          So during the 270 days, we have a total

12   of 1,607 outbound calls.  Do you see that?

13   A.          I do.

14   Q.          Okay.  So the records we have for the

15   calling, shows a total of 1,607 plus 1,065,

16   equaling 2,672 total calls, which is, you would

17   agree, a lot less volume than the over 16,000

18   texts, right?

19               MR. PERRONG:  Objection to form.

20   A.          Yes.

21   Q.          Okay.  Now, we also did a calculation

22   of averages, of both groups.  The outbound calls,

23   which was slightly higher, if you take that 1,607

24   and divide it by 270, you get 5.95.  Do you have

1    any reason to disagree with that math?

2    A.        No.

3    Q.        Okay.  And then if you take the

4    received calls of 1,065 and divide it by the 270

5    days, you get an average received calls of 3.94.

6    Do you have any reason to doubt that math?

7              MR. PERRONG:  Objection to form.

8    A.        No.

9    Q.        So you would agree that looking at the

10   actual records that Verizon produced, it matches

11   your testimony that calling volume is a lot lower

12   than text volume and limited to your close

13   contacts, right?

14             MR. PERRONG:  Objection to form.

15   A.        Yes.

16   Q.        Okay.  We also looked at the average

17   length of the calls.  The average length of the

18   incoming calls was 195.4 seconds across the

19   270 days, which would be 3.2 minutes.  Does that

20   sound about right for an average call for you?

21             MR. PERRONG:  Objection to form.

22   A.        Roughly, yes.

23   Q.        Okay.  Now, the math that we performed

24   on the outbound calls showed an average of

74

1    134.2 seconds for outbound calls which is

2    2.2 minutes.  Does that sound about right for an

3    average --

4              MR. PERRONG:  Objection.

5    Q.        -- for outbound calls?

6              MR. PERRONG:  Objection to form.

7    A.        Yes.

8              MR. TACKETT:  Okay.  I'm going to take

9    those down.

10             We've been going another hour.  Would

11   you like to take a break?

12             MR. PERRONG:  Do you want to take a

13   break or do you want to keep going?

14             THE WITNESS:  We can keep going.

15             MR. PERRONG:  Yeah, let's keep going.

16             MR. TACKETT:  I'd like to take a

17   couple-minute restroom break.

18             MR. PERRONG:  All right.

19             THE WITNESS:  All right.  Yeah.

20             (A short recess is taken.)

21   BY MR. TACKETT:

22   Q.        Okay.  So we were talking about your

23   Verizon records that Verizon produced under a

24   subpoena that we sent, and we've sent the records

1    to your counsel.  The Excel sheet that we were

2    looking at was a little bit different because we

3    highlighted some things and put some notations in,

4    we'll produce a copy of that.

5            I want to ask you some questions about

6    the process of when you got that number, because I

7    know you were saying, no, I remember I got it on

8    August 5th, and then we looked at the notation

9    about the Greenwich Mean Time and figured out that

10   that's probably what the minor difference was in

11   those records, but tell me, when did you get the

12   telephone number, the 804 number?

13   A.          On August 5th of 2024.

14   Q.          And where did you buy that?

15   A.          At a Dollar General in Heathsville,

16   Virginia.

17   Q.          Okay.  How much was the phone?

18   A.          I don't remember the exact price.

19   Roughly, it was between 50 and 100 dollars.

20   Q.          So is that a one-time fee to buy the

21   phone and activation or what?

22   A.          I also had to buy a payment card to put

23   time on it.  They activated the phone at the

24   register when I bought it.

76

1    Q.        What is this payment card?

2    A.        It's a prepaid phone card that you pay

3    the bill on that you buy at the dollar store.  I

4    got the -- I think it started out at, like, $60.

5    It's cheaper now because I've had them for a

6    while, but it was like $60, to the best of my

7    knowledge, for unlimited talk, text, and data

8    through Verizon Wireless.  So when I bought the

9    card, I bought the phone and I bought that card so

10   I could put time on it and have a phone and have

11   cellular service since the phone that I had when I

12   originally moved there I did not have service on.

13   Q.        Okay.  Do you have to keep buying a

14   payment card each month or how does that work?

15   A.        I've not been doing it that way.  I

16   switched it up once I finally got, you know, was

17   able to get a steady job.  When I started working

18   at the shelter, I just started paying it on my

19   debit card, the phone bill.

20   Q.        Okay.  So do you log on to Verizon's

21   website to pay or how does that work?

22   A.        I just call the make-a-payment number

23   that's on the phone, under contacts, and I pay it

24   over the phone and give my debit card number to

1   pay it, whatever you have to do.

2   Q.        And is that Verizon directly that

3   you're calling or is it another service?

4   A.        It's their automated payment system,

5   computerized system.

6   Q.        Okay.  Now, at the time you bought the

7   Android prepaid phone from Dollar General, did you

8   buy a phone for anybody else?

9   A.        No.

10  Q.        Does anyone else use your phone --

11  A.        No.

12  Q.        -- the 804?  No?

13  A.        It's only my number.

14  Q.        So your roommate, Tyler, doesn't use

15  it?

16  A.        No.

17  Q.        Okay.  When you bought the phone and

18  the prepaid card, did Verizon send you any emails

19  to acknowledge the setup or anything like that?

20          MR. PERRONG:  Objection to form.

21  A.        Not that I can remember.

22  Q.        Okay.  And did you have to fill out

23  paperwork in the store about purchasing the

24  prepaid phone?

78

1    A.          No.

2    Q.          And do you remember what street the

3    Dollar General store was on in Heathsville?

4    A.          Northumberland Highway.

5    Q.          Is that a store you go to much?

6    A.          Now that I don't live in that

7    particular area, no.

8    Q.          Okay.  Before you bought the phone, had

9    you ever heard of the TCPA?

10   A.          No.

11   Q.          Okay.  When you had the AT&T phone, did

12   you get marketing messages from any companies?

13               MR. PERRONG:  Objection.  Form.

14   A.          Not that I recall.

15   Q.          Do you subscribe to marketing emails

16   from any companies?

17               MR. PERRONG:  Objection to form.

18   A.          There's a few, like Palmetto State

19   Armory, a few firearms companies that I do, but

20   I -- due to the nature that I've opted into

21   receiving information from them and I have bought

22   things from them, I don't -- they're within their

23   rights.

24   Q.          Yeah.  Not my question.  I'm just

1    asking you if you have done that before.

2    A.          Yes, I have.  Not with the AT&T phone,

3    but with my present phone, certain companies I

4    have.

5    Q.          Well, I was -- that question I was

6    asking about emails.

7    A.          Yes.

8    Q.          Okay.

9                MR. PERRONG:  I guess I'm also seeking

10   to clarify when you say that you -- when you --

11   when you have, you're referring to Mr. Tackett's

12   previous question of receiving text messages from

13   companies?

14               THE WITNESS:  Yes, but they're

15   companies that I have opted into receiving

16   messages from.

17               MR. PERRONG:  Okay.

18               THE WITNESS:  So, I mean, it's kind

19   of...

20   BY MR. TACKETT:

21   Q.          So my question was, actually, are you

22   subscribed to any email marketing, was the

23   question I asked, like, where somebody will send

24   emails to your email account and let you know

80

1    about sales or other things like that?

2    A.        Yes.

3    Q.        Okay.  And what companies are those

4    that you can remember?

5    A.        From the top of my head, Palmetto State

6    Armory.  Guns.com.  And that's all that I can

7    remember on good faith and to the best of my

8    recollection.

9    Q.        Just those two?

10   A.        Yeah.

11   Q.        No car stuff or clothes stuff?

12   A.        No.

13   Q.        Okay.  Walmart, Amazon, anything like

14   that?

15   A.        Amazon does, because I have done

16   business with them and opted in.

17   Q.        Did any of your friends ever tell you

18   that filing a TCPA lawsuit could be a way to make

19   money?

20             MR. PERRONG:  Objection to form.

21   A.        Nobody I know told me about this.

22   Q.        Okay.  So none of your friends have

23   ever filed TCPA lawsuits before?

24   A.        No.

1    Q.         Okay.  Anyone in your family?

2    A.         No.

3    Q.         Anybody you worked with before, ever

4    tell you about TCPA lawsuits?

5    A.         No.

6               MR. PERRONG:  Objection to form.

7    Q.         Your girlfriend ever tell you about

8    TCPA lawsuits?

9               MR. PERRONG:  Objection to form.

10   A.         No.

11   Q.         Okay.  What's your girlfriend's name?

12   A.         Carrie McCray.

13   Q.         M-c-C-r-a-y or is it a-e at the end?

14   A.         M-c-C-r-a-y.

15   Q.         And how do you spell Carrie?

16   A.         C-a-r-r-i-e.

17   Q.         All right.  So none of your friends or

18   coworkers or family told you about filing TCPA

19   lawsuits --

20              MR. PERRONG:  Objection --

21   Q.         -- right?

22              MR. PERRONG:  -- to form.

23   A.         No.

24              MR. TACKETT:  Please let me finish

82

 1    asking the question before you object, just so --

 2              MR. PERRONG:  Yeah.  And --

 3              MR. TACKETT:  -- she can type it up.

 4              MR. PERRONG:  And -- sorry.  Just give

 5    me, like, a few seconds to object --

 6              THE WITNESS:  All right.

 7              MR. PERRONG:  -- just so in case I do

 8    want to do that, just so we're not talking over

 9    each other.

10              THE WITNESS:  Yeah.

11    BY MR. TACKETT:

12    Q.        Okay.  But you would agree that you

13    have filed a lot of lawsuits, right?

14              MR. PERRONG:  Objection to form.

15    A.        Yes.

16    Q.        Okay.  And it's public record, so I've

17    got a long list of them, starting in the fall of

18    2024.  Had you ever filed a lawsuit before that?

19    A.        No.

20    Q.        Okay.  Had you ever had to go to court

21    for anything?

22              MR. PERRONG:  Objection to form.

23    A.        No.

24              MR. TACKETT:  Mr. Perrong, what is

83

1    wrong with the form of that question?

2              MR. PERRONG:  I mean, to the extent

3    it's calling for questions as to outside the scope

4    of discovery and irrelevant information, including

5    the bifurcation period that the Defendant, itself,

6    has sought.

7              MR. TACKETT:  So I want to be clear,

8    that's not a form objection.  That has nothing to

9    do with the formation of my question.

10             MR. PERRONG:  Okay.  I'm still --

11             MR. TACKETT:  That's a relevance

12   objection, which is preserved.  So --

13             MR. PERRONG:  I'm still doing it to

14   preserve the objection.

15             MR. TACKETT:  You don't need to object

16   unless to form, everything else is preserved, as a

17   matter of rule.  And I've now said it on the

18   record.  You're just making the record choppy by

19   objecting to form on every single question.

20             MR. PERRONG:  Not every single

21   question.

22             MR. TACKETT:  We can count later.

23   BY MR. TACKETT:

24   Q.        Okay.  And so you said you've never

1    been to court?

2    A.          No.

3    Q.          Okay.  Have you ever been charged with

4    a crime?

5    A.          No.

6    Q.          Now, these lawsuits, you said you agree

7    you filed a lot of lawsuits.  You're seeking money

8    in all of those lawsuits, aren't you?

9              MR. PERRONG:  Objection to form.

10   A.          I'm seeking what is within my rights as

11   a class action representative as it's my duty to

12   the class.

13   Q.          You are seeking money damages, correct?

14             MR. PERRONG:  Objection to form.

15   A.          Yes.

16   Q.          Okay.  Do you remember how many

17   different lawsuits that you have filed at this

18   point?

19   A.          You know, I don't know an exact number,

20   so I'm going to give a rough estimate of anywhere

21   from 20 to 40, possibly.

22   Q.          So many that you can't remember?

23             MR. PERRONG:  Objection to form.

24   A.          There's been so many messages that I --

1    I can't -- and it's overbearing and it's an

2    invasion of my privacy and what I try to do in my

3    daily life, that I can't even keep track.

4    Q.        Do you remember the names of all of the

5    companies that you've filed lawsuits against?

6    A.        You know, I remember a few, but I don't

7    know every name.  There's so many of them that I

8    just --

9    Q.        Too many to remember?

10   A.        Yeah.

11   Q.        Okay.  Would you agree that -- I have a

12   list just to refresh your recollection.  Would you

13   agree that you filed a TCPA lawsuit against a

14   company called Bond No. 9?

15   A.        Yes.

16   Q.        Okay.  Would you agree that you filed a

17   TCPA lawsuit against Zales?

18   A.        Yes.

19   Q.        Okay.  Would you agree that you filed a

20   TCPA lawsuit against Shopperschoice.com?

21   A.        I don't recall Shopperschoice.

22   Q.        It appears to have been filed in the

23   Middle District of Louisiana on --

24   A.        Maybe.  Possibly I have and I just --

1    Q.          -- October 25th, 2024.

2    A.          Yeah.  Maybe I have, I just -- like I

3    said, there's so many of them, and for me to

4    actually process all of them and go back, it's a

5    lot -- it's a lot to remember, you know, for one

6    person to be able to remember every single one.

7    Q.          So far I've gone in chronological

8    order.  Bond No. 9 was filed October 1st, Zales

9    was filed October 15th, and Shopperschoice was

10   filed October 25th.  Okay?

11   A.          Okay.

12   Q.          Do you remember that you filed a TCPA

13   lawsuit against Filters Fast?

14   A.          Yes.

15   Q.          Okay.  Do you know what Filters Fast

16   is?

17   A.          Honestly, I don't know what their

18   business is because I've never done any marketing

19   or business with them, so they just messaged my

20   phone and that's kind of the grounds on that.

21   Q.          Okay.  But if you really looked at the

22   messages and spent a lot of time thinking about

23   it, wouldn't you remember what Filters Fast does?

24              MR. PERRONG:  Objection to form.

87

1    A.          Well, they typically would send me a

2    link.  And I don't click on links that I don't

3    recognize if I don't know where it's going to take

4    me because I don't know if it's a scam, I don't

5    know what I'm -- what I'm opening up, so I'm not

6    just going to click on it.

7    Q.          So you're not following the link and

8    spending a lot of time with it, right?

9                MR. PERRONG:  Objection to form.

10   A.          Yes.

11   Q.          All right.  So after Filters Fast, do

12   you remember filing a lawsuit against the Home

13   Shopping Network?

14   A.          I may have, again, but I don't remember

15   that company, but as I said, I can't remember

16   every single individual company that I have filed

17   a suit on because there's so many of them that

18   it's just...

19   Q.          Okay.  What about Walker & Company

20   Brands, do you remember filing a TCPA lawsuit --

21   A.          I do.

22   Q.          -- against them?

23   A.          I do.

24   Q.          Okay.  What about FTD, do you remember

88

1    filing a TCPA lawsuit against FTD?

2    A.          I don't remember on that, but it's

3    not -- I'm not saying that I didn't.  You know, as

4    I said, there's so many cases that to remember

5    each individual one it's just hard to fully keep

6    track.

7    Q.          Okay.  FTD, it looks like you filed in

8    the Northern District of Illinois on

9    November 26th.  That's what the public record

10   says, okay?

11   A.          Okay.

12   Q.          Do you remember filing a TCPA lawsuit

13   against Midwest Catalog Brands?

14   A.          I do.

15   Q.          Okay.  And the court records say you

16   filed that on December 5th, 2024.  Does that sound

17   right?

18   A.          That sounds correct.

19   Q.          Okay.  Do you remember filing a TCPA

20   lawsuit against Value City Furniture?

21   A.          I do.

22   Q.          Okay.  The court records say you filed

23   that on December 23rd, 2024.

24   A.          That's correct.

89

1   Q.        Okay.  Do you remember filing a TCPA

2   lawsuit against Alliance Entertainment?

3   A.        Yes.

4   Q.        And that was filed December 29th, 2024,

5   sound right?

6   A.        Yes.

7   Q.        Do you remember filing a TCPA lawsuit

8   against Everyday Dose?

9   A.        Yes.

10  Q.        What is Everyday Dose?

11  A.        I never clicked on their link.  I've

12  never visited their website.  Like I said, they're

13  sending me a link like the other ones have.

14  Q.        So you don't know what it is?

15  A.        No.

16  Q.        Okay.

17  A.        I never -- I don't click on links if I

18  don't know where it's going to take me

19  particularly.

20  Q.        Do you know what Alliance Entertainment

21  is?

22  A.        I do not.

23  Q.        Okay.  Do you know what Midwest Catalog

24  Brands sells?

90

1    A.          I do not.

2    Q.          Okay.  Do you remember filing a TCPA

3    lawsuit against LG Electronics?

4    A.          I may have.  I think I do, but I'm not

5    100 -- you know, like I said, there's so many of

6    these cases, for me to be able to go all the way

7    back and process that and memorize it, is -- it's

8    kind of hard.

9    Q.          Yeah.

10   A.          I probably have.  I'm not saying I

11   haven't.

12   Q.          Well, like, some of the other ones you

13   didn't know what they even sell or make.  I assume

14   LG, you know what they sell and make, right?

15   A.          Some form of electronics.

16   Q.          Yeah.  Have you ever used LG's stuff?

17   A.          No.

18   Q.          Okay.  What does Walker and Company

19   Brands sell, do you know?

20   A.          I do not.

21   Q.          Okay.  Do you remember filing a lawsuit

22   against a company called D'Artagnan, Inc.?

23   A.          Yes.

24   Q.          Okay.  Do you know what they sell?

91

1   A.          I do, but I never bought anything off

2   of them, I never opted into doing any business

3   with them.

4   Q.          What do they sell?

5   A.          Typically, meats.  Only because in the

6   text messages that they sent it kind of was saying

7   that, but I didn't click on the links because I

8   don't have any desire to buy anything from them

9   really.

10  Q.          Do you remember filing a TCPA lawsuit

11  against Office Depot?

12  A.          Yes.

13  Q.          And that was filed January 17th, 2025.

14  Does that sound right?

15  A.          That's correct.

16  Q.          Okay.  What about Perpay, do you

17  remember filing a TCPA lawsuit against Perpay?

18  A.          I don't fully recall that, but again,

19  I'm not saying that I didn't, because I may have

20  and I just don't remember.

21  Q.          I understand.  I'm just asking you what

22  you remember, and you're under oath and you're

23  telling me what you remember and don't remember,

24  and that's your only job here today is to provide

92

```
 1    truthful testimony.
 2              Do you know what Perpay sells?
 3    A.        I do not.
 4    Q.        Okay.  Do you remember filing a TCPA
 5    lawsuit against a company called Richmond Fitness?
 6    A.        I do.
 7    Q.        Okay.  Is that a gym or something, do
 8    you know?
 9    A.        I'm not 100 percent sure.  I don't know
10    what they are.
11    Q.        Okay.  Do you remember filing a TCPA
12    lawsuit against SR Holdings?
13    A.        I don't recall filing one, but, again,
14    I may have and I just -- I probably don't
15    remember --
16    Q.        Okay.
17    A.        -- with there being so many cases.
18    Q.        Do you know what SR Holdings, what they
19    sell or make?
20    A.        I do not.
21    Q.        Okay.  Do you remember filing a TCPA
22    lawsuit against a company called Teleflora?
23    A.        I do.
24    Q.        Okay.  Do you know what Teleflora sells
```

1   or makes?

2   A.        I do not.

3   Q.        Okay.  Do you remember filing a TCPA

4   lawsuit against a company called Skull Shaver?

5   A.        I do.

6   Q.        Okay.  I assume they sell some kind of

7   razor or something, do you know?

8   A.        I don't know what they sell.

9   Q.        Okay.  What about, do you remember

10  filing a TCPA lawsuit against a company called

11  Robbins Research?

12  A.        I do.

13  Q.        Do you know what they sell or make?

14  A.        I do not.

15  Q.        Okay.  Do you remember filing a TCPA

16  lawsuit against a company called Telescents?

17  A.        I don't recall, but again, like I said,

18  I may not fully remember whether I did or not,

19  because there's so many cases.

20  Q.        Do you know what they make or sell,

21  Telescents?

22  A.        I do not.

23  Q.        Do you remember filing a TCPA lawsuit

24  against a company called Pure Green?

1    A.        I do.

2    Q.        Do you know what Pure Green makes or

3    sells?

4    A.        I do not.

5    Q.        Okay.  And it's Pure Green Franchise

6    Corp.  Does that help you remember what they make

7    or sell?

8    A.        I've never bought anything off of them,

9    so I wouldn't -- I never looked at any of their

10   stuff, so I really wouldn't know.

11   Q.        Okay.  Do you consider filing all these

12   lawsuits -- well, strike that.

13             I understand from discovery that you

14   have settled a number of these cases and been paid

15   money to dismiss your claims, right?

16             MR. PERRONG:  Objection to form.

17   A.        Yes.

18   Q.        Okay.  And would you consider that, you

19   know, this has been a good way to supplement your

20   income?

21             MR. PERRONG:  Objection to form.

22   A.        I find that it's just me representing

23   the class and I'm doing it not just for the money

24   but in general terms to be a good, moral citizen,

95

```
1    standing up for the class and for everybody

2    similarly situated, to their best interests.

3    Q.          I want you to turn to Tab 10, and these

4    are responses to Interrogatory No. 13.  It's on

5    the third page.  Do you see that?

6    A.          Yeah.

7    Q.          There's a long objection from your

8    lawyer.  Before the objection is our question,

9    which is:  "Identify any amounts you received in

10   payment for judgments or settlements of TCPA

11   lawsuits related to the Telephone Number," that

12   804 number, "from September 1, 2024 to present."

13            Do you see that?

14   A.          Yes.

15   Q.          And again, then there's a long

16   objection from your lawyer, and then after the

17   objection is an answer, and there's bullets.  Do

18   you see the bullets?

19   A.          I do.

20   Q.          Okay.  And so beginning with the first

21   bullet, this purports to identify the money that

22   you've gotten from TCPA settlements since

23   September 1, 2024, right?

24   A.          Yeah.
```

96

1    Q.        You made some comments about

2    representing the class and so on, but looking at

3    these, these are all individual settlements that

4    you made, correct?

5    A.        That's correct.

6    Q.        Okay.  So in McGonigle v. D'Artagnan,

7    you were paid $10,000 -- it says you were paid

8    $10,015 on April 20th, to settle and dismiss your

9    claims; is that correct?

10   A.        That's correct.

11   Q.        Okay.  And that was not a class action

12   settlement, was it?

13   A.        That was a class action settlement.

14             MR. PERRONG:  Objection to form.

15   Q.        You're saying D'Artagnan was a class

16   action settlement?

17   A.        Yes.

18             MR. PERRONG:  Objection to form.

19   Q.        Would you agree that the court records

20   in that case would best reflect the technicalities

21   of the settlement?

22   A.        Say that again.

23   Q.        Yeah.  I'm asking whether you would

24   defer to what the court records say about the

1    technicalities of the settlement.

2    A.        What do you mean by "defer"?

3    Q.        Yeah.  Would you agree that whatever

4    the court records say are accurate about the type

5    of settlement that it was?

6    A.        Yes.

7    Q.        Okay.  You agree that the amount listed

8    is correct, though, that you were paid that amount

9    of money, $10,015?

10   A.        That's correct.

11   Q.        Okay.  The McGonigle v. Laurice El

12   Badry Rahme, do you agree that you settled that

13   case and were paid $8,000?

14   A.        Yes.

15   Q.        And that one wasn't on my list,

16   actually.  What is Laurice El Badry Rahme?  What

17   do they sell, do you know?

18   A.        I have no idea.

19   Q.        Okay.  But they paid you $8,000 to

20   settle and dismiss your claim, right?

21   A.        That's correct.

22   Q.        Okay.  FTD, would you agree that they

23   paid you $3,000 to settle and dismiss your claim?

24   A.        Yes.

98

1   Q.          Okay.  The next one listed is Filters

2   Fast.  It says they paid you $4,000.  Would you

3   agree they paid you $4,000 to settle and dismiss

4   your claim?

5   A.          That's correct.

6   Q.          The next one listed is Richmond

7   Fitness.  It says they paid you $3,000 to settle

8   and dismiss your claim; is that correct?

9   A.          Yes.

10  Q.          Okay.  Perpay, it says they paid you

11  $3,000 to settle and dismiss your claim; is that

12  correct?

13  A.          Yes.

14  Q.          Okay.  Next it lists Everyday Dose.  It

15  says they paid you $4,000 to settle and dismiss

16  your claim; is that correct?

17  A.          Yes.

18  Q.          Okay.  And by my calculation, that is

19  $35,000.  You can take your time, but does that

20  sound right?

