## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

Andrew James McGonigle, individually   :
and on behalf of others similarly situated   :
  :  Case No. 2:24-cv-04293
         Plaintiff,   :
  :  Judge James L. Graham
     v.   :
  :  Magistrate Judge Chelsey M. Vascura
Value City Furniture, Inc.,   :
  :
         Defendant.   :

---

### Defendant Value City Furniture, Inc.'s Motion for Summary Judgment on Plaintiff Andrew McGonigle's Individual TCPA Claim

---

Defendant Value City Furniture, Inc. ("**Value City**") respectfully moves for summary judgment on Plaintiff Andrew James McGonigle's ("**McGonigle**") individual claim for alleged violation of the TCPA, 47 U.S.C. §227(c)(5). A memorandum in support is included below.

Respectfully submitted,

*/s/ Christopher W. Tackett*
Christopher W. Tackett     (0087776)
(Trial Counsel)
Adrian D. Radilla     (0104701)
**Bailey Cavalieri, LLC**
10 West Broad Street, Suite 2100
Columbus, Ohio 43215
T. 614.221.3155
ctackett@baileycav.com

*Counsel for Defendant Value City Furniture, Inc.*

## MEMORANDUM IN SUPPORT

### I.    Introduction

This lawsuit rests on a faulty legal premise. McGonigle sued Value City claiming violation of the TCPA after receiving a text that Value City sent only because the prior owner of McGonigle's Telephone Number opted-in and gave Value City express consent to send marketing messages to the Telephone Number. Discovery shows that McGonigle laid in wait to let messages collect before raising his invalid legal theory that the text messages violated the TCPA despite being sent with prior express consent. Not only is Plaintiff McGonigle's conduct reprehensible from a policy standpoint, but his claim theory fails on legal grounds for multiple reasons.

First, Value City held express written consent to send marketing messages to the Telephone Number. There is no governing legal standard that requires Value City or any other company to constantly investigate whether any telephone numbers opted-in to their marketing program have potentially been reassigned. Plaintiff McGonigle proposes to create a sea change in the law as a prerequisite for McGonigle to even plead a TCPA claim. No governing statute supports Plaintiff's claim, so he effectively asks this Court to write new law. Not only is McGonigle's request categorically improper, but McGonigle's conduct in courts across the country shows the gross abuse that would come along with the new regime he proposes. As detailed in the background section below, McGonigle filed more than 20 TCPA lawsuits across the country, all alleging businesses holding consent to text the Telephone Number had violated the TCPA by doing so—simply because the number was reassigned to McGonigle without their knowledge, and McGonigle chose to stay silent instead of alerting them he no longer wanted to receive the messages. If McGonigle's proposed new TCPA-compliance regime were adopted and mandated, career plaintiffs could legally obtain the

telephone number of active marketing subscribers and then infect the judicial system with countless lawsuits. Not only is McGonigle's theory unsupported by the governing law, but it would be disastrous from a public policy standpoint.

Second, even if McGonigle weren't relying on a theory of mandatory investigation into number reassignment—which is not supported by any governing law—the TCPA's plain language does not regulate text messaging. Under the U.S. Supreme Court's ruling in *McLaughlin Chiropractic Assocs. v. McKesson Corp.*, the courts have been directed to review the plain language of the TCPA, rather than defer to prior FCC agency interpretations. And, in the months following *McLaughlin* multiple courts have ruled that the TCPA's plain language does not apply to text messages.[1] McGonigle admits he never received a telemarketing call from Value City, only text messages. Based on the Supreme Court's decision in *McLaughlin*, subsequent case law, and the TCPA's plain meaning, McGonigle's TCPA claim must fail because the TCPA sanctions unwanted telephone calls, not text messages.

Third, McGonigle's claim will also fail because courts in the Sixth Circuit have stated that a cell phone is not a residential phone under the TCPA. McGonigle admits he only ever received text messages to one of his cell phones. Additionally, McGonigle did not personally register his cell phone on the national Do Not Call ("**DNC**") Registry, which is a statutory requirement for McGonigle to pursue a private right of action under the TCPA.

Finally, even assuming McGonigle could overcome all the defects noted above, McGonigle lacks Article III standing to pursue his claim because he is not within the zone of interest that the TCPA seeks to protect. McGonigle admitted at deposition that he delayed in

---

[1] *Davis v. CVS Pharmacy, Inc.*, No. 4:24-cv-477-AW-MAF, 2025 U.S. Dist. LEXIS 167366, 2025 WL 2491195, *4 (N.D. Fl. Aug. 26, 2025); *Jones v. Blackstone Med. Servs., LLC*, No. 1:24-cv-01074-JEH-RLH, 2025 U.S. Dist. LEXIS 138371, *10 (C.D. Ill. July 21, 2025).

alerting Value City that he did not want to receive its text messages on the advice of counsel, so he could amass additional statutory damages. McGonigle knew he could reply "Stop" to the messages, and he knew it would take him no more than five seconds to do so. Instead, McGonigle has turned his TCPA lawsuits into his primary career, making more than three times his 2024 annual earnings from TCPA settlements in just the first six months of 2025. The TCPA was not intended to create a profit center for opportunistic plaintiffs. Yet, that is precisely how McGonigle attempts to distort and change the TCPA with his case theory. For these reasons and as explained below, McGonigle's individual TCPA claim against Value City fails, and the Court should rule in Value City's favor under Federal Civil Rule 56.

