1

1       IN THE UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF OHIO

3                   - - -

4    ANDREW JAMES MCGONIGLE,      :
     on behalf of himself and
5    others similarly situated, :

6              Plaintiff,       :

7        vs.                    :Case No. 2:24-cv-04293

8    VALUE CITY FURNITURE, INC.,:

9              Defendants.      :

10                  - - -

11              July 21, 2025

12

13              30(B)(6) Deposition of

14           VALUE CITY FURNITURE, INC.
              by and through RYAN DEZSO,

15

16       a witness herein, called by the Plaintiff for
     cross-examination under the applicable Rules of
17   Federal Civil Court Procedure, taken before me,
     Angela S. Moore, a Professional Reporter and Notary
18   Public in and for the State of Ohio, taken
     pursuant to notice, at the offices of Bailey
19   Cavalieri, 10 West Broad Street, Suite 2100,
     Columbus, Ohio, on Monday, July 21, 2025,
20   commencing at approximately 10:02 a.m., and
     concluding at approximately 12:51 p.m.

21                  - - -

22
              HIGGINS & ASSOCIATES
23         4889 Sinclair Road, Suite 102
             Columbus, OH 43229-5433
24        614.985.DEPO(3376) 888.244.1211

2

APPEARANCES:

    ANDREW R. PERRONG, Esquire
    Perrong Law LLC
    2657 Mount Carmel Avenue
    Glenside, Pennsylvania  19038
    Email:  a@perronglaw.com
    215-225-5529,

            On behalf of the Plaintiff.


    CHRISTOPHER TACKETT, Esquire
    GRAYCEN WOOD, Esquire
    Bailey Cavalieri
    10 West Broad Street, Suite 2100
    Columbus, Ohio  43215
    Email:  ctackett@baileycav.com
    614-221-3155,

            On behalf of the Defendant.

Also present:

 Melita Garrett Abbey




            - - -

3

1                              Monday Morning Session
                               July 21, 2025
2                              10:02 a.m.

3                                  - - -

4                             STIPULATIONS

5          It is hereby stipulated by and between counsel

6    for the respective parties herein that this

7    deposition of RYAN DEZSO may be taken at this time

8    by the Notary; that said deposition is being taken

9    pursuant to notice; that said deposition may be

10   reduced to writing in stenotypy by the Notary,

11   whose notes may thereafter be transcribed out of

12   the presence of the witness; that proof of the

13   official character and qualifications of the

14   Notary, the time and place of the taking of said

15   deposition are hereby waived.

16                               - - -

17

18

19

20

21

22

23

24

4

1                    <u>I N D E X</u>

2                       - - -

3     RYAN DEZSO                              PAGE

4     Cross-examination, by Mr. Perrong          5

5                       - - -

6                   <u>E X H I B I T S</u>

7     PLAINTIFF'S DEPOSITION EXHIBITS   MARKED/REFERRED

8     Exhibit A -                       15    34,52
       (Attentive's text messages)
9
       Exhibit B -                       40
10     (SMS, MMS terms & conditions)

11     Exhibit C -                       40
       (VCF's messaging terms & conditions)
12
       Exhibit D -                       42
13     (Audit letter)

14     Exhibit E -                       49
       (Answers)
15
       Exhibit F -                       49
16     (Complaint)

17     Exhibit G -                       77
       (Responses to Discovery Requests)
18

19                       - - -

20

21

22

23

24

5

1                     P R O C E E D I N G S

2                              - - -

3                          RYAN DEZSO,

4         being by me first duly sworn, as hereinafter

5            certified, deposes and says as follows:

6                       CROSS-EXAMINATION

7    BY MR. PERRONG:

8              Q.      Could you state your full name for

9    the record, please?

10             A.      Ryan Dezso.

11             Q.      Have you ever been deposed before?

12             A.      No.

13             Q.      So I just want to go over a few

14   ground rules for you given that you have not been

15   deposed before.  I ask that we don't speak over

16   each other.  No head shakes or nonverbal responses.

17   The court reporter will not be able to record those

18   down.  If you don't understand the question, just

19   ask me, and I will be happy to rephrase it.  But if

20   you answer the question, I will assume you

21   understood the question.  From time to time your

22   attorneys here might object.  Unless they ask you

23   not to answer the question, you still answer.

24   Happy to take a break whenever you need.  Just ask

6

1     we don't take that break when the question is

2     pending.  Does that sound good?

3              A.      Yep.

4              Q.      Do you understand that you are under

5     oath today, and that is the same oath you would

6     take if you were in a court?

7              A.      Yes.

8              Q.      Is there anything about your

9     condition today or any medical condition that would

10    prevent you from testifying truthfully?

11             A.      No.

12             Q.      Is there any reason you would not be

13    able to remember things accurately today?

14             A.      No.

15             Q.      Did you do anything to prepare for

16    your deposition today?

17             A.      Spent time with counsel.

18             Q.      Without going into what you spoke

19    with counsel, approximately how much time did you

20    spend with counsel to prepare for your deposition.

21                     MR. TACKETT:  Objection.

22    BY MR. PERRONG:

23             Q.      You can go ahead and answer the

24    question.

7

1         A.     Couple hours, two hours.

2         Q.     In preparation of your deposition,

3  other than speaking with your attorney, did you

4  speak to any other employees at Value City

5  Furniture?

6         A.     No.

7         Q.     Did you review any documents to

8  prepare for today's deposition.

9             MR. TACKETT:  Objection to the

10  extent it asks about the content of privileged

11  conversations with counsel.

12             MR. PERRONG:  Yep.

13  BY MR. PERRONG:

14         Q.     Other than that, did you review any

15  documents?

16         A.     Just with counsel.

17         Q.     Okay.  Do you have any documents

18  with you today?

19         A.     No.

20         Q.     Were you asked to search for

21  documents as part of this litigation?

22         A.     Yes.

23         Q.     And among other individuals, who all

24  was involved in that search, besides yourself?

8

```
 1            A.      Just myself.

 2            Q.      What documents did you search for?

 3                    MR. TACKETT:  Objection.

 4                    THE WITNESS:  Just those requested

 5    by counsel.

 6    BY MR. PERRONG:

 7            Q.      What systems did you use to search

 8    for documents?

 9                    MR. TACKETT:  Objection.

10                    THE WITNESS:  I mean, I reached out

11    to our SMS partner.

12    BY MR. PERRONG:

13            Q.      And by SMS partner you mean

14    Attentive?

15            A.      Correct.

16            Q.      Did you search for any documents on

17    Value City's systems?

18            A.      There are no known.

19            Q.      I appreciate that, but my question

20    was a little different.

21                    Did you search to any Value City

22    systems to see whether or not there were any

23    documents responsive to this litigation in those

24    systems?
```

9

1          MR. TACKETT:  Objection.  Continuing

2    objection to the attempts to evade the

3    attorney-client privilege, the attorney work

4    product doctrine about how my client conducted

5    searches, which was specifically the result of

6    referral with counsel and direction from counsel.

7    I'm trying to let you ask some structural questions

8    here, but you are really bumping up against the

9    privilege, Mr. Perrong.

10          MR. PERRONG:  I'm just trying to

11   ascertain what systems were searched for documents

12   and whether or not there were any responsive

13   documents found.

14          MR. TACKETT:  Yeah, and you know

15   what we have produced.  And this is something we

16   can confer about.  And I don't think any of this is

17   within the scope of the deposition notice.  If you

18   can point us the topic in the deposition notice

19   that involves Value City search efforts and

20   methodology.

21          MR. PERRONG:  We asked for documents

22   related -- or related to the process for responding

23   to the interrogatories and request for production.

24   It's at the end of the deposition notice.

1            MR. TACKETT:  You asked for the

2  facts and evidence that serve as the basis for

3  Value City's responses to all requests for

4  productions.

5            MR. PERRONG:  Correct.

6            MR. TACKETT:  You are not asking him

7  that.  You are asking him about searches he

8  conducted, which he specifically testified was

9  based on direction from counsel.

10            MR. PERRONG:  I just want to figure

11  out did he search e-mails, did he search servers of

12  some sort.  We are entitled to know the names of

13  the systems that he searched for responsive

14  documents.  That's not privileged.

15            MR. TACKETT:  So I want to be clear.

16  If the searches are undertaken based on direction

17  from counsel, it is privileged, and it is work

18  product.  It's also not --

19            MR. PERRONG:  What you told him --

20            MR. TACKETT:  Let me finish my

21  objection so that we have a clean record.  So we

22  aren't talking at the same time.  I know you may

23  disagree with what I say.  Let me finish saying it.

24  It is not within the scope of Topic No. 20, which

11

1   you are using to support this questioning.  So any

2   testimony that he has would be his individual

3   testimony anyways, not the testimony of the

4   company.  And then we reserve and maintain the same

5   objection that I made.

6   BY MR. PERRONG:

7        Q.      What systems did you search for

8   documents responsive to this litigation?

9        A.      Attentive.

10       Q.      Where do you currently work?

11       A.      American Signature, Inc.

12       Q.      What is the relationship between

13   American Signature, Inc. and Value City Furniture?

14       A.      It is the parent company of Value

15   City Furniture.

16       Q.      What is your role at American

17   Signature?

18       A.      Director of Paid Media.

19       Q.      I'm sorry?

20       A.      Director of Paid Media.

21       Q.      If I use the term Value City during

22   this deposition, you'll understand that I'm

23   referring to your employer American Signature

24   Furniture?

12

1        A.      Yes.

2        Q.      How long have you held that role as

3   Director of Paid Media at Value City?

4        A.      August of last year.

5        Q.      Prior to your work at Value City,

6   what was your job role?

7        A.      I was a Senior Merchant at

8   Abercrombie & Fitch.

9        Q.      And what did that role entail?

10       A.      I was a merchant buyer of product at

11  Abercrombie.

12       Q.      And in your role at Value City, what

13  do you do?

14       A.      I run all of our paid media,

15  advertising, marketing.

16       Q.      Who do you report to?

17       A.      I report to our Chief Marketing

18  Officer.

19       Q.      Who's the Chief Marketing Officer?

20       A.      Alejandro Alvarez.

21       Q.      And who does he report to?

22       A.      Our President.

23       Q.      Just in terms of the organizational

24  structure then, how does the chief marketing

13

1    officer differ from your job role?

2           A.      He's over the entirety of marketing.

3           Q.      What then is the difference between

4    paid marketing and I guess marketing generally?

5           A.      You have a creative department, you

6    have an operations department, you have a lot of

7    other departments that make up the function as a

8    total.

9           Q.      Does anybody report to you?

10          A.      Yes.

11          Q.      Approximately how many employees

12   report to you?

13          A.      Two.

14          Q.      And what are those employees?

15          A.      What are their names?

16          Q.      Yes.

17          A.      Leah Gombosch and Miranda Canacci.

18          Q.      And what do those individuals do?

19          A.      One is an analyst, works on

20   reporting and analytics.  And the other traffic,

21   creative for our agency.