21            MR. PERRONG:  Objection to form.  It's

22  not.  Your math is wrong.

23  Q.          It's $35,015.  Do you disagree?

24            MR. PERRONG:  And $15, yes.

99

```
1   A.          That's correct.

2   Q.          Okay.  I'm glad the record is so

3   reflected.

4               Now, my understanding is that you have

5   also settled a lawsuit that you filed against

6   Zales; is that right?

7   A.          That's not right.

8   Q.          Okay.  You did not settle the lawsuit

9   you filed against Zales?

10  A.          No.  I have not received a settlement

11  check.

12  Q.          Not my question.  Have you agreed to

13  settle your claims in the lawsuit against Zales?

14              MR. PERRONG:  I'm going to object on

15  the basis that this calls for attorney-client

16  communications and what the contents of any

17  resolution with Zales was.

18              MR. TACKETT:  If it's a deal with an

19  outside party, it's not attorney-client.

20  Q.          Look at Tab 12.

21              MR. PERRONG:  I mean --

22  Q.          Look at Tab 12.

23              MR. PERRONG:  -- moreover, it's

24  Rule 408 and it's also covered by a
```

1    confidentiality agreement.

2            MR. TACKETT:  That's a completely

3    different issue.  If it's 408, then that goes to

4    whether it's admissible to show liability or

5    culpability, it's not whether or not it can be

6    admitted for any other purpose.

7            MR. PERRONG:  It needs to be admitted

8    for a permissible purpose.

9            MR. TACKETT:  And if there's a

10   confidentiality interest that you rest on, the

11   appropriate, narrowly-tailored way to address that

12   is to ask that portion of the transcript be

13   designated confidential.  And we're more than

14   happy to do that.  I don't care whether this

15   portion of the transcript needs to be redacted at

16   some point in time or not, but I am entitled to

17   ask him the question.

18           MR. PERRONG:  I mean, reask the

19   question and I might still assert an objection,

20   but to the extent that you want to ask a question

21   about Exhibit 12, ask him a question about

22   Exhibit 12.

23           MR. TACKETT:  I asked him if he agreed

24   to settle his claim against Zales, and I asked him

1    to turn to 12.

2    A.          You know, I may have.

3    Q.          You don't remember?

4    A.          I probably just don't remember.  I may

5    or may not have, but there's so many cases for me

6    to stay on top of everything, it's a lot to --

7    Q.          Okay.  Look at 12.  This is saying that

8    you've stipulated to dismiss with prejudice your

9    case against Zales.  Do you see that?

10   A.          I -- I don't remember ever authorizing

11   to dismiss.  We never came to any kind of

12   agreement on anything, really, that I remember.

13   Q.          Well, let me read this signed order.

14   It says, "The parties file this Stipulation of

15   Dismissal with Prejudice pursuant to Fed. R. Civ.

16   P. 41(a).  Plaintiff's individual claim is

17   dismissed with prejudice, but the putative class

18   claims are dismissed without prejudice."

19          Do you understand that "dismissed with

20   prejudice" means your claim with Zales is gone and

21   can never be refiled?

22          MR. PERRONG:  To the extent -- I'm

23   going to object.

24          MR. TACKETT:  I'm asking if he

```
 1   understands.

 2               MR. PERRONG:  It's a legal conclusion.

 3               MR. TACKETT:  I know.  That's why I

 4   asked him his understanding.

 5   A.          Yes.

 6   Q.          Okay.  So did Zales pay you money in

 7   exchange for dismissing your claim?

 8               MR. PERRONG:  I'm going to object.

 9   A.          No.

10   Q.          They did not?

11   A.          No.

12   Q.          So you dismissed this one, you settled

13   the others that we went through, but you dismissed

14   this one without getting any payment?

15   A.          No.

16   Q.          The "no" is ambiguous.

17   A.          I -- honestly, I don't recall ever

18   dismissing the claim against Zales, to my memory,

19   so I don't know how this happened.

20   Q.          But you're looking at this court

21   document I just put in front of you, right?

22   A.          Yeah, I'm looking at it.

23   Q.          And it appears to say your claim

24   against Zales is dismissed with prejudice, right?
```

```
 1    A.         You know, maybe I may have, but I don't
 2    remember ever doing this.  I just can't remember
 3    that far back.  I've got so many cases open
 4    that...
 5    Q.         Well, so to your reference of "that far
 6    back," I want you to look at the date on the top
 7    of this piece of paper, it says when it was
 8    entered by the court.  It says June 30th, 2025.
 9    Do you see that?  It's in blue at the top.
10    A.         Yes.
11    Q.         Okay.  So that was 25 days ago, right?
12    A.         From my memory, when I had talked to
13    the Heidarpour Law Firm --
14              MR. PERRONG:  And I'm going to instruct
15    you to not tell anything that you discussed with
16    the Heidarpour Law Firm.
17              MR. TACKETT:  I don't want privileged
18    communications.  I want his understanding, though.
19              MR. PERRONG:  Well, his understanding
20    still bears on privilege.
21              MR. TACKETT:  It does not have to.
22              MR. PERRONG:  Well --
23              MR. TACKETT:  It does not --
24              MR. PERRONG:  -- he's going to --
```

1    you're essentially instructing him to

2    inadvertently disclose privileged information in a

3    roundabout way, which I'm not going to let you do.

4              MR. TACKETT:  I'm asking him whether he

5    settled this case, it appears he did, his memory

6    is not good of it, and I'm trying to figure out

7    what he knows about it.

8    A.        This case wasn't settled.

9    Q.        But your claim was dismissed with

10   prejudice.  That's what that court document says.

11   That's what it -- we read it into the record.  You

12   have it in front of you.  You see that, right?

13   "Plaintiff's individual claim is dismissed with

14   prejudice."  That's what it says, right?

15   A.        I don't remember ever getting a copy of

16   this sent to my email and that's where all my

17   documents are sent.

18   Q.        Are you saying you think it might have

19   been settled without your consent?

20             MR. PERRONG:  Objection to form.

21   A.        No.

22   Q.        So what are you saying?

23   A.        Somehow -- I don't know if this is

24   legit, this doesn't seem right, because I never

```
 1    received a copy of this and now I'm looking at a
 2    copy of it in front of me, it just doesn't
 3    really -- it's not connecting the dots.  My
 4    attorney never sent me this piece of paper, so I'm
 5    trying to -- I'm not able to connect the dots here
 6    is what I'm trying to say.
 7    Q.        I will certify to you, as an officer of
 8    the court, this document was obtained from the
 9    public docket of this case, that's how we got it,
10    from the public record, we downloaded it.  Now, if
11    you flip to the next page, it will show you the
12    lawyers who signed off on this and submitted it to
13    the judge for signature.  There's counsel for
14    Zales, do you see there on the left side?
15    A.        Yes.
16    Q.        And then on the right side is your
17    counsel who submitted it, William Robinson and
18    Anthony Paronich.  Do you see that?
19    A.        Yes.
20    Q.        Is William Robinson one of your
21    lawyers?
22    A.        Not that I -- not that I was notified
23    about.
24    Q.        You agree that Anthony Paronich is one
```

1    of your lawyers, though, right?

2    A.         Yes.

3    Q.         Okay.  And they're on this together as

4    co-counsel, do you see that?

5    A.         Yes.

6    Q.         Okay.  So as far as you know, you have

7    not received any money from Zales is what you're

8    saying?

9    A.         No.

10   Q.         Okay.  Is it possible that Zales has

11   agreed to pay you money at some point in the

12   future and you're just not remembering it?

13   A.         You know, that could be a possibility.

14   Q.         Okay.

15   A.         I'm not saying yes or no, because I

16   don't -- I'm giving you the best information I

17   have on good faith.

18   Q.         Totally understand.  And so I think the

19   easiest way for us to address this will be that I

20   ask your counsel to supplement the response to

21   that interrogatory to the extent that any money is

22   received or is contractually required to be

23   received from Zales, okay?

24   A.         Okay.

 1              MR. TACKETT:  Okay.  Is that something
 2    you're able to do, Mr. Perrong?
 3              MR. PERRONG:  I'm not on this case, I'm
 4    not on Zales.  I will discuss with my co-counsel
 5    and get back to you.
 6              MR. TACKETT:  But Mr. Paronich is your
 7    co-counsel in this present litigation, correct?
 8              MR. PERRONG:  I'm not being deposed
 9    here.
10              MR. TACKETT:  You're -- it's an
11    isolated meet and confer about a supplement to
12    discovery that appears to have been withheld, so
13    I'm asking you while we're on the record.  I know
14    you're not being deposed.
15              MR. PERRONG:  We're not -- we're not --
16    first, we're not withholding anything, A, so, you
17    know, please don't make those assertions.
18    Second --
19              MR. TACKETT:  Read the transcript.  I'm
20    not making any assertion, I'm just saying it
21    appears that a supplement is required.
22              MR. PERRONG:  Okay.  I will discuss
23    with co-counsel and get back to you on a
24    supplement.

1                    MR. TACKETT:  It's 12:27.  I suggest

2       that we take a short lunch break.

3                    MR. PERRONG:  Yeah.

4                          - - - - -

5                    Thereupon, a luncheon recess is taken

6       at 12:28 p.m.

7                          - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                      Friday Afternoon Session

 2                      July 25, 2025, 1:06 p.m.

 3                      - - - - -

 4             CROSS-EXAMINATION (CONT'D)

 5   BY MR. TACKETT:

 6   Q.          Okay.  So before we took a break for

 7   lunch, we had gone through and talked about all of

 8   the settlements that you have from TCPA lawsuits.

 9   Do you remember that?

10   A.          Yes.

11   Q.          And you're not sure whether or not

12   you're getting money from Zales, so we put that

13   one to the side, right?

14             MR. PERRONG:  Actually, we have a

15   clarification on that.

16             MR. TACKETT:  Okay.

17   A.          We have a clarification.

18   Q.          Okay.

19   A.          We are waiting on the court to approve

20   the settlement.

21   Q.          So once -- and I'm familiar with that.

22   I looked at the court docket in Florida, where

23   there was an action filed for a settlement class

24   approval and motion for approval of that class
```

1  settlement, so I saw that.  So are you saying that

2  you need that to go through before you get the

3  settlement payment from Zales?  Is that what

4  you're saying?

5  A.          Yes.

6  Q.          Okay.  And what amount of money will

7  Zales pay you once that all goes through?

8  A.          I do not know until I'm given a

9  settlement agreement and what my attorneys say

10  they think I should take.  Until they tell me what

11  they think I should take, I don't have an exact

12  number on that.

13  Q.          Okay.  So is your testimony that the

14  sum that you'll get from Zales is not yet fixed?

15          MR. PERRONG:  Objection.

16  Q.          It is not yet set?

17  A.          Yes.

18  Q.          Okay.  Do you have any idea of the

19  ballpark of what you might get from Zales?

20          MR. PERRONG:  Objection to form.

21  A.          No, I do not.

22  Q.          Okay.  Now, in these settlements so

23  far, without any money from Zales, you've gotten

24  $35,015, right?

1    A.          Let me look at the math on that and

2    make sure we're right.

3    Q.          It's Tab 10, page 3.  We did the math

4    on the record before.  I was just kind of

5    summarizing.

6    A.          I'm just double-checking.

7    Q.          That's okay.

8    A.          Yes, that would be $35,115 [sic].

9    Q.          It's 35,015?

10   A.          Yes.

11   Q.          Yeah.  Now, in these settlements, are

12   you frustrated that your contract with your

13   lawyers puts a limit on how much of the settlement

14   money that you can get?

15               MR. PERRONG:  Objection to form.

16   A.          No.

17   Q.          Are you familiar with what I'm talking

18   about?

19   A.          Uh-huh.

20   Q.          Yes?

21   A.          Yes.

22   Q.          Can we look at section 16, please,

23   Tab 16.  It's what I've marked as Exhibit 16.

24   It's a document that your counsel has produced in

1    discovery.  There's a copy of your engagement

2    agreement with Kaufman P.A., Heidarpour, it's

3    H-e-i-d-a-r-p-o-you-r, Law Firm, and Paronich,

4    P-a-r-o-n-i-c-h, Law.  Do you see that?

5    A.          Yes.

6    Q.          Okay.  And if you look at the third

7    page of this.

8    A.          All right.

9    Q.          The bottom of the first paragraph, the

10   last sentence.  "You further agree that any amount

11   obtained in excess of your statutory damages are

12   either costs or attorney's fees and belong to us."

13              Do you see that?

14   A.          Yes.

15   Q.          Okay.  And it looks like they've asked

16   you to initial right there.  Is that your

17   initials?  AJM?

18   A.          Where are you seeing this?  Right here

19   (indicating)?

20   Q.          The top of page 3 of 16.

21              MR. PERRONG:  (Indicating).

22   A.          Oh.  Yes.  Yes.  Yes.

23   Q.          And so you understand that if there is

24   a carve-out, let's say 50,000 for attorneys' fees,

1    that you don't get any of that portion of the

2    settlement?

3    A.        Yes.

4    Q.        Okay.  And you're okay with that?

5    A.        Yes.

6    Q.        Okay.  And then I want you to look

7    lower on this page.  It says, "Assignment of right

8    to fee award."

9              Do you see that?

10   A.        Yes.

11   Q.        And it says, "Client assigns to the

12   attorneys all rights conferred by statute or rule

13   to recover attorneys' fees from Defendant."

14             Do you see that?

15   A.        Yes.

16   Q.        And the same question, do you

17   understand that if there's a fee award, that you

18   would be assigning that over to your lawyers and

19   they would get it, instead of you getting any

20   percentage of it?

21   A.        Yes.

22   Q.        And you're okay with that?

23   A.        Yes.

24   Q.        Okay.  I'd like you to turn to the last

114

1    page of this, if you could.  You signed this

2    agreement on October 23rd, 2024, according to

3    this.  Do you see that date?

4    A.        Yes.

5    Q.        Is that -- does that match your

6    recollection of this?

7    A.        Yes.

8    Q.        Okay.  And you signed the agreement

9    with attorneys Avi Kaufman, Anthony Paronich, and

10   Andrew Heidarpour, right?

11   A.        Yes.

12   Q.        Now, in some of the -- because you

13   filed so many different cases, some of those cases

14   you have other lawyers who are not one of these

15   three, right?

16   A.        Yes.

17   Q.        Do you have separate agreements with

18   the other lawyers who are helping you on the

19   cases?

20           MR. PERRONG:  Objection to form.  If

21   you have a specific case, you can ask him about

22   it.

23           MR. TACKETT:  He can answer my question

24   if he understands it.

1   A.          Possibly.  I mean, I don't 100 percent

2   remember every agreement from every individual

3   specified attorney.

4   Q.          Yeah.  And so I'm not asking you to

5   remember every single one.  I'm just asking you

6   whether there are other agreements, besides this

7   one, with any of the attorneys that are

8   representing you on the long list of TCPA cases

9   that we went over.

10  A.          Yes.

11  Q.          Okay.  And those other agreements, do

12  they involve shifting over a portion of recovery

13  to another lawyer that helps with a particular

14  case?

15              MR. PERRONG:  Objection to form.

16  A.          Yes.

17  Q.          Okay.  Okay.  You can close that page.

18  I'm not going to ask any more questions about

19  that.

20              All right.  So at the time you got the

21  804 number, the telephone number, on August 4th --

22  I'm sorry -- August 5th is your testimony, right?

23  A.          Yes.

24  Q.          Okay.  At the time you got that, had

1    you ever heard of the National Do Not Call

2    Registry?

3    A.         I have.

4    Q.         Well, let me make sure we're clear on

5    the question.  I'm saying in August, like when you

6    said you're going to Dollar General to buy the

7    phone, were you aware of the National Do Not Call

8    Registry at that time?

9    A.         Not at that time.

10   Q.         Okay.  Now, when you got the number

11   that we're also calling the telephone number, did

12   you know that that number was already on the

13   Do Not Call Registry when you received it?

14   A.         No, I did not.

15   Q.         Okay.  And how did you first learn

16   about the National Do Not Call Registry?

17             MR. PERRONG:  Objection to form.

18   Objection to the extent it asks for discussions

19   that were with his lawyers.  And I'm instructing

20   the witness not to answer insofar as it reveals

21   discussions that you've had with law firms, but to

22   the extent that you can answer without revealing

23   that.

24   A.         The Heidarpour Law Firm told me to

```
 1   register --
 2               MR. PERRONG:  And then -- well, hold
 3   on.  Let me -- you don't need to tell him anything
 4   that the Heidarpour Law Firm told you or not, so
 5   I'm instructing you not to answer.
 6               MR. TACKETT:  And I'll -- I might be
 7   able to make it simple.
 8   BY MR. TACKETT:
 9   Q.          Is your testimony that you didn't know
10   about the National Do Not Call Registry until you
11   learned about it from the Heidarpour Law Firm?
12               MR. PERRONG:  I'm going to still object
13   insofar as it asks whether or not he learned about
14   the Do Not Call Registry from the Heidarpour Law
15   Firm.
16               MR. TACKETT:  I think his knowledge of
17   it is an independent thing versus --
18               MR. PERRONG:  Okay.
19               MR. TACKETT:  -- any legal advice --
20               MR. PERRONG:  Knowledge -- I mean, it
21   assumes a fact not in evidence that he learned
22   about it or didn't learn about it from the
23   Heidarpour Law Firm.
24               MR. TACKETT:  Well, he testified that
```

118

1     in August he wasn't aware of what it was --

2                MR. PERRONG:  Yes.

3                MR. TACKETT:  -- right?  And then he

4     testified inadvertently that he learned --

5                MR. PERRONG:  Well, I mean, we're going

6     to move to strike that.

7                MR. TACKETT:  Fine.  But I'm just, for

8     the sake of a cleaner record that doesn't talk

9     about a privileged discussion, I'm just asking is

10    it fair to say that you learned about it from your

11    law firm.

12               MR. PERRONG:  And that's privileged.

13               MR. TACKETT:  I don't think it is.

14    Whether they have knowledge of something, I don't

15    think is the same as saying what's the legal

16    advice you got, what are the content of

17    discussions.

18               MR. PERRONG:  Well, if the legal advice

19    is that the Do Not Call Registry exists, then that

20    is a privileged communication that's protected.

21    I'm going to instruct the witness not to answer

22    your question.

23               MR. TACKETT:  Okay.  Well, he already

24    told us he learned about it from the Heidarpour

1    Law Firm.

2              MR. PERRONG:  Okay.  Now, again, that

3    testimony, again, we're going to move to strike

4    that and we're going to move to strike any

5    insinuation or testimony that he inadvertently

6    waived privileged here by saying that he learned

7    about this from the Heidarpour Law Firm.

8              MR. TACKETT:  So noted.

9    BY MR. TACKETT:

10   Q.        Did you know about the Do Not Call

11   Registry independent of any advice or

12   conversations from counsel?

13             MR. PERRONG:  You can answer that.

14   A.        Yes.

15   Q.        How?  When?

16   A.        I don't remember who I talked to

17   100 percent, but it was somebody.

18             MR. TACKETT:  See now we just have a

19   messy record.  He said he didn't know about it,

20   then he said he knew about it from counsel, and

21   now he's saying --

22             MR. PERRONG:  You can characterize it

23   however you want, but you're --

24             MR. TACKETT:  No.  Perjury is a serious

120

1    thing, Mr. Perrong.

2              MR. PERRONG:  He's not perjuring

3    himself.

4              MR. TACKETT:  He was flirting with it

5    when we were talking about --

6              MR. PERRONG:  Oh, come on.

7              MR. TACKETT:  -- the RFA --

8              MR. PERRONG:  Give me a break.

9              MR. TACKETT:  I'm just trying to have a

10   record that has honest, correct answers.  So now

11   he said he knew about it independent of advice

12   from counsel and that's inconsistent with his

13   prior answers.

14             MR. PERRONG:  It's your deposition.

15   You can ask him whatever questions you want and

16   I'll object.

17             MR. TACKETT:  If you want the record to

18   stand, where, apparently, one of the answers is

19   untruthful, then we'll --

20             MR. PERRONG:  I disagree with your

21   characterization that it's untruthful.

22   BY MR. TACKETT:

23   Q.        You don't know anywhere that you

24   learned it from besides counsel, correct?

1          MR. PERRONG:  I mean, you can ask the

2     same question five different ways.  I'm going to

3     object to form.

4          You can answer to the extent that -- I

5     mean, A, do you even understand the question?

6          THE WITNESS:  Yes.

7          MR. PERRONG:  Okay.

8          MR. TACKETT:  Can he answer the

9     question without you disrupting?

10          Can you read it back to him, please?

11          (The record is read back as requested.)

12    A.          Actually, before I started any of these

13    cases, I did research to see if your number had to

14    be registered on the DNC for a case to be

15    substantial or accurate, and from what I can

16    recall, it does have to be registered on the DNC.

17    That number has been registered on the DNC since

18    2014.

19    Q.          Not by you, though, right?  You didn't

20    register the number in 2014, did you?

21    A.          No, but I reregistered it in my name in

22    September.

23    Q.          September?  That's your testimony?

24    A.          Or August.  It was one of those months.

1    I don't recollect the exact date.

2    Q.        Do you want to look -- can you look at

3    Exhibit 4 for me, please?  So your counsel

4    produced this in discovery.  It appears to be a

5    receipt for attempted registration with the Do Not

6    Call Registry.  So you just testified that you

7    tried to register the number in September.  Do you

8    remember saying that?

9            MR. PERRONG:  Objection to form.

10   Objection that it mischaracterizes the exhibit.

11           MR. TACKETT:  Please do not guide the

12   witness on how to talk about this exhibit or we

13   will seek sanctions.

14   BY MR. TACKETT:

15   Q.        Mr. McGonigle, do you recall the

16   testimony that you just gave saying that you

17   thought you tried to reregister in September, do

18   you recall that?  Do you recall saying that?

19   A.        I don't think it was even really a

20   reregister.  I might have worded that wrong.

21   Q.        It's okay.  I'm just asking if you

22   remember saying September.

23   A.        You can't register a number that's

24   already been registered.

123

1    Q.          Okay.  The document in front of us is

2    dated -- it's an email from verify@donotcall.gov.

3    Do you see that?

4    A.          Yeah.

5    Q.          It's dated April 6th, 2025.  Do you see

6    that?

7    A.          Yeah.

8    Q.          The subject is "National Do Not Call

9    Registry."  Do you see that?

10   A.          Yeah.

11   Q.          It is an email to

12   andrewmcgonigle714@gmail.com.  Do you see that?

13   A.          Yes.

14   Q.          And that's your email address, correct?

15   A.          Yes.

16   Q.          And this is saying basically that you

17   tried to register, but the number had already been

18   registered on January 10th, 2014, right?

19              MR. PERRONG:  Objection to form.

20   A.          Yes.

21   Q.          Okay.  With the benefit of looking at

22   this document, does it help refresh your memory

23   that you tried to register on April 6th, 2025,

24   instead of September?

124

```
 1              MR. PERRONG:  Objection to form.
 2   A.         You know, it's been a while since this
 3   has been done, so I don't fully know the exact
 4   date.  It may have been, but I'm not going to give
 5   you any inaccurate information under oath.
 6   Q.         That's fine.  That's why we're looking
 7   at the document that you produced in discovery.
 8   And you see this email and it says April 6th,
 9   2025, correct?
10   A.         Yes.
11   Q.         Okay.  And this was an email that was
12   sent to you when you tried to register the 804
13   telephone number, correct?
14              MR. PERRONG:  Objection to form.
15   A.         Yes.
16   Q.         Okay.  Now, before getting this email
17   at Exhibit 4, had you ever tried to register any
18   of your prior phone numbers on the Do Not Call
19   Registry?
20   A.         No, because I -- I just never -- never
21   did on the other phone numbers.
22   Q.         So that was the first time?
23   A.         Yeah.
24   Q.         Okay.  How did you first -- how did you
```

1    first get in touch with the Heidarpour Law Firm?

2               MR. PERRONG:  Objection to form.

3    Objection to the extent it calls for

4    attorney-client communications.  I'm instructing

5    the witness not to answer.  You don't have to

6    answer.

7               MR. TACKETT:  I think he can answer the

8    question without divulging privilege.

9    BY MR. TACKETT:

10   Q.        Did a lawyer -- did you learn from a

11   lawyer to contact the Heidarpour Law Firm?

12              MR. PERRONG:  You're literally asking

13   him if a lawyer told him to contact a law firm and

14   you're claiming that's not privileged?  I'm

15   instructing the witness not to answer that

16   question.

17              MR. TACKETT:  Yeah, that wouldn't have

18   to be privileged just because a lawyer told him to

19   call another lawyer.

20              MR. PERRONG:  I'm instructing --

21              MR. TACKETT:  If a lawyer --

22              MR. PERRONG:  I'm instructing the

23   witness not to answer.

24              MR. TACKETT:  So he could say, for

1    example, I was consulting with a lawyer and that's

2    how I was referred to the Heidarpour Law Firm.  No

3    part of that answer divulges privilege.

4              MR. PERRONG:  The fact that he was

5    consulting with a lawyer is privileged.

6              MR. TACKETT:  No, it's not.  The

7    content of the consultation is privileged, not the

8    fact that it occurred.

9              MR. PERRONG:  Yeah, and if he --

10             MR. TACKETT:  Every --

11             MR. PERRONG:  And if the content -- and

12   if the content is saying to contact the Heidarpour

13   Law Firm, then that's privileged.

14             MR. TACKETT:  Every privilege log ever

15   will tell you the fact that a communication

16   occurred is not privileged.  So he could

17   absolutely say he consulted with a lawyer and

18   that's what led to it.

19             MR. PERRONG:  He consulted with a

20   lawyer which led to -- it divulges what the

21   contents of the conversation were about.

22             MR. TACKETT:  I have no way of knowing

23   what the conversation was about.  I would assume

24   the consultation wouldn't simply be about here's a

1    list of lawyers, but, anyhow, we can move on.

2    BY MR. TACKETT:

3    Q.        I take it that we do need to do some

4    examination of your interrogatory response in

5    light of this dialogue I've had with Mr. Perrong.

6    Can you please turn to Exhibit 10.  All right.  So

7    at the bottom of the page, on page 3,

8    Interrogatory No. 14, says, "Identify who referred

9    you to the Heidarpour Law Firm."

10            Do you see that?

11   A.        I do.

12   Q.        Okay.  Now, if you flip to the next

13   page, there are some objections.  And then it

14   says, "Subject to the foregoing, Plaintiff states

15   that he was not referred by any individual

16   organization but instead found the Heidarpour Law

17   Firm by performing a Google search for how to stop

18   telemarketing calls and texts."

19            Do you see that?  Have I read that

20   correctly?

21   A.        Yes.

22   Q.        Okay.  Is it your testimony today that

23   you did not find the Heidarpour Law Firm by

24   performing a Google search?