## II.  Undisputed Facts

### A.  *Value City's Marketing Program Requires Express Consent to Receive Messages.*

Value City runs a telemarketing program that only sends marketing messages to Telephone Numbers that subscribe to the program through express written consent of its consumers. Value City's text message marketing "starts with a double opt-in process that requires action on behalf of the individual to send us a message validating their consent." (Ex. B, Dezso Tr. 60:11-14.) When an individual opts in to receive marketing messages, Value City is provided with their telephone number and possibly their email address, but no other identifying information. (Dezso Tr. 23:15-21; *id.* at 48:23-49:6.) The consumer has the ability to text "Stop," or a variety of other phrases, at any time to directly opt-out of receiving the messages. (Dezso Tr. 39:16-40:17.) Or, if the individual texts nearly *any other response* to Value City's short code, the individual will receive the following message:

> VCF: If you need additional help please email us at websupport@vcf.com or call us at (888) 751-8552. Text STOP to opt out.

(*Id.*; Ex. 11.)

Value City works with its third-party vendor, Attentive, Inc. ("**Attentive**"), for its text marketing campaigns. (Dezso Tr. 14:14-21.) Attentive is a leader in SMS marketing campaigns and TCPA compliance. (Dezso Tr. 35:15-36:3; *id.* at 36:16-37:4.) When Value City contracted with Attentive as a vendor to support its marketing program, Attentive provided Value City a TCPA-compliant platform, guidance on platform use, and backend support. (Dezso Tr. 36:10-15; *id.* at 37:22-38:5.) Value City's double opt-in process ensures that it only ever sends marketing messages to individuals who provided their express consent to Value City. (*See* Dezso Tr. 60:5-19.) Value City does not use any automatic systems to generate telephone numbers or leads—its contact lists consists of customers who have expressly opted in to receive messages. (*See* Dezso Tr. 22:21-23:19; *id.* at 24:23-25:6.)

> **B.**    ***McGonigle Is Reassigned the Telephone Number and Lays in Wait to Bring More Than 20 TCPA Lawsuits against Companies that He Alleges Held Prior Consent to Send Marketing Messages to the Telephone Number, including Value City.***

In April 2022, the telephone number 804-238-XXXX ("**Telephone Number**") affirmatively enrolled to receive marketing text messages on Value City's website. (Ex. 1b; Dezso Tr. 48:19-22; *id.* at 23:10-13.) At the time the owner of the Telephone Number signed up to receive marketing messages, the Telephone Number was listed on the national Do Not

4

Call Registry and had been since January 10, 2014. (Ex. 4; *see also* Dezso Tr. 85:24-86:3, stating "if someone explicitly opts in, they're consenting to receive messages, whether they are on the do not call or not.").

In August 2024, McGonigle was reassigned the Telephone Number. (Ex. A, McGonigle Tr. 75:11-13.) He purchased a pre-paid cellular phone at a Dollar General Store in Virginia. (McGonigle Tr. 75:14-16.) Before McGonigle purchased the phone, he says he had never heard of the TCPA. (McGonigle Tr. 78:8-10.) Because the prior owner of the Telephone Number opted-in to receive text messages from Value City, McGonigle began to receive marketing messages from Value City after he obtained the subscribed Number. (Ex. 1c.) McGonigle received 8 text messages from Value City before he reached out to a TCPA law firm, the Heidarpour Law Firm, PLLC ("**Heidarpour Law Firm**") on August 24, 2024. (McGonigle Tr. 136:11-20; *id*. at 140:14-24; Ex. 1c.)

Although McGonigle contacted Heidarpour Law Firm on August 24, he did not send a demand letter to Value City until October 12, 2024, nearly two months later. (Ex. 1a.) Notably, McGonigle's Demand Letter still did not actually request that Value City stop sending him messages. Rather, it stated that the messages were unsolicited.[2] McGonigle testified that he knew he could text "Stop" to opt out of the text messages, and he admitted it would have taken him no more than 5 seconds to do so. (McGonigle Tr. 131:13-132:11.) And yet, McGonigle did not tell Value City he wanted to opt-out, which was a transparent plan to increase his statutory damages after contacting the Heidarpour Law Firm. (*See* McGonigle Tr. 142:5-23.)

---

[2] Nonetheless, Value City immediately unsubscribed the Telephone Number after receiving the letter. (Ex. 1b.)

Indeed, McGonigle acknowledges knowing that if he told Value City he did not want to receive text messages from them at the Telephone Number, the messages would have stopped:

> Q. If on August 25th, you told Value City "STOP" or you sent them a letter [saying], I went and saw a lawyer, I realize that I just have to tell you to stop, I'm going to send you a letter or a stop text, that from August 25th to forever, you wouldn't have gotten any messages from Value City. Do you realize that?
>
> MR. PERRONG: Objection to form.
>
> A. Yes.