22          Q.      How does Value City direct paid

23   marketing to customers?

24          A.      I need more clarity on the question.

14

1    Q.  I assume that there are different

2 channels of advertising of Value City employs?

3    A.  Yes.

4    Q.  What are the channels of advertising

5 Value City employs?

6    A.  I mean TV, connected TV, streaming

7 TV, online video, direct mail, paid social media,

8 paid search, display ads, e-mail marketing, SMS

9 marketing, pretty comprehensive list.

10    Q.  And you understand that this lawsuit

11 is about Value City's SMS text message marketing

12 campaign, correct?

13    A.  Yes.

14    Q.  We already went over this a little

15 bit, but Value City uses a third-party vendor to

16 conduct its SMS marketing?

17    A.  Yes.

18    Q.  And that vendor is Attentive?

19    A.  Yes.

20    Q.  What is Attentive?

21    A.  Attentive is SMS marketing platform.

22    Q.  Does Value City have a consumer

23 relationship management system, a CRM system?

24    A.  We do not.

15

1          Q.     And your job responsibilities

2 involve working with Value City's third-party

3 vendors like Attentive?

4          A.     Yes.

5          Q.     What is the purpose of the text

6 messages that Value City sends?

7          A.     It's a marketing program.

8          Q.     So it's to sell furniture?

9          A.     To sell furniture, to engage people

10 with the brand.

11          Q.     Does Value City make advertising

12 telephone calls?

13          A.     We do not.

14          Q.     I have an exhibit here.  I'll mark

15 it as Plaintiff's Exhibit A.

16                  - - -

17   Thereupon, a document was marked for purposes of

18      identification as Plaintiff's Exhibit A.

19                  - - -

20 BY MR. PERRONG:

21          Q.     If you could just familiarize

22 yourself with that document quickly.

23            Do you recognize this document?

24          A.     Yes.

16

1          Q.      How do you recognize this document?

2          A.      It was produced with counsel.

3          Q.      Is this an export from Attentive's

4     system?

5          A.      Yes.

6          Q.      And this system reflect -- or this

7     document reflects text messages that were sent to

8     the Plaintiff's telephone number from Value City

9     Furniture, correct?

10         A.      That's correct.

11         Q.      Walk me through the process of how

12    each of these messages would get sent.

13         A.      So, I mean, we have a process

14    internally where we come up with the concept.

15    Right.  So we are going to come up with what's the

16    story we want to tell.  Could be a promotion, could

17    be something about brand-related.  So our creative

18    team and our copywriters will work on that with the

19    guidance and direction of our team.  We'll review

20    that creative, and believe it hits the mark.  We

21    have a very small character limit when it comes to

22    SMS marketing.  So you can't be as verbose as you

23    can with other channels and tactics.  So we will

24    review that, we will approve it as a collective

17

1    team.  Once that happens, it will be uploaded to

2    the Attentive platform.  We'll test it to a handful

3    of phone numbers internally to make sure it comes

4    across correctly, text comes through correctly,

5    emojis, whatever it might be, an image.  Once

6    that's validated, and confirmed it tested correctly

7    internally, we will schedule that send to go out to

8    the segment of the list that it's intended for.

9            Q.      Okay.  I have a few clarifying

10   questions about the process.  At any point do any

11   messages undergo a legal or compliance review?

12           A.      No.

13           Q.      And who is the individual that's

14   physically logging into the Attentive platform,

15   uploading the message itself, and sending first the

16   test message and then the actual message itself?

17           A.      It would be one of our team members.

18           Q.      Does that vary or is there a

19   specific team member assigned to that task?

20           A.      It is a specific team member which

21   has varied over the years.

22           Q.      Currently, who is that team member?

23           A.      Her name is Julia Sacchetti.

24           Q.      And who does Julia Sacchetti report

18

1   to?

2          A.      She now reports to our VP of

3   e-commerce.

4          Q.      Is the e-commerce department

5   different than the marketing department?

6          A.      It falls within marketing.

7          Q.      Prior to Ms. Sacchetti joining the

8   team, who was the individual that would have sent

9   the messages?

10         A.      Her name was Lauren Every.

11         Q.      Is she still with the company?

12         A.      She is not.

13         Q.      And when did Lauren Every depart

14  from the company?

15         A.      Some time last fall.

16         Q.      And how long was she with the

17  company approximately?

18         A.      Two years.

19         Q.      Who trained these individuals how to

20  use the Attentive platform?

21         A.      The Attentive team.

22         Q.      Did Attentive provide Value City

23  materials to train the individuals on how to use

24  the platform?

19

1      A.      Can you clarify that question?

2      Q.      For example, did they provide a

3  hands-on training, did they just give you a manual?

4  How does Attentive provide training for the sending

5  of messages?

6      A.      There's virtual training sessions.

7  Jump on Zoom or a Teams call, and walk through it.

8  It's a pretty intuitive platform.

9      Q.      In terms of the lists on Attentive,

10  does Attentive support the functionality of sending

11  different sets of text messages to different lists?

12  For example, like potential customers, existing

13  customers, things of that nature?

14      A.      They do.

15      Q.      Does Value City use any of that

16  functionality?

17      A.      We do.

18      Q.      With respect to the Plaintiff, do

19  you have any knowledge as to what lists within

20  Attentive the Plaintiff was in?

21      A.      I do not.

22      Q.      Do you know if the Plaintiff was

23  ever a Value City customer?

24      A.      I do not.

20

1    Q.    Did Value City ever provide

2  Attentive any, for lack of a better term, training,

3  but specifications for what it wanted to do with

4  Attentive's platform?

5              MR. TACKETT:  Objection.  Form.

6  Confusing.

7  BY MR. PERRONG:

8    Q.    Let me rephrase.

9              Did it provide -- did Value City

10 ever provide any statements of work to Attentive?

11   A.    The statement of work would have

12 been from Attentive to us.

13   Q.    Did Value City provide assertional

14 orders to Attentive?

15             MR. TACKETT:  Objection to form.

16             THE WITNESS:  I don't know what that

17 means.

18 BY MR. PERRONG:

19   Q.    We discussed a little bit about the

20 drafting of the messages themselves.  Is there any

21 specific guidelines or requirements that Value City

22 follows when drafting a message?

23   A.    No.  I mean, we have character

24 limits, that's the biggest thing.  You know, if

21

1    there's continued compliance, that's monitored by

2    Attentive.  But outside of that, it's just within

3    the character limits that are allowed.

4              Q.    Does Attentive allow Value City to

5    scrub numbers against the Do Not Call Registry?

6              A.    Yes, I believe so.

7              Q.    Does Value City use that

8    functionality?

9              A.    I don't know what is built into the

10   organic use of the platform versus an explicate

11   action to be taken against it.

12             Q.    Does Attentive provide the ability

13   to scrub telephone numbers against the reassigned

14   number database?

15                  MR. TACKETT:  Objection.

16                  MR. PERRONG:  What's the basis of

17   the objection?

18                  MR. TACKETT:  I'm noting an

19   objection for the record.  I don't know if you want

20   me to expound upon the objection.  I'm not

21   objecting to the form of the question.  I'm

22   objecting to the premise anyone would need to scrub

23   against the reassigned number database.

24                  MR. PERRONG:  So essentially you are

22

1  objecting it calls for a legal conclusion, or

2  insinuates a legal conclusion?

3              MR. TACKETT:  Among other things,

4  yes.

5  BY MR. PERRONG:

6       Q.    With that in mind, I don't know if

7  there was an answer to the question.

8       A.    Can you ask it again?

9       Q.    Yeah.  Is there a parameter in

10 Attentive to scrub against the reassigned number

11 database?

12             MR. TACKETT:  Objection.  Same

13 objection.

14             Go ahead.

15             THE WITNESS:  They offer an

16 additional service to be able to scrub against the

17 reassigned number database.

18 BY MR. PERRONG:

19      Q.    Does Value City use that service?

20      A.    We do not.

21      Q.    How are telephone numbers loaded

22 into the various lists in Attentive's system?

23      A.    Can you clarify that?

24      Q.    Sure.  We've established that there

23

1    are lists of telephone numbers that are sent

2    messages from Attentive system, correct?

3            A.      That's correct.

4            Q.      Those telephone numbers, are they

5    added on a rolling basis as customers submit their

6    information, or is there a periodic upload of

7    numbers, say, every week, everybody that signed up

8    in the last week gets then uploaded to the system?

9            A.      It's in real time.

10           Q.      So I understand that the Plaintiff's

11   telephone number was submitted into a pop-up box on

12   Value City's website; is that accurate?

13           A.      That's accurate.

14           Q.      Is that pop-up box -- how does that

15   pop-up box then populate Attentive's system?

16           A.      There's a data feed that goes

17   directly to Attentive from there.

18           Q.      So it's an API of sorts?

19           A.      Yep.

20           Q.      When Value City sends a message,

21   when the employees send a message, do they send it

22   immediately or do they set a time to send the

23   message?

24           A.      There's two ways to do it.  You can

24

1   set a time to send it, or you can use the AI of the

2   platform to send it based on the individual's

3   behavior and when they are most likely to open it

4   and engage with the message.  We do it both ways.

5       Q.      What dictates whether it will be

6   opened via the AI -- or sent via AI method versus

7   the timing method?

8       A.      Typically if it's something time

9   sensitive, we will send it based on a schedule,

10  i.e., the final day of a sale.  We don't want to

11  say final hours and send it to somebody at 6:00 at

12  night when they have a mere couple hours versus

13  having the day to potentially complete the sale

14  they have maybe been thinking about.

15      Q.      Do you have any knowledge as to how

16  the AI used by Attentive works to collect the time

17  that a particular person would receive a message?

18      A.      From a technical standpoint, no.

19  From a simplistic standpoint, it's just based on

20  when users are opening their individual text

21  messages.  When they're engaging with them.  It's

22  going to optimize at the individual level.

23      Q.      Other than its website, does Value

24  City obtain telephone numbers to text from any

25

1   other source?

2        A.    You have the ability to opt-in when

3   making a transaction.

4        Q.    Other than a transaction or website,

5   there's no other way?

6        A.    No.

7        Q.    And you do not have any knowledge

8   that the telephone number at issue here was

9   opted-in via transaction, correct?

10        A.    It was opted-in via website pop-up.

11        Q.    How does Value City ensure that the

12   numbers entered into its website are not typos?

13        A.    We would have no ability to validate

14   that.

15        Q.    Besides the telephone number, is any

16   other information entered into a website?

17        A.    You have the ability to enter an

18   e-mail address if you want to.

19        Q.    Does the website also collect the

20   submitter's IP address?

21        A.    No.

22        Q.    When a telephone number is submitted

23   to Value City's website, does itself scrub the

24   number against the Do Not Call list?

26

1      A.      Value City does not.

2      Q.      Does Attentive?

3      A.      That, I'm not a hundred percent

4  positive on.