```
1                   MR. PERRONG:  Objection to form.
2    A.         No.
3                   MR. PERRONG:  Can you rephrase the
4    question because it was phrased as a double
5    negative.
6                   MR. TACKETT:  I can rephrase it.
7    BY MR. TACKETT:
8    Q.         Did you find the Heidarpour Law Firm by
9    performing a Google search?
10   A.         Yes.
11   Q.         And the answer says a search for "how
12   to stop telemarketing calls and texts."  Is that
13   what you searched into Google to find the
14   Heidarpour Law Firm?
15   A.         Yes.
16   Q.         So I will represent to you that I typed
17   that exact search into Google and I went through
18   20 pages of results and none of them were for the
19   Heidarpour Law Firm.  Are you certain that that is
20   what you searched?
21   A.         Well, you know, maybe I may have typed
22   something else in, close to that, but I think what
23   I may have typed in maybe was more, you know, TCPA
24   lawyers or attorneys or something along those
```

1     lines, maybe.  So maybe it wasn't exactly what is

2     on there word for word that I typed in, but I did

3     use Google to find counsel.

4     Q.       Okay.  So you're saying that the search

5     described could be misdescribed in that

6     interrogatory response?

7              MR. PERRONG:  Objection to form.

8     Q.       That it might be more like "TCPA

9     lawyers" instead of "how to stop telemarketing

10    calls and texts"?  You're looking at your lawyer.

11    That's --

12             MR. PERRONG:  Objection to form.

13    Q.       I need you to answer the question.

14    A.       Yes.

15    Q.       Okay.  Look to the right here, on the

16    fifth page, there's a verification here regarding

17    these responses.  "I, Andrew McGonigle, declare

18    under penalty of perjury under the laws of the

19    United States of America that the foregoing is

20    true and correct to the best of my knowledge."

21             Do you see that?

22    A.       Yeah.

23    Q.       Okay.  So you're saying as we're

24    talking about it, that to make that answer fully

130

1    accurate, you would change it a little bit; is

2    that correct?

3              MR. PERRONG:  Objection to form.

4    A.        A little bit.  Not much.

5    Q.        Okay.  Okay.  In your Google search,

6    did you see any information telling you that you

7    could reply "STOP" to make a telemarketing message

8    stop?

9    A.        You know, it's been almost a year since

10   I looked up any of this stuff, so I don't remember

11   exactly.  Maybe I may have.

12   Q.        And at this time, in August of 2024,

13   when you were doing these searches, were you aware

14   that if you typed "STOP", it would unsubscribe you

15   from marketing messages?

16   A.        On certain messages it would.  Some of

17   them it didn't give me that option.  To an extent,

18   yes, I'm aware.

19   Q.        Okay.  So why is it then that when you

20   got messages from Value City, that you didn't just

21   type "STOP" if you didn't want the messages?

22   A.        Because the messages that I received

23   did not give me that prompt or option to do so.

24   Q.        Did you ever try?

```
 1    A.          I didn't -- you know, I didn't think
 2    to, because it didn't say stop to opt out, or -- I
 3    mean, so I didn't know that, you know, and then in
 4    those messages I could because, you know, some
 5    companies, you know, may give you an option, some
 6    may not.
 7    Q.          And so when we were talking earlier, we
 8    went through 22 different TCPA lawsuits that you
 9    filed relating to marketing messages that you
10    received on your cell phone.  Do you remember
11    that?
12    A.          Yes.
13    Q.          Okay.  Did you type "STOP" on any of
14    those marketing message conversations?
15    A.          No.
16    Q.          Okay.  And you realize, though, that if
17    you type "STOP", it opts you out of a marketing
18    program, right?
19                MR. PERRONG:  Objection to form.
20    A.          Yes.
21    Q.          Okay.  And how much time would it take
22    you to type S-T-O-P?
23    A.          Well --
24    Q.          The question is, how much time would it
```

1   take?

2   A.          It would take me a lot of time because

3   I'm usually working or I'm constantly doing

4   something, I'm busy, I'm not on my phone all day.

5   Probably if I had time would be the more

6   questionable part.

7   Q.          I'm saying if you were trying to do it,

8   you were manually using your hand to type, I'm not

9   saying if you got around to doing it, if you were

10  typing, how long would it take you to type "STOP"?

11  A.          Five seconds.

12  Q.          Okay.  I want you to look at

13  Exhibit 11.  You're on the second page.  Go to the

14  first page.  I'm showing you a sample from Value

15  City's marketing program which shows you what

16  happens if you type anything in response to one of

17  these ads.  Now, you see here there's a marketing

18  message from Value City.  And then someone has

19  typed "Hi".  Do you see that?  In the green

20  bubble?

21  A.          Yeah, I --

22  Q.          So if you type "Hi", this is what

23  happens.  You get told, "If you need additional

24  help please email us at websupport@vcf.com or call

133

1   us at (888)751-8552.  Text STOP to opt out."

2            Do you see that?

3   A.       Yes.

4   Q.       If you type any character in response

5   to a Value City marketing ad, this is what comes

6   up.

7   A.       Yes.

8   Q.       So if you had typed any letter, you

9   would have -- you would have received that

10  response, but you never tried, right?

11  A.       I don't recall ever typing that --

12  Q.       Now, if you look at the next page --

13  A.       -- you know, from my memory.

14  Q.       If you look at the next page, it shows

15  that if you type "STOP", this is what you would

16  receive.  Do you see here where they say "Stop"?

17  A.       Yes.

18  Q.       And then what happens?

19  A.       "You are unsubscribed from messaging.

20  No more messages will be sent."

21  Q.       Right.  So you said it would take

22  five seconds.  Would you agree that it took you a

23  lot longer to find a law firm and then have them

24  send a letter to Value City months later?

1          MR. PERRONG:  Objection to form.

2   A.        Maybe.

3   Q.        You can close this.  I don't have any

4   other questions on that.

5          After you got the number, the 804

6   number, have you received any telemarketing calls?

7          MR. PERRONG:  Objection to form.

8   A.        Not that I can remember, but that

9   doesn't mean that I haven't.  I mean, I don't

10  always have my ringer on if I'm busy or working or

11  something, so maybe I did, maybe I didn't.

12  Q.        Have you had any calls that you

13  answered that were telemarketing calls?

14  A.        I've had a debt collector that had

15  called, but I don't remember the name of the

16  company exactly.

17  Q.        Okay.  I appreciate your answer.  I

18  wouldn't view a debt collector as a telemarketing

19  call, but I appreciate the response.

20          And you said in discovery you've never

21  received a call from Value City, correct?

22  A.        Yes.

23  Q.        Okay.  As far as the 21 other companies

24  we went through that you sued, did you receive

135

1    calls from any of them?

2    A.          From my best recollection, I think most

3    of those may have been text messages.

4    Q.          Okay.  Can you remember any calls?

5    A.          Not off the top of my head.

6    Q.          Okay.  On any of your prior phone

7    numbers, did you ever get telemarketing calls?

8    A.          Maybe I may have, but I don't remember

9    exactly if I did or not.

10   Q.          Okay.  Maybe a call to get you to

11   switch cable subscribers or anything like that

12   that you can remember?

13              MR. PERRONG:  Objection to form.

14   A.          I don't remember.

15   Q.          Okay.  The -- according to the Verizon

16   records that we have, you had started having

17   exchanges with the Heidarpour Law Firm on

18   August 24th.  Does that sound accurate to you?

19              MR. PERRONG:  Objection to form.

20   Objection to the extent it asks for

21   attorney-client information.  I'm instructing the

22   witness not to answer.

23              MR. TACKETT:  I'm not asking him what

24   he talked about.  We can look at his phone

```
 1   records, which we have.

 2              MR. PERRONG:  To the extent these phone

 3   records contain privileged records of

 4   communication between Mr. McGonigle and his

 5   counsel, we object.

 6              MR. TACKETT:  Yeah.  The fact that a

 7   communication happened is not privileged.  We've

 8   already gone through that.  The time that it

 9   happened is highly relevant in this litigation.

10   BY MR. TACKETT:

11   Q.         Here we have outbound calls,

12   August 24th, do you see that, on August 24th,

13   2024, there's a call placed from the 804 number to

14   this highlighted number for the Heidarpour Law

15   Firm, 202-234-2727.  Do you see that in the

16   records?

17   A.         Yes.

18   Q.         Okay.  Does that accurately reflect a

19   call that you made?

20   A.         Yes.

21   Q.         Okay.  Now, you see here, on row 301,

22   there's another call from you to that same number

23   for the Heidarpour Law Firm.  Do you see that?

24   A.         Yes.
```

1    Q.          Now, on August 26th, rows 320 through

2    325, show additional calls from your number to the

3    number for the Heidarpour Law Firm.  Do you see

4    that?

5    A.          Yes.

6    Q.          Okay.  On August 27th, this is in row

7    354, shows another call from your number to the

8    Heidarpour Law Firm.  Do you see that?

9    A.          Yeah.

10   Q.          Okay.  Again on August 27th, another

11   call from your number to the Heidarpour Law Firm.

12   Do you see that?

13   A.          Yes.

14   Q.          Okay.  Going down a couple of rows, 358

15   and 359, again shows two more calls from your

16   number to the Heidarpour Law Firm.  Do you see

17   those?

18   A.          Yes.

19   Q.          Okay.  Same date, still August 27th,

20   line 366, shows another call from your number to

21   the Heidarpour Law Firm.  Do you see that?

22   A.          Yes.

23   Q.          Okay.  There's a bit of a break here.

24   The next one we see is on September 6th, 2024,

1    your records show a call from your number to the

2    Heidarpour Law Firm.  Do you see that?

3    A.        Yes.

4    Q.        Okay.  Then that same day, still

5    September 6th, there's records of two more calls

6    from your number to the Heidarpour Law Firm.  Do

7    you see that?

8    A.        Yes.

9    Q.        Okay.  Now, on September 24th, a couple

10   of weeks later, there's another call from your

11   number here to the Heidarpour Law Firm.  Do you

12   see that?

13   A.        Yes.

14   Q.        On September 30th, this is row 564 of

15   the Verizon records, it shows another call from

16   your number to the Heidarpour Law Firm.  Do you

17   see that?

18   A.        Yes.

19   Q.        Okay.  Four more rows down, row 568

20   shows another call from your phone number to the

21   Heidarpour Law Firm.  Do you see that?

22             MR. PERRONG:  Mr. Tackett, this is

23   getting harassing at this point.

24             MR. TACKETT:  I'm asking him if --

```
 1                 MR. PERRONG:  Okay.
 2                 MR. TACKETT:  -- he sees the record.
 3                 MR. PERRONG:  Okay.  What is the
 4    purpose of going through all of his phone records
 5    and asking him every time that he's contacted
 6    counsel?
 7                 MR. TACKETT:  We will be getting to the
 8    purpose very soon.  I'm making a record.
 9    BY MR. TACKETT:
10    Q.        Do you see this entry?
11    A.        Yes.
12    Q.        And do you have any reason to believe
13    that any of these are inaccurate?
14    A.        Honestly, I don't remember all of my
15    phone calls, so how could I -- I mean, I don't
16    know how to respond if they're truly accurate or
17    not.
18    Q.        Would you agree that Verizon's records
19    would be the most accurate way to know about your
20    phone usage?
21    A.        Yes.
22    Q.        Okay.  I'll show you two more.  Row 616
23    and 617 show two more calls from you to the
24    Heidarpour Law Firm on October 7th.  Do you see
```

1    those?

2    A.        Yes.

3    Q.        Okay.  I'll represent to you in the

4    outbound calls we see 72 calls to the Heidarpour

5    Law Firm.  Many of which before the demand letter.

6    Incoming calls, 422 times.  You don't have any

7    basis to object to or disagree with Verizon's

8    records, do you?

9    A.        No.

10   Q.        Okay.  And again, the calling with the

11   Heidarpour Law Firm began on August 24th according

12   to these records that we just reviewed, right?

13   A.        Yes.

14   Q.        Okay.  I'm going to briefly pull up

15   Exhibit 15.  I will not belabor the point, but I

16   do want to look at that same time range and show

17   that those text communications also began at the

18   same time.  So we have Exhibit 15 up with the text

19   log.  Again, the communications with Heidarpour's

20   number are highlighted in yellow.  I'm trying to

21   go up to the beginning.  So here we are.  These

22   rows, Mr. McGonigle, are on August 24th.  Do you

23   see that?

24   A.        Yes.

1    Q.          Okay.  On August 24th, we have a series

2    of rows that show a text exchange back and forth

3    between you and the Heidarpour Law Firm on

4    August 24th.  On the screen right now, I can see

5    those ongoing exchanges from row 1464 down to

6    1491.  Do you see those?

7    A.          Yes.

8    Q.          And again, you don't have any basis to

9    dispute or disagree with the Verizon records,

10   correct?

11   A.          Not on those terms.

12   Q.          Okay.  I will take that down.

13              So why is it that you started talking

14   with the Heidarpour Law Firm on August 24th, that

15   you never once said to Value City that you didn't

16   want to receive text messages until a letter that

17   was sent out on October 12th?

18              MR. PERRONG:  I'm sorry.  Can you

19   repeat the question?

20              MR. TACKETT:  I'll just have her read

21   it back, so I don't change it.

22              (The record is read back as requested.)

23              MR. PERRONG:  I'm going to object to

24   form.  I object to the extent that it calls for

```
1   information that you received or information that
2   the Heidarpour Law Firm told you.  Do not answer
3   with respect to anything that the Heidarpour Law
4   Firm told you.
5   Q.         So do you have an answer?  Why did you
6   wait more than two months before you told Value
7   City that you didn't want to get these text
8   messages?
9             MR. PERRONG:  If it's because of
10  information by the Heidarpour Law Firm, you can
11  just tell him that.
12  A.         Because of information by the
13  Heidarpour Law Firm.
14  Q.         So you believe the only reason that you
15  didn't tell Value City that you didn't want
16  messages was because of legal advice?
17            MR. PERRONG:  Objection to the extent
18  that this again asks him to reveal legal advice.
19            You can answer as -- if that's accurate
20  that the information -- that your answer was
21  informed based on the legal advice that you
22  received.
23  A.         Yes.
24  Q.         So you would agree that if -- if on
```

143

1    October -- strike that.

2              If on August 25th, you told Value City

3    "STOP" or you sent them a letter, I went and saw a

4    lawyer, I realize that I just have to tell you to

5    stop, I'm going to send you a letter or a stop

6    text, that from August 25th to forever, you

7    wouldn't have gotten any messages from Value City.

8    Do you realize that?

9              MR. PERRONG:  Objection to form.

10   A.        Yes.

11   Q.        Okay.  So by waiting to tell Value

12   City, they sent you additional messages without

13   knowing that you didn't want the text messages,

14   right?

15             MR. PERRONG:  Objection to form.

16   A.        Yes.

17   Q.        Did you deliberately wait until they

18   sent more messages so that you would have greater

19   statutory damages?

20             MR. PERRONG:  Objection to form.

21   A.        I knew beyond reasonable doubt that

22   under the Telephone Consumer Protection Act, even

23   if you don't opt out, you still have rights, and I

24   was exercising not only my rights but the class's

144

```
1    rights as a class action representative, not just

2    for income.

3    Q.        That's fine.  I know we're not in

4    court, but for the benefit of the record, I would

5    move to strike that as nonresponsive to the

6    question.

7              MR. TACKETT:  Can you read my question

8    back?

9              (The record is read back as requested.)

10             MR. PERRONG:  Could you read the

11   answer?

12             MR. TACKETT:  The nonresponsive answer.

13             MR. PERRONG:  Come on.

14   A.        No, I didn't --

15             MR. PERRONG:  Don't be coy and make

16   speaking objections about nonresponsive answers.

17             MR. TACKETT:  Please stop.  You're

18   wasting everyone's time.

19             MR. PERRONG:  Yeah, well, you're

20   wasting everybody's time with making extraneous

21   comments when I'm asking the reporter just to

22   simply read back the witness's answer.