(McGonigle Tr. 143:2-10.) By waiting to inform Value City, McGonigle agrees that Value City sent him additional messages without the benefit of knowing that McGonigle allegedly didn't want to receive the text messages. (*Id.* at 143:11-16.) Yet, McGonigle did nothing from August until October 2024 to tell Value City to cease sending text messages to the Telephone Number.

Despite McGonigle's conclusory claim that he was "damaged" by receiving text messages from Value City, McGonigle admits having no disruption from the messages. McGonigle admits that a text message is not nearly as intimate as talking on the phone, and not as invasive from a time-commitment perspective. (McGonigle Tr. 63:15-18; *id.* at 64:21-65:5.) The record reflects that McGonigle received about 60 text messages per day on average, as compared to only about 5 outbound calls and 4 inbound calls per day. (McGonigle Tr. 66:17-67:23; *id.* at 72:14-73:15.) McGonigle admits that he can quickly read a text message. (McGonigle Tr. 65:12-14.)

When Value City finally received the Heidarpour Law Firm's demand letter, Value City immediately opted-out the Telephone Number from its messaging program on October 15, 2024. (Ex. 1b.) McGonigle admits he has not received any text messages from Value City

6

since. (McGonigle Tr. 148:10-12.) In total, McGonigle received 27 text messages from Value City after he acquired the Telephone Number that was already subscribed to marketing messages from Value City. (Ex. 1c.)

Notably, McGonigle received 19 out of the 27 total text messages from Value City *after* McGonigle had first contacted the Heidarpour Law Firm.

### C.    McGonigle Is a Professional TCPA Plaintiff.

McGonigle filed this lawsuit against Value City on December 23, 2024. But, this is not McGonigle's only TCPA lawsuit. McGonigle has filed at least 24 TCPA lawsuits, most of which he states he does not even recall filing or recall any disruption from the subject businesses' messages, which are as follows:[3]

1. *McGonigle v. Laurice El Badry Rahme, Ltd.*, No. 1:24-cv-01742 (E.D. Va., filed Oct. 1, 2024)

2. *McGonigle v. Zale Delaware, Inc.*, No. 1:24-cv-01820 (E.D. Va., filed Oct. 15, 2024)

3. *McGonigle v. Shopperschoice.Com, LLC*, No. 3:25-cv-00152 (M.D. La., filed Oct. 25, 2024)

4. *McGonigle v. Filters Fast LLC*, No. 1:24-cv-02063 (E.D. Va., filed Nov. 19, 2024)

5. *McGonigle v. HSN, Inc.*, No. 8:24-cv-02712 (M.D. Fla., filed Nov. 21, 2024)

6. *McGonigle v. Walker & Co. Brands, Inc.*, No. 1:24-cv-02140 (E.D. Va., filed Nov. 26, 2024)

7. *McGonigle v. FTD, LLC*, No. 1:24-cv-12201 (N.D. Ill., filed Nov. 26, 2024)

8. *McGonigle v. Midwest Catalog Brands LLC*, No. 3:24-cv-00864 (W.D. Wisc., filed Dec. 5, 2024)

9. *McGonigle v. Value City Furniture, Inc.*, No. 2:24-cv-04293 (S.D. Ohio, filed Dec. 23, 2024)

---

[3] "Federal courts may take judicial note of proceedings in other courts of record." *Granader v. Public Bank*, 417 F.2d 75, 82 (6th Cir. 1969).

10. *McGonigle v. Alliance Entertainment, LLC*, No. 0:24-cv-62443 (S.D. Fla., filed Dec. 29, 2024)

11. *McGonigle v. Everyday Dose LLC*, No. 1:24-cv-25115 (S.D. Fla., filed Dec. 30, 2024)

12. *McGonigle v. LG Electronics USA*, No. 1:25-cv-02700 (D.N.J., filed Jan. 11, 2025)

13. *McGonigle v. D'artagnan, Inc.*, No. 1:25-cv-00052 (E.D. Va., filed Jan. 11, 2025)

14. *McGonigle v. Office Depot*, No. 9:25-cv-80069 (S.D. Fla., filed Jan. 17, 2025)

15. *McGonigle v. Perpay, Inc.*, No. 2:25-cv-00326 (E.D. Pa., filed Jan. 20, 2025)

16. *McGonigle v. Richmond Fitness, Inc.*, No. 1:25-cv-00103 (E.D. Va., filed Jan. 21, 2025)

17. *McGonigle v. SR Holdings Management LLC*, No. 1:25-cv-01674 (N.D. Ill., filed Feb. 18, 2025)

18. *McGonigle v. Telefora LLC*, No. 1:15-cv-00807 (E.D. Va, filed May 9, 2025)

19. *McGonigle v. Skull Shaver, LLC*, No. 1:25-cv-00424 (E.D. Va., filed Mar. 8, 2025)

20. *McGonigle v. Robbins Research Int'l, Inc.*, No. 1:25-cv-00800 (E.D. Va., filed May 8, 2025)