5      Q.      Does it scrub against the reassigned

6  number database?

7      A.      It does not.

8      Q.      Does Value City do anything else to

9  make sure that its text message, text messages are

10  sent to only those individuals who want to receive

11  messages?

12      A.      I mean, that's the inherent part of

13  the platform, right.  Any phone number we have has

14  been explicitly opted in.

15      Q.      How does Value City know that the

16  phone numbers that were explicitly opted in remain

17  with the people that opted in to receive them?

18      A.      We wouldn't know that.  All we have

19  is the phone number.

20      Q.      Has Value City ever gotten

21  complaints that it's texting the wrong person?

22              MR. TACKETT:  Objection.  And I

23  would point you to the July 15th letter that we

24  sent objecting to certain topics in the Notice of

1   30(B)(6) Deposition, including specifically topics

2   13 -- excuse me -- 15 and 16.  Where you have asked

3   to have testimony on complaints, grievances,

4   investigations, actual or threatened litigation by

5   other individuals, and Value City's responses to

6   those things.  We're not testifying on those topics

7   today.  We are sitting subject to the objections we

8   sent you.  And this has been a topic of discussion

9   between counsel prior to today, an ongoing meet and

10  conferral.  We are at an impasse on that issue.

11  He's not testifying about any other complaints.

12              MR. PERRONG:  As in our

13  meet-and-confer communications, we made clear that

14  it's still relevant to the Plaintiff's individual

15  claims, because it can show, for example, the lack

16  of proper procedures, et cetera, et cetera, for

17  ensuring the consent remains with a particular

18  individual.  So to the extent that you're

19  instructing him not to answer, clarify that.  Or if

20  we'll take an answer subject to the objection.

21              MR. TACKETT:  Yeah.  So before this

22  deposition we said we are not testifying -- the

23  corporate representative is not testifying about

24  that topic.  So your question, as I understood it,

1  asked him if there were other complaints from other

2  parties separate from Plaintiff Andrew McGonigle.

3  And, yes, I'm instructing him not to answer that

4  question based on the objection that we've already

5  registered and our pre-existing discussion.  So it

6  should come as no surprise we find there's no

7  relevance to whether or not there's a TCPA

8  violation with regard to Plaintiff Andrew McGonigle

9  by asking whether other individuals have complained

10 in the past about a text message.  And we think

11 that your claim that it's relevant to damages is

12 tangential, and there are other ways for you to ask

13 about the processes in place and make your argument

14 about damages.  But we don't think any of them

15 would ever show intentionality of the text messages

16 in question in this case.

17             MR. PERRONG:  To be clear, are you

18 moving to terminate or limit the deposition

19 insofar --

20             MR. TACKETT:  I'm not moving to

21 terminate the deposition.  As we told you in

22 our July 15 --

23             MR. PERRONG:  You are moving to

24 limit it, right?

1          MR. TACKETT:  Please let me finish

2  answering your question so she can type what I'm

3  saying, and whatever you have to say in response.

4          As we said in the July 15, 2025

5  letter, we objected to a number of the topics, we

6  objected to certain phrasing.  And in particular,

7  you know that this Topic 15 regarding attempts to

8  discover complaints of other non-parties, to the

9  extent they exist, we said we are not testifying

10  about that, it's not relevant.  I'm not moving to

11  do anything.  We sat subject to the objections we

12  registered.  You can continue asking all of the

13  questions that you would like.  And to the extent

14  that they go into a topic that we said we're not

15  testifying about, then I'll address it with you.

16  And if you think that it is appropriate, you can

17  raise it with the Court and ask them whether we

18  should be ordered to testify on that topic that we

19  believe is not at all relevant.  And also contrary

20  to the Court's order, staying class discovery and

21  bifurcating class discovery from that discovery on

22  the individual claim of Plaintiff, Andrew

23  McGonigle.

24          MR. PERRONG:  We'll move on.  But we

30

1    will seek judicial intervention to compel an

2    answer.

3    BY MR. PERRONG:

4          Q.      How much sales or revenue is a total

5    portion of Value City's revenues attributable to

6    Value City's text messaging campaign?

7                  MR. TACKETT:  Objection.

8                  THE WITNESS:  I don't know the

9    answer to that.  Yeah, I don't know the answer to

10   that.

11   BY MR. PERRONG:

12         Q.      Besides Attentive are there any

13   other vendors involved in the text messaging

14   campaign?

15         A.      No.

16         Q.      Is there a vendor that operates the

17   Value City website?

18         A.      Yes.

19         Q.      Who is that vendor?

20         A.      The platform is Blueport Commerce.

21         Q.      Blueport?

22         A.      Blueport Commerce.

23         Q.      And does Blueport Commerce utilize

24   any intermediary databases with respect to the

31

1    collection and sending of numbers over to

2    Attentive?

3           A.      They do not.  It's an API that's

4    built into that pop-up that goes directly to

5    Attentive.

6           Q.      Just so I'm clear, sometimes

7    information can exist in multiple databases, right.

8    So when somebody enters a telephone number into

9    Value City's website, it just goes into Attentive's

10   database, it does not go into the website's

11   database?

12          A.      That's correct.

13          Q.      Approximately how often does Value

14   City communicate with Attentive?

15          A.      I mean, are you talking about daily

16   operations?  Can you clarify what you're talking

17   about?

18          Q.      I guess in the day-to-day operations

19   of the sending of a text message campaign, is there

20   daily communications that goes on between Attentive

21   or is it pretty sporadic?

22          A.      It's a pretty consistent

23   relationship.  You know, the individual who at the

24   time is managing the day-to-day, as far as

32

1    scheduling and all of that stuff is probably

2    talking to Attentive on a near daily basis.  And

3    then, you know, we have a close working

4    relationship with that.  So it's almost constant

5    communication.

6         Q.    In what manner does Value City

7    communicate with Attentive?

8         A.    Can you clarify?

9         Q.    Do you use a slack channel, do you

10   use e-mail, video chat, combination of them?

11        A.    Probably a combination of them.

12        Q.    What combination of services do you

13   use?

14        A.    I mean, I'm on a lot of virtual

15   calls with them.

16        Q.    Do you e-mail them?

17        A.    Yep.

18        Q.    Do you send support tickets to them?

19        A.    Probably.  I do not, but probably.

20        Q.    How often do you communicate --

21   well, are you familiar with an individual named

22   Andrew Saga?

23        A.    Yes.

24        Q.    Who is Andrew Saga to you?

33

1      A.      He is an individual that works at

2   Attentive.

3      Q.      Approximately how often do you

4   communicate with Mr. Saga?

5      A.      I've never met Mr. Saga.

6      Q.      But do you talk to him?

7      A.      No.

8      Q.      Does anybody at Value City talk to

9   him?

10     A.      No.

11     Q.      Does Value City have a contract with

12  Attentive?

13     A.      Yes.

14     Q.      Did you review that contract as part

15  of this litigation?

16     A.      No.

17     Q.      Approximately when did Value City

18  start using text message campaign to market to

19  clients?

20     A.      Winter, spring 2022.

21     Q.      And has Value City been with

22  Attentive that entire time?

23     A.      Yes.

24     Q.      Looking back at Plaintiff's Exhibit

34

1   A, it looks like the first message to the

2   Plaintiff's telephone number was sent on April 14,

3   2022?

4           A.      That's correct.

5           Q.      And that would have been right

6   around the initial time that Value City started

7   using Attentive?

8           A.      Shortly before.  We launched shortly

9   before this.

10          Q.      When Value City launched with

11  Attentive, did it upload an existing list of

12  telephone numbers or information to the Attentive

13  platform, or did it organically start to develop

14  those numbers through submissions to its website?

15          A.      We had a small list of -- I can't

16  even tell you the number.  We had a list of numbers

17  from a previous provider that really wasn't used

18  anymore.

19          Q.      To your knowledge, the Plaintiff's

20  number did not come from that list?

21          A.      It did not.

22          Q.      When Value City selected Attentive,

23  did it consider any other text messaging service

24  providers?

35

1        A.     Yes.

2        Q.     What criteria did Value use to

3 select Attentive?

4        A.     It was -- it was a little ambiguous.

5 But it was a pretty robust criteria.  It was a

6 year-long RFP process to go through vendor

7 selection and to launch the SMS program.

8        Q.     Tell me about that RFP process

9 particularly as it pertains to -- I'm looking for

10 specific criteria in terms of legal compliance,

11 compliance with the TCPA, things of that nature,

12 what all did the RFP process contain as it pertains

13 to legal compliance and compliance for sending text

14 messages?

15        A.     I mean, that's what won out

16 Attentive, too, to win the RFP, was their TCPA

17 knowledge, expertise in compliance, they're a

18 leader in the space, I mean, in SMS marketing in

19 general.  I think at the time, and I don't know if

20 this is still true, they were I think the largest

21 SMS marketing platform in the world.  And they did

22 so based on their TCPA expertise largely.  That's

23 something that we thought -- I mean, it was

24 incredibly important to us.  We understand the

1    sensitivity of going into this space, and we wanted

2    to do it with a partner who are true experts and

3    then would own that part of the process for us.

4          Q.     Besides text messaging, does

5    Attentive offer any other marketing services?

6          A.     They do.

7          Q.     Does Value City utilize those

8    services?

9          A.     We do not.

10         Q.     Besides the extensive TCPA expertise

11   that you mentioned, does Attentive provide any sort

12   of training with respect to the TCPA?

13         A.     We did on-boarding when we launched

14   both with Attentive and our counsel on the approach

15   to TCPA.

16         Q.     What was Attentive's approach to the

17   TCPA?

18         A.     I can't speak to specifics.  I mean,

19   everything about their program is approached in a

20   TCPA compliant way from the ability to acquire

21   phone numbers, like the way that their sign-up

22   works, it's a complex process.  It's a two-step

23   explicate opt-in.  You know, starting with that, it

24   takes an action of an individual to actually send

```
 1   us a text message, all the way through to database
 2   maintenance, and ongoing program audits.  Basically
 3   they allow us to run a program where TCPA
 4   compliance is constantly in effect.
 5           Q.     Did Attentive customize its platform
 6   in any manner to meet Value City's specific needs?
 7           A.     They did not.
 8           Q.     Did Value City conduct any legal
 9   compliance, audits or reviews to monitor
10   Attentive's compliance with the TCPA?
11                  MR. TACKETT:  Objection.
12                  You can answer.
13                  THE WITNESS:  I can't speak to
14   specifics.  But there was a period of time during
15   the end of the RFP process into post-contract where
16   legal teams worked very closely together to develop
17   an understanding and adherence to TCPA law and TCPA
18   compliance.  But again, I can't speak to specifics.
19   That was between the legal teams and then part of
20   the training that was passed onto us.
21   BY MR. PERRONG:
22           Q.     What kind of training was passed on
23   to you?
24           A.     Basically TCPA basics.
```

38

1    Q.  And who conducted this training?

2    A.  If I remember correctly, that was

3 with our counsel.