23             Can you read back the question and the

24   answer, please?
```

```
 1              (The record is read back as requested.)
 2    BY MR. TACKETT:
 3    Q.        Okay.  So do you realize that you
 4    didn't file the class action until December?
 5    A.        Yes.
 6    Q.        Okay.  So your answer, when I'm asking
 7    you about the period of time between August --
 8    A.        No, I did not --
 9    Q.        -- and October -- please, let me
10    finish.
11    A.        All right.
12    Q.        -- has nothing to do with when you
13    became a class representative in December.  Do you
14    understand that?
15              MR. PERRONG:  I'm going to object to
16    the extent that this calls for discussions that
17    you had with the Heidarpour Law Firm, including as
18    to timing and resource allocation, things of that
19    nature especially, and any sort of timing with
20    which the Heidarpour Law Firm filed the complaint.
21              MR. TACKETT:  There's a completely
22    different question on the table now, that you are
23    now disrupting.  Geez.
24    A.        I did not deliberately wait to get more
```

1    statutory damages.

2    Q.          Okay.

3    A.          That was never my goal.

4    Q.          Okay.

5    A.          The answer to the question, I already

6    answered it.  I was just standing up for the class

7    and their rights as a class representative and

8    following the duties as I signed in the contract.

9    Q.          I know we talked about this.  The

10   period of time I'm asking about, from August to

11   October 12th, you weren't a class representative.

12   You said you understood that, right?  You filed

13   the suit in December, correct?

14   A.          Yes, but it was a class action lawsuit.

15   Q.          I know.

16   A.          So that would still later on entitle me

17   as a class representative.

18   Q.          But you did already testify that that

19   would be the effect of the delay, so we can't

20   change those facts, lawyers can argue about them

21   later.

22               Now, if you can look at Exhibit 1(a),

23   please.  This is a letter from the Heidarpour Law

24   Firm to the Value City Furniture, Inc. Legal

1  Department, dated October 12, 2024.  Do you see

2  that?

3  A.        Yes.

4  Q.        And this is on letterhead for the

5  Heidarpour Law Firm, right?

6  A.        Yes.

7  Q.        And in the upper left-hand corner of

8  that letterhead, it lists a telephone number of

9  202-234-2727, right?

10  A.        Yes.

11  Q.        Okay.  And that's the same number we

12  were looking at in your phone records, right?

13  A.        Yes.

14  Q.        Okay.  This letter is asking that Value

15  City not send any more marketing messages to your

16  804 number, right?

17  A.        Yes.

18  Q.        And it's dated October 12th, right?

19  A.        Yes.

20  Q.        Okay.  And then it's saying please opt

21  him out by October 21, 2024.  Do you see that?

22  A.        Yes.

23  Q.        Okay.

24             MR. PERRONG:  Objection to form.

1    Q.        And I'd like you to look at 1(c).  Go

2    to the last page.  You might want to turn it

3    sideways to landscape.  This shows text messages

4    from Value City to your phone.  Now, the very last

5    one happened on what date there?

6    A.        October 15th, 2024.

7    Q.        Okay.  So within three days of this

8    letter going out, you're opted out, right?

9    A.        Yes.

10   Q.        And have you received any other

11   messages from Value City since you were opted out?

12   A.        No.

13   Q.        Okay.  So would you agree --

14   A.        Not that I recall.  I mean...

15   Q.        You can't remember any other messages

16   from Value City, right?

17   A.        Not that I can remember.

18   Q.        And our records show that no more

19   happened, just to be clear.

20            So again, if you told Value City on

21   August 26th, and they did the same thing and

22   stopped within three days, you would have gotten a

23   lot less text messages from Value City, right?

24   A.        Yes, but, arguably, I shouldn't have

1    gotten any if I opted out all together.

2    Q.        That's not my question.  It's just

3    about mitigation of damages.

4              MR. PERRONG:  Yeah, mitigation of

5    damages is not a defense in a TCPA action.

6              MR. TACKETT:  Yeah, but by lying in

7    wait shows that he's not within the protected zone

8    of interest.

9    BY MR. TACKETT:

10   Q.        And you did, you laid in wait, right?

11   You went to Heidarpour, August 24th, and you

12   waited until two months later to tell Value City

13   you didn't want the messages; isn't that right?

14             MR. PERRONG:  Objection to form.

15   Q.        That's what happened, right?

16   A.        I waited because I wanted to know what

17   to do, what I needed to do as far as standing up

18   for my rights.

19   Q.        And I don't want to -- I don't want you

20   to talk about what you said with your lawyer, I'm

21   not asking for that.

22   A.        That's all I can say.

23   Q.        Okay.  Now, with the 21 other companies

24   that you sued, did you wait just as long to tell

1   them that you didn't want the text messages?

2            MR. PERRONG:  Objection to form.

3   A.            You know, I don't remember.  I have so

4   many cases.  I can't tell you how long I waited to

5   do anything because I don't know, you know, time

6   frames.  We're going back almost a year on all

7   this.

8   Q.            Did you -- did you know that Value

9   City's records show that somebody opted in and

10  said we want marketing messages to be sent to this

11  telephone number, are you aware of that?

12           MR. PERRONG:  Objection to form.

13  A.            No.  I never opted in ever.

14  Q.            That's not my question.  That's not my

15  question.  I actually said someone else.  And if

16  you don't know that, then that's okay.

17  A.            It would have been somebody else that

18  maybe had the same number prior to me even being

19  issued that number, but I never -- you know --

20  Q.            So just listen to my question.  My

21  question is, did you know that Value City's

22  records show that someone opted in the number

23  804-238-5410 and asked for marketing messages to

24  be sent to that number?  Did you know that their

151

1    records show that?

2    A.          No.

3    Q.          Go to 1(b), please.  All right.  So

4    this is an audit letter generated by the TCPA

5    compliance company, Attentive.  Do you see that on

6    the letterhead in the top?

7    A.          Yes.

8    Q.          Okay.  It says:  To Whom It May

9    Concern, for the phone number in question,

10   804-238-5410, we can confirm the user visited

11   https://www.valuecityfurniture.com and signed up

12   to receive text messages from VCF at the following

13   URL on April 14th, 2022, at 1:07.  The user was

14   shown a promotion advertising the company's SMS

15   program.  And then there's a picture of the

16   advertisement for the text marketing program.

17              Do you see that?

18   A.          Yes.

19   Q.          Okay.  And then it says, according to

20   Attentive's records, that the user clicked on that

21   and sent -- then sent a text message to the VCF

22   phone number to confirm signing up for marketing

23   text messages.

24              Do you see where it says that?

1    A.          Yes.

2    Q.          Okay.  And then it says Value City

3    responded with the following messages to the user

4    on April 14th, 2022, at 1:07:52 and 1:07:55

5    respectively.  And then it shows the messages they

6    sent when the number was opted into the program.

7              Do you see those?

8    A.          Yes.

9    Q.          Okay.  And it says since the user

10   joined the VCF SMS program on August 14th, 2022,

11   the VCF number has never received a STOP message

12   from the user, and the user never otherwise

13   contacted Attentive to withdraw their express

14   consent to receive text messages from Value City

15   Furniture, VCF.

16             Do you see that?

17   A.          Yes.

18   Q.          At VCF's direction, Attentive manually

19   opted the phone number out on October 15, 2024.

20             Do you see that?

21   A.          Yes.

22   Q.          And then it says the phone number

23   received no messages from VCF through the

24   Attentive platform after the opt out.

1              Do you see that?

2    A.        Yes.

3    Q.        Okay.  So I understand that you're

4    saying you're not the one who signed up, I

5    understand you're saying that, but do you now

6    understand from me reviewing these records with

7    you that someone did sign up for this telephone

8    number, the 804 number, to receive marketing

9    messages?

10   A.        Yes.

11   Q.        Okay.  My question for you is, how

12   would Value City know that you didn't want the

13   messages?

14   A.        They wouldn't know because they didn't

15   originally, when they first started messaging

16   me --

17   Q.        Exactly.

18   A.        -- give me an option to opt out, so it

19   wasn't like I could just automatically, you know,

20   stop that.  I didn't have any power.

21   Q.        Like you said, they wouldn't know,

22   right?

23   A.        Yes.

24   Q.        They can't read your mind, can they?

1    A.        No, but...

2    Q.        Okay.  So --

3              MR. PERRONG:  Hold on.  He wasn't done

4    answering his question.

5    A.        But they should have an option if they

6    really, you know, on their messages, maybe, so

7    somebody can opt out.

8    Q.        Do you remember looking at Exhibit 11

9    where I showed you if you typed anything, it

10   reminds you of how to opt out?  Do you want to

11   look at it again?

12   A.        I've seen it.  No, I know what you're

13   talking about.

14             MR. TACKETT:  Okay.  We're going to

15   take a couple of minutes and then I think I'm

16   about done.

17             (A short recess is taken.)

18   BY MR. TACKETT:

19   Q.        Just a few more things I want to go

20   through before we wrap up.  I want to look at one

21   of your requests for admissions responses.  This

22   is Exhibit 7.  It's the first set of

23   interrogatories and requests for admissions and

24   document requests.  And these are dated

1    April 16th, 2025.  Are you there on 7?

2    A.        Yeah.

3    Q.        Okay.  Now, the first two say, "Admit

4    You did not reply 'STOP'...."

5              Do you see that?

6    A.        Yes.

7    Q.        Okay.  You agree that that answer is

8    correct?

9    A.        That's correct.

10   Q.        Okay.  And it says, "Admit You could

11   have replied 'STOP' when you received the first

12   text message to the Telephone Number from Value

13   City."  You said, "Admits."  Do you see that?

14   A.        Yes.

15   Q.        Okay.  Do you agree with that?

16   A.        Yes.

17   Q.        Okay.  Now, I want you to look at

18   No. 6.  It says, "Admit that you have visited

19   Value City's website."  You say, "Denies."  Do you

20   see that?

21   A.        Yes.

22   Q.        Do you believe that answer is correct?

23   A.        That is correct.

24   Q.        Okay.  So I have an issue with that,

1    because of something else you submitted.  I want

2    you to look at Exhibit 2, please.  Okay.  Do you

3    recognize this?

4    A.          You know, yeah.  Maybe.  I may have

5    signed this.  I don't remember, but...

6    Q.          This says "Affidavit of Andrew

7    McGonigle" and it's on the case caption for this

8    case against Value City Furniture.  Do you see

9    that?

10   A.          Yes.

11   Q.          Okay.  And this is signed and dated

12   January 25th, 2025, "under the pains and penalties

13   of perjury," followed by your signature.  Do you

14   see that?

15   A.          Yes.

16   Q.          Okay.  Do you agree that's your

17   signature?

18   A.          Yes.

19   Q.          Okay.  Now, do you see paragraph No. 5

20   there, where it says, "After receiving the

21   affidavit of verified Answer, I went to that

22   website," which paragraph 4 above says

23   "valuecityfurniture.com."

24               Do you see that?

1    A.        Yes.

2    Q.        Okay.  So you agree that you did go to

3    Value City's website in January; is that right?

4    A.        You know, I may have.  I just -- I

5    don't remember going.

6    Q.        You don't remember, but you signed this

7    document, under the penalties of perjury, saying

8    you did.  Do you see that?

9    A.        Yes.

10   Q.        Okay.  Now, if we look back at 7, and

11   we go to the second page of 7, RFA No. 6, and it

12   says, "Admit that you have visited Value City's

13   website," and you say you haven't.  But based on

14   the affidavit you filed in the court, this is not

15   correct.  Do you understand that?

16   A.        Yes.

17   Q.        So with the benefit of looking at your

18   affidavit, would you agree that the response to

19   RFA No. 6 should be changed?

20   A.        Yes.

21   Q.        Okay.  And just to clarify -- go back

22   to 7, please.  It looks like you flipped to 2.  If

23   you go to the eighth page of 7, the RFA responses

24   that we've been talking about have a verification

1    from you saying, "I...declare under penalty of

2    perjury...that the foregoing is true and correct

3    to the best of my knowledge," and then it's signed

4    by you.  Do you see that?

5    A.        Yes.

6    Q.        Is that your signature?

7    A.        Yes.

8    Q.        Okay.  So that's two RFA responses that

9    you've agreed on the record should be changed.  Do

10   you think there are any others?

11            MR. PERRONG:  Objection to form.

12   A.        Not that I know of from the top of my

13   head.

14   Q.        Okay.  If you look at RFA No. 3, do you

15   see 3?

16   A.        Yes.

17   Q.        It should be on page 2.  I don't think

18   you're on the right page.  It's Exhibit 7.

19   Exhibit 7, page 2.

20   A.        All right.

21   Q.        Do you see it?

22   A.        Yeah.

23   Q.        This says you tried to register the

24   number with the Do Not Call Registry on

1    August 5th and that you got an email, but do you

2    remember looking at Exhibit 4 and the date on the

3    email was April 6th, 2025?  You're there.  You

4    were there.  Do you remember that now with

5    Exhibit 4 in front of you?

6    A.        Yes.

7    Q.        Okay.  So that date should be changed,

8    correct?

9    A.        Yes.

10   Q.        Okay.  Just a few more questions.

11             Do you know on your phone how to block

12   a number, like if you don't want to get messages

13   from a number?

14   A.        Yes.

15   Q.        Did you ever try to do that with any of

16   the marketing text messages you got from any of

17   the 22 companies you sued?

18   A.        No.

19   Q.        Okay.  And there's, like, a selection

20   you do, you can do, like block and report as spam.

21   Are you familiar with that?

22   A.        Yes.

23   Q.        Do you know how to do that?

24   A.        Yes.

1   Q.          It's not that hard to do, right?

2   A.          Uh-uh.

3   Q.          No?

4   A.          No.

5   Q.          So why didn't you do that with any of

6   the marketing messages if you didn't want to get

7   them?

8               MR. PERRONG:  Objection to form.

9   A.          Because I knew I had a right to stand

10  my ground and keep -- keep my peace and privacy.

11  Q.          But if you -- if you said it was easy

12  to do and you knew how to do it, wouldn't that be

13  the easiest way to keep your peace and privacy, as

14  you say?

15  A.          I was looking at more of the principle.

16  Q.          Well, the question is, would that be

17  the easiest way to keep your privacy and peace?

18  A.          Yes, but no principle would be enforced

19  if I did so.

20  Q.          Okay.  Have you ever used any

21  call-blocking apps?

22  A.          No.

23  Q.          When you would get marketing messages

24  on your phone, would you open them?

1  A.        No.

2  Q.        Okay.  And then you said you wouldn't

3  open them and -- you said you wouldn't click the

4  links?

5  A.        I won't click on a link if I don't know

6  where it's sending me to.

7  Q.        Okay.  And when you were Googling to

8  search for TCPA lawyers, did you ever look up --

9  strike that.

10         Now, in terms of the messages, like we

11  talked about, there's 22 different companies you

12  sued.  Did any of the messages from any of the

13  companies upset you or was there anything in the

14  messages that was really bothersome?

15  A.        It was more just the principle of the

16  fact that my phone's going off and I'm having

17  messages sent to me that I -- I never consented to

18  receiving.  I've never done business with any of

19  these places, so the principle is more what

20  bothered me.  It's not the messages, what it

21  contained inside of them, you know, themselves,

22  but the principle of the matter.

23  Q.        Understood.  Can we agree there's

24  nothing -- so I think so, but can we agree that

1   there's nothing upsetting about the content, like,

2   of getting a notice that a couch is on sale?

3               MR. PERRONG:  Objection to form.

4   A.          No.

5   Q.          Not upsetting, right?

6   A.          It is upsetting.  It causes me

7   emotional distress to get messages from companies

8   I've never done any business with.

9   Q.          But you enjoy getting messages from

10  Guns.com?

11              MR. PERRONG:  Objection to form.

12  A.          Due to the nature that I have ordered

13  stuff from them or Palmetto State Armory, I do not

14  mind getting offers from them, or Sportsman's

15  Warehouse, who I've also ordered some stuff -- not

16  ordered stuff, but opted in to receive deals from.

17  Q.          So you're fine with getting messages

18  about guns but not couches, is what you're saying,

19  right?

20  A.          Since I opted in, yes.

21  Q.          Now, if you -- again, if you didn't

22  want to receive a message, you agree it would take

23  five seconds to type "STOP", right?

24  A.          Yes, but it --

Q. You also said that you know how to report something is spam, right?

A. Yes.

Q. Okay. And you said it was easy to do that, right?

A. Yes.

Q. Okay. Are there other companies, besides the ones we listed, that are messaging you that you've chosen not to sue?

MR. PERRONG: Objection to form.

A. You know, not right that I know of. I'm not saying that there isn't, but I don't know -- I don't memorize all the companies that are messaging me. There may be. I'm not saying yes or no. Yeah, there's a possibility, but I don't 100 percent know on that.

MR. TACKETT: I don't have any other questions.

MR. PERRONG: All right. I have some redirect.

- - - - -

REDIRECT EXAMINATION

BY MR. PERRONG:

Q. So, Mr. McGonigle, can you turn to

```
 1    Exhibit 10.  Request for Admission 11.  And in
 2    this request for admission, you denied that your
 3    largest source of income was monies related to
 4    TCPA lawsuits, expressly including settlement
 5    payments relating to the lawsuits in 2015 [sic],
 6    as your largest source of income.  Mr. McGonigle,
 7    is 2015 over yet?
 8              MR. TACKETT:  Objection to form.
 9    A.        2015 has been over.
10    Q.        I'm sorry.  2025.
11    A.        2025?
12    Q.        Yes.
13    A.        No, 2025 is not over yet.
14    Q.        And, in fact, you are continuing to
15    work at the animal shelter, correct?
16    A.        That's correct.
17    Q.        So is it also your understanding that
18    the IRS treats payments you receive from
19    settlements different than the money that you
20    receive as a result of wages from your employment?
21              MR. TACKETT:  Objection to form.
22    Leading --
23    A.        That is correct.
24              MR. TACKETT:  -- and calls for a legal
```

1   conclusion.

2           MR. PERRONG:  Okay, okay.  Now --

3           MR. TACKETT:  Wait.

4           MR. PERRONG:  No, no, no.  You are now

5   making --

6           MR. TACKETT:  Andrew --

7           MR. PERRONG:  Hold on.

8           MR. TACKETT:  Mr. -- Mr. Perrong, I am

9   allowed --

10          MR. PERRONG:  You're making --

11          MR. TACKETT:  -- to make --

12          MR. PERRONG:  You're making speaking

13  objections.

14          MR. TACKETT:  Please don't talk --

15          MR. PERRONG:  You can object to form --

16          MR. TACKETT:  -- at the same time as

17  me.

18          MR. PERRONG:  You can object to form,

19  but you are --

20          MR. TACKETT:  You are leading --

21          MR. PERRONG:  -- now making speaking

22  objections, leading the witness.

23          MR. TACKETT:  I'm objecting to the form

24  of the question.  I'm not leading the witness.

1    He's not my witness.  I'm allowed to explain why

2    your question is so inappropriate.  You are

3    leading him to build a record that you find

4    appropriate for you, about legal conclusions

5    relating to the way the IRS treats these payments,

6    which he absolutely doesn't know about.

7                    MR. PERRONG:  Okay.  Now, this is --

8    BY MR. PERRONG:

9    Q.          Mr. McGonigle, do you understand -- do

10   you have a basic knowledge of the way the IRS

11   treats payments, settlement payments from TCPA

12   lawsuits as opposed to payments from -- that you

13   obtain as a result of wages and working?

14                    MR. TACKETT:  Objection to form.

15   Leading.

16   A.          Yes, I do.

17   Q.          And is the basis of that your

18   communications with counsel?

19                    MR. TACKETT:  Objection to form.

20   Leading.

21   A.          Yes.

22   Q.          So based on your communications with

23   counsel, what is your understanding of the way

24   that -- what is your -- is it your understanding

1    that the IRS treats income from TCPA or money that

2    you receive from TCPA different than your wages?

3              MR. TACKETT:  Objection to form.

4    Leading.  Also, it implies a waiver of the

5    attorney-client privilege.

6              MR. PERRONG:  I'm instructing him to

7    waive privilege as to -- I'm instructing him to

8    waive the privilege for the --

9    A.         From my understanding, I receive a 1099

10   from income from settlements.  Whereas, if I'm

11   working, I get a W-2 from HR at the company I work

12   for.  And there's different billing period -- tax

13   periods with two different forms, you know, as far

14   as a W-2 and a 1099.  A 1099 is, you know, I have

15   to file it myself and I have to pay in, I think,

16   every month or something, it's different, but W-2

17   is I pay every, like, week.

18   Q.         Okay.

19   A.         So it's -- they treat the settlements a

20   little different as far as tax goes.  And it's

21   different percentages that they take out,

22   typically, versus, you know, a regular paycheck

23   that's earned income.

24   Q.         And then you also testified, I believe,

```
 1    at first, and depending on to the extent that I'm

 2    just asking you to recall what the record

 3    reflects, do you remember first saying that you

 4    didn't -- when Mr. Tackett asked you as to your

 5    income from TCPA as opposed to income from your

 6    work, do you remember saying that you didn't

 7    recall the exact amount?

 8             MR. TACKETT:  Objection.

 9    A.        Yes.

10    Q.        Have you ever sat down before today and

11    actually done an express calculation, vis-à-vis

12    the exact numbers, between the money that you

13    received as a result of working versus as a result

14    of your statutory damages under the TCPA?

15             MR. TACKETT:  Objection to form.

16    Leading.  Also "vis-à-vis" is patently --

17             MR. PERRONG:  Okay.  Now --

18             MR. TACKETT:  -- ambiguous.

19             MR. PERRONG:  -- you're making speaking

20    objections.

21             MR. TACKETT:  Please stop interrupting

22    me.

23             MR. PERRONG:  No, no.  You're making

24    speaking objections.
```

```
1                    MR. TACKETT:  It's about the form.

2                    MR. PERRONG:  You can't make a speaking

3      objection as to form.

4                    MR. TACKETT:  Yes, I can.

5                    MR. PERRONG:  No.  You need to state

6      the objection succinctly.  Look at the rules.

7                    MR. TACKETT:  I did state it

8      succinctly.  "Vis-à-vis" is patently ambiguous.

9                    MR. PERRONG:  No, no, no.  "Vis-à-vis,"

10     you're expounding on a speaking objection.

11                   MR. TACKETT:  No.  I'm identifying --

12                   MR. PERRONG:  You can -- you can say --

13                   MR. TACKETT:  -- what could be

14     rephrased so you can fix the question.  That's the

15     whole purpose of a form objection.  Unlike you,

16     who said, "Objection, Form," over and over every

17     time I asked a question.

18                   MR. PERRONG:  Right.  Because that's --

19     that's what's permitted under the rules.

20                   MR. TACKETT:  No, that's not what's

21     appropriate, actually.  That's called obstruction.

22     I'm allowing you to fix a bad question.

23     BY MR. PERRONG:

24     Q.        You've never sat down and actually done
```

```
 1    the -- run the actual complete calculation with
 2    respect to the year 2005 as of yet, have you?
 3                MR. TACKETT:  Objection for form.
 4    A.          Until today --
 5                MR. TACKETT:  Calculation of what?
 6    A.          Until today, I have not --
 7    Q.          The calculation of -- let me rephrase.
 8                The calculation of monies that you --
 9    the exact to-the-penny calculation of the money
10    that you've received from your work as opposed to
11    the exact calculation from the statutory damages
12    that you received under the TCPA, to the penny?
13    A.          No, I have not.
14    Q.          I want to turn to Exhibit 7.  And your
15    answer to Request 3.  There you denied insofar as
16    you personally attempted to register the number on
17    or about August 5th, 2024.  Did you attempt to
18    personally register your number on the Do Not Call
19    Registry on multiple occasions?
20                MR. TACKETT:  Objection to form.
21    Leading.
22    A.          I did.
23    Q.          On approximately what dates did you
24    attempt to, to the best of your recollection,
```

1   attempt to register your number on the Do Not Call

2   Registry?

3   A.          On August 5th was one date from the

4   best of my recollection.  I think I might have --

5   I may have done it possibly sometime in September

6   again.  But, you know, then I had eventually found

7   out that it had already been registered since

8   January of 2014, January 10th of 2014 to be exact.

9   Q.          On each of those occasions did you

10  receive an email from the Do Not Call Registry?

11  A.          Yes.

12  Q.          I want to turn to Exhibit 4.  This is

13  one such -- this is one such confirmation that

14  your number is on the Do Not Call Registry; is

15  that right?

16              MR. TACKETT:  Objection to form.

17  Leading.  Counsel is testifying.

18  A.          That is correct.

19  Q.          You received other emails identical to

20  this one?

21              MR. TACKETT:  Objection.  Form.

22  Leading.

23  A.          Yes.

24  Q.          Do you know what happened to those

1    emails?  Do you still have those emails somewhere?

2    A.        I probably do on one of my phones --

3    one of the many different emails that I do have

4    linked to the same phone number.

5    Q.        I want to ask about Exhibit 8.  You

6    have -- the last bullet point on page 2, you say

7    that you recall having a number in the 386 area

8    code associated with T Mobile?

9    A.        Yes.

10   Q.        Approximately what time did you have

11   that number?

12   A.        I want to say in the year of, like,

13   2022 or '3.  I'm not 100 percent sure of the year,

14   though, or the month.

15   Q.        Would this number have been the one

16   that you might have had during January to April of

17   '24 or was this not?

18             MR. TACKETT:  Objection to --

19   A.        It was not.

20             MR. TACKETT:  -- form.  Leading.

21   Q.        Okay.  You also testified that the 804

22   number at issue is listed on your Facebook page?

23             MR. TACKETT:  Objection.  Form.

24   Leading.

1    A.       Yes.

2    Q.       To your knowledge, is that publicly

3    open or is it locked down on a private, so that

4    only your friends can see that?

5    A.       It's locked down on a private.

6    Q.       You've never had -- have you ever had a

7    phone -- more than one phone number at any one

8    time?

9    A.       Are you referring to during when this

10   case has started?

11   Q.       Yes.

12   A.       No.

13   Q.       If a phone number -- if you stopped

14   paying for a phone number, what happens?

15   A.       Typically after 30 days, 30 to 90 days,

16   I don't know the exact time frame, the number just

17   doesn't -- it kind of disappears, you don't have

18   it anymore if you don't pay.

19   Q.       And if you forget your password to an

20   email for the same time, what happens?

21   A.       You just -- the email might stay there,

22   you just can't log into it.

23   Q.       I want to ask about this Instagram page

24   on Exhibit 13.  Is it possible that this account

```
 1   might have been automatically created?
 2              MR. TACKETT:  Objection to form.
 3   Leading.
 4   A.          That is a possibility.
 5   Q.          Is it also possible that this account
 6   might have been somebody that just took your
 7   photos from your Facebook and created an account?
 8              MR. TACKETT:  Objection to form.
 9   Leading.
10   A.          That could also be possible.
11   Q.          Have you ever posted anything to
12   Facebook about Value City Furniture?
13   A.          No, I have not.
14   Q.          Have you ever messaged anybody on
15   Facebook about Value City Furniture?
16   A.          No, I have not.
17   Q.          Have you ever posted anything to
18   Instagram about Value City Furniture?
19   A.          No, I have not.
20   Q.          Have you ever posted anything to
21   Facebook -- I'm sorry -- Instagram about -- or, I
22   guess, messaged, I don't even know if you can --
23   A.          Messenger.
24   Q.          -- can you message someone on
```

175

1    Facebook -- or on Instagram with Value City

2    Furniture?

3    A.          I don't know.  I don't even have an

4    Instagram that I know of.

5    Q.          You never entered into any sweepstakes

6    with Value City Furniture?

7    A.          No, I have not.

8    Q.          What does Value City Furniture sell?

9    A.          Well, they obviously tell you in the

10   message, so they sell furniture.

11   Q.          I want to turn to Exhibit 1(c).  If you

12   recall, when was the date that you first obtained

13   your telephone number?

14   A.          It was August 5th of 2024.

15   Q.          And Exhibit 1(c), do you see where it

16   says 2024-8-6 and there's a message?  It's about a

17   third of the way down the third page.

18   A.          Yes.

19   Q.          So this message would have been sent

20   the day after you received your phone number?

21   A.          That's correct.

22   Q.          And then you see another message on

23   August 9th?

24   A.          Yes.

1    Q.          And that message would have also been

2    sent after you received your phone number?

3    A.          Yes.

4    Q.          And then you see 12th, 13th, 18th,

5    20th, 22nd, and 24th, those messages you would all

6    have received after you received your phone

7    number?

8    A.          Yes.

9    Q.          Do you recall what date your testimony

10   was that you first searched for information

11   relating to the TCPA or the Heidarpour Law Firm?

12   A.          I don't remember an exact date.

13   Q.          Your phone records showed that you

14   first reached out to the Heidarpour Law Firm on

15   August 24th of 2024; is that right?

16   A.          Yes.

17   Q.          So for the messages between

18   August 6th and August 24th, you had no knowledge

19   that you could send "STOP" to opt out of those

20   messages, right?

21            MR. TACKETT:  Objection to form.

22   Leading.  Mischaracterizes the prior testimony.

23   A.          No, I did not.

24   Q.          Why wouldn't you have known that you

1    could do so?

2    A.          Because with them just themselves

3    sending me a text message, it never gave a prompt

4    to stop, to opt out, or anything.

5    Q.          What is your understanding as to the

6    difference between a class action settlement and

7    an individual settlement?

8               MR. TACKETT:  Objection.

9    A.          In a class action settlement you -- if

10   you're a class action representative, you're not

11   representing yourself, you're representing the

12   class, versus where if you're in an individual

13   lawsuit, you're representing yourself and yourself

14   solely.

15   Q.          I have a question about Exhibit 13,

16   page 2.  I'm sorry.  13.  So it's the one

17   previous.

18   A.          All right.

19              MR. TACKETT:  That's 12.  Not 13.

20              MR. PERRONG:  I stand corrected.  Yes.

21   The tabs are out of order on my document here.

22   BY MR. PERRONG:

23   Q.          To the extent you know, who is William

24   Robinson?

1  A.          He is the local attorney appointed on

2  my case.

3  Q.          In January of 2025 of this year, would

4  you have recalled the exact terms or search

5  queries you put into Google to find the Heidarpour

6  Law Firm?

7              MR. TACKETT:  Objection to form.

8  Leading.

9  A.          I wouldn't be able to remember exactly

10 what I typed in, because it's been, you know, a

11 while since I searched for anyone to do

12 litigation.

13 Q.          Turn to Exhibit 10, Question 14.  On

14 the second page, the page -- page 4.  To be clear,

15 when your response is that you found the

16 Heidarpour Law Firm by performing a Google search

17 for how to stop telemarketing calls and texts, was

18 this response intended by you to say that this is

19 exactly what you searched for or generally what

20 you searched for?

21             MR. TACKETT:  Objection.

22 A.          I would have to say generally.

23 Q.          Earlier, you testified that Value City

24 would -- that you could not think of any

1   additional ways in which Value City would have

2   known that the number was reassigned.  Do you

3   recall that testimony?

4           MR. TACKETT:  Objection to form.

5   A.      Yes.

6   Q.      Are you aware of a database called the

7   Reassigned Numbers Database?

8           MR. TACKETT:  Objection to form.

9   A.      No.  I didn't know anything about that.

10  Q.      As a general matter, do you understand

11  whether or not somebody else entering in a

12  telephone number, prior to when you had it, is

13  consent for you to receive messages?

14          MR. TACKETT:  Objection to form.  Calls

15  for a legal conclusion.  And leading.

16  A.      Repeat that question.

17  Q.      Yeah.  Suppose -- let me ask you an

18  analogy from everyday life.  If Mr. Tackett tells

19  me -- or tells you that you can take my car keys

20  and drive my car, does that mean that I gave you

21  permission to take my car?

22          MR. TACKETT:  Objection to form.  False

23  hypothetical.

24  A.      No.

1    Q.          So by that same conclusion, if somebody

2    else had the telephone number prior to you, and

3    told Value City that they could text you, does

4    that mean that Value City has permission to text

5    you?

6              MR. TACKETT:  Objection to form.  Calls

7    for a legal conclusion and relies on the prior

8    false hypothetical.

9    A.          No.

10   Q.          What is your understanding of what the

11   purpose of the Do Not Call list is?

12   A.          To the best of my knowledge and on good

13   faith, I understand that the Do Not Call list is

14   for people's numbers that don't want telemarketing

15   or robocalls or any unauthorized personnel

16   contacting them of any sort.

17   Q.          So you would agree that texting "STOP"

18   is an additional step beyond putting your number

19   on the Do Not Call list, right?

20   A.          That's correct.

21   Q.          And blocking a number is an additional

22   step that you need to take beyond putting your

23   number on the Do Not Call list, right?

24              MR. TACKETT:  Objection to form.

1    Leading.

2    A.        That's correct.

3    Q.        So you stated that it takes you

4    five seconds to text "STOP" to a message, right?

5    A.        Yes.

6    Q.        That's five more seconds than you would

7    have had to spend by putting your number on the

8    Do Not Call list, right?

9              MR. TACKETT:  Objection to form.

10   A.        Yes.

11   Q.        Do you think that you should have to

12   take an additional step to get somebody who

13   shouldn't be texting you to stop?

14             MR. TACKETT:  Objection to form.  Calls

15   for a legal conclusion.

16   A.        No.

17   Q.        Do not call means just that, do not

18   call, right?

19   A.        That's correct.

20   Q.        And are you also aware that government

21   agencies sometimes say that if you type something

22   back to a message, you'll get more messages?

23             MR. TACKETT:  Objection to form.  No

24   foundation.  Leading.

182

```
 1    A.        Yes.