21. *McGonigle v. Telescents, Inc.*, No. 1:25-cv-00845 (E.D. Va., filed May 15, 2025)

22. *McGonigle v. Pure Green Franchise Corp.*, No. 0:25-cv-61164 (S.D. Fla., filed June 10, 2025)

23. *McGonigle v. Dickey's Barbecue Restaurants, Inc.*, 1:25-cv-1062 (E.D. Va., filed June 24, 2025)

24. *McGonigle v. Moriarty Gem Corp.*, 1:25-cv-398 (N.D. Ind., filed July 18, 2025)

(*See* McGonigle Tr. 85:4-94:10 for McGonigle repeated admission of having no real knowledge of the numerous lawsuits he has filed.) As of July 1, 2025, McGonigle had received $35,015 in TCPA settlement payments, but referenced additional settlement money that would be incoming. (McGonigle Tr. 110:22-111:10.) At the time of McGonigle's deposition,

at least one other settlement was pending approval.[4] (*Id.* at 109:11-110:21.) By comparison, McGonigle earned only $10,471.94 in wages in 2024. (Ex. 18, McGonigle's W2s.) McGonigle's new career pursuing TCPA litigation and settlements had already earned him more than three times his annual earnings for 2024, as of July of this year. (*See* McGonigle Tr. 44:2-6.) As a professional TCPA plaintiff, McGonigle is exploiting the TCPA against the statute's legislative intent and reaping the benefits of his status as a professional TCPA plaintiff.

Value City sent marketing messages to the Telephone Number solely due to the Telephone Number being affirmatively enrolled in its marketing program. Value City had no idea the Telephone Number had a new user beginning in August 2024, or that the new user may not want marketing messages sent to the Telephone Number any longer. The pleadings in McGonigle's other cases reflect the same bad faith, TCPA trap attempt by McGonigle, which is premised on McGonigle trying to re-write the governing law.

McGonigle disingenuously claims the messages "harmed" him. But, in reality, McGonigle refused to alert the companies that he no longer wanted to receive marketing text messages to the Telephone Number, so that he could increase damages for his dubious TCPA lawsuits. And now, McGonigle is on track to increase his income 6-fold through his new business of filing TCPA lawsuits. The marketing text messages McGonigle received from Value City, which held express consent for sending the messages to the Telephone Number, have been a windfall for McGonigle—not a harm.

---

[4] Since July 1, 2025, the dockets reflect that McGonigle has settled and dismissed his cases with LG Electronics, USA, Inc. and HSN, Inc., though the settlement amounts paid to McGonigle in those cases are unknown to Value City.

### III. <u>Legal Standard</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Containerport Group, Inc. v. American Fin. Group, Inc.*, 128 F. Supp. 2d 470, 472 (S.D. Ohio 2001) (quoting Fed. R. Civ. P. 56(c)). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-8 (1986)).

The moving party bears the burden "of showing that no genuine issue as to any material fact exists and that it is entitled to judgment as a matter of law." *Thompson v. Chase Bankcard Servs.*, 737 F. Supp. 2d 860, 868 (S.D. Ohio 2010) (citing *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003)). The evidence submitted, and inferences drawn from the evidence, must be viewed in the light most favorable to the opposing party. *Id*. If the moving party satisfies its burden, "summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Containerport* at 473 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The nonmoving party cannot rest on its pleadings. *Thompson* at 869. The court may "enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence." *Id*.

IV.     **Argument**

> A.     *This Court is Empowered to Interpret the Plain Meaning of the TCPA—under which a Text Message is Not a Call, and McGonigle Does Not have a Claim.*

Recently, the United States Supreme Court decided that district courts should interpret the TCPA's plain language and that district courts are no longer bound by the FCC's agency guidance interpreting the TCPA. *See McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 222 L. Ed. 2d 405, 427 (2025). In *McLaughlin*, the Supreme Court analyzed whether the FCC's *Amerifactors* order was binding on the court in determining the merits of the plaintiff's lawsuit, who had alleged that defendant McKesson sent unsolicited fax advertisements without the required opt-out notice. *Id.* at 415-416. The Supreme Court's conclusion was that "the Hobbs Act does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of the relevant statute is correct." *Id.* at 416. Therefore, the FCC's order was not binding on any court. The Supreme Court went on to state:

> [t]he District Court is not bound by the FCC's interpretation of the TCPA. The District Court should interpret the statute as courts traditionally do under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation.

*Id.* at 427; *see also Davis v. CVS Pharmacy, Inc.*, No. 4:24-cv-477-AW-MAF, 2025 U.S. Dist. LEXIS 167366, 2025 WL 2491195, *4 (N.D. Fl. Aug. 26, 2025) (explaining the difference between appropriate respect and appropriate deference and stating "[o]ne can provide 'appropriate respect' to an agency's view without adopting a statutory interpretation that conflicts with the ordinary public meaning of clear statutory text."). Accordingly, this Court should review the plain language of the TCPA in analyzing McGonigle's claims in this litigation. In doing so, the Court will see that: i) the TCPA does not set forth any requirement

11

that companies holding express consent to contact a number have any duty to conduct constant investigation about whether the number may become reassigned *and* ii) the TCPA's plain language does not govern text messaging.