4    Q.  Did Attentive provide that training?

5    A.  They did as well.

6    Q.  Does Attentive provide performance

7 monitoring and reports related to text messaging

8 campaigns?

9    A.  They do.

10    Q.  What basic metrics do those reports

11 contain?

12    A.  It's really engagement metrics with

13 marketing platform -- or with the marketing tactic.

14 So you're looking at open rates, you're looking at

15 click-through rates.  Pretty simplistic.  You're

16 looking at new customer acquisition rate, how many

17 people are you acquiring in the list, how many

18 people are you losing from the list and opting out

19 as well, and what's your net, plus or minus.

20    Q.  When you say that you're looking at

21 who you are losing from the list, how would

22 somebody be lost from the list?

23    A.  They would opt out.

24    Q.  Do those reports also contain an

1     outline of undeliverable messages?

2           A.      They do.

3           Q.      Approximately what percentage of

4     messages that Value City sends are returned as

5     undeliverable?

6           A.      I can't give you a number off the

7     top of my head, but that's a number we can get to

8     you.

9           Q.      Does Value City continue sending

10     text messages to numbers after they're deemed

11     undeliverable?

12           A.      I couldn't speak to that. There's a

13     variety of reasons a number it could be -- it could

14     be undeliverable. So I believe the answer is yes,

15     but I cannot confirm that.

16           Q.      How -- when somebody we mentioned

17     opts out, how does Value City or Attentive process

18     the opt-out? Does Value City rely on Attentive to

19     receive the message, and then remove it from the

20     list? Is there somebody actually reading the

21     messages? How does that opt-out work?

22           A.      The opt-out message is very

23     simplistic. You can reply with stop, which is the

24     common phrase, right. So you can reply to the text

40

1    message with stop, or a variety -- there's like 10

2    or 15 words in the realm of stop.  You can say no,

3    you can say a variety of synonyms that would be

4    adjacent to that, and it's an automatic opt-out in

5    realtime.  If you say anything else in response, if

6    you reply to our text message with anything else,

7    or just to our five-digit short code with anything

8    else, you will receive an automated response.

9    Because if it doesn't match to those 10 to 15 words

10   synonym criteria, you'll receive an automated

11   response that says, with directive to please reply

12   stop to opt out, or with our customer service phone

13   number, which you can call for help.  If you need

14   help, if you can't figure out how to reply stop to

15   opt out, happy to call us, and we can manually opt

16   you out.  But otherwise, it's not made a process in

17   real time.

18          Q.     I want to bring in a document that's

19   Plaintiff's Exhibits B and C.

20                     - - -

21      Thereupon, documents were marked for purposes of

22       identification as Plaintiff's Exhibits B and C.

23                     - - -

24   BY MR. PERRONG:

41

1          Q.     Just take the time to familiarize

2    yourself with them.

3          A.     I'm good.

4          Q.     So the document marked as Exhibit B

5    is entitled SMS, MMS, Mobile Message Marketing

6    Program Terms and Conditions.

7                 The document as Exhibit C is marked

8    Value City Furniture Messaging Terms and

9    Conditions.  The documents obviously speak for

10   themselves, but I'm just trying to clarify when

11   each of these documents were in force and the

12   differences between those documents.  As B was

13   initially the document that was provided to us, and

14   then we later got document C.  So I'm just trying

15   to understand what the differences between the

16   documents are and when each one was enforced?

17         A.     They would have been enforced at the

18   same time.  Document B is what is hosted on our

19   website via our terms and conditions page.

20   Document C is hosted by Attentive.

21         Q.     Okay.  Thank you.  You can put those

22   away.

23                Would both of those documents be

24   policies related to text messages?

42

1          A.      Yeah.

2          Q.      And those are Value City's policies?

3          A.      Value City's policies, yes.

4          Q.      And the second policy, although it's

5 hosted on Attentive.  It lists Value City Furniture

6 so this is Value City's policy, it's just hosted on

7 Attentive?

8          A.      It's aligned on between Value City

9 and Attentive.

10         Q.      Who drafted these policies?

11         A.      Attentive.

12         Q.      Did Attentive provide Value City any

13 other policies with respect to the TCPA?

14         A.      Not that I'm aware of.  They may

15 have provided counsel with that, but not that I'm

16 aware of.

17         Q.      I want to bring in a document that

18 we'll mark as Exhibit D.

19                 - - -

20   Thereupon, a document was marked for purposes of

21      identification as Plaintiff's Exhibit D.

22               - - -

23 BY MR. PERRONG:

24         Q.      Do you recognize this document?

43

```
1              A.     Yes, I do.

2              Q.     How do you recognize this document?

3              A.     This was populated at the request of

4       counsel.

5              Q.     To clarify, counsel asked Attentive

6       to draft this letter?

7              A.     As far as I remember, yes.  I mean,

8       this came up when the complaint letter was

9       received.  And then counsel reached out to me, and

10      that was part of our whole process.

11             Q.     So you asked Attentive to make

12      the -- you asked Attentive to create this letter at

13      the urging of your counsel?

14             A.     At the request of counsel, I asked

15      Attentive to populate this audit letter for the

16      phone number.

17             Q.     Approximately how many audit letters

18      did you ask Attentive to populate?

19                    MR. TACKETT:  Objection.  I just

20      want to clarify.  Are you asking him how many audit

21      letters regarding Andrew McGonigle, or are you

22      asking him to answer about audit letters that may

23      relate to third-party claimants?

24                    MR. PERRONG:  I'm asking about audit
```

44

1    letters generally.

2              MR. TACKETT:  Okay.  So same

3    objection as before if you're asking him about the

4    existence of other complaints or responses to other

5    complaints, and we would rest on our same objection

6    regarding Topic No. 15 and our refusal to testify

7    about that.

8              MR. PERRONG:  Okay.  So then we will

9    just move on from that.  Insofar as it pertains to

10   that, we will seek judicial intervention on that.

11   BY MR. PERRONG:

12        Q.    In terms of Mr. McGonigle, how many

13   versions of this letter have been made?

14        A.    This one.

15        Q.    I'll represent to you that there's

16   another version of this letter that has another

17   page to it, I believe it's blank.  I don't have it

18   as an exhibit, but I'm just trying to figure out

19   why there are, I guess, two versions of the same

20   letter that was produced in discovery.

21             MR. TACKETT:  Objection to form.  If

22   you have something else that you want him to look

23   at that you think is a distinct document, put it in

24   front of him.  There's no way for him to say

45

1    whether there is or is not another version.  You

2    are just referencing you potentially have another

3    perhaps identical letter that has another page in

4    it that's blank.  So it would be a copy as far as

5    I'm hearing you.  I think it would be better just

6    to let him look at it.

7                     MR. PERRONG:  I'll move on.

8    BY MR. PERRONG:

9         Q.     This letter is signed by Andrew

10   Saga?

11        A.     Yes, it is.

12                     MR. TACKETT:  For the sake of the

13   record, the letter does not bear a signature.  It

14   has a font typed face that appears to be a little

15   fancier looking, but it is a typed face.

16   BY MR. PERRONG:

17        Q.     The letter was purportedly drafted

18   by Andrew Saga?

19        A.     Yes.

20        Q.     And you mentioned that you had

21   spoken to Andrew Saga sporadically, how often,

22   approximately, did you speak -- do you speak with

23   Andrew Saga?

24                     MR. TACKETT:  Objection to form.

46

1    Mischaracterizes prior testimony.

2                    THE WITNESS:  To clarify, I've never

3    spoken to Mr. Saga.

4    BY MR. PERRONG:

5         Q.    You've sent him e-mails?

6         A.    I've never sent Mr. Saga e-mails.  I

7    don't know his e-mail address, I don't know his

8    contact information.  He is, as I understand, from

9    this letter, an engineer at Attentive, and he would

10   be the one to populate this, and it was sent to us

11   through our direct contact at Attentive.

12        Q.    Who's the direct contact at

13   Attentive?

14        A.    At this point in time, I think it's

15   Colleen McCauley.

16        Q.    Can you spell her last name if you

17   know it?

18        A.    I think it's M-c-C-a-u-l-e-y.

19        Q.    Did Value City specify any policies

20   and legal requirements that it desired Attentive to

21   comply with?

22        A.    Can you clarify?

23        Q.    Certainly.  So, for example, in some

24   marketing campaigns there is a requirement that a

47

1    company like Value City requires their vendor to

2    create a letter such as this one within 24,

3    48 hours of receipt of a complaint, something like

4    that.   To your knowledge, are there those sorts of

5    contractural provisions that Value City imposed on

6    Attentive?

7            A.     Not to my knowledge.

8            Q.     Does Value City itself maintain an

9    internal do not call or do not text list?

10           A.     I can't speak to that.

11           Q.     Why can't you speak to that?

12           A.     There's nothing that I know of that

13   exists.   There could be, but there's nothing to my

14   knowledge.

15           Q.     Does it maintain a company specific

16   do not call policy?

17           A.     I don't know the answer to that

18   either.

19           Q.     Not to your knowledge, there's no --

20           A.     No.

21                  MR. PERRONG:  We've been going at

22   this for about an hour, let's take a short five,

23   10-minute break.

24                  MR. TACKETT:  Sounds good.

48

1                    (Brief Recess.)

2      BY MR. PERRONG:

3            Q.      So you understand you are still

4      under oath?

5            A.      Yes.

6            Q.      Do you know of an individual named

7      Andrew James McGonigle?

8            A.      Yes.

9            Q.      How do you know Mr. McGonigle?

10           A.      From the complaint that we are here

11     discussing today.

12           Q.      He's the Plaintiff in this lawsuit,

13     right?

14           A.      Correct.

15           Q.      And he received text messages from

16     Value City?

17           A.      His phone number received text

18     messages, that's correct.

19           Q.      Why did Mr. McGonigle receive text

20     messages from Value City?

21           A.      Because his phone number was opted

22     in in April of 2022.

23           Q.      Do you know who opted in

24     Mr. McGonigle's phone number into Value City's

49

1   website?

2           A.      I do not.  As I said earlier, we

3   don't collect that kind of information.  I don't

4   know names, I know phone numbers, and I know that

5   they are taking action to explicitly opt-in to send

6   messages to opt that consent.

7           Q.      Do you know when Mr. McGonigle

8   obtained this phone number?

9           A.      I think it was some time in August

10  of last year based on the information from the

11  complaint.

12                          - - -

13      Thereupon, documents were marked for purposes of

14          identification as Plaintiff's Exhibits E & F.

15                          - - -

16              MR. TACKETT:  Do you want the

17  complaint first in the sequence or the answer?

18              MR. PERRONG:  I'm going to ask

19  questions regarding the answers as it contains to

20  the complaint.  They are not reproduced in the

21  answers.

22              MR. TACKETT:  Understood.  You said

23  E and F, which one is which?

24              MR. PERRONG:  E is the answer, and F

50

1   is the complaint itself.