 2    Q.        In fact, if you look at Exhibit 11.

 3    Could you please turn to Exhibit 11?

 4    A.        Yes.

 5    Q.        This exhibit shows that if you texted

 6    "Hi", you would have received another message,

 7    right?

 8              MR. TACKETT:  Objection to form.

 9    Leading.

10    A.        Yes.

11    Q.        What does this message show you would

12    have received if you texted "Hi"?

13    A.        It's saying to text "STOP" to opt out.

14    Q.        Would you have wanted an additional

15    message sent if you had sent a "Hi"?

16    A.        Preferably, no.

17    Q.        With respect to the following page,

18    where it says "STOP", you would have received a

19    second message?

20              MR. TACKETT:  Objection to form.

21    Mischaracterizes.

22    A.        Yes.

23              MR. PERRONG:  That's all my questions.

24                        - - - - -
```

183

1                    RECROSS-EXAMINATION

2      BY MR. TACKETT:

3      Q.          So when you were just looking at

4      Exhibit 1 and he said "second message," what he

5      called "second message" is actually a confirmation

6      of being opted out, correct?

7                    MR. PERRONG:  Objection.  Form.

8      A.          Yes.

9      Q.          Okay.  And you want to be opted out,

10     right?

11                   MR. PERRONG:  Objection.  Form.

12     A.          Yes.

13     Q.          Okay.  Now, you're aware that the

14     telephone number, the 804 number, was registered

15     on the Do Not Call list in 2014, right?

16     A.          Yes.

17     Q.          That was in Exhibit 4 when we looked at

18     it.  Do you remember that?

19     A.          Yes.

20     Q.          Okay.  So we also looked at the audit

21     letter from Attentive, which showed that the

22     number was opted into the marketing program in

23     2022.  Do you remember that?

24     A.          Yes.

1    Q.          Okay.  So the number was on the Do Not

2    Call list for eight years before it signed up --

3    before it was signed up and opted in, correct?

4    A.          Yes.

5              MR. TACKETT:  Okay.  I don't have

6    anything further.

7              MR. PERRONG:  All right.  So we will

8    instruct you to do what's called a read and sign,

9    which means that you will get a transcript of

10   everything that's said here today, you'll have

11   30 days to read it, make any corrections or edits,

12   and then get that back to the court reporter, in

13   addition to designating any information that we

14   should feel was confidential.  You have to make

15   the decision whether or not to exercise that

16   right.  It is my professional opinion that you

17   should exercise that right and I'm advising you to

18   so exercise.

19             THE WITNESS:  All right.

20             (Signature not waived.)

21                    - - - - -

22             Thereupon, the foregoing proceedings

23             concluded at 3:03 p.m.

24                    - - - - -

State of Ohio    :        C E R T I F I C A T E
County of Franklin: SS

     I, Carolyn M. Burke, RPR, a Notary Public in
and for the State of Ohio, certify that Andrew
James McGonigle was by me duly sworn to testify to
the whole truth in the cause aforesaid; testimony
then given was reduced to stenotype in the
presence of said witness, afterwards transcribed
by me; the foregoing is a true record of the
testimony so given; and this deposition was taken
at the time and place specified on the title page.

     Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure, the witness and/or the parties
have not waived review of the deposition
transcript.

     I certify I am not a relative, employee,
attorney or counsel of any of the parties hereto,
and further I am not a relative or employee of any
attorney or counsel employed by the parties
hereto, or financially interested in the action.

     IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal of office at Columbus,
Ohio, on August 7, 2025.

_Carolyn M. Burke_
_____
Carolyn M. Burke, RPR, Notary Public - State of
Ohio.  My commission expires July 17, 2028.

```
            Witness Errata and Signature Sheet
              Correction or Change Reason Code
        1-Misspelling  2-Word Omitted  3-Wrong Word
          4-Clarification  5-Other (Please explain)