### B. There is No Legal Requirement to Investigate Potential Number Reassignment.

McGonigle's case theory—and that of the class—lacks any legal support and seeks to punish Value City for following the governing law. McGonigle relies on the FCC's 2015 agency guidance from *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015). McGonigle asks this Court to make new law and impose a requirement that every business sending telemarketing messages must check the Reassigned Number Database daily to determine whether any phone number on their entire list of subscribers has been reassigned. Under the Supreme Court's ruling in *McLaughlin*, district courts are not bound by the FCC's interpretation of the TCPA and, thus, are not bound by the 2015 agency guidance that McGonigle cites. What's more, the Sixth Circuit had already previously rejected the FCC's attempt to require businesses to search the Reassigned Number Database.

Indeed, even before *McLaughlin*, the Sixth Circuit declined to follow the FCC's guidance based on the D.C. Circuit Court specifically setting aside the FCC's guidance related to reassigned telephone numbers and the one-call rule for reassigned numbers as being unfair, arbitrary, and capricious. *Allan v. Pa. Higher Educ. Assistance Agency*, 968 F.3d 567, 571 (6th Cir. 2020) (citing *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018)); *see also Lucas v. Calling*, No. 1:12-cv-630, 2020 U.S. Dist. LEXIS 252927 (S.D. Ohio Sept. 8, 2020) (noting the D.C. Circuit struck down portions of *In re Rules and Regulations*). The FCC's interpretations that

McGonigle relies on are not binding on this Court, according to the U.S. Supreme Court, the Sixth Circuit, and the D.C. Circuit.[5]

The D.C. Circuit struck down that 2015 FCC guidance regarding reassigned number investigation because it would impose an unfair obligation on companies to continuously check if any numbers that they have consent to contact have been reassigned, and then also continuously evaluate whether the express consent *may have* changed. According to the D.C. Circuit, the relevant standard is one of reasonable reliance by the caller or messenger on the called party's prior consent. *ACA Int'l*, 885 F.3d at 707-709. This standard is reasonable because the new owner of a phone number is in the best position to alert the message-sender whether they would like to revoke the existing consent to receive marketing calls or texts. Otherwise, businesses would need to check the Reassigned Number Database constantly, determine if any numbers on their opt-in lists had been reassigned, then contact the telephone number to determine if they still had consent. In sum, McGonigle's proposal is just that—a proposal. It is not the law. And, it is also an unworkable proposal from a policy standpoint. The analysis could stop there. Value City held express consent to contact the Telephone Number and it had no legal requirement to investigate and discover reassignment of the number in August of 2024. Further, as soon as McGonigle implied[6] that he no longer wanted to receive the messages, Value City did not send another message. As a result, Value City is entitled to summary judgment on McGonigle's claim that Value City somehow violated the

___

[5] Even so, *In re Rules and Regulations* only applies to autodialed calls, as stated in the opinion: "*Callers* are liable for *robocalls* to reassigned wireless numbers when the current subscriber to or customary user of the number has not consented, subject to a limited, one-call exception for cases in which the caller does not have actual or constructive knowledge of the reassignment[.]" 30 FCC Rcd at 7965. As explained in Section B below, a text message is not a call under the TCPA.

[6] Again, note that even McGonigle's demand letter failed to state that he no longer wanted Value City to send marketing messages to the Telephone Number.

TCPA by sending marketing texts to the Telephone Number that had subscribed to Value City's text message marketing program.

### C. *The TCPA Does Not Apply to Text Messages.*

Even if McGonigle didn't fundamentally lack a prima facie claim—after the Supreme Court's ruling in *McLaughlin*, courts have correctly interpreted the TCPA's plain meaning and found that the TCPA does not apply to text messages. Again, this Court need not reach that interpretation to grant summary judgment against McGonigle. But a plain reading of the TCPA shows that it does not regulate text messages. Courts have recognized that upon being instructed by the Supreme Court that their hands are no longer tied by guidance written by agency bureaucrats. For example, the Central District of Illinois recently held that the term "telephone call" as contained in the TCPA does not encompass cell phone text or SMS messaging. *Jones v. Blackstone Med. Servs., LLC*, No. 1:24-cv-01074-JEH-RLH, 2025 U.S. Dist. LEXIS 138371, *10 (C.D. Ill. July 21, 2025). In *Jones*, three named plaintiffs brought a consolidated class action against the defendant for violations of the TCPA arising out of marketing text messages they had received to their phones. *Id*. at *2-3. In fact, the plaintiffs repeatedly texted "STOP" to the defendant to opt out of the text messages, but the defendant never opted them out. *Id*. at *4. In analyzing whether the text messages were a violation of the TCPA, the court recognized that "only 'call', 'telephone call', and 'artificial or prerecorded-voice telephone call' appear in Section 227(c) and its implementing regulations." *Id*. at *8 (citing 47 U.S.C. § 227(c)(1)(D), (c)(5); 47 C.F.R. § 64.1200(c)(2)(iii), (d)).