2                  MR. TACKETT:  Okay.  Thank you.

3   BY MR. PERRONG:

4        Q.     So referencing the allegations in

5   the complaint with the answer.  Paragraph 9.

6        A.     Which exhibit?

7        Q.     Of both.  So the way they work, they

8   both -- so we allege that the Plaintiff uses, and

9   at all times since August 5, 2024, used telephone

10  number 804-238-XXX as his personal telephone

11  number.  And your response says:  Value City is

12  without knowledge or information specific to form

13  or belief as to the truth of the allegations

14  contained in Paragraph 9, and, therefore, denies

15  the same.  So subsequent to this, is there any

16  information that you have in Value City's knowledge

17  that would contradict the Plaintiff's allegation

18  that he has used the telephone number and had the

19  telephone number since August 5, 2024?

20       A.     No.  I don't know when the Plaintiff

21  started using the phone number.

22       Q.     Okay.  Paragraph 12, we state that

23  the Defendant delivered or caused to be delivered

24  text messages to telephone number, the number,

51

1    including on at least September 22, 25, and the

2    other date listed.  And its response you say that,

3    quote, Value City received express consent to send

4    automated marketing text messages to McGonigle's

5    telephone number at issue on April 14, 2022.  My

6    question to you is does Value City contend that it

7    had consent to contact Mr. McGonigle in 2024 based

8    on the 2022 opt-in?

9                  MR. TACKETT:  Objection to the

10   extent it calls for a legal conclusion.

11                  But you may answer.

12                  THE WITNESS:  Again, the consent

13   operates off of a phone number.  I don't know the

14   individual owner of the phone number.  So then

15   based upon the 2022 consent, then yes.

16   BY MR. PERRONG:

17        Q.        Paragraph 13.  You say:  Some of the

18   text entries are below, and include some

19   screenshots on the following pages, following three

20   pages.  In response to that in paragraph 13, at the

21   end it says Value City denies that the images in

22   Paragraph 13 fully, fairly, or accurately summarize

23   or characterize the text message, and denies the

24   truth of the remaining allegations of that

52

1    paragraph.

2              If now you can turn to Exhibit A,

3    the list of text messages and go to the last page

4    there.

5         A.    Page 4?

6         Q.    Yes.

7              October 12th is the same message as

8    in the Plaintiff's screenshot; is that correct?

9              MR. TACKETT:  Objection to form.

10             THE WITNESS:  Yes.

11   BY MR. PERRONG:

12        Q.    The text message in October 14th is

13   the same message as in the Plaintiff's screenshot

14   of October 14th?

15             MR. TACKETT:  Objection to form.

16             You can answer.

17             THE WITNESS:  Yes.

18   BY MR. PERRONG:

19        Q.    The text message in October 15th is

20   the same text message as in the screenshot?

21        A.    Yes.

22        Q.    Turning to the next page.

23             MR. TACKETT:  Of which document?

24             MR. PERRONG:  Of the complaint.

53

1             MR. TACKETT:  Okay.

2    BY MR. PERRONG:

3         Q.    And then going back.

4         A.    Which exhibit is that?  Sorry.

5         Q.    So this exhibit here.

6         A.    Okay.  I'm with you.

7         Q.    And then I believe it's --

8         A.    I'm with you.

9             MR. TACKETT:  Exhibit A and Exhibit

10   F?

11            MR. PERRONG:  Yes.

12            THE WITNESS:  Thank you.

13   BY MR. PERRONG:

14        Q.    So the text message in September 14

15   is the same message as the one in the document,

16   with the exception of a picture?

17        A.    Yes.

18        Q.    And 95207 is Value City short code?

19        A.    Yes.

20        Q.    And then going back down and up

21   on -- or down on the list as well, on

22   September 22nd, that's the text message that's

23   referenced in September 22nd of that line?

24        A.    It appears to be.  The assumption of

54

1    what's underneath that arrow.

2         Q.    I'll give you that.

3               Does appear on the second page as

4    well, because it's cut off.  It's the following

5    page.

6         A.    Yeah.

7         Q.    And then the final message on

8    September 25th, at least that we provided

9    screenshots of, that matches the text message in

10   the logs that were provided?

11        A.    Yes.

12        Q.    I'm done with these exhibits for

13   now.

14              Does Value City utilize skiptracing

15   databases?

16        A.    I don't know what that is.

17        Q.    Besides verifying a number when it's

18   submitted, as you explained through Attentive's

19   double opt-in process, is there any verification

20   that Value City does on a periodic basis to verify

21   that the number is the wrong or right number?

22        A.    Well, when you opt-in, the start of

23   us sending an individual text messages would be a

24   text received to us from that individual.  After

1    that, they are going to receive text messages based

2    on their engagement with the platform, which could

3    be high engagement, more messages; less engagement,

4    less messages until in opting out.

5         Q.    Even if they don't engage for three

6    years, though, they would continue to receive

7    messages until they opted out?

8         A.    Potentially, very rarely.  By that

9    point, they would probably be in a lapsed list and

10   receive very few to none, but the consent would

11   still exist and we would have the ability to market

12   to them.

13        Q.    Would -- to your knowledge, is the

14   Plaintiff's number on a lapsed -- was the

15   Plaintiff's number ever on a lapsed list?

16        A.    To my knowledge, no, based on the

17   text message record.  The frequency of messages

18   would tell me that they are opening, in some way

19   engaging with the messages to continue to receive

20   them at that frequency.

21        Q.    And none of the messages that the

22   Plaintiff received, other than the initial message,

23   indicated that he could reply stop to cancel; is

24   that right?

1          A.      Can you repeat the question?

2          Q.      None of the text messages that the

3    Plaintiff would have received, so that's from

4    approximately August 5th of 2024 onward, none of

5    those messages indicated that the Plaintiff could

6    have texted stop to stop; is that right?

7          A.      It does not appear that that was in

8    any of the messages during that time.

9          Q.      Does Value City periodically send

10   messages that include the language to text stop to

11   stop?

12         A.      We do.

13         Q.      How often does Value City send such

14   messages?

15         A.      It's usually about once a quarter.

16         Q.      I'm looking through all of these

17   messages, and I can represent to you that I can do

18   a control F to search for all of this, and stop

19   does not appear in any of the messages, other than

20   the second message.  So why would that be that if

21   Value City is sending periodic stop messages, why

22   would these not be reflected in the logs?

23         A.      We may not have during this time

24   period.  It's a voluntary -- it's voluntary to do

57

 1     that.  So there's times we've done it; there's

 2     times we haven't done it.  Again, I can't confirm

 3     during this time period, other than what you're

 4     showing.

 5              Q.      From your training with Attentive,

 6     and from your own knowledge of the TCPA, I'm not

 7     asking you as an attorney, but just as your own

 8     knowledge, are you aware TCPA prohibits Value City

 9     to send marketing text messages to individuals who

10     did not provide their consent?

11                   MR. TACKETT:  Objection.

12                   THE WITNESS:  Can you repeat?

13     BY MR. PERRONG:

14              Q.      Are you aware that the TCPA

15     prohibits companies like Value City from marketing

16     to individuals who did not provide their consent?

17                   MR. TACKETT:  Objection to form to

18     the extent it applies a rule as opposed to asking a

19     question.  Also object to the extent it calls for a

20     legal conclusion.

21                   You can answer to the extent you are

22     able.

23                   THE WITNESS:  One more time.

24     BY MR. PERRONG:

1    Q.    Based on your own knowledge and the

2  training provided to you by Attentive --

3    A.    Yeah.

4    Q.    -- is it your understanding that the

5  TCPA prohibit -- when we are talking about TCPA

6  consent, we understand what we are talking about,

7  yes?

8              If you could say.

9    A.    Yes.  Sorry.

10    Q.    So in terms of that, does that

11  consent, to your knowledge, follow a phone number

12  or does it follow a person?

13              MR. TACKETT:  Objection.  Same

14  objection as before.

15              THE WITNESS:  To my knowledge, it's

16  the phone number.

17  BY MR. PERRONG:

18    Q.    I want to go back to the answer, and

19  turn to Value City's affirmative defenses, which

20  are on page -- start on page 11.

21              And Affirmative Defense 2 says that

22  McGonigle and the proposed class are barred from

23  asserting their claims in whole or in part to the

24  extent the text messages at issue were sent with

59

1    their prior expressed permission and consent.  And

2    that consent was not effectively revoked.  So the

3    question is what evidence does Value City have that

4    Mr. McGonigle consented to receive text messages

5    from Value City?

6                    MR. TACKETT:  Objection to the

7    extent it calls a legal conclusion or seeks to

8    evade the attorney-client work product doctrine or

9    attorney-client privilege.

10                    Notwithstanding the objection, you

11   can answer.

12                    THE WITNESS:  Ask your question

13   again.

14   BY MR. PERRONG:

15        Q.    What evidence does Value City have

16   that Mr. McGonigle consented?

17                    MR. TACKETT:  Objection.  Same

18   objection.

19                    THE WITNESS:  Again, the consent

20   that I know of is based on a phone number, not an

21   individual.  I don't have that personally

22   identifiable information.

23   BY MR. PERRONG:

24        Q.    Turning to Paragraph 5.  It says

1    that the complaint is barred in whole or in part

2    because Value City has established and implemented

3    reasonable practices and procedures to prevent

4    violations of the TCPA and related regulations.

5    Can you tell me more about those reasonable

6    practices and procedures that Value City has

7    implemented?

8                    MR. TACKETT:  Objection to the

9    extent it calls for a legal conclusion.

10                    Go ahead.

11                    THE WITNESS:  Yeah, I mean, it

12    starts with a double opt-in process that requires

13    action on behalf of the individual to send us a

14    message validating their consent.  Outside of that,

15    I mean, the assumption of TCPA compliance is how

16    the Attentive platform operates.  And the ability

17    to exit a list is a very simple process, actually.

18    Simpler than getting on the list to receive

19    messages.

20                    Q.    Turning to Paragraph 13.  It says

21    that all claims brought in the complaint are barred

22    to the extent that McGonigle and the proposed class

23    members had an established business relationship

24    with Value City or had previously purchased from

61

1    Value City.  Sitting here today, do you have any

2    knowledge of any evidence that Mr. McGonigle had an

3    established business relationship with Value City?

4                    MR. TACKETT:  Objection.  Same

5    objection.

6                    Go ahead.

7                    THE WITNESS:  I do not.

8    BY MR. PERRONG:

9         Q.    Sitting here today, do you have any

10   knowledge that Mr. McGonigle purchased anything

11   from Value City?

12        A.    I don't know if he did or not.

13        Q.    Were you asked to search Value

14   City's purchase records as part of this litigation

15   to ascertain whether or not Mr. McGonigle had

16   purchased anything from Value City?

17                    MR. TACKETT:  Objection to the

18   extent that calls for attorney-client privileged

19   communications.