   Page/Line        Correction or Change        Reason Code

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____

   _____    _____    _____
```

I, Andrew James McGonigle, have read the entire
transcript of my deposition taken in this matter,
or the same has been read to me.  I request that
the changes noted on my errata sheet(s) be entered
into the record for the reasons indicated.

Date_____Signature_____

                          Ref: CB314944AM

**Exhibits**

314944 Exhibit 001a 4:7
314944 Exhibit 001b 4:8
314944 Exhibit 001c 4:9
314944 Exhibit 002 4:10 156:2
314944 Exhibit 004 4:11 122:3 124:17 159:2,5 171:12 183:17
314944 Exhibit 007 4:12 154:22 158:18,19 170:14
314944 Exhibit 008 4:16 172:5
314944 Exhibit 010 4:19 127:6 164:1 178:13
314944 Exhibit 011 4:22 132:13 154:8 182:2,3
314944 Exhibit 012 4:23 100:21,22
314944 Exhibit 013 5:3 59:12 173:24 177:15
314944 Exhibit 014 5:4 68:4
314944 Exhibit 015 5:5 140:15,18
314944 Exhibit 016 5:6 111:23

**$**

$10,000 96:7
$10,015 96:8 97:9
$100 37:11
$12 34:23 43:9,16
$15 98:24
$24,960 43:18
$3,000 97:23 98:7,11
$35 47:12
$35,000 42:5, 23 43:7 98:19
$35,015 98:23 110:24
$35,115 111:8
$4,000 98:2, 3,15
$50 37:10
$60 46:17,19 76:4,6
$8,000 97:13, 19
$9 25:24

**-**

--yeah 58:13

**0**

0243 47:6

**1**

1 45:10 95:12,23 183:4
1(a) 146:22
1(b) 151:3
1(c) 148:1 175:11,15
1,065 72:15 73:4
1,607 72:12, 15,23
1,608 72:8
1,654 71:3,10
1.33 26:20 28:3
10 15:7 39:10 95:3 111:3 127:6 164:1 178:13
100 16:16 31:15 58:1 75:19 90:5 92:9 115:1 119:17 163:16 172:13
1099 167:9, 14
10th 123:18 171:8
11 40:16 44:7 132:13 154:8 164:1 182:2,3
110th 23:2
12 28:21,23 30:10 32:22
99:20,22 100:21,22 101:1,7 147:1 177:19
127 60:23
12:27 108:1
12:28 108:6
12th 141:17 146:11 147:18 176:4
13 32:22 57:14 59:12 95:4 173:24 177:15,16, 19
134.2 74:1
13th 35:4 176:4
14 28:21,23 67:24 68:4 127:8 178:13
1464 141:5
1491 141:6
14th 151:13 152:4,10
15 30:10 53:10 54:11 64:15 66:4 140:15,18 152:19
15th 86:9 148:6
16 111:22,23 112:20
16,000 72:17
16,301 67:8, 13,15
16,302 67:10
16th 155:1
17 25:8
17th 91:13
18th 176:4
195.4 73:18
1996 12:4
1:06 109:2
1:07 151:13
1:07:52 152:4
1:07:55 152:4
1st 66:9,22 86:8

**2**

2 66:24 67:2, 7 72:8 156:2 157:22 158:17,19 172:6 177:16
2,672 72:16
2.2 74:2
20 84:21 128:18
2005 170:2
2014 121:18, 20 123:18 171:8 183:15
2015 12:11 164:5,7,9
2016 25:8
2017 25:12 26:15
2018 25:13 26:15
202-234-2727 136:15 147:9
2022 38:20 45:10 151:13 152:4,10 172:13 183:23
2023 17:5 26:15 32:7 38:20 47:1,9 48:4
2024 14:8 17:6,7 35:3, 11 45:15,20 48:3,5,8,9, 19,20 66:8, 14 69:15 70:2 75:13 82:18 86:1 88:16,23 89:4 95:12, 23 114:2 130:12 136:13 137:24 147:1,21 148:6 152:19 170:17 175:14 176:15
2024-8-6 175:16
2025 38:3 39:2,6,14 40:11 66:9, 22 91:13 103:8 109:2 123:5,23 124:9 155:1 156:12 159:3 164:10,11, 13 178:3
20th 96:8 176:5
21 134:23 147:21 149:23
22 22:12 49:8 131:8 159:17
161:11
22nd 176:5
23 20:11 22:10 30:13, 23
238-5410 46:13
23rd 88:23 114:2
24 17:9 37:5 172:17
24th 135:18 136:12 138:9 140:11,22 141:1,4,14 149:11 176:5,15,18
25 103:11 109:2
25- 42:16 43:6
252 45:24 46:16 47:1, 20 48:2 51:9
252-518-3959 36:7 45:21
25th 86:1,10 143:2,6 156:12
26(c)(5) 7:3
260 17:22
26th 88:9 137:1 148:21
270 66:7,23 67:7,13,16 72:11,24 73:4,19
27th 137:6, 10,19
29th 89:4

**3**

3 111:3 112:20 127:7 158:14,15 170:15 172:13
3- 28:8
3.2 73:19
3.94 73:5
30 64:9,15 173:15 184:11
30- 43:6
300 16:22 33:15
301 136:21
30th 103:8 138:14
32 36:16 43:11 60:22

**320** 137:1
**325** 137:2
**35,000** 42:17
**35,015** 111:9
**352** 51:4
**352-763-0243**
    47:2
**354** 137:7
**358** 137:14
**359** 137:15
**366** 137:20
**386** 172:7
**3:03** 184:23

— **4** —

**4** 122:3
    124:17
    156:22
    159:2,5
    171:12
    178:14
    183:17
**40** 36:16
    43:11,14,16
    84:21
**408** 99:24
    100:3
**41(a)** 101:16
**422** 140:6
**4th** 66:8,11,
    15,18,22
    69:24 70:3
    71:12 72:1
    115:21

— **5** —

**5** 156:19
**5.95** 72:24
**50** 46:20,21
    75:19
**50,000**
    112:24
**500** 28:8
**52** 43:17
**564** 138:14
**568** 138:19
**5680** 58:24
    59:6
**591** 68:16,22,
    24
**592** 69:22,23
    70:12,24
    71:10
**5th** 45:15
    66:11,14
    69:15 70:2,5
    71:17 72:2
    75:8,13
    88:16
    115:22
    159:1
    170:17

**171**:3
**175**:14

— **6** —

**6** 155:18
    157:11,19
**60.3** 67:15,
    16,18
**616** 139:22
**617** 139:23
**660** 12:16
    16:21 17:9
    35:16 50:11
**6th** 123:5,23
    124:8
    137:24
    138:5 159:3
    176:18

— **7** —

**7** 154:22
    155:1
    157:10,11,
    22,23
    158:18,19
    170:14
**72** 140:4
**7th** 139:24

— **8** —

**8** 45:7 172:5
**8/5** 68:24
**804** 46:12,18
    48:2 52:9
    53:3 64:19
    75:12 77:12
    95:12
    115:21
    124:12
    134:5
    136:13
    147:16
    153:8
    172:21
    183:14
**804-238**
    48:20
**804-238-5410**
    36:1 44:12
    70:2,13
    71:13
    150:23
    151:10
**804-296-7007**
    70:7 71:13
**888 751-8552**
    133:1

— **9** —

**9** 85:14 86:8
**90** 173:15
**9166** 19:11
    20:5

**9th** 175:23

— **A** —

**a-e** 81:13
**A-L-L-A-N**
    26:7
**A-L-L-E-N**
    26:8
**absolutely**
    9:9 126:17
    166:6
**account**
    38:6,24 39:1
    54:24 55:19
    57:10,13,16,
    20,22 58:7,
    9,15,19
    59:13 60:7,
    9,21 79:24
    173:24
    174:5,7
**accounts**
    38:7 55:13
    60:23
**accurate**
    66:11 97:4
    121:15
    130:1
    135:18
    139:16,19
    142:19
**accurately**
    136:18
**acknowledge**
    77:19
**Acme** 14:2
**Act** 143:22
**action** 27:24
    28:22 29:15
    84:11 96:11,
    13,16
    109:23
    144:1 145:4
    146:14
    149:5 177:6,
    9,10
**activated**
    75:23
**activation**
    52:2 75:21
**actual** 65:17
    73:10 170:1
**ad** 133:5
**added** 47:23
**addition**
    184:13
**additional**
    132:23
    137:2
    143:12
    179:1
    180:18,21
    181:12
    182:14
**address**
    12:13,16
    16:2,3 19:10
    21:8,10

**22:24 35:16,**
    17 55:3,5
    100:11
    106:19
    123:14
**addresses**
    58:23,24
**adds** 42:23
**admissible**
    100:4
**admission**
    40:15 164:1,
    2
**admissions**
    154:21,23
**admit** 39:4
    155:3,10,18
    157:12
**Admits**
    155:13
**admitted**
    100:6,7
**ads** 132:17
**Advance**
    37:1,18
**advertiseme
nt** 151:16
**advertising**
    151:14
**advice** 11:8,
    11 117:19
    118:16,18
    119:11
    120:11
    142:16,18,
    21
**advising**
    184:17
**affidavit**
    156:6,21
    157:14,18
**afford** 51:1
**Afternoon**
    109:1
**agencies**
    181:21
**agency**
    27:23
**agree** 39:16
    40:11 44:2,
    16 54:3
    57:21 58:8,
    10,16 60:3
    63:11,19
    65:1 72:17
    73:9 82:12
    84:6 85:11,
    13,16,19
    96:19 97:3,
    7,12,22 98:3
    105:24
    112:10
    133:22
    139:18
    142:24
    148:13
    155:7,15
    156:16
    157:2,18

**161**:23,24
**162**:22
**180**:17

**agreed** 99:12
    100:23
    106:11
    158:9
**agreement**
    100:1
    101:12
    110:9 112:2
    114:2,8
    115:2
**agreements**
    114:17
    115:6,11
**ahead** 49:20
**ahold** 50:4
**AJM** 112:17
**Allen** 27:10
**Allen's** 26:5,
    9 27:17 28:4
**Alliance**
    89:2,20
**allocation**
    145:18
**allowed**
    165:9 166:1
**allowing**
    169:22
**Amazon**
    80:13,15
**ambiguous**
    102:16
    168:18
    169:8
**America**
    129:19
**amount**
    32:23 97:7,8
    110:6
    112:10
    168:7
**amounts**
    95:9
**Amusements**
    30:2,4
**analogy**
    179:18
**Andrew** 8:2,
    13 58:12
    65:16 68:10,
    18 114:10
    129:17
    156:6 165:6
**andrew.
mcgonigle.
5680.** 58:19
**andrewmcgo
nigle714@
gmail.com.**
    55:4 123:12
**Android**
    52:8,11 77:7
**animal** 34:7,
    9,17 35:2
    36:22 43:3

164:15
**answering** 11:10 154:4
**answers** 8:23 120:10, 13,18 144:16
**Anthony** 105:18,24 114:9
**anymore** 173:18
**apartment** 12:21,22,23 13:8,20 15:11 17:23 19:21 21:16 23:13
**app** 50:3
**apparently** 120:18
**appears** 58:15 70:12 85:22 102:23 104:5 107:12,21 122:4
**application** 35:12
**appointed** 178:1
**approval** 109:24
**approve** 109:19
**approximate** 14:22
**approximately** 14:8 170:23 172:10
**apps** 160:21
**April** 39:2 45:19 48:3, 5,8 96:8 123:5,23 124:8 151:13 152:4 155:1 159:3 172:16
**area** 78:7 172:7
**arguably** 148:24
**argue** 146:20
**arm** 51:7
**Armory** 78:19 80:6 162:13
**asks** 116:18 117:13 135:20 142:18
**assert** 100:19
**assertion**

107:20
**assertions** 107:17
**assigning** 113:18
**Assignment** 113:7
**assigns** 113:11
**associate** 53:1
**assume** 9:17 12:2 13:22 27:2 43:17 90:13 93:6 126:23
**assumes** 117:21
**assuming** 22:12
**AT&T** 46:1, 10 47:19 51:8,15 78:11 79:2
**attempt** 170:17,24 171:1
**attempted** 122:5 170:16
**attend** 6:16, 18 7:10,15
**attending** 6:12,13,14
**Attentive** 151:5 152:13,18, 24 183:21
**Attentive's** 151:20
**attorney** 105:4 115:3 178:1
**attorney's** 112:12
**attorney-client** 10:14 11:5 99:15, 19 125:4 135:21 167:5
**attorneys** 10:17 110:9 113:12 114:9 115:7 128:24
**attorneys'** 112:24 113:13
**Aubrey** 20:4
**audit** 151:4 183:20
**August** 17:2 45:15,20 48:2,3 66:8, 11,14,18,22 69:15 70:2 71:12 72:1,2

75:8,13 115:21,22 116:5 118:1 121:24 130:12 135:18 136:12 137:1,6,10, 19 140:11, 22 141:1,4, 14 143:2,6 145:7 146:10 148:21 149:11 152:10 159:1 170:17 171:3 175:14,23 176:15,18
**Augustine** 21:12 29:10, 14,20
**authorizing** 101:10
**Auto** 37:1,18
**automated** 77:4
**automatically** 153:19 174:1
**average** 64:13 67:14, 20 73:5,16, 17,20,24 74:3
**averages** 72:22
**Avi** 114:9
**avoid** 8:23
**award** 113:8, 17
**aware** 53:9, 13 116:7 118:1 130:13,18 150:11 179:6 181:20 183:13

―――――
**B**
―――――

**B-U-R** 22:1
**back** 11:15 21:9 22:7 49:8 59:6 66:15 67:21 68:10 86:4 90:7 103:3,6 107:5,23 121:10,11 141:2,21,22 144:8,9,22, 23 145:1 150:6 157:10,21 181:22 184:12
**bad** 169:22

**Badry** 97:12, 16
**bag** 19:1
**ball** 69:19
**ballpark** 110:19
**bank** 38:6,7, 11,12,22 56:9
**banks** 38:8
**barely** 6:22
**based** 34:24 39:11 40:23 44:8 142:21 157:13 166:22
**basic** 166:10
**basically** 28:18 50:2 51:8 123:16
**basis** 7:16 99:15 140:7 141:8 166:17
**baskets** 33:13
**bears** 103:20
**began** 140:11,17
**beginning** 95:20 140:21
**begins** 69:21
**belabor** 140:15
**Belleview** 12:7,9 22:21,23 24:4,11
**belong** 112:12
**benefit** 40:1 60:6 62:9 123:21 144:4 157:17
**bifurcation** 83:5
**bill** 51:1 66:10 70:5 76:3,19
**billing** 167:12
**binder** 39:11 44:21
**bit** 75:2 130:1,4 137:23
**block** 159:11,20
**blocking** 180:21
**blue** 31:6 103:9
**boat** 33:9,11

**Bob** 31:7,18
**Bobby** 16:6 50:16
**Bobby's** 16:17
**Bond** 85:14 86:8
**born** 11:19
**boss** 21:21
**bothered** 161:20
**bothersome** 161:14
**bottom** 112:9 127:7
**bought** 51:8, 20 66:13 75:24 76:8,9 77:6,17 78:8,21 91:1 94:8
**boyfriend** 18:4 21:7,20 22:11
**boyfriend's** 21:21,23
**Brands** 87:20 88:13 89:24 90:19
**break** 10:8,9 36:9 74:11, 13,17 108:2 109:6 120:8 137:23
**briefly** 140:14
**bring** 19:3
**broken** 51:5
**Bryant** 24:16
**bubble** 132:20
**build** 166:3
**bullet** 95:21 172:6
**bullets** 95:17,18
**Burke** 6:6
**Burnham** 21:24
**burning** 19:16
**business** 27:8 33:19, 21 80:16 86:18,19 91:2 161:18 162:8
**busy** 64:3 132:4 134:10
**butcher** 32:18
**buy** 51:14 52:4 75:14, 20,22 76:3

77:8 91:8
116:6

**buying** 76:13

___

**C**

**C-A-R-R-I-E**
81:16

**C-R-O-S-W-
E-L-L** 33:24

**C-U-N-N-I-N-
G** 23:24

**cable** 135:11

**calculation**
72:21 98:18
168:11
170:1,5,7,8,
9,11

**calculator**
43:20

**call** 24:5
57:22 58:9
64:14 65:2
68:4 70:13,
21 71:1,9,12
73:20 76:22
116:1,7,13,
16 117:10,
14 118:19
119:10
122:6 123:8
124:18
125:19
132:24
134:19,21
135:10
136:13,19,
22 137:7,11,
20 138:1,10,
15,20
158:24
170:18
171:1,10,14
180:11,13,
19,23 181:8,
17,18
183:15
184:2

**call-blocking**
160:21

**called** 34:9
38:12 85:14
90:22 92:5,
22 93:4,10,
16,24
134:15
169:21
179:6 183:5
184:8

**calling** 45:16
50:3 64:20
69:21 72:15
73:11 77:3
83:3 116:11
140:10

**calls** 10:14
63:2 64:11,
18,22 70:17
71:4,10,11
72:7,12,16,
22 73:4,5,
17,18,24

74:1,5 99:15
125:3
127:18
128:12
129:10
134:6,12,13
135:1,4,7
136:11
137:2,15
138:5
139:15,23
140:4,6
141:24
145:16
164:24
178:17
179:14
180:6
181:14

**camp** 21:19

**caption**
156:7

**car** 80:11
179:19,20,
21

**card** 47:23
51:24 52:4
75:22 76:1,
2,9,14,19,24
77:18

**cards** 56:13,
15

**care** 100:14

**carnival**
18:15,17
19:6,8 30:1
47:22

**Carolina**
18:20

**Carolyn** 6:6

**Carrie** 81:12,
15

**carrier** 46:1
47:19 51:13

**cart** 25:9

**carve-out**
112:24

**case** 7:15
39:3,18 42:9
44:20 50:5
82:7 96:20
97:13 101:9
104:5,8
105:9 107:3
114:21
115:14
121:14
156:7,8
173:10
178:2

**cases** 88:4
90:6 92:17
93:19 94:14
101:5 103:3
114:13,19
115:8
121:13
150:4

**Catalog**
88:13 89:23

**caution**
41:20

**cell** 46:10
49:15 68:13,
20,22
131:10

**cellular**
76:11

**certify** 105:7

**chance**
62:20

**change**
54:12 130:1
141:21
146:20

**changed**
44:8 56:3
157:19
158:9 159:7

**character**
133:4

**characterizat
ion** 120:21

**characterize**
119:22

**charged** 84:3

**Charring**
19:11,15,16,
20 20:6 21:5

**cheaper**
46:21 47:17
76:5

**check** 26:24
31:22 99:11

**choose** 53:1

**choppy**
83:18

**chosen**
163:9

**Chris** 8:7
13:24 14:1

**Chris's** 14:4

**chronologica
l** 86:7

**Church**
12:17 16:21
17:9 35:19
50:11

**Churchill**
35:16

**Circle** 19:11,
20 20:6

**circumstanc
es** 65:11

**citizen** 94:24

**city** 7:14 8:8
12:18 15:24
21:11 44:23
88:20
130:20
132:18
133:5,24
134:21
141:15
142:7,15
143:2,7,12
146:24

147:15
148:4,11,16,
20,23
149:12
152:2,14
153:12
155:13
156:8
174:12,15,
18 175:1,6,8
178:23
179:1 180:3,
4

**City's** 132:15
150:9,21
155:19
157:3,12

**Civ** 101:15

**claim** 97:20,
23 98:4,8,
11,16
100:24
101:16,20
102:7,18,23
104:9,13

**claiming**
125:14

**claims** 94:15
96:9 99:13
101:18

**clarification**
70:19
109:15,17

**clarify** 40:8
79:10
157:21

**Clark** 27:10

**class** 84:11,
12 94:23
95:1 96:2,
11,13,15
101:17
109:23,24
144:1 145:4,
13 146:6,7,
11,14,17
177:6,9,10,
12

**class's**
143:24

**clean** 40:8

**cleaner**
118:8

**clear** 69:20
83:7 116:4
148:19
178:14

**click** 87:2,6
89:17 91:7
161:3,5

**clicked**
89:11
151:20

**client** 44:23
113:11

**close** 44:21
64:23 73:12
115:17
128:22
134:3

**clothes**
80:11

**co-counsel**
106:4 107:4,
7,23

**code** 172:8

**coexistence**
55:20

**collector**
134:14,18

**comments**
96:1 144:21

**communicat
e** 65:7

**communicati
on** 118:20
126:15
136:4,7

**communicati
ons** 99:16
103:18
125:4
140:17,19
166:18,22

**companies**
78:12,16,19
79:3,13,15
80:3 85:5
131:5
134:23
149:23
159:17
161:11,13
162:7 163:7,
13

**company**
13:11 14:2
27:5,7,12,14
30:15 85:14
87:15,16,19
90:18,22
92:5,22
93:4,10,16,
24 134:16
151:5
167:11

**company's**
151:14

**complaint**
145:20

**complete**
170:1

**completely**
100:2
145:21

**complex**
12:23 20:1

**compliance**
151:5

**computerize
d** 77:5

**Concern**
151:9

**concluded**
184:23

**conclusion**
102:2 165:1
179:15
180:1,7

181:15

**conclusions** 166:4

**conducted** 7:6

**confer** 107:11

**conferred** 113:12

**confidential** 100:13 184:14

**confidentiality** 100:1,10

**confirm** 151:10,22

**confirmation** 171:13 183:5

**confirmed** 71:1

**confirming** 11:10

**confused** 70:4

**confusion** 72:5

**connect** 105:5

**connecting** 105:3

**consent** 104:19 152:14 179:13

**consented** 161:17

**constantly** 132:3

**consultation** 126:7,24

**consulted** 126:17,19

**consulting** 126:1,5

**Consumer** 143:22

**CONT'D** 109:4

**contact** 35:23 50:6 125:11,13 126:12

**contacted** 139:5 152:13

**contacting** 180:16

**contacts** 73:13 76:23

**contained** 161:21

**content** 118:16 126:7,11,12

162:1

**contents** 99:16 126:21

**continuing** 164:14

**contract** 111:12 146:8

**contractually** 106:22

**conversation** 126:21,23

**conversations** 119:12 131:14

**copy** 65:20 68:11 75:4 104:15 105:1,2 112:1

**corner** 147:7

**Corp** 94:6

**corporate** 6:11,12,18, 19 7:9,14,17

**correct** 40:19 44:5, 6,13 47:4 58:12 61:3 84:13 88:18, 24 91:15 96:4,5,9,10 97:8,10,21 98:5,8,12,16 99:1 107:7 120:10,24 123:14 124:9,13 129:20 130:2 134:21 141:10 146:13 155:8,9,22, 23 157:15 158:2 159:8 164:15,16, 23 171:18 175:21 180:20 181:2,19 183:6 184:3

**corrected** 177:20

**corrections** 184:11

**correctly** 37:22 127:20

**correspondence** 56:9,13

**costs** 112:12

**couch** 162:2

**couches** 162:18

**counsel** 11:7,11 75:1 105:13,17

106:20 111:24 119:12,20 120:12,24 122:3 129:3 136:5 139:6 166:18,23 171:17

**count** 83:22

**counting** 42:8

**County** 34:7, 9,16 35:2,5 36:14,22 37:14,23 38:2 43:3 44:4

**couple** 16:12 17:8 21:14 22:4 25:19, 20 33:1 34:2 137:14 138:9 154:15

**couple-minute** 74:17

**court** 9:1,24 10:2 42:22 82:20 84:1 88:15,22 96:19,24 97:4 102:20 103:8 104:10 105:8 109:19,22 144:4 157:14 184:12

**covered** 99:24

**coworker** 56:21

**coworkers** 81:18

**coy** 144:15

**crab** 33:9,12

**crabs** 33:13

**create** 53:17, 18 55:1

**created** 55:14 174:1, 7

**creating** 60:15 71:7

**credit** 38:10, 17 56:13,15

**crime** 84:4

**Cross** 19:11, 18,20 20:6 21:6

**CROSS-EXAMINATION** 8:5 109:4

**Crosswell's** 35:1

**Croswell** 33:23

**Croswell's** 33:22

**culpability** 100:5

**Cunningham** 23:21

**Cunningham** 23:24

**current** 12:12,16 44:12 55:2

**cutter** 32:17

—————
**D**
—————

**D' ARTAGNAN** 90:22 96:6, 15

**daily** 56:1 85:3

**damaged** 47:16

**damages** 84:13 112:11 143:19 146:1 149:3, 5 168:14 170:11

**data** 15:17 66:18 71:2 76:7

**database** 179:6,7

**date** 35:4 66:12 71:17 103:6 114:3 122:1 124:4 137:19 148:5 159:2, 7 171:3 175:12 176:9,12

**dated** 123:2, 5 147:1,18 154:24 156:11

**dates** 170:23

**David** 18:6 23:7 50:19

**Davis** 23:7

**day** 27:18 28:19 33:16 64:2,8 67:14,21 132:4 138:4 175:20

**days** 66:7,23 67:8 72:11 73:5,19 103:11 148:7,22 173:15 184:11

**deal** 99:18

**deals** 162:16

**debit** 76:19,

24

**debt** 134:14, 18

**December** 88:16,23 89:4 145:4, 13 146:13

**decent** 51:6

**decided** 46:11

**decision** 184:15

**declare** 129:17

**Defendant** 83:5 113:13

**defense** 149:5

**defer** 96:24 97:2

**delay** 146:19

**deliberately** 143:17 145:24

**demand** 140:5

**demonstrative** 66:3

**denied** 164:2 170:15

**Denies** 155:19

**deny** 39:4 40:18,21,22

**Department** 147:1

**depended** 30:7

**dependent** 28:16

**depending** 28:24 168:1

**deposed** 107:8,14

**deposition** 6:15,17 7:5, 8,10,15,18, 19,23 8:15 9:20 10:12, 24 41:21 120:14

**Depot** 91:11

**describe** 66:7

**designated** 100:13

**designating** 184:13

**designed** 69:20

**desire** 91:8

**Destefano** 31:7,8

**details** 47:14

dialogue 127:5

difference 66:1 75:10 177:6

direct 58:18

direction 152:18

directly 77:2

disagree 73:1 98:23 120:20 140:7 141:9

disappears 173:17

disclose 104:2

discovery 39:3,12 41:18 42:3 83:4 94:13 107:12 112:1 122:4 124:7 134:20

discuss 107:4,22

discussed 10:16,17 103:15

discussion 118:9

discussions 116:18,21 118:17 145:16

dismiss 94:15 96:8 97:20,23 98:3,8,11,15 101:8,11

Dismissal 101:15

dismissed 101:17,18, 19 102:12, 13,14 104:9, 13

dismissing 102:7,18

dispute 141:9

disrupting 121:9 145:23

distress 162:7

District 85:23 88:8

divide 67:13 72:24 73:4

divided 67:15

divulges 126:3,20

divulging 125:8

DNC 121:14, 16,17

docket 105:9 109:22

document 14:14 41:18 56:23 57:3 68:14 69:11 102:21 104:10 105:8 111:24 123:1,22 124:7 154:24 157:7 177:21

documented 54:8

documents 11:3 55:24 104:17

dog 34:18

dogs 34:19

dollar 75:15 76:3 77:7 78:3 116:6

dollars 75:19

Dose 89:8,10 98:14

dots 105:3,5

double 128:4

double-checking 111:6

doubt 73:6 143:21

downloaded 105:10

drafted 41:22

Dreamland 30:2,4,12 31:22 32:7 36:3

drive 17:22 179:20

dry 34:19

due 78:20 162:12

duly 8:3

duplex 13:2

duties 146:8

duty 84:11

___

**E**
___

e-n 26:7

E-N-G-E-L 31:4

earlier 44:11 131:7 178:23

early 17:1

earned

167:23

easiest 51:10 106:19 160:13,17

easily 66:15

easy 160:11 163:4

edits 184:11

effect 146:19

eighth 157:23

EI 97:11,16

elected 7:13

electronics 90:3,15

Ellen 35:8

email 53:19 54:19,24 55:2,5,12, 13,18,23 56:4,8,12,17 57:4 58:23, 24 79:22,24 104:16 123:2,11,14 124:8,11,16 132:24 159:1,3 171:10 173:20,21

emails 54:23 77:18 78:15 79:6,24 171:19 172:1,3

emotional 162:7

employer 36:6

employment 28:1 29:4,21 31:23 164:20

end 22:12 67:3,7,9 71:2 72:8 81:13

ends 71:2

enforced 160:18

engagement 112:1

Engel 31:2

enjoy 162:9

entered 103:8 175:5

entering 179:11

enters 6:21

Entertainment 89:2,20

entitle 146:16

entitled 100:16

entry 139:10

equaling 72:16

equals 67:16

essentially 104:1

Essex 34:7, 9,16 35:2,5 36:14,22 37:14,23 38:2 43:2 44:4

estimate 43:8 84:20

eventually 171:6

everybody's 144:20

everyday 89:8,10 98:14 179:18

everyone's 144:18

evidence 117:21

ex-girlfriend 20:22

ex-girlfriend's 19:9 20:3

exact 16:3 21:10 24:20 25:15 27:19 32:23 38:19 42:15,18 43:7 47:7,14 49:23 55:16 75:18 84:19 110:11 122:1 124:3 128:17 168:7,12 170:9,11 171:8 173:16 176:12 178:4

examination 127:4 163:22

Excel 65:16 75:1