There, the plaintiffs tried to rely on the FCC's 2003 regulations for support that text messages should fall within the TCPA's purview. *Id*. at *8-9. In response, the *Jones* court quoted *McLaughlin* and stated, "[p]ursuant to *McLaughlin* and *Loper Bright*, the Court agrees

with the Defendant that based on a plain reading of the TCPA and its implementing regulations, Section 227(c)(5) does not apply to text messages." *Id.* at *9-10. Interpreting the plain meaning of the TCPA, the court found that a "telephone call" did not encompass a text or SMS message, stating

> While the Court affords a certain amount of respect to the FCC's interpretation of the terms used in the TCPA, the fact remains that Section 227(c)(5) of the TCPA includes "telephone call" and does not mention text messages or SMS messages, and nowhere does the TCPA define "telephone call" to include text and/or SMS messages.

*Id.* at *10-13. Ultimately, the court there recognized that "[i]t is not for a court to legislate by reading into the TCPA something that is not there" and dismissed the plaintiffs' TCPA claims. *Id.* at *14-15. Even more recently, the Northern District of Florida agreed that text messages are not telephone calls under §227(c)(5) of the TCPA at the motion to dismiss stage. *Davis*, 2025 WL 2491195 at *1 (stating, "[t]he statutory text here is clear, and a text message is not a 'telephone call'.").

Courts also took this position before *McLaughlin*. In *Soliman v. Subway Franchisee Adver. Fund Trust, Ltd.*, the Second Circuit found that 1) the TCPA covers only automatic telephone dialing systems that generate telephone numbers and do not rely on pre-existing telephone numbers, and 2) text messages do not fit within those categories. 101 F.4th 176, 180-183, 187 (2d Cir. 2024). In *Soliman*, the plaintiff also responded "STOP" but continued to receive messages anyway. *Id.* at 178. In making its decision, the court reiterated the purpose of the TCPA, which is "to protect against automatic systems that, by generating telephone numbers automatically, could tie up the telephone lines of public emergency services and businesses with sequentially numbered telephone lines, or otherwise result in tying up a called party's line." *Id.* at 183 (citing *Facebook, Inc. v. Duguid*, 592 U.S. 395, 399, 405 (2021)). However,

15

"[t]hese concerns are not implicated by a system that uses a pre-existing list of telephone numbers that are not automatically or randomly generated, but that are drawn from other sources, including, as here, from consumers themselves who voluntarily provided them." *Id.*

Additionally, the Ninth Circuit has stated that text messages were not under the purview of the TCPA because the messages did not use prerecorded voices. *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1158, 1161 (9th Cir. 2023) ("We hold that Congress clearly intended 'voice' in 47 U.S.C. § 227(b)(1)(A) to encompass only audible sounds, because the ordinary meaning of voice and the statutory context of the TCPA establish that voice refers to an audible sound."). Indeed, the Sixth Circuit's only decision on this issue relied on the FCC's 2003 guidance. *Keating v. Peterson's Nelnet, LLC*, 615 Fed.Appx. 365, 370 (6th Cir. 2015) (deferring "to the reasonable interpretation of the [TCPA] offered by the FCC in its 2003 guidance.") Post-*McLaughlin*, this Court is required to independently interpret the plain meaning of the TCPA, instead of relying wholesale on the FCC's guidance.

This Court should follow the *Jones* court's reasoning and find that the TCPA does not encompass text messages. This case is an exact parallel to *Jones*, except that Value City's conduct was even less culpable than the defendant in *Jones*. The *Jones* court found that text messages were not telephone calls, such that the TCPA did not apply, even when the *Jones* plaintiffs had attempted to opt out of receiving the marketing messages. Here, the previous owner of the Telephone Number expressly signed up to receive marketing text messages from Value City. (Ex. 1b, Audit Letter.) The Telephone Number was reassigned to McGonigle in August 2024. (McGonigle Tr. 75:5-13.) After McGonigle was reassigned the Telephone Number, McGonigle received 27 marketing text messages from Value City, from August 6, 2025 until October 15, 2025, when Value City manually opted-out McGonigle from its

marketing messages immediately upon receipt of McGonigle's counsel's demand letter to Value City. (Ex. 1a; Ex. 1b; Ex. 1c.)

McGonigle's phone records obtained through subpoena show that he contacted the Heidarpour Law Firm on August 24, 2024. (McGonigle Tr. 136:11-20; *id.* at 140:14-24.) Yet, McGonigle did not send Value City any communication about its text messages until October 12, 2024—three weeks later. (Ex. 1a.) McGonigle only received 8 text messages from Value City prior to the time he contacted the Heidarpour Law Firm. (Ex. 1c.) Then, he lurked and laid in wait, receiving more messages to accrue more statutory damages, after conferring with counsel. (McGonigle Tr. 142:5-23.)