20                    THE WITNESS:  I don't believe so.

21   BY MR. PERRONG:

22        Q.    Other than those policies provided

23   by Attentive, do you have any written policies or

24   procedures in place to comply with the National Do

62

1    Not Call rules?

2         A.    I mean, all of our terms and

3    conditions are populated in the exhibits that we

4    looked at previously.

5         Q.    We talked a little bit about

6    Attentive's training with respect to the TCPA and

7    the communications that Attentive had with your

8    company's attorneys and then your company's

9    attorneys passed on to you, without going into what

10   your company's attorneys discussed with you, were

11   any Value City employees required to certify or

12   acknowledge compliance with the TCPA?  For example,

13   I've read such and such, and I agree to abide by

14   these terms?

15        A.    I don't believe there was any formal

16   documentation, no.

17        Q.    We spoke about Attentive's policies

18   and procedures and TCPA compliance, does -- to your

19   knowledge, does Attentive periodically update those

20   policies?

21        A.    Attentive is always updating with

22   the evolution of TCPA law and compliance.  I mean,

23   again, we've talked about it at length, but that's

24   the reason we chose them is their expertise and

1    their ability to govern the program so we can

2    operate with the confidence that it's operating

3    against the TCPA compliance.

4         Q.    Does Attentive communicate those

5    changes to you?

6         A.    I can't remember a situation where

7    they did.  You know, they're always passing on

8    learnings and happenings in the space, that gets

9    into a space where it's usually very legal ease and

10   technical; so we don't usually get into a lot of

11   that.  From time to time they pass on learnings of

12   things going on in the evolution of the SMS

13   marketing space.

14        Q.    Does Attentive ever share its

15   internal policies with you?

16        A.    No.

17        Q.    Has Value City ever trained

18   Attentive with respect to the procedures

19   established in the National Do Not Call rules?

20        A.    Can you clarify that question?

21        Q.    Yeah.  Sure.  We talked a lot about

22   training Attentive provided to Value City, but has

23   Value City provided Attentive any training or

24   requested training in procedures for the policies

64

1    established under the National Do Not Call rules?

2         A.    Not that I'm aware of.  Again, we

3    have handled that relationship with Attentive and

4    their expertise in the space, so.

5         Q.    As part of that experience and

6    expertise, did any of -- was there ever any

7    training on the reassigned number database?

8              MR. TACKETT:  Objection.

9              THE WITNESS:  There was not.  I

10   didn't know a lot about it until this complaint, to

11   be honest.

12   BY MR. PERRONG:

13        Q.    Did you, yourself, participate in

14   any training with respect to the National Do Not

15   Call rules?  For example, with the individuals that

16   you mentioned that are the ones logging into the

17   Attentive platform and sending the messages, or

18   were they ever present in that training that

19   Attentive provided?

20        A.    At the time of the training, yes.

21        Q.    So they were present in Attentive's

22   training?

23        A.    Correct.

24        Q.    Other than the initial on-boarding

1    training that Attentive provided to you, and as you

2    mentioned, sometimes they send communiques about

3    happenings in the TCPA space, do they provide any

4    recurrent training on TCPA?

5         A.    Nothing standardized, but at request

6    they would.

7         Q.    You mentioned at request they did,

8    has Value City ever made such a request of

9    Attentive?

10        A.    No.

11        Q.    I think you might have answered

12   this, but does Attentive or Value City document

13   that training at all?

14        A.    I don't think it was documented.

15        Q.    What process does Attentive use to

16   prevent telephone solicitation to numbers on the Do

17   Not Call list?

18             MR. TACKETT:  Objection.  I'm going

19   to point you back to the objections that we served

20   on July 15th.  You just asked about Attentive's

21   policies regarding telephone solicitations, there's

22   no telephone call at issue in this case.  Your

23   discovery responses admitted that McGonigle never

24   received a call, Value City has also said in

1    discovery that they don't make calls, now you're

2    asking about Attentive's policies regarding calls.

3               MR. PERRONG:  I'm not asking about

4    policies with calls.  Maybe I'm -- I'm asking

5    actually, quite frankly, with respect to the

6    explicate text with the regulation itself, and the

7    language used in the regulation, which is to

8    prevent telephone solicitations to any telephone

9    number on any list established pursuant to the Do

10   Not Call rules.

11              MR. TACKETT:  Could you go to the

12   question for me, please?  I thought he said

13   telephone calls, solicitations.

14              Q:  What process does Attentive use

15   to prevent telephone solicitation to numbers on the

16   Do Not Call list?

17              MR. TACKETT:  Okay.  Thank you.

18              Sorry about that.  My objection

19   still stands to the extent you are talking about a

20   telephone call, and also to the extent it's asking

21   about Attentive as opposed to Value City.

22              But you are good to answer with

23   those objections in mind.

24              THE WITNESS:  Could you ask it one

67

1    more time?

2                      MR. TACKETT:  Let her read it.

3                      Q:  What process does Attentive use

4    to prevent telephone solicitation to numbers on the

5    Do Not Call list?

6                      MR. TACKETT:  Same objection.

7                      THE WITNESS:  It's the opt-in

8    process.  Again, it takes an explicate opt-in by an

9    individual consenting to the terms and conditions.

10   It requires them sending us a message to be a part

11   of that list and ask to receive messages from us.

12   BY MR. PERRONG:

13                     Q.     Does Value City employ a version of

14   the National Do Not Call Registry obtained from the

15   administrator of the registry no more than 30 days

16   prior to the date any message is sent?

17                     A.     Not that I'm aware of.

18                     Q.     Does Attentive employ a version of

19   the National Do Not Call Registry obtained by the

20   administrator of the Do Not Call Registry no more

21   than 30 days prior to the date any message is sent?

22                     A.     I can't speak to Attentive's use of

23   the Do Not Call List.

24                     Q.     Does Value City maintain records

68

1   documenting any process that Attentive would have

2   used?

3         A.      Can you clarify?

4         Q.      Does Value City have records of -- I

5   understand that you say you don't know --

6         A.      Sure.

7         Q.      -- whether or not Attentive had

8   that.  But does it maintain -- I would assume the

9   answer is no, if it doesn't even know whether or

10   not Attentive maintained it, it doesn't have any

11   records of whether or not Attentive maintained it,

12   would that be a fair statement?

13         A.      That is correct.

14         Q.      When was the last time that Value

15   City evaluated its procedures to see whether or not

16   it should include or implement the numbers in the

17   reassigned number database?

18               MR. TACKETT:  Objection to the

19   extent that applies.  Reassigned number database is

20   a required component of TCPA compliance or seeks a

21   legal conclusion about that.

22               You can go ahead and answer.

23               THE WITNESS:  Again, I didn't know

24   much about the reassigned number database until

69

1    this complaint.  You know, as I've done some

2    research and learned, it's relatively new, somewhat

3    unreliable, very expensive and difficult to manage

4    and sustain.  To do so today is different than it's

5    going to be tomorrow and the day after and the day

6    after.  So as a voluntary practice, it's not really

7    doing the job unless you do it in constant

8    perpetuity, which is impossible to maintain.

9    BY MR. PERRONG:

10          Q.     I think you mentioned, and I think

11   this would be a fair characterization, correct me

12   if I'm wrong, but that Value City relied on

13   Attentive's TCPA knowledge and expertise with

14   respect to, for example, the Do Not Call Registry,

15   would that be a fair assessment?

16          A.     Yes.

17          Q.     You also testified that, to your

18   knowledge, Attentive does offer a reassigned number

19   database functionality within its platform; is that

20   accurate?

21          A.     As I learned, yes.

22          Q.     How -- if Attentive -- if Value City

23   is relying on Attentive to do its TCPA compliance,

24   and Attentive, as you point out, has knowledge and

70

1  expertise in this space, why can't Value City rely

2  on its expertise in that space as it pertains to

3  the reassigned number database?

4          MR. TACKETT:  Objection to the

5  extent it mischaracterizes.

6          Go ahead.

7          THE WITNESS:  I'm not following your

8  question.

9  BY MR. PERRONG:

10         Q.     You mentioned some problems with the

11 reassigned number database, it's very expensive,

12 difficult to maintain, et cetera, et cetera.  Would

13 seem to me that Attentive's platform sort of solves

14 those problems by giving you a turnkey solution, is

15 that not your understanding of what Attentive's

16 platform does?

17         A.     No.

18         Q.     Why not?

19         A.     It's a completely separate manual

20 process for them.

21         Q.     How is it a manual process for

22 Attentive?

23         A.     Because again, they have to run in

24 constant perpetuity reassigned numbers, and there's

1    a cost associated and an outreach required for

2    every single one of those to confirm whether that

3    individual phone number still wants to receive text

4    message marketing when a number is reassigned.  The

5    assumption that's made, and as I understand to be

6    TCPA compliant, is that a customer has the ability,

7    as I mentioned earlier, to very simply opt out, and

8    can say anything back to us and clarify the ability

9    to opt out in real time within seconds.

10        Q.    So it's your contention that it's

11   incumbent upon the customer to send a stop request

12   to ensure that -- for you to ensure the number you

13   are texting still belongs to the intended

14   recipient?

15        A.    I didn't say that.

16        Q.    If you're not checking the

17   reassigned number databases, what other steps,

18   other than an opt-out can you take to ensure that

19   the number you are texting still belongs to the

20   intended recipient?

21             MR. TACKETT:  Objection to the

22   extent it implies a legal requirement to constantly

23   be in touch verifying that an opt-in still wants to

24   receive messages.

72

1             You can go ahead. Notwithstanding

2 that objection to form, go ahead.

3             THE WITNESS: Can you ask one more

4 time?

5 BY MR. PERRONG:

6        Q. What steps does Attentive take to

7 ensure that the number they are texting still

8 belongs to the intended recipient?

9             MR. TACKETT: Objection. Same

10 objection.

11             THE WITNESS: I mean, once a number

12 is opted in, the assumption until opted out

13 otherwise, is there's consistent. If the number is

14 reassigned, the assumption is if you do not want to

15 receive messages you can opt out through seconds in

16 a multitude of outreach.

17 BY MR. PERRONG:

18        Q. So it's Value City's routine

19 business practice to rely upon customers to send

20 stop requests?

21        A. In the same way that it's Value

22 City's reliance on customers to join the list, yes.

23        Q. Would you agree that reassigned

24 numbers are a common cause of texting parties who

73

1    never requested text messages from Value City?

2              MR. TACKETT:  Objection to form.

3              THE WITNESS:  I have no idea how

4    frequently numbers are reassigned.

5    BY MR. PERRONG:

6         Q.    Has Attentive ever provided you a

7    risk analysis or a written explanation with respect

8    to the use of the reassigned number database?

9         A.    No.

10              Can we break?

11        Q.    Yeah, sure.

12              (Brief Recess.)

13   BY MR. PERRONG:

14        Q.    Do you understand you are still

15   under oath?