excess 112:11

exchange 102:7 141:2

exchanges 135:17 141:5

exclude 7:1, 16

excluding 7:2

exercise 184:15,17, 18

exercising 143:24

exhibit 59:12 65:23 66:3 68:4 100:21, 22 111:23 122:3,10,12 124:17 127:6 132:13 140:15,18 146:22 154:8,22 156:2 158:18,19 159:2,5 164:1 170:14 171:12 172:5 173:24 175:11,15 177:15 178:13 182:2,3,5 183:4,17

exists 118:19

explain 9:15 41:5 54:17 166:1

expounding 169:10

express 28:1 29:4,21 152:13 168:11

expressly 164:4

extent 10:13, 17 15:3 83:2 100:20 101:22 106:21 116:18,22 121:4 125:3 130:17 135:20 136:2 141:24 142:17 145:16 168:1 177:23

extra 37:12

extraneous 144:20

___

**F**
___

Facebook 52:21,22 53:4,10 54:11,19 55:1,20 60:13 61:10 62:2 172:22 174:7,12,15, 21 175:1

fact 117:21 126:4,8,15 136:6 161:16 164:14 182:2

facts 42:1,2
146:20
factual 71:7
fair 118:10
faith 54:9
80:7 106:17
180:13
fall 82:17
false 41:23
179:22
180:8
familiar
59:18
109:21
111:17
159:21
family 81:1,
18
Fast 86:13,
15,23 87:11
98:2
faster 65:9
February
20:11 22:9
25:11,12
30:13,22
Fed 101:15
fee 75:20
113:8,17
feed 34:20
feel 9:8
184:14
fees 112:12,
24 113:13
figure 104:6
figured 75:9
file 36:6
101:14
145:4
167:15
filed 44:20,
22 80:23
82:13,18
84:7,17
85:5,13,16,
19,22 86:8,
9,10,12
87:16 88:7,
16,22 89:4
91:13 99:5,9
109:23
114:13
131:9
145:20
146:12
157:14
filing 80:18
81:18 87:12,
20 88:1,12,
19 89:1,7
90:2,21
91:10,17
92:4,11,13,
21 93:3,10,
15,23 94:11
fill 35:12
77:22

filled 35:15
Filters 86:13,
15,23 87:11
98:1
finally 76:16
find 94:22
127:23
128:8,13
129:3
133:23
166:3 178:5
Finders
27:24 29:1,
18
fine 36:10
66:17 118:7
124:6 144:3
162:17
finish 9:10
81:24
145:10
firearms
78:19
firm 103:13,
16 112:3
116:24
117:4,11,15,
23 118:11
119:1,7
125:1,11,13
126:2,13
127:9,17,23
128:8,14,19
133:23
135:17
136:15,23
137:3,8,11,
16,21 138:2,
6,11,16,21
139:24
140:5,11
141:3,14
142:2,4,10,
13 145:17,
20 146:24
147:5
176:11,14
178:6,16
firms 116:21
Fitness 92:5
98:7
five-minute
36:9
fix 169:14,22
fixed 110:14
flip 105:11
127:12
flipped
157:22
flirting 120:4
Florida 12:9
17:14,16,21
19:12 21:12
22:23 26:12
29:8,9,10
32:12
109:22
folks 7:12
24:5

follow 67:6
followers
60:22
foregoing
127:14
129:19
158:2
184:22
forever
143:6
forget 53:15
173:19
forgot 16:20
form 11:20
12:14 20:20,
24 22:20
24:7,19 27:4
28:6,12
29:13,16,19,
22 32:2
35:13,18,24
36:4,24
38:4,9,18,23
39:7,15
40:13,20
41:2 42:13
43:5 44:9
48:13,22
49:17 53:5,
12,21 54:2,
6,16 56:7,
10,14,18
57:5,9,11
58:11 59:2,
17 60:10,18
61:16,20,24
62:5,17,23
63:3,7,17,21
65:4,10,24
67:5,12,22
68:11 69:10,
19 70:16
72:19 73:7,
14,21 74:6
77:20 78:13,
17 80:20
81:6,9,22
82:14,22
83:1,8,16,19
84:9,14,23
86:24 87:9
90:15 94:16,
21 96:14,18
98:21
104:20
110:20
111:15
114:20
115:15
116:17
121:3 122:9
123:19
124:1,14
125:2 128:1
129:7,12
130:3
131:19
134:1,7
135:13,19
141:24
143:9,15,20
147:24
149:14
150:2,12
158:11

160:8 162:3,
11 163:10
164:8,21
165:15,18,
23 166:14,
19 167:3
168:15
169:1,3,15,
16 170:3,20
171:16,21
172:20,23
174:2,8
176:21
178:7 179:4,
8,14,22
180:6,24
181:9,14,23
182:8,20
183:7,11
format 68:14
formation
83:9
forms 167:13
forward
44:14
found 51:10
127:16
171:6
178:15
foundation
181:24
frame 47:7
173:16
frames 150:6
Franchise
94:5
free 50:2
61:7 62:3,
13,21
Friday 109:1
friend 16:5
friend's
15:22
friends 60:16
63:9 64:23
80:17,22
81:17 173:4
front 9:24
59:15
102:21
104:12
105:2 123:1
159:5
frustrated
111:12
FTD 87:24
88:1,7 97:22
full 8:11 26:1
fully 20:11
25:21 32:23
88:5 91:18
93:18 124:3
129:24
furniture 8:9
44:23 88:20
146:24
152:15
156:8
174:12,15,

18 175:2,6,
8,10
future
106:12

——— G ———

gap 49:7,8,
10
gave 27:2
39:11 40:6,
24 41:14
42:23 46:11
51:9 122:16
177:3
179:20
Geez 145:23
Gene 51:16,
18
general
75:15 77:7
78:3 94:24
116:6
179:10
generally
178:19,22
generated
151:4
girlfriend
21:5 22:8
63:8 64:23
70:10 71:2
81:7
girlfriend's
70:14 71:14
81:11
give 35:5
42:11,18,19
59:8 62:10
68:10 76:24
82:4 84:20
120:8 124:4
130:17,23
131:5
153:18
giving 41:23
106:16
glad 99:2
GMT 71:19,
21
goal 146:3
good 46:10
54:9 80:7
94:19,24
104:6
106:17
180:12
Google
127:17,24
128:9,13,17
129:3 130:5
178:5,16
Googling
161:7
governing
7:7
government
181:20

governs 7:5
graduate 12:10
graduated 23:8 24:23
graduating 25:2
greater 143:18
green 93:24 94:2,5 132:19
Greenwich 71:22 75:9
grew 15:1
ground 8:20 160:10
grounds 39:17 86:20
group 63:13
groups 72:22
guess 79:9 174:22
guide 122:11
guns 162:18
Guns.com 162:10
Guns.com. 80:6
guy 13:24 14:1 15:7 21:22 31:5 33:7,9 47:21
guy's 51:16
guys 15:10, 19 20:13,16 23:16 36:9 51:9
gym 92:7

———
H
———

H-E-I-D-A-R-P-O-YOU-R 112:3
H-I-T-C-H-K-O-K 32:14
half 13:16 18:9 48:17
hand 132:8
happened 102:19 136:7,9 148:5,19 149:15 171:24
happening 71:24
happy 9:16 40:2,7 100:14
harassing 138:23

hard 47:14 88:5 90:8 160:1
head 8:17,24 9:1 22:15 60:20 80:5 135:5 158:13
hear 39:19
heard 58:6 78:9 116:1
hearing 67:18
heat 64:2
Heathsville 15:23 16:1, 24 17:7,12 75:15 78:3
Heidarpour 103:13,16 112:2 114:10 116:24 117:4,11,14, 23 118:24 119:7 125:1, 11 126:2,12 127:9,16,23 128:8,14,19 135:17 136:14,23 137:3,8,11, 16,21 138:2, 6,11,16,21 139:24 140:4,11 141:3,14 142:2,3,10, 13 145:17, 20 146:23 147:5 149:11 176:11,14 178:5,16
Heidarpour's 140:19
helping 33:11 114:18
helps 57:15 115:13
hide 69:19
high 12:5,7 22:17 23:8, 14 24:12,21, 23 25:2,7
higher 72:23
highlighted 75:3 136:14 140:20
highlighting 66:2
highly 136:9
Highway 16:4 78:4
hire 35:4
history 69:21
Hitchcock 32:11,13

hold 42:12 117:2 154:3 165:7
Holdings 92:12,18
home 12:12, 16 16:7,8 24:16 87:12
honest 120:10
honestly 86:17 102:17 139:14
hour 25:24 28:21,23 30:10 32:22 34:23 43:9, 16 64:9 74:10
hours 10:7 36:14 37:8,9 43:11
house 12:20 15:22 16:18 17:23 19:22, 23 21:15 23:1,12 50:17
HR 167:11
https://www.valuecityfurniture.com 151:11
Hugh 21:24
hurry 65:6
hydraulic 30:19
hypothetical 179:23 180:8

———
I
———

i-g-h-a-m 24:3
I-N-T-E-R-L-A-C-H-E-N 17:19
I...declare 158:1
idea 97:18 110:18
identical 171:19
identify 45:8 95:9,21 127:8
identifying 169:11
Illinois 88:8
images 59:13,16 60:7,8 61:2
implies 167:4

important 56:4,24 58:5
inaccurate 124:5 139:13
inadvertently 104:2 118:4 119:5
inappropriate 166:2
including 83:4 145:17 164:4
income 37:12,13 38:3 39:5,14 40:12,23 41:1,4,9,16 44:3 94:20 144:2 164:3, 6 167:1,10, 23 168:5
incoming 70:17 71:9 73:18 140:6
inconsistent 120:12
Incorporated 26:6
independent 117:17 119:11 120:11
indicating 112:19,21
individual 13:14 87:16 88:5 96:3 101:16 104:13 115:2 127:15 177:7,12
information 10:14 39:18 78:21 83:4 104:2 106:16 124:5 130:6 135:21 142:1,10,12, 20 176:10 184:13
informed 142:21
initial 112:16
initials 112:17
inside 161:21
insinuation 119:5
Instagram 57:7,10,12, 16,20,21 58:7 59:13 60:15,17 173:23 174:18,21 175:1,4

install 26:18
instruct 103:14 118:21 184:8
instructed 11:7
instructing 10:15 11:5 104:1 116:19 117:5 125:4, 15,20,22 135:21 167:6,7
instructs 12:1
insurance 55:22 56:22
intended 178:18
interest 100:10 149:8
Interestingly 8:22
interests 95:2
Interlachen 17:17,21 32:12
internet 15:13,14,16, 19 20:16,17, 18
interrogatories 154:23
interrogatory 53:22 95:4 106:21 127:4,8 129:6
interrupting 168:21
intimate 63:16 65:2
invasion 85:2
involve 115:12
irrelevant 83:4
IRS 164:18 166:5,10 167:1
isolated 107:11
issue 100:3 155:24 172:22
issued 69:14 71:16 150:19
issues 11:17

**J**

**Jackson**
18:6 50:19

**Jacksonville**
29:9,17

**James** 8:13

**January**
20:10 22:9
25:12 30:13,
22 45:10
48:5,8,19,20
91:13
123:18
156:12
157:3 171:8
172:16
178:3

**job** 18:19
25:6,9,23
26:19 27:9
28:24 30:14
32:21 34:6
35:12 37:19
76:17 91:24

**jobs** 27:18
28:10,17
36:23

**joined**
152:10

**judge** 9:24
105:13

**judgments**
95:10

**July** 17:1
109:2

**June** 103:8

**K**

**K-A-R-E-N**
23:22

**Karen** 23:21

**Kate** 20:4

**Kaufman**
112:2 114:9

**keeping** 46:8

**keys** 179:19

**kid** 15:2

**kiddie** 30:18

**kind** 14:14
18:15 21:18
24:22 26:14
27:18 37:10,
13 41:23
47:13 51:11,
12 52:10
53:20 56:23
79:18 86:20
90:8 91:6
93:6 101:11
111:4
173:17

**knew** 119:20
120:11
143:21
160:9,12

**knowing**
6:21 126:22
143:13

**knowledge**
57:19 76:7
117:16,20
118:14
129:20
158:3
166:10
173:2
176:18
180:12

**L**

**labor** 27:18,
24 28:19,22
29:1,15,18

**Labormax**
27:22 28:20
29:12

**laid** 149:10

**Lake** 19:11
24:16 29:23

**landline**
15:10 16:17
18:10 20:13
23:16 24:5,
10

**landscape**
148:3

**Lane** 12:17
17:9 35:19
50:12

**largest** 39:5,
14 40:12,22,
24 41:4,8,15
164:3,6

**late** 17:1

**Laurice**
97:11,16

**law** 103:13,
16 112:3,4
116:21,24
117:4,11,14,
23 118:11
119:1,7
125:1,11,13
126:2,13
127:9,16,23
128:8,14,19
133:23
135:17
136:14,23
137:3,8,11,
16,21 138:2,
6,11,16,21
139:24
140:5,11
141:3,14
142:2,3,10,
13 145:17,
20 146:23
147:5
176:11,14
178:6,16

**laws** 129:18

**lawsuit**
11:17 42:5
44:21,23

80:18 82:18
85:13,17,20
86:13 87:12,
20 88:1,12,
20 89:2,7
90:3,21
91:10,17
92:5,12,22
93:4,10,16,
23 99:5,8,13
146:14
177:13

**lawsuits**
39:5,13
80:23 81:4,
8,19 82:13
84:6,7,8,17
85:5 94:12
95:11 109:8
131:8 164:4,
5 166:12

**lawyer** 8:8
10:21 11:15
41:22 95:8,
16 115:13
125:10,11,
13,18,19,21
126:1,5,17,
20 129:10
143:4
149:20

**lawyers** 11:1
40:16 42:4,
21,23
105:12,21
106:1
111:13
113:18
114:14,18
116:19
127:1
128:24
129:9
146:20
161:8

**leading**
164:22
165:20,22,
24 166:3,15,
20 167:4
168:16
170:21
171:17,22
172:20,24
174:3,9
176:22
178:8
179:15
181:1,24
182:9

**learn** 116:15
117:22
125:10

**learned**
117:11,13,
21 118:4,10,
24 119:6
120:24

**lease** 14:13
20:22 21:2

**leaves** 6:21

**led** 126:18,
20

**Lee** 27:10
50:16

**left** 19:5 32:7
105:14

**left-hand**
147:7

**leg** 51:7

**legal** 14:14
102:2
117:19
118:15,18
142:16,18,
21 146:24
164:24
166:4
179:15
180:7
181:15

**legally** 30:8,
9

**legit** 104:24

**length** 73:17

**letter** 133:8,
24 140:5
141:16
143:3,5
146:23
147:14
148:8 151:4
183:21

**letterhead**
147:4,8
151:6

**LG** 90:3,14

**LG's** 90:16

**liability**
100:4

**life** 56:1 85:3
179:18

**light** 127:5

**limit** 111:13

**limited** 73:12

**lines** 129:1

**link** 6:13
7:12 87:2,7
89:11,13
161:5

**linked** 172:4

**links** 87:2
89:17 91:7
161:4

**list** 8:22
35:16,22,23
42:20,22
82:17 85:12
97:15 115:8
127:1
180:11,13,
19,23 181:8
183:15
184:2

**listed** 21:2
53:4,23 97:7
98:1,6 163:8
172:22

**listen** 58:5
150:20

**lists** 45:12
98:14 147:8

**literally**
125:12

**litigation**
107:7 136:9
178:12

**live** 13:9
15:21 16:11
17:13,16,20
18:7,13 20:5
21:4,13
22:6,18 23:3
78:6

**lived** 14:6
17:12 22:3,
11,13,19,23
24:4 50:14

**living** 14:11,
21 15:18
19:7 20:21
23:9 50:18

**load** 52:4

**loaded** 26:17

**local** 178:1

**located**
26:11 29:7

**location** 52:2

**locked**
173:3,5

**log** 68:4
76:20
126:14
140:19
173:22

**login** 53:16

**long** 14:6,20,
23 15:4
16:11 18:7
20:5 21:13
23:9 25:10,
14 26:13
30:20 32:24
34:1 37:7
38:16 47:5
64:13,16
65:12 82:17
95:7,15
115:8
132:10
149:24
150:4

**longer**
133:23

**looked** 61:3
73:16 75:8
86:21 94:9
109:22
130:10
183:17,20

**lost** 19:14

**lot** 21:19
28:7,15
54:18,22
71:9 72:17
73:11 82:13
84:7 86:5,22
87:8 101:6
132:2
133:23

148:23
**loud** 8:23
**Louisiana** 85:23
**lower** 73:11 113:7
**lunch** 108:2 109:7
**luncheon** 108:5
**lying** 149:6

---
**M**
---

**M-C-C-R-A-Y** 81:13,14
**made** 41:7 43:4 44:3 71:4,12 96:1,4 136:19
**mail** 57:6
**majority** 37:12
**make** 8:21 9:7 28:20 30:5 37:21 40:8 41:6 43:15 61:6 80:18 90:13, 14 92:19 93:13,20 94:6 107:17 111:2 116:4 117:7 129:24 130:7 144:15 165:11 169:2 184:11,14
**make-a-payment** 76:22
**makes** 93:1 94:2
**making** 28:3, 4,10,14,15 55:12 60:24 83:18 107:20 139:8 144:20 165:5,10,12, 21 168:19, 23
**man** 56:16
**manually** 132:8 152:18
**March** 25:12
**marked** 111:23
**marker** 24:22
**marketing** 62:3 78:12, 15 79:22 86:18 130:15

131:9,14,17
132:15,17 133:5
147:15 150:10,23 151:16,22 153:8 159:16 160:6,23 183:22
**Marketplace** 52:23
**Markets** 32:11
**Mary** 19:12 29:23
**Maryland** 18:22
**match** 114:5
**matches** 65:18 73:10
**math** 15:6 43:15,19 67:15 73:1, 6,23 98:22 111:1,3
**matter** 83:17 161:22 179:10
**Mccray** 81:12
**Mcgonigle** 8:2,7,13 58:12 68:19 69:1,22 96:6 97:11 122:15 129:17 136:4 140:22 156:7 163:24 164:6 166:9
**mcgoniglean drew38@ gmail.com.** 55:8
**means** 41:11 101:20 181:17 184:9
**meant** 37:14
**meat** 32:17
**meats** 91:5
**mechanics** 7:7
**media** 52:17, 19 55:19 61:12
**meet** 107:11
**memorize** 90:7 163:13
**memorized** 55:10
**memory** 11:17 47:8 57:15 102:18

103:12
104:5
123:22
133:13
**mentioned** 59:6
**message** 50:5 67:3 130:7 131:14 132:18 151:21 152:11 155:12 162:22 174:24 175:10,16, 19,22 176:1 177:3 181:4, 22 182:6,11, 15,19 183:4, 5
**messaged** 86:19 174:14,22
**messages** 44:24 52:24 64:4 67:9 78:12 79:12, 16 84:24 86:22 91:6 130:15,16, 20,21,22 131:4,9 133:20 135:3 141:16 142:8,16 143:7,12,13, 18 147:15 148:3,11,15, 23 149:13 150:1,10,23 151:12,23 152:3,5,14, 23 153:9,13 154:6 159:12,16 160:6,23 161:10,12, 14,17,20 162:7,9,17 176:5,17,20 179:13 181:22
**messaging** 133:19 153:15 163:8,14
**Messenger** 62:11 174:23
**messy** 119:19
**met** 8:9 10:21 11:14
**middle** 15:2 85:23
**Midwest** 88:13 89:23
**Mike** 31:2,19
**mind** 153:24

162:14
**mine** 59:23
**minimum** 30:8
**minor** 75:10
**minute** 65:14
**minutes** 64:9,15,18 73:19 74:2 154:15
**mischaracter izes** 122:10 176:22 182:21
**misdescribe d** 129:5
**misundersta nding** 72:3
**mitigation** 149:3,4
**mobile** 24:16,17 172:8
**mom** 21:7 22:11 23:4, 19 24:5
**mom's** 23:20
**moment** 59:8
**money** 28:10,15 39:4,13 43:3 61:6,15,22 62:21 80:19 84:7,13 94:15,23 95:21 97:9 102:6 106:7, 11,21 109:12 110:6,23 111:14 164:19 167:1 168:12 170:9
**monies** 164:3 170:8
**month** 16:22 20:8 33:2 34:4 37:17 38:19 39:1 46:15,17,19 47:12 70:5 76:14 167:16 172:14
**months** 16:12 17:2,8 18:8,9 20:7 21:14 22:4, 10 25:19,20, 22 27:19 37:6 46:6 47:8 48:9, 11,18 49:7 121:24 133:24 142:6 149:12

**moral** 94:24
**motion** 109:24
**move** 7:1 16:23 118:6 119:3,4 127:1 144:5
**moved** 14:10,21 17:8,15 20:9 21:5 22:9 23:14 24:12 46:7 76:12
**Moving** 44:14
**multiple** 170:19

---
**N**
---

**n-h-a-m** 22:2
**named** 13:24 14:1
**names** 85:4
**narrowly-tailored** 100:11
**National** 116:1,7,16 117:10 123:8
**native** 65:23 68:11,13 69:10
**natural** 49:12
**nature** 78:20 145:19 162:12
**needed** 149:17
**negative** 128:5
**negatively** 8:16 24:1
**Network** 87:13
**nodding** 8:24
**nonresponsi ve** 144:5,12, 16
**North** 12:16 16:21 17:9 18:20 35:16, 19 50:11
**Northern** 88:8
**Northumberl and** 16:4 78:4
**notation** 75:8
**notations** 75:3
**note** 6:4,10, 15 66:19

69:10
**noted** 119:8
**notice** 6:15
7:4,8 162:2
**notified**
105:22
**November**
88:9
**number** 23:1
25:17 35:23
36:3,6
42:16,19
43:7 44:12,
15,16,17,18
45:1,17,20,
23 46:3,6,9,
13,16,18
47:1,2,5,15,
21 48:2,3,4,
21 49:1,12,
21,22,23
50:7 51:4,10
53:4 54:20
55:16 66:12
67:18 69:1,
14,15 70:1,
6,9,13
71:14,17
75:6,12
76:22,24
77:13 84:19
94:14 95:11,
12 110:12
115:21
116:10,11,
12 121:13,
17,20 122:7,
23 123:17
124:13
134:5,6
136:13,14,
22 137:2,3,
7,11,16,20
138:1,6,11,
16,20
140:20
147:8,11,16
150:11,18,
19,22,24
151:9,22
152:6,11,19,
22 153:8
155:12
158:24
159:12,13
170:16,18
171:1,14
172:4,7,11,
15,22 173:7,
13,14,16
175:13,20
176:2,7
179:2,12
180:2,18,21,
23 181:7
183:14,22
184:1
**numbers**
45:4,9,13
52:14 53:23
54:4,8,13
70:22
124:18,21
135:7
168:12

179:7
180:14

---
**O**
---

**O-C-K-L-A-**
**W-A-H-A**
24:14
**Oakcrest**
17:22
**oath** 9:23
10:3 41:14,
15,20,24
91:22 124:5
**object** 39:17
69:9 82:1,5
83:15 99:14
101:23
102:8
117:12
120:16
121:3 136:5
140:7
141:23,24
145:15
165:15,18
**objected**
40:4
**objecting**
83:19
165:23
**objection**
10:13 11:4,
20 12:14
13:5 16:10
20:20,24
22:20 24:7,
19 25:18
27:4 28:6,12
29:13,16,19,
22 31:24
35:13,18,24
36:4,24
38:4,9,18,23
39:7,15
40:13,20
41:2 42:12,
13 43:5 44:9
48:13,22
49:17,19
53:5,12
54:2,6,16
56:7,10,14,
18 57:5,9,11
58:11 59:2,
17 60:10,18
61:16,20,24
62:5,17,23
63:3,7,17,21
65:4,10
67:5,12,22
70:16 72:19
73:7,14,21
74:4,6 77:20
78:13,17
80:20 81:6,
9,20 82:14,
22 83:8,12,
14 84:9,14,
23 86:24
87:9 94:16,
21 95:7,8,
16,17 96:14,
18 98:21

100:19
104:20
110:15,20
111:15
114:20
115:15
116:17,18
122:9,10
123:19
124:1,14
125:2,3
128:1 129:7,
12 130:3
131:19
134:1,7
135:13,19,
20 142:17
143:9,15,20
147:24
149:14
150:2,12
158:11
160:8 162:3,
11 163:10
164:8,21
166:14,19
167:3 168:8,
15 169:3,6,
10,15,16
170:3,20
171:16,21
172:18,23
174:2,8
176:21
177:8 178:7,
21 179:4,8,
14,22 180:6,
24 181:9,14,
23 182:8,20
183:7,11
**objections**
127:13
144:16
165:13,22
168:20,24
**observe** 7:12
**observing**
7:17,20
**obstruction**
169:21
**obtain**
166:13
**obtained**
105:8
112:11
175:12
**Ocala** 29:8,
17,20
**occasionally**
52:24
**occasions**
170:19
171:9
**occurred**
126:8,16
**Ocklawaha**
24:11,13
26:12
**October** 37:4
86:1,8,9,10
114:2
139:24

141:17
143:1 145:9
146:11
147:1,18,21
148:6
152:19
**offers** 7:11
162:14
**office** 69:18
91:11
**officer** 42:22
105:7
**one-time**
52:1 75:20
**ongoing**
141:5
**open** 103:3
160:24
161:3 173:3
**opened**
38:24 39:1
**opening** 87:5
**operator**
30:16
**opinion**
184:16
**opposed**
166:12
168:5
170:10
**opt** 131:2
133:1
143:23
147:20
152:24
153:18
154:7,10
176:19
177:4
182:13
**opted** 78:20
79:15 80:16
91:2 148:8,
11 149:1
150:9,13,22
152:6,19
162:16,20
163:6,9,22
184:3
**option** 7:11,
13 130:17,
23 131:5
153:18
154:5
**opts** 131:17
**order** 7:2
86:8 101:13
177:21
**ordered**
162:12,15,
16
**organization**
127:16
**original** 44:3
66:12 70:1
**originally**
46:8 76:12
153:15

**Orlando**
29:23
**outbound**
71:11 72:7,
12,22 73:24
74:1,5
136:11
140:4
**overbearing**
85:1
**overtime**
36:19
**owned** 18:3
21:21 57:12
**owner** 27:14

---
**P**
---

**P-A-R-O-N-I-**
**C-H** 112:4
**P.A.** 112:2
**p.m.** 108:6
109:2
184:23
**pack** 19:1
**pages** 53:10
54:11
128:18
**paid** 26:23
51:2 94:14
96:7 97:8,
13,19,23
98:2,3,7,10,
15
**pains** 156:12
**Palmetto**
78:18 80:5
162:13
**paper** 103:7
105:4
**paperwork**
77:23
**paragraph**
112:9
156:19,22
**parentheses**
71:18
**parents'** 16:7
**park** 24:15,
16
**parked** 21:18
**Paronich**
105:18,24
107:6 112:3
114:9
**part** 6:5 20:1
30:3 126:3
132:6
**participating**
7:19
**parties** 7:10
101:14
**Parts** 37:2,18
**party** 7:15
99:19

passively
7:20

password
53:16,19,20
54:13,22
173:19

patently
168:16
169:8

pay 13:15
16:13 25:23
26:19 27:1
30:9 31:22
32:20 33:4,
14 34:22
66:10 70:4
76:2,21,23
77:1 102:6
106:11
110:7
167:15,17
173:18

paycheck
167:22

paying 16:16
26:21 46:16,
17 47:10
76:18
173:14

payment
75:22 76:1,
14 77:4
95:10
102:14
110:3

payments
164:5,18
166:5,11,12

payroll 27:5

peace
160:10,13,
17

penalties
156:12
157:7

penalty
129:18
158:1

penny
170:12

people 53:1
62:11,16
63:4,5,10,13
64:21

people's
180:14

percent
31:15 58:1
92:9 115:1
119:17
163:16
172:13

percentage
113:20

percentages
167:21

performed
73:23

performing

127:17,24
128:9
178:16

period 48:17
49:13 68:3,5
83:5 145:7
146:10
167:12

periods
167:13

perjuring
120:2

perjury
119:24
129:18
156:13
157:7

perjury...that
158:2

permanent
18:17

permissible
100:8

permission
179:21
180:4

permitted
169:19

Perpay
91:16,17
92:2 98:10

Perrong 6:4,
8 7:24 10:13
11:4,12,20,
23 12:14
13:5 16:10
20:20,24
22:20,22
24:7,19
25:18 27:4
28:6,12
29:13,16,19,
22 31:24
32:2 35:13,
18,24 36:4,
10,24 38:4,
9,18,23
39:7,15,22
40:5,9,13,20
41:2 42:12
43:5 44:9
48:13,22
49:17 53:5,
12 54:2,6,16
56:7,10,14,
18 57:5,9,11
58:11 59:2,
5,17 60:10,
18 61:16,20,
24 62:5,17,
23 63:3,7,
17,21 65:4,
10,20 67:5,
12,22 68:6,
15 69:2,9
70:16 72:19
73:7,14,21
74:4,6,12,
15,18 77:20
78:13,17
79:9,17
80:20 81:6,
9,20,22

82:2,4,7,14,
22,24 83:2,
10,13,20
84:9,14,23
86:24 87:9
94:16,21
96:14,18
98:21,24
99:14,21,23
100:7,18
101:22
102:2,8
103:14,19,
22,24
104:20
107:2,3,8,
15,22 108:3
109:14
110:15,20
111:15
112:21
114:20
115:15
116:17
117:2,12,18,
20 118:2,5,
12,18 119:2,
13,22 120:1,
2,6,8,14,20
121:1,7
122:9
123:19
124:1,14
125:2,12,20,
22 126:4,9,
11,19 127:5
128:1,3
129:7,12
130:3
131:19
134:1,7
135:13,19
136:2
138:22
139:1,3
141:18,23
142:9,17
143:9,15,20
144:10,13,
15,19
145:15
147:24
149:4,14
150:2,12
154:3
158:11
160:8 162:3,
11 163:10,
19,23 165:2,
4,7,8,10,12,
15,18,21
166:7,8
167:6
168:17,19,
23 169:2,5,
9,12,18,23
177:20,22
182:23
183:7,11
184:7

person 7:1,3,
7 86:6

personal
11:16 46:9
65:2

personally

170:16,18

personnel
180:15

pertains
41:10

phone 11:15
15:11,17
16:17 18:10
20:14 23:17
24:18 36:5
46:9 47:11,
16,22 48:5,
7,10,11,18
49:14,15
50:4 51:1,5,
6,8,14,20
52:7,10
54:20 63:1,
6,12,15,20,
24 64:6,8,
14,17,19,22
65:2 66:8,10
68:13,20
70:1,5,21
71:1,4
75:17,21,23
76:2,9,10,
11,19,23,24
77:7,8,10,
17,24 78:8,
11 79:2,3
86:20 116:7
124:18,21
131:10
132:4 135:6,
24 136:2
138:20
139:4,15,20
147:12
148:4 151:9,
22 152:19,
22 159:11
160:24
172:4 173:7,
13,14
175:20
176:2,6,13

phone's
161:16

phones
53:17 172:2

photo 58:15,
16

photograph
68:12

photographs
60:1

photos
60:14,15
174:7

phrased
128:4

picture 53:11
58:14 59:19
151:15

pictures
59:24 60:22

piece 26:21
103:7 105:4

place 13:9
16:24 18:15,

17 22:8

places
161:19

Plaintiff
127:14

Plaintiff's
101:16
104:13