Additionally, McGoingle never texted "Stop" or sent any other message to Value City requesting he be opted-out of the messaging. Yet, McGonigle admits he knows that he could text stop or use the report-as-junk-and-delete function on his phone to stop receiving messages. (McGonigle Tr. 159:11-160:18.) Value City was operating under express consent to send marketing messages to the Telephone Number. (Ex. 1b.) Yet, when McGonigle received the Telephone Number, he never texted "Stop" to Value City or made any other attempts to opt out of the messages. McGonigle was aware that he could text "Stop" to opt out, and he admits that texting "Stop" would have taken him all of 5 seconds. (McGonigle Tr. 131:13-132:11.)

McGonigle never received a voice call from Value City. (McGonigle Tr. 134:20-22.) Moreover, Value City does not use an automatic telephone dialing system to generate telephone numbers. Rather, its contact lists comprise customers who have expressly opted-in to receive messages. (*See* Dezso Tr. 22:21-23:19; *id.* at 24:23-25:6.) Therefore, *even if McGonigle could make a claim despite Value City having consent to send the messages*, the remaining issue is

17

whether Value City's text messages, only 8 of which were sent before McGonigle obtained counsel to pursue his TCPA claim, constitute "calls" under the TCPA. The Supreme Court has given this Court free reign to interpret the TCPA's plain meaning. Other courts tasked with the same question have found that the plain language of the TCPA does not encompass text messages. *Jones*, 2025 U.S. Dist. LEXIS 138371, at *10-13; *Davis*, 2025 WL 2491195 at *1; *Soliman*, 101 F.4th at 183. This Court should arrive at the same result when it analyzes the plain language of the TCPA.[7]

### D. Even if the TCPA Did Apply, McGonigle Did Not Personally Register His Telephone Number on the DNC Registry.

Even if the TCPA applied to text messages (it does not), McGonigle would still not have a valid claim. McGonigle's TCPA claim relies upon 47 C.F.R. §64.1200(c), which requires a residential telephone subscriber to personally register his telephone number on the national DNC Registry. To be sure, 47 C.F.R. §64.1200(c)(2) prohibits solicitations to "[a] residential telephone subscriber *who has registered his or her telephone number on the national do-not-call registry* of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." One court has dismissed a plaintiff's TCPA claim because that plaintiff did not personally register their telephone number on the DNC Registry. *Caitlin Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 U.S. Dist.

---

[7] Notably, some courts have also held that the TCPA does not apply to cell phones at all. *Cunningham v. Sunshine Consulting Grp., LLC*, No. 3:16-2921, 2018 U.S. Dist. LEXIS 121709, *1 (M.D. Tenn. July 20, 2018); *See also Cunningham v. Spectrum Tax Relief, LLC*, No. 3:16-2283, 2017 U.S. Dist. LEXIS 118797, *7 (M.D. Tenn. July 7, 2017) ("Plaintiff alleges only calls to his cellular phone. Accordingly, he fails to state a claim for relief under 47 U.S.C. § 227(c)(5)[.]"); *Cunningham v. Enagic USA, Inc.*, No. 3:15-0847, 2017 U.S. Dist. LEXIS 97486, *14 (M.D. Tenn. June 23, 2017) (holding same).

The Court need not reach this conclusion, but it illustrates that when courts have looked at the TCPA's plain language may jurists have found the plain language does not in any way suggest application to text messages. Such a conclusion was only ever reached because agency interpretation was improperly used in lieu of the required legislative action in our American system of governance.

LEXIS 124614, *9 (N.D. Iowa June 9, 2022) (finding "Section 64.1200(c) plainly requires that the call to be initiated to the person who registered the number on the registry," and dismissing plaintiff's TCPA claim).

McGonigle admits that the Telephone Number was previously registered on the DNC Registry since 2014. (McGonigle Tr. 183:13-16; Ex. 4.) Yet, the only evidence that McGonigle provided substantiating that he registered the Telephone Number on the DNC Registry was an email dated April 6, 2025 (4 months into this litigation) confirming the Telephone Number was registered on January 10, 2014. (Ex. 4.) McGonigle testified that this was the first time he tried to register the Telephone Number on the DNC Registry.

> Q. Okay. Now, before getting this email at Exhibit 4, had you ever tried to register any of your prior phone numbers on the Do Not Call Registry?
>
> A. No, because I -- I just never – never did on the other phone numbers.
>
> Q. So that was the first time?
>
> A. Yeah.

(McGonigle Tr. 124:16-23; *id.* at 122:2-124:23.) Therefore, McGonigle has not complied with the requirements of Section 64.1200(c)(2), which is the basis for McGonigle's right to private action. McGonigle's individual claim, thus, also fails for that reason.

### E.    *McGonigle Does Not Have Standing to Bring His TCPA Claim.*

In addition to McGonigle's previously explained defects, McGonigle also lacks Article III standing, and he does not fall within the zone of interest that the TCPA seeks to protect. Article III standing requires that a plaintiff must show:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*United States ex rel. Nguyen v. City of Cleveland*, Nos. 16-3379/3420, 2017 U.S. App. LEXIS 6492, *7 (6th Cir. Mar. 3, 2017) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000)). "To be a particularized injury, 'it must affect the plaintiff in a personal and individual way.'" *Duncan v. Liberty Mut. Ins. Co.*, 745 Fed. Appx. 575, 578 (6th Cir. 2018) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016)). Further, "a plaintiff must allege a concrete harm even in the context of a statutory violation." *Jordan v. Beasley*, No. 24-5122, 2024 U.S. App. LEXIS 28498, *6-7 (6th Cir. Nov. 7, 2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426, 141 S. Ct. 2190, 210 L. Ed. 2d 568 (2021)) "While Congress may authorize a private plaintiff to sue a defendant over violations of federal law, that 'does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III.'" *Jordan* at *7.