16        A.    Yes.

17        Q.    Other than sending a stop request,

18   can you point to any other affirmative steps that

19   your company takes to avoid texting numbers that

20   have been reassigned?

21        A.    Not that I'm aware of.

22        Q.    Is it Value City's claim that the

23   text messages to Plaintiff's phone number are a

24   result of some isolated error despite these stop

74

1   procedures?

2               MR. TACKETT:  Objection to form.

3               Go ahead.

4               THE WITNESS:  No, it's not the

5   result of an error.  It's a result of the consent

6   given in April of 2022 of the phone number.

7   BY MR. PERRONG:

8        Q.     Sitting here today, what of Value

9   City's procedures would have caught the fact that

10  the number you were trying to text no longer

11  belonged to the party you intended to reach?

12              MR. TACKETT:  Objection to form.

13  Confusing and also implies a legal violation which

14  we certainly dispute that there has been one.

15              You're free to answer.

16              THE WITNESS:  Can you repeat the

17  question?

18  BY MR. PERRONG:

19       Q.     Yeah.  What of Value City's

20  procedures would have caught the fact that the

21  number you texted no longer belonged to the party

22  that you intended to reach?

23              MR. TACKETT:  Objection.  Same

24  objection.

1          THE WITNESS:  There's no required

2     procedures against that.  Again, under the

3     assumption that there's consent from the phone

4     number, I don't -- there's no required or standard

5     procedures that would allow us otherwise to know

6     that.

7     BY MR. PERRONG:

8          Q.     You said multiple times now I think,

9     consent from the phone number, what -- what

10    information informs your knowledge that the consent

11    is linked to a phone number?

12         MR. TACKETT:  Objection.  To the

13    extent it calls for a legal conclusion.

14         Go ahead.

15         THE WITNESS:  A phone number is

16    opting in.  Again, I don't have any information

17    about an individual, other than a phone number

18    sending us a message stating we send them messages

19    in return.

20    BY MR. PERRONG:

21         Q.     So to be clear, Value City does not

22    confirm that telephone numbers still belong to the

23    individual customer before texting those numbers,

24    correct?

1              MR. TACKETT:  Objection.

2              THE WITNESS:  The assumption is that

3    once opted in and receiving a message from the

4    phone number that they've consented against the

5    terms and conditions.  And I wouldn't know anything

6    otherwise until -- until noted by trying to opt

7    out.  There's a variety of ways you have to opt out

8    very simply.

9              MR. PERRONG:  At this time I'll take

10   a 10, 15-minute break just to wrap up my outline,

11   and see if there's anything.  If not, we will

12   proceed.

13             MR. TACKETT:  Okay.

14             (Brief Recess.)

15   BY MR. PERRONG:

16        Q.    Do you understand you are still

17   under oath?

18        A.    Yes.

19        Q.    I just had a few more questions to

20   wrap up this deposition.

21             I am going to transfer what we'll

22   mark whatever the next letter is.

23                   - - -

24     Thereupon, a document was marked for purposes of

1            identification as Plaintiff's Exhibit G.

2                 - - -

3   BY MR. PERRONG:

4        Q.    I want to turn to page 8.  And

5   question 10 asks for policies, practices and

6   procedures Defendant uses or used to avoid

7   violations of the TCPA.  And the response says that

8   the TCPA policies, practices and procedures that

9   inform Attentive's practices would be in possession

10   of Attentive not Value City.

11          So I just have a few questions on

12   this.  Has Attentive ever provided Value City any

13   of its practices, policies and procedures that it

14   uses to avoid violations of the TCPA?

15        A.    I'm not in possession of any.  That

16   may have been shared with legal teams when we were

17   on-boarding with Attentive, but I don't have

18   anything around their TCPA compliance procedures,

19   other than they are TCPA compliant.

20        Q.    And I think you testified yourself

21   that Value City itself does not have any sort of

22   procedures other than those which are presumably

23   followed by Attentive?

24        A.    Correct.  Governed by the program

78

1    run by Attentive.

2           Q.     With respect to 11, similar

3    question.  It asks for policies the Defendant uses

4    regarding instructions or requests that a Defendant

5    or a vendor on its behalf stopped delivering text

6    messages.  And it says that you will provide

7    responsive documents.  What sort of documents does

8    Value City use regarding requests or instructions

9    that it stop delivering text messages to a

10   telephone number?

11                  MR. TACKETT:  Objection.

12                  Go ahead.

13                  THE WITNESS:  Can you clarify that

14   question?  I'm not exactly following.

15   BY MR. PERRONG:

16          Q.     I think part of the problem is I

17   don't really understand what documents Value City

18   has provided regarding its policies, practices and

19   procedures that it uses.  Particularly as you said

20   Value City has no such policies, other than those

21   used by Attentive, to stop delivering text messages

22   to phone numbers.

23          A.     Is that the end of your question?

24          Q.     Yes.

79

1       A.      Or statement.

2               Yeah, I mean, there's no processed

3    documents.  I would reference back to the terms and

4    conditions that we looked at earlier.  The only

5    other thing that could be shown would be the

6    response received when someone sends a message that

7    says, you know, with the opt-out language with the

8    response, auto response saying they have opted out.

9    Or if they say anything else to us with the

10   language that gives them clarified direction on

11   reply stop to opt out, or call customer service and

12   we will help you.

13      Q.      If somebody calls customer service,

14   and they want to be helped, how does that do not

15   call request make it to Attentive?

16      A.      What are they looking for help on?

17      Q.      So suppose that I receive a similar

18   message, and I am instructed to call customer

19   service, walk me through the process of what

20   happens when I call the 800 number for customer

21   service?

22      A.      Am I assuming you are looking to opt

23   out of our list by calling customer service?

24      Q.      Yes.

1      A.      Okay.  You call customer service,

2  say I'm trying to get out of the list, they will

3  give you explicate instruction, just like you

4  received by text message.  You can text stop or no,

5  any of the synonyms.  Stop is the simplest.  You

6  can send that text no, and you are out immediately.

7  Otherwise, they can reach out to our team, who can

8  go into the platform and manually opt you out

9  immediately.

10      Q.      Is that customer service process

11  memorialized in a script?

12              MR. TACKETT:  Objection.

13              THE WITNESS:  Not that I'm aware of,

14  I don't know.  That may be.  There's a lot of

15  scripts for, you know, the communications that our

16  customer service team does, but I don't know what

17  that looks like.

18  BY MR. PERRONG:

19      Q.      What communications has Value City

20  had with Attentive with respect to this litigation?

21              MR. TACKETT:  Objection to the

22  extent that that would seek communications had by

23  legal counsel, whether external or internal, direct

24  with legal counsel or Attentive.  Otherwise, you

81

1    can answer.

2                      MR. PERRONG:  To clarify, does your

3    objection extend to communications in which Value

4    City's employees were carbon copied on e-mails with

5    Attentive, which also include legal counsel?

6                      MR. TACKETT:  I'm not being deposed.

7    I'm simply raising an objection to the extent that

8    your question would inquire of matters that are

9    within the attorney work product.

10                      MR. PERRONG:  The question that I

11   have though is, it's at least our contention that

12   documents in which Value City employees are carbon

13   copied would waive that privilege.

14                      MR. TACKETT:  Yeah.  And I'm not

15   being deposed.  But I'm not talking about any

16   written communications.

17                      MR. PERRONG:  Right.  But to be

18   clear, you are instructing him not to answer?

19                      MR. TACKETT:  I'm not.

20   BY MR. PERRONG:

21        Q.      Okay.  Do you have knowledge of any

22   communications with Attentive with respect to this

23   litigation?

24        A.      Yes.

82

1    Q.    What communications with Attentive

2    have been had with respect to this litigation?

3        A.    The request to produce the documents

4    requested by counsel.

5        Q.    Besides those documents, have there

6    been any communications with Attentive with respect

7    to how to avoid a situation like this?

8                MR. TACKETT:  Objection to form.

9                THE WITNESS:  Not that I'm aware of.

10   BY MR. PERRONG:

11       Q.    Have you had any communications with

12   Attentive with respect to the feasibility of

13   implementing the use of the reassigned number

14   database as a result of this litigation?

15               MR. TACKETT:  Objection to form to

16   the extent it implies any legal requirement to use

17   the reassigned number database.

18               You can go ahead and answer, though.

19               THE WITNESS:  Yes, we've discussed

20   the reassigned number database, and ability to use

21   it.  Which led us to the conclusion that, you know,

22   Attentive is, again, as I said earlier, the

23   largest -- one of the largest, if not the largest

24   SMS marketing platform in the world.  And they are

83

1    experts in all things SMS marketing and TCPA

2    compliance, requirements, and evolution of.

3    They've educated us on the reassigned number

4    database.  And it's, one, not a requirement.  And,

5    two, not something that's a practical use case at

6    this point in time.

7    BY MR. PERRONG:

8         Q.      Why would it not be a practical use

9    case?

10        A.      As I stated earlier, it's a

11   continuous and manual process to do that.  To run

12   it right now would be to run it differently an hour

13   from now, tomorrow and the next day.  Every time

14   you run that against every number in the database,

15   sure, there's a cost associated with it, but it's

16   also a manual process to then outreach to that

17   phone number and confirm whether they do or do not

18   in fact want to be in -- to receive the messages

19   that that phone number has already consented and

20   explicitly opted into.  That would be an ongoing

21   cycle that would be nearly impossible to manage

22   based on the current procedures with it.

23        Q.      Approximately how many discussions

24   have you had with Attentive regarding the use of

1    the reassigned number database?

2              MR. TACKETT:  Objection.  Same

3    objection as the last time.  Also relevance.

4              Go ahead.

5              THE WITNESS:  Probably one.

6    BY MR. PERRONG:

7         Q.     Turning to No. 14.

8              We asked for internal do not call or

9    do not text lists that the Defendant maintains as a

10   result of unsubscribed or stop requests sent in

11   response to text messages from or on behalf of

12   Defendant.  I want to clarify two points of

13   testimony that you've made.  The first is I think

14   it's your testimony that Value City itself does not

15   maintain an internal do not call or do not text

16   list other than that which is maintained by

17   Attentive; is that right?

18        A.     As far as I'm aware.

19        Q.     Second question is, is the

20   Plaintiff's number on Attentive's do not call list?

21        A.     The Plaintiff's phone number is now

22   opted out, and is on the do not message list.

23   Again, call, we do not do.  Message, we do.  And it

24   is on the do not message list.  It's explicitly

85

1    opted out at this point in time once we received a

2    complaint.

3         Q.    With respect to Attentive's

4    reassigned number database offering, is that

5    something that Value City can just check a box or

6    does that require additional on-boarding?

7              MR. TACKETT:  Objection to form.

8              THE WITNESS:  I'm not positive.  I

9    know it's a separate and additional offering to the

10   program as it exists today.  So whether that's -- I

11   don't know what it takes from an on-boarding or

12   contractual standpoint, I don't know.