planned 46:8

platform
152:24

point 9:13
10:8 23:18
31:20 36:23
37:1 84:18
100:16
106:11
138:23
140:15
172:6

policy 55:23
56:22

portion
64:18
100:12,15
113:1
115:12

possibility
48:14 57:24
58:4 106:13
163:15
174:4

possibly
48:14 50:8
84:21 85:24
115:1 171:5

post 61:6
62:2

posted 60:7,
8 61:18
174:11,17,
20

posting 62:6

posts 61:19

potentially
61:15

pots 33:12

power
153:20

Preferably
182:16

prejudice
101:8,15,17,
18,20
102:24
104:10,14

prepaid 46:3
47:23 51:23
76:2 77:7,
18,24

prepare
10:11

prepared
40:16

present
45:10 79:3
95:12 107:7

presently
46:13 50:9

preserve
83:14

preserved
83:12,16

Pretty 29:5

previous
79:12
177:17

price 75:18

Primarily
55:19,24

principle
160:15,18
161:15,19,
22

print 55:22
56:21

printed
56:20 57:1

prior 55:6
59:7 120:13
124:18
135:6
150:18
176:22
179:12
180:2,7

privacy 85:2
160:10,13,
17

private
173:3,5

privilege
11:5 103:20
125:8 126:3,
14 167:5,7,8

privileged
103:17
104:2 118:9,
12,20 119:6
125:14,18
126:5,7,13,
16 136:3,7

problem 6:6

proceed 7:22

proceedings
184:22

process 9:12
75:6 86:4
90:7

produce
75:4

produced
65:23 66:20
68:5 69:11
73:10 74:23
111:24
122:4 124:7

production
65:17 67:6

products
62:4

professional
184:16

Professionals 28:2

profile 58:14
62:12

program
131:18
132:15
151:15,16
152:6,10
183:22

promotion
151:14

prompt
130:23
177:3

property
21:20

protected
118:20
149:7

Protection
143:22

protective
7:2

provide 32:3
91:24

provider
15:13 20:18

public 82:16
88:9 105:9,
10

publicly
173:2

pull 66:15
140:14

purchasing
77:23

Pure 93:24
94:2,5

purported
6:11

purports
95:21

purpose
100:6,8
139:4,8
169:15
180:11

pursuant
101:15

pusher 25:9

put 41:19
51:24 65:15
69:3 75:3,22
76:10
102:21
109:12
178:5

putative
101:17

puts 111:13

putting 61:9
180:18,22
181:7

---

**Q**

queries
178:5

question 9:7,
15 11:21,24
12:3 39:20,
24 40:3,6
49:13 58:6,8
69:5 78:24
79:5,12,21,
23 82:1
83:1,9,19,21
95:8 99:12
100:17,19,
20,21
113:16
114:23
116:5
118:22
121:2,5,9
125:8,16
128:4
129:13
131:24
141:19
144:6,7,23
145:22
146:5 149:2
150:14,15,
20,21 151:9
153:11
154:4
160:16
165:24
166:2
169:14,17,
22 177:15
178:13
179:16

questionable
132:6

questions
7:19 9:13,14
44:15 49:7
75:5 83:3
115:18
120:15
134:4
159:10
163:18
182:23

---

**R**

Rahme
97:12,16

ran 49:22

range 140:16

rate 25:23
26:19 32:20
34:22

razor 93:7

reached
176:14

read 59:5
65:13
101:13
104:11
107:19
121:10,11

127:19
141:20,22
144:7,9,10,
22,23 145:1
153:24
184:8,11

ready 18:24

realize
131:16
143:4,8
145:3

reask 100:18

reason 9:5
54:12 68:17
73:1,6
139:12
142:14

reasonable
143:21

reassigned
69:1,16
179:2,7

recall 32:23
39:8,9
57:17,19
61:9 62:6
78:14 85:21
91:18 92:13
93:17
102:17
121:16
122:15,18
133:11
148:14
168:2,7
172:7
175:12
176:9 179:3

recalled
178:4

receipt 122:5

receive
63:23 70:1
133:16
134:24
141:16
151:12
152:14
153:8
162:16,22
164:18,20
167:2,9
171:10
179:13

received
42:5 67:4,8,
14 73:4,5
95:9 99:10
105:1 106:7,
22,23
116:13
130:22
131:10
133:9 134:6,
21 142:1,22
148:10
152:11,23
155:11
168:13
170:10,12
171:19
175:20
176:2,6

182:6,12,18

receiving
78:21 79:12,
15 156:20
161:18

recess 36:12
74:20 108:5
154:17

recognize
59:15,20
61:8 70:9
87:3 156:3

recollect
25:21 57:17
122:1

recollection
29:11 33:3
36:5 42:10
46:2 47:13
49:4 54:9
55:7,17 58:1
61:1 80:8
85:12 114:6
135:2
170:24
171:4

record 6:4,
10,22 8:12
11:9 40:8
42:2 66:19
70:11 71:7,
11 82:16
83:18 88:9
99:2 104:11
105:10
107:13
111:4 118:8
119:19
120:10,17
121:11
139:2,8
141:22
144:4,9
145:1 158:9
166:3 168:2

records
11:16 66:16
67:9,19
68:18,21
71:6 72:5,14
73:10 74:23,
24 75:11
88:15,22
96:19,24
97:4 135:16
136:1,3,16
138:1,5,15
139:4,18
140:8,12
141:9
147:12
148:18
150:9,22
151:1,20
153:6
176:13

recover
53:20 54:13,
18 113:13

recovered
42:17

recovery
115:12

**RECROSS-EXAMINATION** 183:1

redacted 100:15

redirect 163:20,22

reference 46:24 103:5

referenced 58:24

referred 126:2 127:8, 15

referring 35:19 41:10 79:11 173:9

refiled 101:21

reflect 6:22 70:13 96:20 136:18

reflected 99:3

reflects 67:7 70:21 168:3

refresh 11:16 57:15 85:12 123:22

register 75:24 117:1 121:20 122:7,23 123:17,23 124:12,17 158:23 170:16,18 171:1

registered 53:10 121:14,16, 17 122:24 123:18 171:7 183:14

registration 122:5

Registry 116:2,8,13, 16 117:10, 14 118:19 119:11 122:6 123:9 124:19 158:24 170:19 171:2,10,14

regular 52:8 167:22

related 95:11 164:3

relating 44:24 131:9 164:5 166:5 176:11

relevance 40:4 83:11

relevant 39:18 136:9

relies 180:7

remember 16:3 17:2 20:11,19 21:9 22:7,13 23:1 24:20 25:15 27:19 32:23 39:1 47:14 48:6, 11,16,24 49:23 51:17 53:16,19 54:5 58:7 60:13,14,24 61:2 75:7,18 77:21 78:2 80:4,7 84:16,22 85:4,6,9 86:5,6,12,23 87:12,14,15, 20,24 88:2, 4,12,19 89:1,7 90:2, 21 91:10,17, 20,22,23 92:4,11,15, 21 93:3,9, 15,18,23 94:6 101:3, 4,10,12 103:2 104:15 109:9 115:2, 5 119:16 122:8,22 130:10 131:10 134:8,15 135:4,8,12, 14 139:14 148:15,17 150:3 154:8 156:5 157:5, 6 159:2,4 168:3,6 176:12 178:9 183:18,23

remembered 53:23

remembering 106:12

remind 41:13

reminds 154:10

rent 13:4,16, 23 16:13,15, 21 19:23

Rentals 14:2

renting 13:8, 13,15 18:1

repair 33:11

repeat 39:24 141:19 179:16

rephrase 39:23 40:3 128:3,6 170:7

rephrased 169:14

replied 155:11

reply 130:7 155:4

report 159:20 163:2

reporter 6:7 9:1 10:2 59:5,8 144:21 184:12

reporting 6:9 7:11

repost 62:3, 14

reposted 62:20

represent 42:21 128:16 140:3

representative 6:11,12,18, 20 7:9,14, 17,18 84:11 144:1 145:13 146:7,11,17 177:10

representing 94:22 96:2 115:8 177:11,13

represents 67:3

request 40:15 164:1, 2 170:15

requested 121:11 141:22 144:9 145:1

requests 154:21,23, 24

required 30:9 106:22 107:21

reregister 122:17,20

reregistered 121:21

research 93:11 121:13

reserve 6:24

reside 13:19

residences 56:3

resolution 99:17

resource 145:18

respect

10:16 142:3 170:2 182:17

respond 139:16

responded 152:3

response 7:21 40:6 53:22 106:20 127:4 129:6 132:16 133:4,10 134:19 157:18 178:15,18

responses 39:12 42:4 95:4 129:17 154:21 157:23 158:8

rest 100:10

restroom 74:17

result 164:20 166:13 168:13

results 128:18

retained 69:15

reveal 142:18

revealing 116:22

reveals 116:20

review 11:3

reviewed 140:12

reviewing 153:6

RFA 44:7 120:7 157:11,19, 23 158:8,14

Richmond 92:5 98:6

rid 51:3

ride 30:16,17

rides 30:18

rights 78:23 84:10 113:12 143:23,24 144:1 146:7 149:18

ringer 134:10

road 18:14, 16 19:1 51:6

Robbins 93:11

Robinson 105:17,20

177:24

robocalls 180:15

Rogers 16:6

Rogers' 50:17

roofers 26:18

roofing 26:17 28:17

roofs 26:17

room 6:21

rooming 14:24

roommate 13:6,8,15, 19,22,23 14:11,21 77:14

roommate's 14:16

rotate 30:17

rough 43:8 84:20

roughly 23:11 25:5 36:17 38:20 41:7 55:15 64:10 73:22 75:19

roundabout 104:3

row 66:23 67:2,7 68:22 69:7,22 70:12 71:3 72:8 136:21 137:6 138:14,19 139:22 141:5

rows 137:1, 14 138:19 140:22 141:2

rule 7:2,3 83:17 99:24 113:12

rules 7:8 8:20 169:6, 19

run 34:20 170:1

runs 34:18, 19

RV 21:17,18

___
S
___

S-H-I-F-F-L-E-T 35:10

S-T-O-P 131:22

Saint 21:12 29:9,14,20

sake 43:15

118:8
**sale** 162:2
**sales** 80:1
**sample** 132:14
**sanctions** 122:13
**sanitize** 34:18
**sat** 168:10 169:24
**scam** 87:4
**school** 12:6, 7 15:2 22:17 23:8,15 24:12,21,23 25:2,7
**scope** 83:3
**screen** 6:5, 10,23 65:16 141:4
**screw** 26:18
**scroll** 68:6,7, 8
**scrolling** 68:18
**Seafood** 33:22
**search** 127:17,24 128:9,11,17 129:4 130:5 161:8 178:4, 16
**searched** 128:13,20 176:10 178:11,19, 20
**searches** 130:13
**sec** 68:7
**seconds** 73:18 74:1 82:5 132:11 133:22 162:23 181:4,6
**section** 111:22
**seek** 7:2 122:13
**seeking** 79:9 84:7,10,13
**seeks** 39:17
**sees** 139:2
**select** 63:12
**selection** 159:19
**self-portraits** 60:4
**selfie** 60:1
**sell** 90:13,14, 19,24 91:4 92:19 93:6,

8,13,20 94:7 97:17 175:8, 10
**sells** 89:24 92:2,24 94:3
**send** 50:5 52:24 56:20 57:2,3 62:9 63:23 64:4 77:18 79:23 87:1 133:24 143:5 147:15 176:19
**sending** 89:13 161:6 177:3
**senior** 23:14 24:12
**sentence** 112:10
**separate** 33:12 114:17
**September** 14:7,8 17:9 35:4 37:4 95:12,23 121:22,23 122:7,17,22 123:24 137:24 138:5,9,14 171:5
**series** 141:1
**service** 7:11 26:6,9 30:1 46:10,12 50:4 51:13, 21 76:11,12 77:3
**services** 27:8 29:7
**Session** 109:1
**set** 51:21,22 64:18 110:16 154:22
**setting** 58:7
**settle** 96:8 97:20,23 98:3,7,11,15 99:8,13 100:24
**settled** 94:14 97:12 99:5 102:12 104:5,8,19
**settlement** 39:13 96:12, 13,16,21 97:1,5 99:10 109:20,23 110:1,3,9 111:13 113:2 164:4 166:11 177:6,7,9
**settlements**

38:2 40:12 41:7,11,15 42:6,18 44:4 95:10,22 96:3 109:8 110:22 111:11 164:19 167:10,19
**setup** 77:19
**shake** 33:12
**shaking** 8:17,24
**shape** 69:19
**share** 61:14 62:12,15
**Shaver** 93:4
**she'll** 56:21
**sheet** 65:16 75:1
**shelter** 34:7, 10,17 35:3 36:22 37:10 43:3 76:18 164:15
**Shifflet** 35:8
**shifting** 115:12
**shop** 32:18
**Shopperschoice** 85:21 86:9
**Shopperschoice.com** 85:20
**Shopping** 87:13
**short** 36:12 74:20 108:2 154:17
**show** 33:16 67:15,19 69:20 100:4 105:11 137:2 138:1 139:22,23 140:16 141:2 148:18 150:9,22 151:1 182:11
**showed** 73:24 154:9 176:13 183:21
**showing** 71:6 132:14
**shown** 151:14
**shows** 67:14 71:12 72:15 132:15 133:14 137:7,15,20 138:15,20 148:3 149:7 152:5 182:5

**sic** 32:14 111:8 164:5
**side** 8:24 105:14,16 109:13
**sideways** 148:3
**sign** 14:13 153:7 184:8
**signature** 57:22 58:9 105:13 156:13,17 158:6 184:20
**signed** 101:13 105:12 114:1,8 146:8 151:11 153:4 156:5, 11 157:6 158:3 184:2, 3
**signing** 151:22
**similarly** 95:2
**simple** 43:16 117:7
**simply** 7:20 126:24 144:22
**single** 83:19, 20 86:6 87:16 115:5
**sister** 50:19
**sister's** 18:4
**situated** 95:2
**Skull** 93:4
**slightly** 72:23
**slow** 28:9
**small** 63:13
**Smart** 56:16
**smartphone** 52:13 66:13
**smiling** 11:9
**SMS** 151:14 152:10
**snapshot** 71:6
**social** 52:17, 19 55:19 61:12
**sold** 47:22
**solely** 177:14
**sort** 145:19 180:16
**sought** 83:6
**sound** 39:13 42:9,24 43:24 67:20

73:20 74:2 88:16 89:5 91:14 98:20 135:18
**sounds** 15:6 31:10 35:1 37:7 88:18
**source** 39:5, 14 40:12,23, 24 41:4,8,9, 16 164:3,6
**sources** 38:3
**Southeast** 23:2
**spam** 159:20 163:2
**speak** 9:6
**speaking** 144:16 165:12,21 168:19,24 169:2,10
**species** 33:13
**specific** 58:8 114:21
**Spectrum** 6:8
**spell** 12:18 14:18 17:18 24:13 31:3 32:13 33:23 34:14 35:9 81:15
**spelled** 24:2 27:11,12 31:10 32:15
**spelling** 31:16
**spend** 51:7 181:7
**spending** 87:8
**spent** 86:22
**Sportsman's** 162:14
**spray** 34:18
**spreadsheet** 69:8
**square** 26:20 28:3
**squeegee** 34:19
**SR** 92:12,18
**stand** 120:18 160:9 177:20
**standalone** 13:1,3
**standing** 95:1 146:6 149:17
**stands** 71:21
**Star** 38:10,17
**start** 8:19 9:8

30:11 72:7

**started** 19:8
26:20 30:23
35:2,11
55:12 76:4,
17,18
121:12
135:16
141:13
153:15
173:10

**starting**
82:17

**starts** 68:16,
21,22 71:11

**state** 6:16
8:11 21:11
30:7 78:18
80:5 162:13
169:5,7

**stated** 181:3

**statements**
56:9

**states**
127:14
129:19

**stationary**
18:19

**statute**
113:12

**statutory**
112:11
143:19
146:1
168:14
170:11

**stay** 13:6
23:9 64:14
101:6
173:21

**staying**
15:22 19:6

**steady** 76:17

**step** 180:18,
22 181:12

**stepdad**
23:4,19 24:6

**stepdad's**
23:6

**stipulated**
101:8

**Stipulation**
101:14

**Stock** 26:5,9
27:17

**stop** 47:15
127:17
128:12
129:8 130:7,
8,14,21
131:2,13,17
132:10
133:1,15,16
143:3,5
144:17
152:11
153:20
155:11
162:23

168:21
176:19
177:4
178:17
180:17
181:4,13
182:13,18

**STOP'** 155:4

**stopped** 35:1
148:22
173:13

**store** 52:2
76:3 77:23
78:3,5

**Straight**
47:18

**street** 23:2
78:2

**strike** 94:12
118:6 119:3,
4 143:1
144:5 161:9

**stub** 27:1

**stuff** 18:18
19:2,3 31:23
52:23 55:24
64:2 80:11
90:16 94:10
130:10
162:13,15,
16

**subject**
123:8
127:14

**Subleasing**
13:18

**submitted**
105:12,17
156:1

**subpoena**
74:24

**subscribe**
78:15

**subscribed**
79:22

**subscribers**
135:11

**substantial**
121:15

**succinctly**
169:6,8

**sue** 163:9

**sued** 134:24
149:24
159:17
161:12

**suggest**
108:1

**suit** 87:17
146:13

**sum** 110:14

**summarizing**
111:5

**supervisor**
27:9 31:1,2,
7,17 35:7

**supplement**
94:19
106:20
107:11,21,
24

**supplementi
ng** 37:11

**supports**
71:7

**Suppose**
179:17

**supposed**
12:2

**swear** 6:1

**sweepstakes**
61:14,19
62:8 175:5

**switch** 30:19
46:11 53:17
135:11

**switched**
31:19 76:16

**sworn** 6:3
8:3 10:2,3

**system** 77:4,
5

———
**T**
———

**T-A-P-P-A-H-
A-N-N-O-C-K**
12:19 34:15

**tab** 39:10
45:7 57:14
95:3 99:20,
22 111:3,23

**table** 26:23
33:8 145:22

**tabs** 177:21

**Tackett** 6:1
7:4 8:6,8
36:8,11,13
40:2,7,10
49:19 59:10
65:22 66:5
67:24 68:2,
7,9,17,23
69:4,6
70:18,20
74:8,16,21
79:20 81:24
82:3,11,24
83:7,11,15,
22,23 99:18
100:2,9,23
101:24
102:3
103:17,21,
23 104:4
107:1,6,10,
19 108:1
109:5,16
114:23
117:6,8,16,
19,24 118:3,
7,13,23
119:8,9,18,
24 120:4,7,
9,17,22
121:8
122:11,14

125:7,9,17,
21,24 126:6,
10,14,22
127:2 128:6,
7 135:23
136:6,10
138:22,24
139:2,7,9
141:20
144:7,12,17
145:2,21
149:6,9
154:14,18
163:17
164:8,21,24
165:3,6,8,
11,14,16,20,
23 166:14,
19 167:3
168:4,8,15,
18,21 169:1,
4,7,11,13,20
170:3,5,20
171:16,21
172:18,20,
23 174:2,8
176:21
177:8,19
178:7,21
179:4,8,14,
18,22 180:6,
24 181:9,14,
23 182:8,20
183:2 184:5

**Tackett's**
79:11

**takes** 181:3

**talk** 10:23
47:18 63:1,
5,13,20
64:5,7 76:7
118:8
122:12
149:20
165:14

**talked** 10:18,
20 103:12
109:7
119:16
135:24
146:9
161:11

**talking** 42:1
44:17,18
48:4 63:12,
15,24 74:22
82:8 111:17
120:5
129:24
131:7
141:13
154:13
157:24

**Tappahanno
ck** 12:17
34:7,13,14
38:15

**tax** 57:2
167:12,20

**taxes** 26:24
31:23 43:18

**TCPA** 38:2
39:4,13
40:12 41:15

42:5 44:4
78:9 80:18,
23 81:4,8,18
85:13,17,20
86:12 87:20
88:1,12,19
89:1,7 90:2
91:10,17
92:4,11,21
93:3,10,15,
23 95:10,22
109:8 115:8
128:23
129:8 131:8
149:5 151:4
161:8 164:4
166:11
167:1,2
168:5,14
170:12
176:11

**technicalities**
96:20 97:1

**technically**
41:3

**Teleflora**
92:22,24

**telemarketin
g** 127:18
128:12
129:9 130:7
134:6,13,18
135:7
178:17
180:14

**telephone**
24:9 35:23
44:16 45:1,
9,16 53:23
54:4 75:12
95:11
115:21
116:11
124:13
143:22
147:8
150:11
153:7
155:12
175:13
179:12
180:2
183:14

**Telescents**
93:16,21

**telling** 58:23
91:23 130:6

**tells** 179:18,
19

**temp** 27:23
29:7

**terms** 28:19
94:24
141:11
161:10
178:4

**testified**
44:11 71:13
117:24
118:4 122:6
167:24
172:21
178:23

testifies 8:3

testify
146:18

testifying
171:17

testimony
39:11 41:24
44:8 58:6
59:7 65:19
71:8 73:11
92:1 110:13
115:22
117:9 119:3,
5 121:23
122:16
127:22
176:9,22
179:3

text 44:24
63:16,19
64:1,4 65:3,
7,13 67:3,8
71:8 73:12
76:7 79:12
91:6 133:1
135:3
140:17,18
141:2,16
142:7 143:6,
13 148:3,23
150:1
151:12,16,
21,23
152:14
155:12
159:16
177:3 180:3,
4 181:4
182:13

texted 182:5,
12

texting 50:2
64:20 65:9
180:17
181:13

Textnow
49:21 50:1,
2,9,23

texts 63:23
67:14,20
72:18
127:18
128:12
129:10
178:17

thing 41:13
55:1 59:19
117:17
120:1
148:21

things 51:12
56:4 61:14,
18 62:3 75:3
78:22 80:1
145:18
154:19

thinking
86:22

thought
122:17

tile 26:5,9,17
27:17

tiles 26:17

time 9:6
14:10,22
15:4,18
24:22 26:1
31:5 36:21
47:7,23
48:18 49:13
51:24 64:5
68:5 71:6,22
72:1,2 75:9,
23 76:10
77:6 86:22
87:8 98:19
100:16
115:20,24
116:8,9
124:22
130:12
131:21,24
132:2,5
136:8 139:5
140:16,18
144:18,20
145:7
146:10
150:5
165:16
169:17
172:10
173:8,16,20

timeline
34:24

times 43:16
54:18 62:8
140:6

timing
145:18,19

to-the-penny
170:9

today 8:9
9:23 10:7
62:20 91:24
127:22
168:10
170:4,6
184:10

told 47:22
80:21 81:18
116:24
117:4
118:24
125:13,18
132:23
142:2,4,6
143:2
148:20
180:3

top 22:15
58:10 60:20
68:10 80:5
101:6 103:6,
9 112:20
135:5 151:6
158:12

tops 18:9
64:9

total 47:2
48:4 51:4
67:8 72:11,
15,16

Totally
106:18

touch 125:1

track 85:3
88:6

trailer 17:24
18:1,3,11
21:15 23:15
24:10,15

transcript
100:12,15
107:19
184:9

transfer
51:13

transport
34:21

treat 167:19

treats 164:18
166:5,11
167:1

trial 49:19

truck 59:20,
22

true 129:20
158:2

truth 10:4

truthful 92:1

turn 39:10
95:3 101:1
113:24
127:6 148:2
163:24
170:14
171:12
175:11
178:13
182:3

Tyler 14:17,
24 77:14

type 9:2 52:7
82:3 97:4
130:21
131:13,17,
22 132:8,10,
16,22 133:4,
15 162:23
181:21

typed 69:18
128:16,21,
23 129:2
130:14
132:19
133:8 154:9
178:10

types 52:19

typically
30:9 87:1
91:5 167:22
173:15

typing
132:10
133:11

U

Uh-huh 29:1
51:20 63:19
111:19

Uh-uh 160:2

unauthorized
180:15

understand
9:14,22
18:23 41:12
49:5,9,10
91:21 94:13
101:19
106:18
112:23
113:17
121:5
145:14
153:3,5,6
157:15
166:9
179:10
180:13

understanding
42:3 99:4
102:4
103:18,19
164:17
166:23,24
167:9 177:5
180:10

understands
102:1
114:24

understood
9:17 13:7
28:16 37:22
54:10
146:12
161:23

Union 38:10,
17

unit 13:3
31:6

United
38:11,12,22
129:19

Unlike
169:15

unlimited
64:20 76:7

unmodified
65:24

unsubscribe
130:14

unsubscribed
133:19

untruthful
120:19,21

uploaded
59:13

upper 147:7

upset 161:13

upsetting
162:1,5,6

URL 151:13

usage 65:17
66:8 68:21
139:20

user 151:10,
13,20 152:3,
9,12

V

V-I-A-R-S
14:19

valuecityfurniture.com.
156:23

VCF 151:12,
21 152:10,
11,15,23

VCF's
152:18

vehicles
55:22

verbalize
8:23

verification
129:16
157:24

verified
156:21

verify@
donotcall.
gov. 123:2

Verizon
46:11 52:13
65:17 66:13,
20 67:19
68:5 69:11
70:11 73:10
74:23 76:8
77:2,18
135:15
138:15
141:9

Verizon's
68:21 76:20
139:18
140:7

version
65:24 66:2

versus
117:17
167:22
168:13
177:12

Viars 14:17

view 134:18

Virginia
12:17 15:23
16:1,24
17:15 33:8
34:13 38:15
46:8 75:16

virtually
6:17,19

vis-à-vis
168:11,16
169:8,9

visited 89:12
151:10
155:18
157:12

voice 63:2

volume
72:17 73:11,
12

---
**W**
---

**W-2** 27:2
32:3 35:5
167:11,14,
16

**wage** 30:8

**wages**
164:20
166:13
167:2

**wait** 9:10
142:6
143:17
145:24
149:7,10,24
165:3

**waited**
149:12,16
150:4

**waiting**
109:19
143:11

**waive** 167:7,
8

**waived** 119:6
184:20

**waiver** 167:4

**walk** 34:19

**Walker** 87:19
90:18

**Walmart**
25:9,10
80:13

**wanted** 51:6
149:16
182:14

**Warehouse**
162:15

**wasting**
144:18,20

**water** 34:20

**ways** 121:2
179:1

**website**
76:21 89:12
155:19
156:22
157:3,13

**websupport
@vcf.com**
132:24

**week** 16:16
18:19,20,21
28:5,8 33:15
36:14 37:10,
11 167:17

**weeks** 33:1
34:2 43:17
138:10

**West** 19:11,
13 20:5 21:5

**Wifi** 49:22
50:3,12,15,
16,19

**William**

105:17,20
177:23

**win** 61:15,22
62:3,21

**Wireless**
47:3 48:4
51:4 76:8

**withdraw**
152:13

**withheld**
107:12

**withholding**
107:16

**witness's**
40:1 144:22

**WOOD** 68:16

**word** 19:13,
14 129:2

**worded**
122:20

**words** 56:2

**work** 25:10,
14 26:3,13
27:16 32:10,
24 33:6,17
34:1,8 37:1
43:17 55:21,
24 56:17,19
57:2 76:14,
21 164:15
167:11
168:6
170:10

**worked**
21:21 26:5,
14 27:17
30:1,23
32:11,18
33:7 36:7,22
47:21 51:9
81:3

**Workforce**
27:8

**working**
18:14,16
19:6,8 26:1
27:21 30:11
33:8 35:1,2
36:2,15,21
37:18,22
38:1 76:17
132:3
134:10
166:13
167:11
168:13

**worth** 62:15

**wrap** 154:20

**written** 26:24

**wrong** 42:19
83:1 98:22
122:20

---
**Y**
---

**yard** 34:20

**year** 11:19
12:10 17:4
20:8 23:14

24:12,17,20
25:3,16
41:8,16 42:6
43:2,17
48:17 49:10,
24 130:9
150:6 170:2
172:12,13
178:3

**years** 15:7
20:12 23:10,
11 24:21
25:1,8,13
38:21 47:13
184:2

**yellow**
140:20

**York** 18:21

---
**Z**
---

**Zales** 42:8
85:17 86:8
99:6,9,13,17
100:24
101:9,20
102:6,18,24
105:14
106:7,10,23
107:4
109:12
110:3,7,14,
19,23

**zone** 72:1,2
149:7

**Zoom** 6:12,
17,19 7:7,12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - - - -

Andrew James McGonigle, individually
and on behalf of others similarly
situated,

    Plaintiff,

     v.

Value City Furniture, Inc.,

    Defendant.

:
:
:
:
:
:
:

Case No. 2:24-cv-04293

Judge James L. Graham

Magistrate Judge
Chelsey M. Vascura

- - - - -

STATEMENT PURSUANT TO RULE 30(E) OF THE FEDERAL RULES OF CIVIL
PROCEDURE REGARDING WITNESS REVIEW OF THE DEPOSITION TRANSCRIPT

1.  I am an employee of Spectrum Reporting LLC ("Spectrum").  I am the record custodian for all documents related to the facts stated herein.

2.  The purpose of this statement is to comply with Rule 30(e) of the Federal Rules of Civil Procedure.

3.  On July 25, 2025, a court reporter from Spectrum appeared at the deposition of Andrew James McGonigle in the above-referenced action.  At the end of the deposition, the deponent and/or the parties did not waive the right to review and sign the deposition transcript.

4.  The deponent was notified directly or through counsel of the time allowed for reviewing the transcript and the procedure for doing so via a letter dated August 7, 2025.

5.  The time allowed for review of the transcript has expired, and the deponent has not signed the transcript.

Dated:  09/11/2025

Spectrum Reporting LLC
400 South Fifth Street, Ste. 201
Columbus, OH 43215
800-635-9071 or 614-444-1000
transcripts@spectrumreporting.com

ref:  CB314944AM