When an individual acts as a professional plaintiff, the Court can (and should) reject the plaintiff's argument that he suffered an injury-in-fact. *See Stoops v. Wells Fargo Bank, N.A.*, 197 F.Supp. 3d 782, 796-803 (W.D. Penn. 2016) (finding a plaintiff who purchased multiple phones for the purpose of bringing a TCPA action did not have standing to sue because her main purpose was to bring TCPA lawsuits, therefore her privacy interests were not violated); *Garcia v. Credit One Bank, N.A.*, No. 2:18-CV-191 JCM (EJY), 2020 U.S. Dist. LEXIS 136881, *8 (D. Nev. July 31, 2020) (finding the plaintiff lacked standing when "[i]nstead of taking the steps necessary to stop the alleged injury (the unwanted calls), he took steps to allow the continuance of the injury while building a record to facilitate a later claim."). A professional plaintiff's lack of standing aligns with Congress's purpose for the TCPA—to prevent "the

proliferation of intrusive, nuisance [telemarketing] calls to their homes." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012) (internal quotations omitted) (alteration in original).

The standing analysis also "includes a requirement that 'the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 349 (6th Cir. 2007) (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 475 (1982)). The zone of interest test "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 398 (1987); *see Stoops* at 805 (finding the "Plaintiff's interests are not within the zone of interests intended to be protected by the TCPA.").

McGonigle lacks Article III standing. He also does not fall within the zone of interest that the TCPA seeks to protect. McGonigle is using the TCPA as his business. He has made three times more from TCPA settlements in the first six months of 2025 than his earned wages in all of 2024. (*Compare* Ex. 18, W2s, *with* McGonigle Tr. 110:22-111:10.) McGonigle manufactured additional violations of the TCPA when he waited, on the advice of counsel, for weeks before raising any concern about the prior Telephone Number owner's express consent to receive marketing text messages from Value City. (McGonigle Tr. 142:5-143:16.) When McGonigle first began communicating with the Heidarpour Law Firm, he had received only 8 text messages from Value City. (McGonigle Tr. 140:10-13; Ex. 1c.) At the Heidarpour Law Firm's apparent direction, McGonigle racked up 19 more messages from Value City before he contacted Value City about the messages. (Ex. 1c; McGonigle Tr. 142:5-143:16.) According to McGoingle, it would have taken him no more than 5 seconds to opt out of

receiving the messages. (McGonigle Tr. 132:7-11.) What's more, McGonigle agrees that the text messages he received were not disruptive to his life, taking up less than a minute of his time. (*See* McGonigle Tr. 65:12-14.) Much like the plaintiff in *Stoops*, McGonigle laid in wait to receive more text messages and accrue more statutory damages before bringing the issue to Value City's attention.

The TCPA was not intended to be a vehicle for rewarding underhanded actors that set up companies like Value City for sending messages to a telephone number while holding express consent to contact the number.. Yet that is exactly what McGonigle attempts here. McGonigle's attempts to exploit the TCPA and punish Value City when it had consent to send the marketing messages at issue. The context here demonstrates McGonigle does not have a valid legal claim—and he is also not within the zone of interest that the TCPA intends to protect. McGonigle's opportunistic interests are inconsistent with Congress's intent—to prevent the proliferation of intrusive, nuisance telemarketing calls to individual's homes. *Mims*, 565 U.S. at 372. As explained in this Motion, McGonigle never received a call from Value City, nor did he receive a call to a residential landline. And, above all, McGonigle and the Heidarpour Law Firm attempt to manipulate the TCPA to reap a windfall that the TCPA does not permit or intend. All these factors, taken together, indicate that McGonigle does not have a valid claim and also is not within the TCPA's zone of interest; accordingly, McGonigle lacks standing to bring his claims.

**V.    Conclusion**

For the multiple dispositive reasons detailed above, Value City respectfully requests that this Court grant judgment in its favor on McGonigle's individual claims.

Respectfully submitted,

/s/  Christopher W. Tackett
Christopher W. Tackett      (0087776)
(Trial Counsel)
Adrian D. Radilla      (0104701)
**Bailey Cavalieri, LLC**
10 West Broad Street, Suite 2100
Columbus, Ohio 43215
T. 614.221.3155
F. 614.221.0479
ctackett@baileycav.com
aradilla@baileycav.com

*Counsel for Defendant Value City Furniture, Inc.*

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing Motion for Summary Judgment has been served on October 17, 2025, via this Court's ECF system.

/s/  Christopher W. Tackett
Christopher W. Tackett      (0087776)