13   BY MR. PERRONG:

14        Q.    You mentioned there's an additional

15   cost associated with it, what's the additional

16   cost?

17        A.    I do not know.

18        Q.    Has Attentive ever provided you its

19   written procedures to comply with the National Do

20   Not Call rules?

21        A.    No.  There's no documentation that's

22   been provided to me.  Again, that could have been

23   shared with counsel at the time of the on-boarding

24   and discussions from the legal teams.  But again,

1    do not call, if someone explicitly opts in, they're

2    consenting to receive messages, irregardless

3    whether they are on the do not call or not.

4          Q.    Did -- in your initial on-boarding

5    with Attentive, and in any sort of subsequent

6    communiques and communications, to the best of your

7    recollection, did Attentive address the issue of --

8    or I should say, every address the issue of or --

9          MR. TACKETT:  Off the record.

10   BY MR. PERRONG:

11         Q.    In any of those communiques, initial

12   training, whatnot, did Attentive ever bring up the

13   problem or bring up the possibility that people

14   change telephone numbers and that it may end up

15   that you're texting somebody that did not, in fact,

16   opt in, a different person than the person who

17   opted in?

18         A.    I don't remember discussing the

19   specifics of that instance during the on-boarding

20   process.  But again, the assumption was the

21   simplicity of opting out of the program.  I mean,

22   it happens every day.  We acquire new people every

23   day and lose people every day.  It happens every

24   singe day, all day long.  More difficult to get in

87

1    than get out.  And I think the assumption was that

2    if somebody wanted to get out under that instance,

3    under that requirement, they can get out very

4    easily.

5           Q.     With respect to the request for

6    proposal process --

7           A.     Yeah.

8           Q.     -- to your knowledge, was anything

9    to the extent of what I just described, ensuring

10   people who change numbers do not continue to get

11   text messages, was that included in the request for

12   proposal process?

13          A.     I don't remember that aspect of it.

14          Q.     Same question, but with respect to

15   training that was provided as opposed to the

16   initial on-boarding, was there any sort of training

17   provided to confirm that a number still belongs to

18   somebody who had submitted their information?

19          A.     No.  The same answer applies.

20   Training, on-boarding were simultaneous, one in the

21   same time.

22          Q.     Other than as a result of this

23   litigation, your policies were never evaluated to

24   include the use of the reassigned number database?

1          MR. TACKETT:  Objection.  Same

2    objection as earlier.  Objecting to the extent it

3    implies a legal requirement to consult the

4    reassigned number database.

5          Notwithstanding the objection, go

6    ahead and answer.

7          THE WITNESS:  Again, we assessed it

8    with the Attentive team as a result of this

9    complaint to understand what it is, and what the

10   feasibility of its use is.  Understanding it's a

11   separate product, and in addition to our contract

12   requirements for TCPA.  Yeah, we assessed it with

13   the Attentive team or discussed it with the

14   Attentive team.

15   BY MR. PERRONG:

16          Q.    Approximately what percentage of

17   numbers on Attentive's -- or on this Attentive

18   platform have been reassigned?

19          MR. TACKETT:  Objection to form.

20   When you say Attentive platform, are you talking

21   about --

22          MR. PERRONG:  I'll rephrase.

23   BY MR. PERRONG:

24          Q.    What percentage of numbers did Value

89

1  City contact were subsequently reassigned?

2              MR. TACKETT:  Objection to form.

3              THE WITNESS:  I don't know the

4  answer to that.  We would have to run some

5  reassigned number analysis of the entire plan, I

6  don't know.

7  BY MR. PERRONG:

8       Q.     Value City has never run that

9  analysis?

10      A.     No.

11      Q.     How would the Plaintiff know to

12 respond to stop to opt out if none of your messages

13 included that language in the message?

14      A.     I'm going to be honest, it's pretty

15 common sense and intuitive these days.  But

16 throwing that out, again, all the Plaintiff would

17 have to do is anything, just say anything to us,

18 and you would get that explicate direction.  Or you

19 could avoid that all together and you could look up

20 our phone number and call our customer service to

21 get out as well.  There are a bunch of hard ways to

22 get it done.  And there are easy ways that

23 consumers today understand and inherently know how

24 to get out.

90

1    Q.    You said he could look up the phone

2  number, how would he look up the phone number?

3    A.    Google.  It'd be on our website or

4  you could Google it.  There's a variety of ways to

5  find the phone number for Value City Furniture.

6    Q.    How would the Plaintiff know that

7  the text messages come from Value City Furniture

8  when the text messages only say VCF, and the link

9  has VCF.ATTNTV, and don't even name Value City

10 Furniture?

11   A.    When you click on the link it takes

12 you to the website.

13   Q.    So is it Value City's contention

14 that customers need to click on unsolicited text

15 message links to opt out?

16           MR. TACKETT:  Objection to form.

17 Mischaracterizes.  Argumentative.

18           Go ahead.

19           THE WITNESS:  Can you clarify your

20 question?

21 BY MR. PERRONG:

22   Q.    I think that it's general -- to

23 speak of general knowledge in common consumer

24 circles that is if you receive a text message from

91

1    somebody that you don't know with a link in it,

2    it's probably a bad idea to try and click that

3    link, right?

4              MR. TACKETT:  Objection.

5              THE WITNESS:  I don't typically do

6    it.

7    BY MR. PERRONG:

8         Q.    So then if I receive a text message

9    saying -- from a number I don't recognize with VCF

10   and a link VCF.ATTNTV, that as you mentioned,

11   really can't name Value City Furniture in full

12   because of the limits of the characters, how am I

13   supposed to know that these text messages are

14   originating from VCF as opposed to anything else?

15             MR. TACKETT:  Objection to form.

16             THE WITNESS:  I mean, I would argue

17   in the same way that you're saying that it's common

18   knowledge to not click on a link that you don't

19   know, that it's similarly common knowledge you have

20   the option to opt out by saying stop, no, or

21   something like that.

22             MR. PERRONG:  I have no further

23   questions.

24             However, I will say that to be

1  clear, we're not terminating the deposition.  We're

2  suspending the deposition at this time based on

3  your instruction to the deponent not to answer the

4  questions related to some of the issues that you

5  argue are class-wide issues, we contend are

6  individual issues related to other complaints and

7  things of that nature.  And the other questions

8  that we were not permitted to ask because of the

9  objections.  So we will seek judicial intervention

10  on those.

11           MR. TACKETT:  I understand that with

12  respect to complaints or concerns raised by other

13  individuals besides Mr. McGonigle, I don't know if

14  there was another issue.  Was there another issue?

15           MR. PERRONG:  I think the other

16  issue -- let me look.

17           MR. TACKETT:  I just want the record

18  to be clear.

19           MR. PERRONG:  I mean, the record

20  will reflect any time you made that sort of

21  objection to seeking class-wide issues and seeking

22  information that you have objected to in your

23  letter.

24           MR. TACKETT:  So there were two

1    times, but they were both on that same concept.

2    Because the other one you asked him if he had

3    received requests, but it was relating to other

4    people.  So it's the same issue.  And to be clear,

5    if the Court instructs us to come back and answer

6    questions about that, we will be more than happy to

7    cooperate with doing so.

8                    MR. PERRONG:  I think there was also

9    a question as to the -- the revenue attributable to

10   Value City's text messaging campaign that you also

11   objected to.

12                   MR. TACKETT:  I objected in the

13   letter, but Mr. Dezso's answer today was that he

14   didn't know.

15                   MR. PERRONG:  Okay.

16                   MR. TACKETT:  So I don't think

17   that's right.

18                   MR. PERRONG:  Okay.  I think it

19   would make me feel a little bit better if we just

20   said that to the extent we are not remembering

21   something correctly, and the transcript reflects

22   there's an objection on the record, based on your

23   letter and your objections, that those are still

24   preserved pending judicial resolution.  But other

94

1    than that, we are on the same page as to the line

2    of questioning.

3                    MR. TACKETT:  Yeah, if there's

4    something in the transcript that reflects an

5    impasse during the deposition, yeah, certainly, you

6    all are free to raise it with the Court in terms of

7    continuing the deposition for that purpose, if the

8    Court instructs us to do so.

9                    Otherwise, we will read the

10   transcript.

11                   MR. PERRONG:  To be clear, the other

12   thing we would also suspend on, to the extent we

13   are in a bifurcated discovery period; so to the

14   extent we will take another 30(B)(6) deposition on

15   class discovery, I just want to make sure we are

16   not -- that we are preserving that.

17                   MR. TACKETT:  No worries.

18   Obviously, if this matter gets to class discovery,

19   you're not constrained from having another 30(B)

20   deposition on class issues.  That's implicit in our

21   objections in the July 15th letter.

22                   MR. PERRONG:  I just wanted to make

23   a clear record.

24                   MR. TACKETT:  Understood.

1          MR. PERRONG:  So long as you take a

2     read and sign.

3          MR. TACKETT:  We will.

4          MR. PERRONG:  All right.  Thank you.

5               (Signature not waived.)

6                    - - -

7          Thereupon, the deposition concluded at

8     approximately 12:51 p.m.

9                    - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

96

1               AFFIDAVIT/ERRATA SHEET

2   STATE OF OHIO:
                          SS:
3   COUNTY OF FRANKLIN:

4   MCGONIGLE vs. VALUE CITY FURNITURE, INC.

5
            I, RYAN DEZSO, do hereby certify that I
6   have read the foregoing transcript of my deposition
    given on July 21, 2025, and wish to make the
7   following additions, corrections, amendments, or
    deletions:

8

9   PAGE NO.   LINE NO.   CHANGE AND REASON FOR CHANGE:

10

11

12

13

14

15

16

17  In all other respects, the transcript is true and
    correct.
18

19                          _____
                            RYAN DEZSO
20
    Subscribed and sworn to before me this____ day
21  of _____, 2025.

22

23  _____
    NOTARY PUBLIC, STATE OF OHIO
24  My Commission Expires:

1              C E R T I F I C A T E

2                        - - -

3

      THE STATE OF OHIO:
4                                    SS:
      COUNTY OF FRANKLIN:
5

6

7              I, Angela S. Moore, a Professional
      Reporter and Notary Public in and for the State of
      Ohio, do hereby certify that before the taking of
8      his said deposition, the said RYAN DEZSO was first
      duly sworn by me to tell the truth, the whole
9      truth, and nothing but the truth;
              That said deposition was taken in all
10     respects pursuant to the stipulations of counsel
      heretofore set forth; that the foregoing is the
11     deposition given at the said time and place by the
      said RYAN DEZSO;
12             That I am not an attorney for or
      relative of either party and have no interest
13     whatsoever in the event of this litigation.
              IN WITNESS WHEREOF, I have hereunto set
14     my hand and official seal of office at Columbus,
      Ohio, this 6th day of August, 2025.

15

16

17

18

19     /s/Angela S. Moore _____

20     Notary Public, State of Ohio

21

      My Commission Expires:  February 28, 2026.
22

23                       - - -

24