# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ANDREW JAMES MCGONIGLE, | ) | |
| *on behalf of himself and* | ) | Case No. 2:24-cv-04293 |
| *others similarly situated*, | ) | |
| | ) | |
| Plaintiff, | ) | Judge James L. Graham |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Chelsey M. Vascura |
| VALUE CITY FURNITURE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## **RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**<u>Table of Contents</u>**

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD ......................................................................................................... 2

COUNTERSTATEMENT OF FACTS ............................................................................... 2

    1.    Plaintiff's Protected Telephone Number and Value City's Unauthorized Text Message Campaign .......................................................................................................................... 2

    2.    Value City's Lack of Consent to Contact Plaintiff ................................................. 3

    3.    The TCPA's Protections and Plaintiff's Standing ................................................. 5

ARGUMENT ....................................................................................................................... 7

    1.    The TCPA's plain text makes clear that it applies to text messages sent to cell phones, which are "calls" to "residential" lines. ......................................................................... 7

        a.    The plain meaning of the word "call" includes text messages. ...................................... 9

        b.    That interpretation of the word "call" aligns with Section 227(c)'s private right of action and substantive regulatory provisions. ...................................................................... 12

        c.    *Jones* and *Davis* do not align with the TCPA's provisions and do not appropriately analyze the plain meaning of the word "call," rendering the narrow interpretation advocated by Value City inappropriate. ............................................................................................ 15

        d.    The interpretation by so-called "agency bureaucrats" was appropriately applied in line with Congressional intent as required by our American system of governance. .................. 18

    2.    The calls violated the TCPA's Do Not Call provisions. Plaintiff does not assert some reassigned number claim. .................................................................................................... 21

    3.    The requirement that one "personally" register their number on the Do Not Call Registry is atextual and contrary to law. ............................................................................ 27

    4.    Plaintiff has standing because he has suffered a violation of the statute. ......................... 31

        a.    Plaintiff is nothing like Ms. Stoops or Mr. Garcia. ..................................................... 33

        b.    Plaintiff has suffered a Congressionally-authorized statutory injury. ......................... 36

        c.    Prudential Standing is dead. A "zone of interests" analysis is inappropriate. Even so, Mr. McGonigle clearly falls within whatever "zone of interests" the TCPA embraces. ....... 38

CONCLUSION .................................................................................................................... 42

## Summary of the Argument

### I. Text Messages Are "Calls" Under the TCPA's Do Not Call Registry Provisions (pp. 7-21)

The plain language of the TCPA protects consumers from unwanted text messages to numbers on the National Do Not Call Registry. Statutory terms receive their ordinary, contemporary meaning at the time of enactment. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019). Under that standard, the word "call" encompasses text messages, a conclusion the Supreme Court confirmed in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016), and the Sixth Circuit has twice adopted in *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union*, 708 F.3d 737, 742 (6th Cir. 2013), and *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015).

Sections 1.a and 1.b, pp. 9-14, outline how the TCPA's text supports this interpretation in multiple ways and how this interpretation aligns with the TCPA's other statutory provisions. The ordinary dictionary definition of "call" means any attempt to communicate by telephone, which includes text messages. The statute's reference to "calls" to paging services in Section 227(b) demonstrates Congress understood that written messages to telephone numbers constitute "calls." And the statute defines "telephone solicitation" to include any "call or message" for commercial purposes, 47 U.S.C. § 227(a)(4), further confirming coverage of text messages. Additionally, the FCC's implementing regulation at 47 C.F.R. § 64.1200(e), which has the force and effect of law, explicitly states that Do Not Call List rules apply to "telemarketing calls or text messages to wireless telephone numbers."

Section 1.c, pp. 15-18, addresses the Defendant's contrary out-of-circuit authorities, *Jones* and *Davis*, which misapplied principles of statutory construction and the plain language meaning of the word "call" outlined in the previous sections. It argues that Value City's

interpretation imposes atextual, artificial limitations based on modern linguistic intuitions, rather than applying the broad language Congress actually used. It is on this basis that the narrow interpretation advocated for by Value City is inappropriate. Section 1.d, pp. 18-21, addresses the Defendant's argument that the Supreme Court's recent decisions in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) and *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 149 (2025), require disregarding the FCC's longstanding interpretative guidance, which is in lockstep with the statutory text. It argues that, although after Loper Bright, there are many cases where agencies' reasonable decisions are no longer entitled to deference, this is not such a case.

## II. Value City Violated the TCPA by Calling Mr. McGonigle's Number on the Do Not Call Registry Without His Consent (pp. 21-27)

Consent under the TCPA belongs to "subscribers," not telephone numbers. 47 C.F.R. § 64.1200(c)(2)(ii). The applicable regulation defines "subscriber" in relevant part as the person currently responsible for payment and authorized to manage the account. 47 C.F.R. § 64.1100(h). When a number is reassigned to a different subscriber, any prior consent to contact that number is extinguished. *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 705 (D.C. Cir. 2018). As a result, Value City called Mr. McGonigle's number without his consent.

Multiple courts have rejected this so-called "intended recipient" defense in analogous contexts. In *N.L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164 (9th Cir. 2020), the Ninth Circuit held that the TCPA's reference to the "called party" means the current subscriber, not the person the caller intended to reach. And as the Eastern District of Michigan recently held, "Congress intended, as consistent with the statute's text and purpose, to impose strict liability for nonconsented-to robocalls, even when innocently made to a wrong or reassigned number." *Massarello v. Power Home Remodeling Grp., LLC*, 2025 WL 2463153, at *3 (E.D. Mich. Aug.

27, 2025). Value City's purported consent from 2022 cannot bind Mr. McGonigle, who acquired the number in 2024 and never provided consent. Plaintiff's related discovery regarding the Reassigned Number Database was relevant to determining whether Defendant might have a defense on that basis, not to establish an element of his claim. Because Value City did not do so, it assumed the risk of calling numbers on the Do Not Call Registry without consent.

### III. The TCPA Does Not Require Personal Registration (pp. 27-31)

Defendant's related argument that Plaintiff must have personally registered his number on the Do Not Call Registry contradicts the statutory scheme and has been rejected by virtually every court to address it. The implementing regulation requires that DNC registrations "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." 47 C.F.R. § 64.1200(c)(2). As explained in *Abrahamian v. loanDepot.com LLC*, 2024 U.S. Dist. LEXIS 44009 (D. Ariz. Mar. 13, 2024), and *Nichols v. eHealthInsurance Servs.*, 2025 U.S. Dist. LEXIS 37917 (N.D. Cal. Mar. 3, 2025), the regulation's use of "indefinitely" removes any ambiguity about which numbers should be protected, encompassing reassigned numbers on the Do Not Call Registry where the prior subscriber registered.

The TCPA's structure distinguishes between DNC registration, which attaches to numbers indefinitely, and consent, which is personal to the subscriber. This is further evidenced by the fact that the Registry contains only telephone numbers, not names. Registration on the DNC thus persists through reassignment precisely to protect subsequent subscribers like Plaintiff. Defendant's contrary interpretation would create an impossible burden on consumers and undermine the statute's protective purpose.

**IV. Plaintiff Has Article III Standing and Falls Within the TCPA's Zone of Interests Because He Suffered a Statutory Harm (pp. 31-42)**

Mr. McGonigle has standing because he suffered the concrete injury Congress identified in the TCPA: receipt of unwanted telemarketing text messages to his number on the Do Not Call Registry. In *Dickson v. Direct Energy, LP*, 69 F.4th 338, 343 (6th Cir. 2023), the Sixth Circuit confirmed that alleged TCPA injuries "satisfy the demands of Article III because [the plaintiff's] alleged injury under the TCPA constitutes a concrete harm." Defendant's reliance on *Stoops* is misplaced. That case involved a plaintiff who admitted purchasing thirty-five cell phones "in order to manufacture" TCPA lawsuits as her "business."

Section 4.a, pp. 33-36, further distinguishes *Stoops* and *Garcia*, the authorities Defendant cites, because Mr. McGonigle obtained a single cell phone for legitimate personal use and does not use his number solely to generate litigation. It addresses that Mr. McGonigle's failure to text stop does not deprive him of standing because of some untoward perception that Mr. McGonigle somehow wanted the calls. As *Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d 1187, 1196 (M.D. Tenn. 2017), explained, "allowing [lack of subjective annoyance] to negate [a plaintiff's] right to privacy and seclusion would require the Court to embrace a line of reasoning that would ultimately undermine the rights of most, if not all, TCPA plaintiffs."

Section 4.b, pp. 36-38, addresses how the Plaintiff has standing because he has suffered an injury expressly authorized by statute, not because of "prudential" concerns. It is in this respect that Section 4.c, pp. 37-42, addresses Defendant's "zone of interests" argument, which fails under *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). *Lexmark* held that courts cannot "limit a cause of action that Congress has created merely because 'prudence' dictates." The Supreme Court further eliminated the prudential standing analysis in *Bostock v. Clayton County*, 590 U.S. 644 (2020).

*Bostock* affirmatively and definitively forecloses Defendant's purposive approach to standing. *Bostock* held that "when the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law." *Id.* at 652-53. The TCPA's text grants a private right of action to "any person who has received more than one telephone call" in violation of the DNC rules. Mr. McGonigle is such a person, and no atextual limitation on "professional plaintiffs" appears in the statute.

Mr. McGonigle thus has standing.

## <u>INTRODUCTION</u>

This Court should deny Defendant Value City Furniture, Inc.'s ("Value City" or "Defendant")'s motion for summary judgment. Aimed at preventing unwanted intrusions into Americans' daily lives, the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, affords substantial protections against unwanted telemarketing. Significantly, the TCPA imposes liability on companies, like Value City, who send marketing text message calls to cell phones without consent. That's exactly what occurred here. Value City now seeks summary judgment by attempting to distance itself from the very telemarketing operation it created, controlled, and profited from. This motion should be denied because it is not merely possible that a reasonable jury could enter a verdict in Plaintiff's favor; no reasonable jury could do otherwise.

Value City's business model relies, in part, on text message advertising. But that business model has a problem: because Value City sent text messages to telephone numbers, like Plaintiff's, which were reassigned to customers who never asked to receive them, Value City violated the explicit text of the TCPA's Do Not Call Registry provision. Value City's motion for summary judgment relies on multiple misapprehensions about the law. For starters, Value City makes much about how the TCPA does not require it to use the FCC's Reassigned Number Database. Fair point. But it's irrelevant at summary judgment. Although it is completely within Value City's prerogative to refuse to use the RND, in so doing, Value City assumed the risk of texting people on the DNC Registry, like Plaintiff, without consent, because their numbers were reassigned from someone else. That makes Value City liable under the plain text of the statute.

Value City's motion also reflects that it has trouble grasping other parts of a statute whose mandates are quite clear. It attempts to adopt an atextual readings of the statute on the basis of one or two court opinions to argue that the TCPA does not apply to text messages and

imposes other requirements found nowhere in the law, and which actually run contrary to federal law. And, despite a mountain of authority holding that people like Mr. McGonigle are precisely the type of people that Congress intended to encourage when it created the TCPA, it argues that Mr. McGonigle lacks standing. All these legally questionable arguments do not entitle Value City to summary judgment. This case must proceed.

Summary judgment ought to be denied.

## LEGAL STANDARD

Under Rule 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact" and that one party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). A district court in this posture may not weigh evidence or make credibility determinations. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008). Rather, the court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## COUNTERSTATEMENT OF FACTS

### 1. Plaintiff's Protected Telephone Number and Value City's Unauthorized Text Message Campaign

Plaintiff Andrew James McGonigle is the regular and sole user of his cellular telephone number, (804) 238-XXXX ("Telephone Number"), having acquired it on August 5, 2024, when he purchased a prepaid cellular phone at a Dollar General Store in Virginia. (McGonigle Dep.

2

75:11-16). At all relevant times, Plaintiff used this Telephone Number strictly as his personal residential telephone line and did not use it for business or commercial purposes. (McGonigle Dep. 70:10-15, 77:1-24). The Telephone Number has been registered on the National Do Not Call Registry since January 10, 2014. When Plaintiff later attempted to register the Telephone Number himself after obtaining the number in 2024, he could not do so, confirming it was already listed on the DNC Registry. (McGonigle Dep. 121:19-22). Plaintiff understood the purpose of the DNC Registry to be protecting people whose numbers are registered from unwanted telemarketing. (McGonigle Dep. 180:10-16, 121:12-20). The telephone line exists for legitimate, non-litigation-related purposes. (McGonigle Dep. 148:24, 149:1, 181:11-19).

Despite the Telephone Number's protected status on the DNC Registry, between August 6, 2024, and October 15, 2024, Value City delivered, or caused to be delivered, at least 27 unsolicited marketing text message calls to Plaintiff's Telephone Number. Value City admits that these messages were sent for the explicit purpose of advertising and marketing its furniture. (Dezso Dep. 15:5-10). Each of these text messages advertised and promoted Value City's furniture business and services. The text messages were sent more than 30 days after the Telephone Number had been registered on the DNC Registry, and more than two years after the prior user's alleged "consent." (MSJ at 5-6). Value City admits that the marketing text messages it sent to Plaintiff were intended for someone other than Plaintiff. Specifically, they were intended for an unknown prior user of the Telephone Number. (Dezso Dep. 48:9-22, 49:1-11).

## 2. <u>Value City's Lack of Consent to Contact Plaintiff</u>

Plaintiff testified that he did not give Value City prior express consent or permission to deliver advertisement or marketing text messages to the Telephone Number. (McGonigle Dep. 161:15-22). Plaintiff never provided the Telephone Number to Value City, never visited Value

City's website, never signed up to receive marketing messages from Value City, and never otherwise gave Value City express consent to send him text messages. (*see generally* McGonigle Dep.). The "consent" that Value City claims to have held was provided by a prior, unknown user of the Telephone Number on April 14, 2022, more than two years before Plaintiff obtained the number. (MSJ at 5-6). Value City does not know who provided this purported "consent," and maintains no other identifying information about this individual, but readily admits it was not the Plaintiff. (Dezso Dep. 48:9-22, 49:1-11). It is Value City's understanding that consent under the TCPA follows the phone number, irrespective of the subscriber itself. (Dezso Dep. 51:12-15).

When asked how Value City would know if the Telephone Number was still held by the person who initially opted in, Value City's representative specifically stated that Value City "wouldn't know" the answer to that question. (Dezso Dep. 26:15-19). Value City admits that Plaintiff never consented, was never ever a customer of Value City, never purchased anything from the company, and never had any established business relationship with Value City. (Dezso Dep. 60::61). It thus has no evidence for its affirmative defense that the Plaintiff consented in any manner, shape, or form whatsoever.

Despite claiming to use vendor Attentive, Inc. for TCPA compliance, whom it described as a "leader in the space," Value City failed to implement any system or process to detect or investigate whether telephone numbers on its marketing list had been reassigned to new users. (Dezso Dep. 35:15-24, 64:5-11, 69:10-21). Value City does not query the FCC's Reassigned Number Database[1] before sending marketing messages and does nothing to ensure that text

---

[1] Given the transient nature of cellular telephone numbers, in 2018, the FCC established the Reassigned Number Database, which went online in 2021, to insulate companies like Defendant from liability for violating the TCPA by allowing them to determine whether a telephone number they intend to contact has been reassigned to someone who has not previously consented to be contacted by them. *See In re Advanced Methods to Target & Eliminate Unlawful Robocalls*, 33 FCC Rcd 12024 (F.C.C. Dec. 13, 2018).

messages are being sent to the individuals who originally requested them. (Dezso Dep 26:5-19). Value City acknowledged that Attentive offers an optional service that allows clients to scrub their marketing lists against the Reassigned Number Database. (Dezso Dep 69:17-21). But, despite relying on Attentive for its purported TCPA compliance expertise, Value City elected not to implement this RND service. (Dezso Dep. 64:5-11, 69:10-21). In fact, Value City does not even scrub contacts against the Do Not Call List or use it as an initial matter. (Dezso Dep. 67:13-17). Value City also has never run an analysis to determine what percentage of numbers on its marketing list might have been reassigned to new users who have not consented to receive its messages. (Dezso Dep. 88:24, 89:1-10).

Value City does not have any procedures in place to determine whether a telephone number on its marketing list has been reassigned to a new user who has not consented to receive marketing messages. Value City's affirmative choice not to use the Reassigned Number Database led Value City to simply rely on the assumption that, until they were otherwise notified through an attempted opt-out, the number holder continued to consent, and it did so, regardless of whether that assumption was reasonable or accurate. (Dezso Dep. 70:23-24, 71:1-24, 72:6-22). Value City takes no "other affirmative steps" to "avoid texting numbers that have been reassigned," other than requiring call recipients to text "STOP." (Dezso Dep. 73:17-21).

### 3. The TCPA's Protections and Plaintiff's Standing

The TCPA, 47 U.S.C. § 227(c)(5), creates a private right of action for individuals whose telephone numbers are registered on the DNC Registry and who receive more than one telephone solicitation within a twelve-month period from the same entity. The Telephone Number is a residential telephone number within the meaning of the TCPA and its implementing regulations. (McGonigle Dep. 70:10-15, 77:1-24). Before Plaintiff acquired the Telephone Number in August

2024, he had never heard of the TCPA. (McGonigle Dep. 78:8-10.) After receiving eight unsolicited text messages from Value City within approximately three weeks, Plaintiff sought legal advice from the Heidarpour Law Firm on August 24, 2024. (McGonigle Dep. 136:11-20.) Plaintiff testified that he did not text "STOP" to Value City because the unsolicited messages he received did not provide that prompt or option to do so. (McGonigle Dep. 130:19-23, 131:1-6.) In fact, at the time that he received the subject messages, Mr. McGonigle testified that he had no idea that he could send "STOP" to opt out of the messages. (McGonigle Dep. 131:1-6, 176:17-23). While Value City claims that a consumer can text "STOP" or "a variety of other phrases" at any time to opt-out, and that texting "nearly any other response" would generate an automated message with opt-out instructions, MSJ at 4, it is undisputed that these opt-out instructions *were never communicated to Plaintiff* in *any of* the messages he *actually* received. (McGonigle Dep. 132::133). Plaintiff further testified that if he were to text anything like "Hi" in response, he would receive an additional message, and he generally did not click on links in unsolicited messages because he did not trust them. (McGonigle Dep. 182:14-16, 87:1-6)

Mr. McGonigle stated that he brought this suit "not just for the money but in general terms to be a good, moral citizen." (McGonigle Dep. 94:22-24). Plaintiff explained that his decision to pursue legal action was motivated by a desire to vindicate his rights and the rights of other similarly situated individuals who are class members and who received similar communications. (McGonigle Dep. 143:17-24, 144:1-2).

As a direct result of Value City's unauthorized text messages, Plaintiff suffered actual harm, including invasion of his privacy. (McGonigle Dep. 160:10). Mr. McGonigle brought this suit because he received "so many messages" that it is "overbearing" and "an invasion of [his] privacy." (McGonigle Dep. 84:24, 85:1-3). Value City's repeated text messages disrupted

Plaintiff's use of his cellular telephone and forced him to spend time reviewing and dealing with unwanted commercial solicitations, requiring Plaintiff to stop what he was doing, review the unwanted commercial solicitations, and determine how to handle them. (McGonigle Dep. 132:2-6, 64:1-6).

## ARGUMENT

### 1. The TCPA's plain text makes clear that it applies to text messages sent to cell phones, which are "calls" to "residential" lines.

Value City's motion relies on two interrelated arguments, that, as a textual matter, the TCPA does not apply to text messages, because they are not "calls," under the statute, MSJ at 12-13, and that any decisions to the contrary are not binding, MSJ at 15-18. Value City's primary argument is that the text of § 227(c) forecloses the FCC from granting Do Not Call List protections to telephone subscribers who receive text messages, because text messages are not a form of telephone calls. That's incorrect. When it comes to the TCPA, you can only call those who, like Blondie, have said, "Call me. Call me on the line." *Perrong v. Bradford*, No. 2:23-CV-00510-JDW, 2024 WL 2133801, at *1 (E.D. Pa. May 13, 2024), *rev'd on other grounds*, 157 F.4th 251 (3d Cir. 2025) (quoting Blondie, *Call Me, on* American Gigolo (Polydor 1980)).

The Sixth Circuit has already treated text messages as "calls" under the TCPA's prohibitions, and nothing in the authorities the Defendant cites to authorizes this Court to disregard that binding authority. The Sixth Circuit has twice rejected the reading Value City advances, holding that text message calls are "calls" under the TCPA. *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013); *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370 (6th Cir. 2015). Contrary to this well-

established, and binding, Sixth Circuit authority, Value City relies on two out-of-circuit cases[2]
which have held that text message calls are not "calls" for TCPA purposes, *Jones v. Blackstone
Med. Services, LLC*, 2025 WL 2042764 (C.D. Ill. July 21, 2025), and *Davis v. CVS Pharmacy,
Inc.*, No. 4:24-cv-477, 2025 WL 2491195 (N.D. Fla. Aug. 26, 2025).

      Value City is correct that, unless otherwise defined, statutory text is given its "ordinary,
contemporary, common meaning" in the relevant context "at the time Congress enacted the
statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019); *with* MTD at 19 (discussing the
"plain language" of the TCPA). But besides running contrary to the Sixth Circuit's previous two
holdings on this very issue, Value City's, *Jones'*, and *Davis'* interpretation ignores another
important admonition: "[I]t is ultimately the provisions of our laws rather than the principal
concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs.,
Inc.*, 523 U.S. 75, 79 (1998). As yet another Court held most recently, "Defendant's invitation to
inject a distinction between written and oral telephone solicitations is contrary both to the
remedial bent of the TCPA and precedent." *Wilson v. MedVidi Inc*, No. 5:25-cv-3996, ECF No.
28 (N.D. Cal. Oct. 7, 2025) (citing *Oncale*).

      It is for this reason Supreme Court, every Circuit Court, and the majority of district
courts, even after *McLaughlin*, disagree with Value City. *See Campbell-Ewald Co. v. Gomez*,
577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a
'call'".); *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, at n.2 (11th Cir. 2025) ("We use the terms
'robocalls' and 'robotexts' as shorthand for calls and texts made 'using any automatic telephone
dialing system or an artificial or prerecorded voice'—*i.e.*, the calls and texts that the TCPA

---

[2] In its reply, Value City may attempt to deploy yet another out-of-circuit case that was decided in the interim, *Sayed
v. Naturopathica Holistic Health, Inc.*, No. 8:25-CV-00847-SDM-CPT, 2025 WL 2997759 (M.D. Fla. Oct. 24,
2025). This case relies on much the same faulty reasoning embraced by *Jones* and *Davis*.

regulates….We note that even though the statute on its face does not mention text messages, the FCC—by regulation—has interpreted the word 'call' to include text messages."); *Drazen v. Pinto*, 74 F.4th 1336, 1346 (11th Cir. 2023) ("we hold that the receipt of an unwanted text message causes a concrete injury"); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023) (holding text messages are calls); *Breda v. Cellco Partnership*, 934 F.3d 1, 3 n.1 (1st Cir. 2019) ("The TCPA also applies to . . . text messages."); *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 463 (7th Cir. 2020) ("We therefore agree with the Second and Ninth Circuits that unwanted text messages can constitute a concrete injury-in-fact."). "The Supreme Court ratified the FCC's interpretation that a text message was a call for the purposes of the TCPA in *Campbell-Ewald v. Gomez*." *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 198-99 (D. Mass. 2021).

    a.  The plain meaning of the word "call" includes text messages.

To interpret a statutory term, courts look to its "ordinary meaning" when the statute was enacted, often "by reference to dictionaries in use at the time." *Delek US Holdings, Inc. v. United States*, 32 F.4th 495, 498 (6th Cir. 2022). Here, the "ordinary, contemporary, common meaning" of the word "call" in this context is 'to communicate with or try to get into communication with a person by a telephone.'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 & n.3 (9th Cir 2009) (quoting *Webster's Third New International Dictionary* (2002)). There's no question that a text is a "telephone" communication; of course it is. It's sent to a "telephone number," just like other transmissions that can violate the Do Not Call List rules. *See* 47 U.S.C. § 227(c)(3)(F). As both the FCC and courts have long recognized, the plain meaning of the word "call" in the TCPA thus encompasses *any* attempt to communicate by phone, "regardless of whether that call is communicated by voice or text." *Satterfield*, 569 F.3d at 954 ; *see* 18 FCC Rcd. 14014, 14115 ¶ 165 (2003). As a matter of ordinary, everyday meaning, the term "call" includes text messages.

Sixth Circuit precedent, relying on identical reasoning, precludes Defendant's argument that a text cannot be a "call." Like other courts, the Sixth Circuit has held that this plain dictionary definition, *any attempt* to communicate with someone by telephone, is the meaning of "telephone call" that Congress intended in 1991, when the TCPA was enacted. *Ashland*, 708 F.3d at 742; *Keating*, 615 F. App'x at 370. And texting is a means of communicating with someone by telephone. So, the established definition of "telephone call" readily encompasses texts. *See, e.g.*, *Wilson*, 2025 WL 2856295, at *2 (N.D. Cal. 2025); *Mujahid v. Newity, LLC*, 2025 WL 3140725, at *2 (N.D. Ill. 2025).

The established meaning of the word "call" is especially clear in the nearby autodialer provisions in section 227(b) of the original TCPA, and renders the authorities cited by Value City distinguishable. Absent contrary evidence, a statutory word or phrase is presumed to bear a consistent meaning throughout a statute. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). The word "call" is used extensively in the provisions of the statute that prohibit automatic dialing technology and robocalls, which were also part of the statute when it was first enacted in 1991. Most notably, section 227(b) prohibits using autodialer or robocall technology "to make any call ... to any telephone number assigned to a paging service." 47 U.S.C. § 227(b)(1)(A)(iii). A typical paging device in the early 1990s would have displayed an incoming message as written text. So, the use of the word "call" in connection with pagers in section 227(b) establishes "that the term 'call' cannot invoke only the common usage ... in which a 'call' refers to oral communication between two parties via telephone." *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1005 (N.D. Ill. 2010). If a text "call" to a pager can violate the TCPA, a text "call" to a cell phone can too. *Id.*

And that "supports the interpretation that the term 'call' as used in § 227(c) also

encompasses 'text messages.'" *Mujahid*, 2025 WL 3140725, at *2. Relying on plain language, the FCC determined as early as 2003 that, when the TCPA says "call," it "encompasses both voice calls and text calls to wireless numbers." 18 FCC Rcd. 14014, 14115 ¶ 165 (2003). The FCC first announced its interpretation of the word "call" in the context of the TCPA's autodialer provisions, presumably because those provisions of the statute use the word more extensively. *See Medvidi*, 2025 WL 2856295, at *3. But the FCC has since confirmed, including in a formal statutory regulation *applicable at the time of the messages here*, that the meaning of the word "call" is the same in the Do Not Call List context. *See* 47 C.F.R. § 64.1200(e); 38 FCC Rcd. 12247, 12256–57 ¶ 26 (2023); *In re. Hernandez*, 2018 WL 6830220, at *1 ¶ 3 (F.C.C. Dec. 21, 2018). That law reflects "the plain meaning of the statutory text as it has been understood by consumers, the FCC, and courts since the TCPA's passage." *Medvidi*, 2025 WL 2856295, at *3. For that matter, this means that the Supreme Court's holding in *Campbell-Ewald*, 577 U.S. at 156, controls, because reading the word "call" differently in § 227(c)(5) than in neighboring provisions would make no sense. *See, e.g.*, 38 F.C.C. Rcd. at 12257 (rejecting that "anomalous" interpretation). If Congress intended to cabin § 227(c)(5)'s private right of action to *exclude* text messages as "calls," it wouldn't have conveyed that by using a term that elsewhere in the statute *includes* them, as the Supreme Court held in *Campbell-Ewald*.

That renders both *Soliman* and *Trim* distinguishable. *Soliman* did not address whether text messages can be "calls" for the purposes of the TCPA; rather, it addressed whether a text message could be an "artificial or prerecorded *voice*" under Section 227(b), which prohibits making calls using an artificial or prerecorded "voice." In so holding, *Soliman* simply held, as a matter of statutory construction, that the use of the word "voice" means "something audible, not a text message." *Soliman v. Subway Franchisee Advert. Fund Tr., LTD.*, 101 F.4th 176, 187 (2d

11

Cir. 2024). It certainly doesn't stand for the proposition that a text message is not a "call," only that such calls do not use a "prerecorded voice" because they do not transmit aural speech. So too in *Trim,* which, like *Soliman*, addressed whether a text message that "did not include audible components" was a "voice." *Trim v. Reward Zone USA LLC*, 76 F.4th 1157, 1158 (9th Cir. 2023). That analysis is inapplicable here; the Plaintiff does not argue that Value City used a prerecorded "voice" in its text messages so as to violate 47 U.S.C. § 227(b)(1)(A)(iii).

In this respect, Defendant argues that the Sixth Circuit's holding in *Keating*, 615 F. App'x at 370, helps it. It actually helps Plaintiff, because that case explicitly addressed the disputed term here, "call," not the irrelevant term Defendant points to, "voice." And in *Keating*, like in *Ashland*, the Sixth Circuit held that the phrase "call" in subsection (b) includes text messages. *Id.* ("We thus unhesitatingly afford deference to the agency holding that a text message should be treated as a "call" for purposes of the TCPA."). In so doing, the Sixth Circuit remarked that the purpose of the Do Not Call List provisions further supported that interpretation. Congress's stated goal was "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." *Id.*; 47 U.S.C. § 227(c)(1). And nothing in the TCPA suggests that Congress thought "oral messages were more invasive or objectionable than written ones." *Medvidi*, 2025 WL 2856295, at *3.

   b.  That interpretation of the word "call" aligns with Section 227(c)'s private right of
       action and substantive regulatory provisions.

Value City attempts to distinguish *Keating* by pointing out that it relied on the FCC's interpretation of the term "call," which it claims is inapplicable after *Loper Bright* and *McLaughlin.* But the fresh look authorized by *McLaughlin* confirms that the FCC's position adheres to the ordinary, contemporary meaning of the terms Congress used in the TCPA's Do Not Call List provision, § 227(c). It also comports with the FCC's 2023 statutory regulations,

which remain unaffected after those cases, and which have the "force and effect of law." *Chrysler Corp. v. Brown*, 441 U.S. 281, 282 (1979) (holding substantive agency regulations, like 47 C.F.R. § 64.1200(e), have the "force and effect of law."); 47 C.F.R. § 64.1200(e) ("The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers."). That conclusion follows from § 227(c)'s broad definition of a prohibited "telephone solicitation" and a functional definition of a "residential telephone subscriber" that focuses on the *use* of a phone, not its physical characteristics or location. It is reinforced by additional textual evidence in the form of updates Congress made to the TCPA's terms after its 1991 enactment and the FCC's establishment of the DNC in 2003, and the FCC's 2023 regulation revisions. And all this shows that Congress expressly delegated this question to the FCC to regulate. So, either way, the FCC's statutory regulations "effectuate the will of Congress." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 371 (2024).

Simply put, Plaintiff relies on an informed reading that aligns with the statute, not "guidance written by agency bureaucrats." (MSJ at 15). Reading section 227(c)(5)'s private right of action in context with the substantive Do Not Call List provisions of section 227(c) and the applicable statutory regulations in effect at the time of the calls at 47 C.F.R. § 64.1200(e) further confirms that text messages are covered as "calls." To see why, start with the core of section 227(c), its prohibition on "making or transmitting a *telephone solicitation* to the telephone number of any subscriber" on the Do Not Call List. 47 U.S.C. § 227(c)(3)(F). Text messages, of course, are "ma[de] or transmitt[ed]" to a "telephone number." *Id.* And it is well-established that the residential telephone "subscriber[s]" protected by the Do Not Call List include cell phone subscribers. *See, e.g.*, *Harriel v. Bealls, Inc.*, 2025 WL 2379617, at *2 (M.D. Fla. 2025); *Cacho*

13

*v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203 & n.4 (S.D.N.Y. 2024) (collecting cases).
The statute expressly defines a "telephone solicitation" to mean "a telephone *call or message* ...
which is transmitted to any person" for commercial purposes. 47 U.S.C. § 227(a)(4) (emphasis
added). That reference to a "call or message" covers texts even more clearly than the word "call"
standing alone, which is itself clear, as examined above.

  The term "telephone solicitation" thus clearly encompasses text messages. As explained
above, "the ordinary, contemporary, and common meaning" of the word "call" in the TCPA
includes text messages. *Satterfield*, 569 F.3d at 953–54 & n.3. And contemporary definitions of
the word "message" do too; a message was "[a]ny notice, word, or communication, *no matter the
mode and no matter how sent*." *Message*, *Black's Law Dictionary* (6th ed. 1990) (emphasis
added). More generally, the definition of "telephone solicitation" focuses not on a
communication's form but on whether it has "the purpose of encouraging" various kinds of
commercial transactions. 47 U.S.C. § 227(a)(4); *see, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th 493
(7th Cir. 2025) (holding Do Not Call List liability turned on whether a text message had the
requisite commercial purpose). At the same time, the statute uses broad, inclusive language to
describe how such a communication might be conveyed, directing the FCC to prohibit "making
*or* transmitting" a telephone solicitation to "any" listed number. 47 U.S.C. § 227(a)(4), (c)(3)(F)
(emphases added). Congress presumably used all that broad and disjunctive language to capture
a wide range of communication mediums, including text messages. *See Medvidi*, 2025 WL
2856295, at *3 (explaining that the "telephone solicitation" definition "makes clear that
Congress was more concerned with the purpose of the telephone communications ... than the
form in which those communications are transmitted"); *Pepper v. GVG Capital LLC*, 677 F.
Supp. 3d 638, 643 (S.D. Tex. 2023) (similar).

    c. *Jones* and *Davis* do not align with the TCPA's provisions and do not appropriately analyze the plain meaning of the word "call," rendering the narrow interpretation advocated by Value City inappropriate.

Value City would have this Court interpret the Do Not Call List provisions more narrowly, insisting that the words "telephone call" in section 227(c)(5) can only mean "voice call," and therefore the statute categorically excludes text messages. Its arguments mainly rely on two recent district court cases, *Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195 (N.D. Fla. 2025), and *Jones v. Blackstone Medical Services*, 792 F. Supp. 3d 894 (C.D. Ill. 2025), *appeal docketed*, No. 25-2398 (7th Cir. Aug. 12, 2025). But none of the arguments made by Value City or by those cases is persuasive. Defendant doesn't even appropriately analyze the text of the statute, as does Plaintiff here. Rather, it simply concludes that it's entitled to judgment as a matter of law because two out-of-circuit district court cases, relying on an insufficiently rigorous analysis, and one of which is currently on appeal, say so. In essence, Defendant argues that, after *Loper Bright* and *McLaughlin*, the Court should not defer to the FCC's interpretation. But applying well-established principles of statutory construction doesn't get it to where it wants, particularly as neither Defendant nor the cases it cites grapple with statutory construction.

In *Jones* and *Davis*, the respective courts held that a text message could not be a "call" for purposes of § 227(c)(5)'s private right of action because "[t]ext messaging was not an available technology in 1991," and "in today's American parlance, 'telephone call' means something entirely different from 'text message.'" *Jones*, 2025 WL 2042764 at *4. That's not how statutory interpretation works. *Jones* and its progeny[3] get statutory interpretation wrong in two important ways, as the Southern District of Florida has observed. *Bosley v. A Bradley Hosp.*

---

[3] Though Value City also cites to *Davis*, the latter of the two cases, the reasoning in that case rests on the same faulty basis as *Jones*. *Davis*, 2025 WL 2491195, at *2 ("Certainly, no ordinary person would think of a text message as a 'telephone call.'"). As in *Jones*, this reading improperly substitutes modern intuitions for well-reasoned statutory construction to opine as to what an open-ended statutory delegation of authority covers.

*LLC*, No. 25-CV-22336, 2025 WL 2686984, at *5 (S.D. Fla. Sept. 19, 2025) (citing multiple cases for the proposition that text messages constitute "calls" under the TCPA). Statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315–16 (1980); *Bostock*, 590 U.S. at 652-53. Consider a 1991 law that bars "vehicles" from a park. That law applies equally to Cybertrucks and to sedans, though the former didn't exist at the time. So, too, here: The TCPA prohibits sending text messages to phone numbers on the national Do Not Call List, just as it prohibits traditional voice calls.

*First*, as the Supreme Court has warned, "modern intuition" doesn't always match "evidence of a term's meaning at the time of [a statute]'s enactment." *New Prime*, 586 U.S. at 114. When there's a mismatch, the contemporary meaning of the text is what controls, not present-day usage. *See id. Jones* and *Davis* went astray by reflexively applying present-day intuitions about how ordinary people today discuss text messages to language from 1991, before the first text message was ever sent. "While every statute's *meaning* is fixed at the time of enactment," it is commonplace that "new *applications* may arise in light of changes in the world." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). Using the same reasoning, using the word "call" could not refer to a text message sent to a "paging service," the most analogous type of communication in 1991, which is explicitly protected, merely because the practice of texting a pager evolved into the practice of texting a cell phone. *Jones* is thus wrong as a techno-historical matter: in 1991, "calls" to pagers resulted in the transmission and reception of text and were precursors to modern text messages. This shows Congress already used the word "call" to also cover sending written text messages to a pager telephone number. It would be incongruous if the definition didn't apply to an evolved form of that very same technology.

*Second*, it's irrelevant that Congress didn't have text messages specifically in mind in

1991 when it extended protection to "calls." Because the text already covers text messages, there is no need to rewrite the TCPA to update it for modern technology. "The mere fact that Congress did not envision the ubiquitousness of text messaging in 1991 does not mean the FCC's conclusion lacks support." *Wilson v. Skopos Fin., LLC*, No. 6:25-cv-376, 2025 WL 2029274, at *4 (D. Or. July 21, 2025). Courts look to the meaning of the words Congress used, not the "particular manifestation of a problem" that would have been front of mind. *Nat'l Cable & Telecom. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009); *see Oncale*, 523 U.S. at 79. And in its mandate, Congress articulated a broad intelligible principle untethered to technological developments. All that the contrary decisions show is the obvious fact that most residential subscribers still had landlines in 1991 and that text messages to them were not yet "messages" because they had not been invented yet. But even if that's true, that doesn't mean Congress intended anything to turn on or the sophistication of a telephone to which a message is sent. *See Cacho*, 739 F. Supp. 3d at 205. A contrary approach leaves telephone subscribers "at the mercy of advancing technology" and permits telemarketers to "erode the privacy guaranteed by the" TCPA merely because of the technology they use. *Kyllo v. United States*, 533 U.S. 27, 28 (2001). There are limits to the "power of technology to shrink the realm of guaranteed privacy." *Id.* 34.

Especially in this context, where Congress knows that telecommunications technology tends to evolve with time, courts should not lightly assume that Congress drew arbitrary lines based on the specific technology used, particularly in a section dealing with "consumer privacy."[4] It is the meaning of those terms that governs, not the specific facts or technology that

---

[4] In fact, even in 1991, an interpretation that hinged on the involvement of wires so as to exclude cell phones or cordless phones would have been strange. Cordless phones were already in widespread use by 1991. *See* Peter Kerr, Cordless Phones Catching On, New York Times (Feb. 16, 1983), https://www.nytimes.com/1983/02/16/garden/cordless-phones-catching-on.html. And even traditional landline providers were regularly using wireless technology to transmit long-distance calls back then; for example, AT&T

Congress would have had in mind in 1991. *Id.* at 36 ("While the technology used in the present case was relatively crude, the rule we adopt must take account of more sophisticated systems that are already in use or in development."). As explained, the statute *does* explicitly cover any "telephone solicitation," which is expressly defined to include any "call or message." 47 U.S.C. § 227(a)(4). "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 550 (2d Cir. 2024) (quoting *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 212, (1998)).

> d.  The interpretation by so-called "agency bureaucrats" was appropriately applied in line with Congressional intent as required by our American system of governance.

Sometimes, "the best reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright*, 603 U.S. at 395. Even after *Loper Bright* and *McLaughlin*, agencies can still receive deference for their reasonable interpretations in appropriate cases, and neither case affects explicit agency rulemaking, so long as Congress articulated an intelligible principle and the agency promulgates law consistent with Congress' articulated intent. *Id.* at 394-95. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.*; *see Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587-88 (6th Cir. 2025). Congress can nevertheless craft an open-ended statutory mandate that accommodates developments "in light of advances in technology," *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2505 (2025), and still articulate an intelligible, open-ended principle.

That's precisely what Congress did when it directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to

---

transmitted most landline calls from Hawaii to the mainland U.S. by satellite in the 1980s and between states using microwaves. *See Inquiry Into the Policies to be Followed in the Authorization of Common Carrier Facilities to Meet Pacific Telecommunications Needs During the Period 1981-1995*, 47 Fed. Reg. 21868-02.

avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). In context, the ordinary meaning of § 227(c)'s text here establishes that Congress articulated an intelligible principle untethered to subsequent technological developments by authorizing the FCC to protect *all* "residential telephone subscribers," including cell phone subscribers and paging subscribers, who receive text "messages." 47 U.S.C. § 227(c)(1).

And the FCC has exercised that authority to provide *explicit statutory protection* in the TCPA's implementing regulations, and not mere interpretative guidance, to subscribers who use their wireless telephone numbers to receive text messages. *See* 47 C.F.R. § 64.1200(e) (confirming that all Do Not Call List regulations are applicable to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers"). As an appropriately promulgated administrative regulation authorized by Congress, that statutory pronouncement has the force and effect of law, even after *Loper Bright*. *Chrysler Corp.*, 441 U.S. at 281.

After *Loper Bright*, there are many cases where agencies' reasonable decisions are no longer entitled to deference, but this is not one of them. Section 227(c) is an express delegation of that sort. Congress didn't write Do Not Call List rules itself. Instead, it tasked the FCC with evaluating alternative approaches based on (among other things) open-ended criteria such as "effectiveness in protecting … privacy rights" and "other advantages and disadvantages." 47 U.S.C. § 227(c)(1)(A). And it empowered the FCC to make rules "that *the Commission determines* are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E) (emphasis added). To that end, Congress in 1993 tasked the FCC with deciding whether cell phone companies are "common carriers" whose subscribers therefore have rights under the TCPA, and again in 1996 to address whether new services, like text messages, provided by them were "exchange services." *Compare* 47 U.S.C. § 332(a)(1)(A), 47 U.S.C. §

19

153(53), (54) *with* 47 U.S.C. § 227(c)(3). That confers discretionary authority to "fill up the details," using open-ended language that bestows "flexibility." *Loper Bright*, 603 U.S. at 395. The FCC's longstanding and consistent interpretation of the word "call" is thus an "informed judgment" to which this Court can "properly resort for guidance," and which "expressly delegates to the FCC "authority to give meaning to a particular statutory term." *Id.* at 388, 395 (quoting *Skidmore*, 323 U.S. at 139–140); *see Mujahid*, 2025 WL 3140725, at *3; *Medvidi*, 2025 WL 2856295, at *3.

Acting under that express delegation, and in line with the textual analysis above, the FCC has reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier," "eliminate[s] any potential confusion in the industry," and aligns with both its longstanding determination that cell phone numbers are eligible for protection and the established meaning of the word "call" in other TCPA contexts. 38 F.C.C. Rcd. at 12256–57 ¶¶ 26–27. What's more, when Congress amended the TCPA in 2019 as part of the TRACED Act, not only was it aware that the FCC and every court had interpreted the statute to cover text messages, it *ratified* that interpretation with an explicit reference to text messages in the amendment. 47 U.S.C. § 227(i)(1)(A) (instructing the FCC to prescribe regulations related to "a call made or *a text message* sent"). "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239–40 (2009). "Where, as here, 'Congress has not just kept its silence by refusing to overturn the administrative construction, but has ratified it with positive legislation,' we cannot but deem that construction virtually conclusive." *CFTC v. Schor*, 478 U.S. 833, 846 (1986). Because the FCC acted reasonably and consistently in reaching that conclusion, this Court should affirm that "reasoned

20

decisionmaking." *Loper Bright*, 603 U.S. at 395.

Recognizing this, even after *Jones* and *Davis*, courts have continued to defer to the FCC's well-reasoned decision to prohibit text messages to cell phones on the DNC, even after *Loper Bright* and *McLaughlin*, particularly in light of the *statutory* rulemaking hook contained in 47 C.F.R. § 64.1200(e). *See, e.g.*, *Bosley*, 2025 WL 2686984, at *7; *Harriel*, 2025 WL 2379617, at *2; *Wilson*, 2025 WL 1784815, at *5; *Lirones v. Leaf Home Water Sols., LLC*, No. 5:23-CV-2087, 2024 WL 4198134, at *6 (N.D. Ohio Sept. 16, 2024); *Lyman v. QuinStreet, Inc.*, No. 23-cv-5056, 2024 WL 3406992, at *4 (N.D. Cal. July 12, 2024); *Mujahid*, 2025 WL 3140725, at *2. The Sixth Circuit's decisions on this very issue relied, at least in part, on those well-reasoned decisions and interpretations. *Ashland*, 708 F.3d at 742; *Keating*, 615 F. App'x at 370. This court should do the same. In light of the statutory text, as appropriately informed by a reasoned textual analysis, the FCC's regulatory rulemaking which has the effect of law, and the FCC's reasoned longstanding guidance, the best reading of the statute is that the word "call" includes text calls.

## 2. The calls violated the TCPA's Do Not Call provisions. Plaintiff does not assert some reassigned number claim.

The basis of the Plaintiff's claims are simple and statutory: the Plaintiff contends that he received text message calls to his cell phone number on the National Do Not Call Registry, and in so doing, that the Defendant violated the TCPA. That is sufficient for the Plaintiff to state a cognizable legal claim. Defendant contends that it was entitled to do so, however, because it had "consent." But "consent" from whom, exactly? The *previous owner* of Mr. McGonigle's number in 2022, prior to when it was reassigned to Mr. McGonigle in 2024. (MSJ at 5-6). Value City thinks that consent provided by a telephone number's previous owner is consent to contact all subsequent owners of a telephone number. (Dezso Dep. 51:12-13) ("The consent operates off of

a phone number."). Defendant fundamentally misapprehends consent under the TCPA. Under the TCPA, consent is linked to a telephone *subscriber*, and *not* the telephone number at issue.

First, "consent is an affirmative defense that a plaintiff is not required to plead in order to assert a TCPA claim." *Dahdah v. Rocket Mortgage, LLC*, No. 22-11863, 2024 WL 4299564, at *6 (E.D. Mich. Sept. 26, 2024). Moreover, Defendant, not Mr. McGonigle, bears the burden of proof of establishing prior express consent. *Id*. (citing *Shelton v. Direct Energy, L.P.*, 2019 WL 4194179, at *5 (N.D. Ohio Aug. 27, 2019)). And Value City certainly has not established that it obtained consent *from Mr. McGonigle* to send text calls to *his* cellular telephone number. To the contrary, the parties do not dispute that any putative consent, if any, would have been provided by the telephone number's *previous* owner in 2022, a full two years *before* the number was assigned to Mr. McGonigle. Reviewing the statutory text shows why Defendant is mistaken.

The TCPA prohibits sending telephone solicitations to phones on the National Do Not Call Registry, except those solicitations for which the caller "has obtained the *subscriber's* prior express invitation or permission." 47 C.F.R. § 64.1200(c)(2)(ii). And the relevant regulation explicitly defines a "subscriber" as either, "(1) The party identified in the account records of a common carrier as responsible for payment of the telephone bill; (2) Any adult person authorized by such party to change telecommunications services or to charge services to the account; or (3) Any person contractually or otherwise lawfully authorized to represent such party." 47 C.F.R. § 64.1100(h). Thus, as a plain matter of statutory construction, at the time he received the text messages for which he sues, Mr. McGonigle, not the number's previous owner, was the "subscriber" because he was the person identified in the account records of his cell phone carrier as responsible for payment of the telephone bill. Mr. McGonigle, and nobody else, was authorized to change telecommunications services and charge them to his account, and no other

22

person was contractually or otherwise lawfully authorized to represent him. (McGonigle Dep. 66:10-16, 76:1-24, 77:1-16). That's the end of the matter: Value City did not have consent to contact the "subscriber" of the number, Mr. McGonigle.

"[T]he reassignment of a wireless number extinguishes any consent given by the number's previous holder and exposes the caller to liability for reaching a party who has not given consent." *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 705 (D.C. Cir. 2018). A contrary rule would "effectively require consumers to opt out of such calls when the TCPA clearly requires the opposite—that consumers opt in before they can be contacted." *Id.* But contrary to Value City's exhortation, *ACA* makes clear that the standard is *not* reasonable reliance, rather, it's strict liability when the caller does not use the RND, as here. *Id.* at 707-08 (striking FCC's proposed reasonable reliance standard as arbitrary and capricious). As the Eastern District of Michigan recently remarked to this end, "Congress intended, as consistent with the statute's text and purpose, to impose strict liability for nonconsented-to robocalls, even when innocently made to a wrong or reassigned number." *Massarello v. Power Home Remodeling Grp., LLC*, No. 24-CV-12480, 2025 WL 2463153, at *3 (E.D. Mich. Aug. 27, 2025), *motion to certify appeal denied*, No. 24-CV-12480, 2025 WL 3172842 (E.D. Mich. Nov. 13, 2025) (citing *Dickson v. Direct Energy, LP*, 69 F.4th 338, 341 (6th Cir. 2023)). In any case, nothing Defendant did can be characterized as "reasonable reliance;" it was willful ignorance.

In this respect, Value City simply adopts a variation of the "intended recipient" defense that has been rejected by at least three circuit courts of appeal when it comes to prerecorded robocall claims under Section 227(b) of the TCPA, which contains *broader* consent language of the "called party," not just the "subscriber." 47 U.S.C. § 227(b)(1)(A). In rejecting that the "called party" does not include previous number owners, the Ninth Circuit has held:

Reviewing the district court's jury instructions de novo for legal error, *Navellier v. Sletten*, 262 F.3d 923, 944 (9th Cir. 2001), we agree with our sister circuits. Credit One's intent to call a customer who had consented to its calls does not exempt Credit One from liability under the TCPA when it calls someone else who did not consent.

This follows from the language of the TCPA itself. We interpret the statute in accordance with its ordinary and natural meaning, considering the key statutory terms in the context in which they are used. *E.g.*, *Hall v. United States*, 566 U.S. 506, 511, 132 S.Ct. 1882, 182 L.Ed.2d 840 (2012); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); *Confederated Tribes & Bands of the Yakama Indian Nation v. Alcohol & Tobacco Tax & Trade Bureau*, 843 F.3d 810, 812 (9th Cir. 2016). In this case, Credit One's argument founders on the more probable meaning of the TCPA's term "called party," and the statutory context that inescapably amplifies what Congress meant (and did not mean) when it used that term.

\*      \*      \*

One notices that this provision nowhere references an "intended" recipient of the calls. *Soppet*, 679 F.3d at 640 ("The phrase 'intended recipient' does not appear anywhere in § 227 ...."). Credit One's argument thus starts off in the backseat, for there is no obvious statutory text on which to ground an "intended recipient" interpretation. And as we now walk through how the undefined term "called party" is used in the statute, Credit One's interpretation becomes more and more untenable as every statutory reference to "called party" is considered.

*N. L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1167 (9th Cir. 2020). In reaching the same conclusion, the Seventh Circuit noted that "[t]he phrase 'intended recipient' does not appear anywhere in § 227, so what justification could there be for equating 'called party' with 'intended recipient of the call'?" *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 640 (7th Cir. 2012); *id.* at 643 ("We conclude that 'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made."). The Eleventh Circuit held the same. *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1252 (11th Cir. 2014) ("We accordingly reject State Farm's argument that the 'intended recipient' is the 'called party' referred to in 47 U.S.C. § 227(b)(1)(A)."); *Breslow v. Wells Fargo Bank, N.A.*, 755 F.3d 1265, 1267 (11th Cir. 2014) ("During the pendency of this appeal, another panel of this court, faced with the same question,

concluded in a published opinion that 'called party,' for purposes of § 227(b)(1)(A)(iii), means the subscriber to the cell phone service. That panel rejected the defendant's contention that called party could mean intended recipient.").

Given this well-established precedent that the "called party" under the TCPA does not include the previous "subscriber,[5]" there is no basis to adopt Value City's contrary argument with respect to the even *more* restrictive language of a "subscriber" here to read "previous subscriber." Indeed, to this end, the FCC has interpreted the language of "called party" in Section 227(b) *to mean the "subscriber." See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015) (¶ 73) ("We find that the 'called party' is the subscriber, *i.e.*, the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan. Both such individuals can give prior express consent to be called at that number."); *see also id*. at ¶ 72 ("We clarify that the TCPA requires the consent not of the intended recipient of a call, but of the current subscriber (or non-subscriber customary user of the phone) and that caller best practices can facilitate detection of reassignments before calls.").

There is no "intended recipient" defense under the TCPA. *N. L.*, 960 F.3d at 1167. Value City's reading is as atextual as it gets. That Value City "intended" to call the "previous subscriber" but reached Mr. McGonigle does not matter. The statutory text and associated definitions do not say the "subscriber at the time of consent," they do not say the "previous subscriber," and they do not say the "original subscriber." They say "subscriber". And the "subscriber" here is Mr. McGonigle, and he did not consent. As the *Massarello* court held,

---

[5] As will be explained below, although the TCPA's consent and Do Not Call Registry regimes both use the term "subscriber," a previous subscriber's consent does not transfer to the current subscriber, but a previous subscriber's Do Not Call Registry registration remains, because such registrations must remain on the Registry "indefinitely."

"Here, the defendant's interpretation 'would expose new subscribers to unwanted calls and unjustified expense. Congress might have thought the current approach [Plaintiff's interpretation, here] preferable, as a safeguard of persons assigned to recycled numbers, even though this protection comes at a cost to [companies making calls].'" 2025 WL 2463153, at *3 (*quoting Soppet*, 679 F.3d at 641).

It is in this respect that the Plaintiff's discovery on the Reassigned Number Database in his case is distinguishable. The Plaintiff does *not* rely on the RND as an affirmative element of his TCPA claim, nor does he attempt to create an RND claim where there exists no statutory authority for the same. The Plaintiff's Complaint does not even *reference* the RND. Defendant does not contend as much. (Dezso Dep. 68:18-21) (speaking objection of Attorney Takett). Rather, the Plaintiff sought discovery as to the Defendant's use of the Reassigned Number Database to ascertain whether the Defendant might have some reason for to the claims at issue and why it contacted Plaintiff without consent. If Defendant used the Reassigned Number Database as it was intended to be used, then the Plaintiff would never have received text message calls because using the database would have removed the Plaintiff's reassigned number from Value City's list. Correspondingly, if Value City did so and contacted the Plaintiff due to some failure of the database, that might afford a defense to Value City. *See Elleby v. Liberty Univ., Inc.*, No. 521CV00093KDBDCK, 2022 WL 715577, at *3 (W.D.N.C. Mar. 9, 2022) (considering but ultimately rejecting good faith defense based on use of Reassigned Number Database). But Value City did not, so the court need not even consider that defense.

As Value City correctly notes, it is each business's prerogative of whether or not it wants to use the RND to determine whether any numbers it is calling were reassigned. (MSJ at 13). Many companies successfully do so and avoid liability of the exact type Value City faces here.

Value City decided not to. That's Value City's right. But Value City also texted the Plaintiff without consent because of that business decision, and must now live with the consequences.

**3.** **The requirement that one "personally" register their number on the Do Not Call Registry is atextual and contrary to law.**

Reading 47 C.F.R. § 64.1200(c)(2) to require personal registration for each new subscriber cannot be reconciled with the requirement that registrations "must be honored indefinitely," or with the reality that the Registry stores only numbers, not names. Relying on *Rombough v. Robert D. Smith Ins. Agency, Inc.*, No. 22-CV-15-CJW-MAR, 2022 WL 2713278, at *2 (N.D. Iowa June 9, 2022), the Defendant misstates the applicable law. The FCC's regulations permit a "residential telephone subscriber" to register "his or her telephone number" on the Registry. 47 C.F.R. § 64.1200(c)(2). Once a telephone number is registered on the Registry, the "registrations must be honored indefinitely, or until the registration is cancelled by the consumer of the telephone number is removed by the database administrator." *Id*. Previously, such registrations had to be renewed, but this hasn't been the case since at least the mid-2000s.

Therefore, *Rombough* purports to require some consumers to do the impossible, personally *re*register a number already on the Registry. It has been disagreed with by every other court to consider it and its premises. *See, e.g.*, *Watson v. Manhattan Luxury Automobiles, Inc.*, No. 20 CIV. 4572 (LGS), 2022 WL 4586407, at *9 (S.D.N.Y. Sept. 29, 2022) (holding that "whether each class member registered their number on the NDNCR is irrelevant."); *Klassen v. Solid Quote LLC*, No. 23-CV-00318-GPG-NRN, 2023 WL 7544185, at *4 (D. Colo. Nov. 14, 2023); *D.G. v. William W. Siegel & Assocs.,* 791 F. Supp. 2d 622, 625 (N.D. Ill. 2011) ("Plaintiff is the regular user and carrier of the phone, Plaintiff qualifies as a "called party" under the TCPA."); *Olney v. Progressive Cas. Ins. Co.*, 993 F. Supp. 2d 1220, 1225 (S.D. Cal. 2014) ("Defendant seeks to arbitrarily limit standing to only the individual whose name appears on the

27

bill. Notably, Defendant does not cite a single case to support this position. Further, this position has been rejected by other courts.").

    *Rombough* has been rejected in detail by a multitude of courts, including in *Abrahamian v. loanDepot.com LLC,* 2024 U.S. Dist. LEXIS 44009, *5-6 (D. Ariz. March 13, 2024):

> The Court is not bound by this case. Moreover, the Court finds the complete language of the implementing regulation more instructive. *See* 47 C.F.R. § 64.1200(c)(2). Though the regulation states that it applies to a "residential telephone subscriber who has registered his or her number" on the DNC Registry, it goes on to require that DNC registrations "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*
>
> The Court reads this language to mean that as phone numbers change hands, the DNC Registry may not always reflect which consumers requested to be included. Therefore, the Court finds that the language includes the term "indefinitely" to remove the ambiguity of which numbers should be protected. Furthermore, the Ninth Circuit takes a broad view of this regulatory language. *See Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 988-91 (9th Cir. 2023) (applying the TCPA even when unsolicited calls or texts are intended for or solicited by another individual or someone else using the phone at the time).

*Id.* at *6 (cleaned up). The *Abrahamian* Court is far from alone. *See, e.g.*, *Murch v. GPS Cap. Mkts., LLC*, 2025 U.S. Dist. LEXIS 169651, *38 (D. Or. June 6, 2025) ("After fully considering the TCPA's private right of action, the statutory scheme, and other language in the implementing regulation as discussed above, the Court declines to follow *Rombough*."). And yet another federal court recently made forcefully clear how much of an outlier *Rombough* was:

> [T]he Court holds that a plaintiff alleging a violation of the TCPA's NDNC Registry provision need not allege or prove that he personally registered his phone number to state a claim. Every court to consider this issue — with one exception — has reached the same conclusion. . . .  In *Rombough*, the court focused on the following language from the implementing regulation: "No person or entity shall initiate any telephone solicitation to . . . [a] residential telephone subscriber *who has registered* his or her telephone number on the" NDNC Registry." 47 C.F.R. § 64.1200(c) (emphasis added). This language was viewed in isolation, and the court did not explain how its construction could be reconciled with the very next sentence of the implementing regulation, which provides that "registrations must be honored indefinitely[.]" *Id.* There is no limitation as to time period; nor is there a limitation as to whether the phone number is still used by the person who originally listed it in the NDNC Registry.

*Nichols v. eHealthInsurance Servs.*, 2025 U.S. Dist. LEXIS 37917, *8-9 (N.D. Ca. Mar. 3, 2025).

      *Rombogh's* error lies in that it conflated two distinct regimes under the TCPA. The TCPA's Do Not Call registration regime is distinct from its consent regime, and the regulations implementing § 227(c) make that clear. Congress directed the Commission to create "a single national database to compile a *list of telephone numbers* of residential subscribers who object to receiving telephone solicitations." 47 U.S.C. § 227(c)(3) (emphasis added). The Commission implemented that mandate by prohibiting any person from initiating telephone solicitations to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry," and by requiring that "[s]uch do-not-call registrations must be honored indefinitely." 47 C.F.R. § 64.1200(c)(2). By law, that database cannot include names, only telephone numbers. "[T]he only consumer information telemarketers and sellers will receive from the national registry is the registrant's telephone number. *This is the minimum amount of information that can be provided* to implement the national registry." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14037 (emphasis added). Thus, once a "subscriber" registers their telephone number on the Registry, the number remains on the registry "indefinitely," including for subsequent subscribers.

      By contrast, the only way to lawfully call a registered number for telemarketing is to obtain the *current* subscriber's prior express invitation or permission, which must be "evidenced by a signed, written agreement between the consumer and seller which states that the consumer agrees to be contacted by this seller and includes the telephone number to which the calls may be placed." 47 C.F.R. § 64.1200(c)(2)(ii). And though the subscriber's (i.e. Mr. McGonigle's) prior

permission is required, a private cause of action runs not to the registrant, but to "any person who has received more than one telephone call" in violation of those regulations. 47 U.S.C. § 227(c)(5). As the Fourth Circuit has held, that cause of action "is not limited to telephone subscribers" at all. *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 657 (4th Cir. 2019).

Thus, in the reassigned number context, the prior subscriber's *consent* is legally *irrelevant*, but the prior subscriber's DNC *registration continues* to bind telemarketers and protect *any* person who receives violative calls to that registered *number*. In other words, registration attaches to the number and persists "indefinitely" until cancelled or removed, while DNC consent (the prior express invitation or permission) attaches to the "consumer." This indefinite nature of DNC protections distinguishes them from consent-based mechanisms.

Because the "Do-Not-Call Registry lists numbers, not names," a "telemarketer ordinarily does not know if consent to receive telephone messages comes from the subscriber of a particular number or some other user." *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 990 n.8 (9th Cir. 2023). Though this approach "may cause telemarketers difficulties," it is up to "Congress or implementing agencies to address any such supposed difficulties." *Id.* The Reassigned Number Database was created precisely to square the asymmetry between these two regimes because it helps companies who chose to use it avoid liability for calling a number which may remain registered on the national Do Not Call Registry and associated with earlier consent, yet later be reassigned to a different consumer who did not grant that permission and does not wish to receive calls, precisely as here. That Reassigned Number Database scheme presupposes what the text already indicates: the DNC registration status of a telephone number can persist through reassignment, but any "prior express invitation or permission" is personal to the consumer who signed the agreement and cannot be carried forward to bind a different, later subscriber.

Not only that, but Mr. McGonigle has explicitly testified that he personally attempted to re-register his telephone number on the Do Not Call Registry but could not because the number was already on it. (McGonigle Dep. 121:19-22). Thus, at the very least, the issue of whether Plaintiff registered, or perhaps more accurately, attempted to reregister his number, on the Do Not Call Registry is a disputed factual issue inappropriate for adjudication at summary judgment, to the extent it matters as a matter of law (it does not). In any event, Defendant itself admits Mr. McGonigle's number has been on the Registry since 2014. Its argument is that the Registry somehow ceased to protect Mr. McGonigle when he became the subscriber is an atextual result that the regulation's "indefinite" language squarely rejects.

Despite this attempted (re)registration, the impracticality and atextual nature of Value City's proposed rule underscores its untenability. Millions of Americans change phone numbers every year. If Defendant's theory were correct, each consumer inheriting a number that had already been placed on the Registry, just as the Plaintiff here, would unknowingly lose their protections, even if they attempted to "reregister" the number, which is itself impossible. Telemarketers could then flood those numbers with impunity, despite Congress's intent to stop unwanted solicitations. Nothing in the statute, regulations, or case law supports this loophole, and this Court should not create one. This Court should reject Defendant's invitation to import an atextual personal registration requirement that appears nowhere in the statute and would eviscerate its protections. This is no basis to grant summary judgment to the Value City, either.

### 4. **Plaintiff has standing because he has suffered a violation of the statute.**

Equally meritless is Value City's argument that Mr. McGonigle should lose here for the same reason that Melody Stoops lost in *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016). Defendant would have the Court believe that *Stoops*, which predates the litany

31

of subsequent rulings clarifying not only its limited usefulness but also cases *specifically addressing similar plaintiffs' standing*, stands for the proposition: "no standing for repeat TCPA litigant." Of course it doesn't. *Stoops* has never been understood to stand for the proposition that a so-called "professional plaintiff," a loaded term with zero legal significance, lacks standing under the TCPA. The facts of *Stoops*, the single case depriving a TCPA plaintiff of Article III standing based on the proven factual lack of an actual injury in fact, and even then, only after having proven the same at summary judgment, are as follows:

- Ms. Stoops "purchased at least thirty-five cell phones and cell phone numbers with prepaid minutes for the purpose of filing lawsuits under the Telephone Consumer Protection Act." *Id.* at 788.
- She selected Florida telephone numbers for these cell phones "because there is a depression in Florida," where "people would be usually defaulting on their loans or their credit cards." *Id.*
- She "collected a shoe box full of cell phones to fish for accidental wrong number calls." *Id.* at 796.
- Finally, she admitted that she specifically bought those cell phones "in order to manufacture" a TCPA lawsuit and admitted that "It's my business. It's what I do." *Id.* at 799.

 On that testimony and much more similar ilk, the district court held that Ms. Stoops had suffered no injury-in-fact. *Id.* at 800-01. The plaintiff in *Garcia* did precisely the same thing, by continuing to re-purchase "pre-paid phone minutes, apparently in order to keep receiving unwanted calls." *Garcia v. Credit One Bank, N.A.*, No. 218CV191JCMEJY, 2020 WL 4431679, at *3 (D. Nev. July 31, 2020). This fact, along with his admission that "if he instructed [the defendant] at any time during one of these calls to cease calling him, [defendant] would have likely complied," led the court to conclude the plaintiff had not suffered an injury-in-fact because he filed the action "as part of a scheme to generate revenue." *Id.* The facts of *Stoops* and *Garcia* undermine Defendants' argument, as Mr. McGonigle isn't alleged to have done any of this.

a.   Plaintiff is nothing like Ms. Stoops or Mr. Garcia.

Value City's gross mischaracterizations of the Plaintiff's testimony notwithstanding, as an initial matter, Mr. McGonigle isn't alleged to have done any of what Ms. Stoops or what Mr. Garcia did. The cell phone at issue is his *only* cell phone number, which Mr. McGonigle uses for personal, family, and household purposes, and not for the sole purpose of filing suit under the TCPA, as in *Stoops*. (McGonigle Dep. 52:14-16; 64:21-24). And no part of Mr. McGonigle's deposition testimony reflects the fact that he did not text "STOP" because he thought that the Defendant would honor that request and deprive him of revenue, as did Mr. Garcia. To the contrary, Mr. McGonigle expressed doubt that texting "STOP" would stop the messages, particularly because the messages failed to provide a mechanism for opting out, which is itself illegal. (McGonigle Dep. 130:5-23; 131:1-6). In fact, he testified that he didn't text "STOP" "Because the messages that I received did not give me that prompt or option to do so." (McGonigle Dep. 130:19-23). And, when asked if he deliberately waited until Value City "sent more messages" so that he would "have greater statutory damages," Mr. McGonigle unequivocally denied the same, stating that he was "was exercising not only my rights but the class's rights as a class action representative, not just for income," (McGonigle Dep. 143:17-24; 144:1-2), precisely the *opposite* testimony of Mr. Garcia.

And failing to send "STOP" doesn't mean that Mr. McGonigle consented, either. As Mr. McGonigle correctly pointed out, he "shouldn't have gotten any" calls if he had not opted in, and he shouldn't ask for someone to stop doing something he never asked for in the first instance. (McGonigle Dep. 148:24; 149:1; 181:11-19) ("Q. Do not call means just that, do not call, right? A. That's correct."). Because *inaction* cannot provide the basis for a finding of *express* consent, Value City's motion also fails as a matter of law. *See Lusskin v. Seminole Comedy, Inc.*, No. 12-

33

62173-Civ, 2013 U.S. Dist. LEXIS 86192, at *7-8 (S.D. Fla. June 19, 2013) (distinguishing express consent from implied consent). Value City's argument is wrong because it "misstates the injury required to bring a TCPA claim and assumes a failure to mitigate statutory damages where no such duty exists." *Trim v. Mayvenn, Inc.*, No. 20-cv-03917-MMC, 2022 U.S. Dist. LEXIS 63222, at *6-7 (N.D. Cal. Apr. 5, 2022) (rejecting nearly identical argument).

Defendant also relies on *Stoops* for its atextual argument that the TCPA imposes a requirement that calls be "unwanted," but the weight of authority rejects that reasoning. That is because most courts interpreting *Stoops* have agreed with a limitation of this sort only where a plaintiff has purchased a line *solely to generate TCPA litigation* and *with no other purpose.* *Greenley v. Laborers' Int'l Union of N. Am.*, 271 F. Supp. 3d 1128, 1139 (D. Minn. 2017) (finding standing where "[h]ere, by contrast [to Stoops], [plaintiff] attests that he did not purchase the cellular telephone that [defendant] contacted for the sole purpose of initiating TCPA litigation."); *Evans v. Nat'l Auto Div., LLC*, Civ. No. 15-8714, 2016 WL 4770033, at *3 (D.N.J. Sep. 13, 2016) ("*Stoops* is distinguishable from this case on the grounds that the plaintiff in that case acknowledged that she only purchased cell phones in order to file TCPA lawsuits."); *Morris v. Unitedhealthcare Ins. Co.*, No. 4:15-CV-638, 2016 WL 7115973, at *6 (E.D. Tex. Nov. 9, 2016), report and recommendation adopted, 2016 WL 7104091 (E.D. Tex. Dec. 6, 2016) (standing where defendant "proffered no evidence that [the subject phone line] is a residential telephone number Plaintiff maintains purely for the purpose of filing TCPA lawsuits" and distinguishing *Stoops* on this basis); *Bais Yaakov of Spring Valley v. Educ. Testing Serv.*, 367 F. Supp. 3d 93, 115 (S.D.N.Y. 2019) (same).

As will be discussed below, the relevant determination for *every court* to have considered the issue post-*Lexmark* and post-*Stoops* is whether the plaintiff obtained and maintained the lines

at issue purely for the purpose of filing TCPA lawsuits. Because the evidence here is precisely to the contrary—Plaintiff obtained a new telephone number because he moved to a new state and didn't even know about the TCPA until he was bombarded by unsolicited telemarketing calls-- Plaintiff has standing under the correct test. (McGonigle Dep. 148:24; 149:1; 181:11-19)

Value City's atextual reading imposes requirements for standing that appear nowhere in the text of the statute. No part of the TCPA's text requires call recipients to text back "STOP" in response to an unsolicited call; to the contrary, it provides another right of action and additional damages to call recipients who do so. 47 C.F.R. § 64.1200(d)(3). This is not to mention that Value City's argument that Plaintiff should have texted back STOP "puts the onus – and risk of being the target of malware and phishing scams – on the recipient of the text. This stands in contrast with the clear purpose of the TCPA to protect consumers from nuisance calls and protect consumer privacy." *Newell v. JR Cap., LLC*, 791 F. Supp. 3d 571, 584 (E.D. Pa. 2025) (*citing* S. Rep. 102-178, at 5 (1991) and *Satterfield*, 569 F.3d at 954 (9th Cir. 2009) (discussing TCPA's purpose of curbing calls that are a nuisance and an invasion of privacy)). To this end, Mr. McGonigle stated that he doesn't click on links in unsolicited messages because he doesn't trust them. (McGonigle Dep. 182:14-16, 87:1-6). Thus, Mr. McGonigle's failure to reply "STOP" to the messages is no matter at summary judgment: he isn't required to do so, and Value City's atextual arguments otherwise find no support in the statute.

Nor does the allegation that Mr. McGonigle has obtained statutory damages against companies who violate his privacy affect his standing in any way, let alone sufficiently to grant summary judgment to Value City. Even if a victim of illegal calls subjectively considered the statutory damages from a given call to outweigh his injuries from that call, his standing would not be diminished. Congress was well aware of this possibility when it passed the TCPA, and no

general rule requires plaintiffs who prove their cases to end up worse off than before the defendant injured them. *See Cunningham v. Rapid Response Monitoring Servs.*, 251 F. Supp. 3d 1187, 1196 (M.D. Tenn. 2017). As the Court in *Cunningham* went on to elucidate on the issue of standing in expressly rejecting that notion:

> The determinative issue, then, is not Cunningham's motivations, but whether he was injured. An ordinary consumer who pled the facts that Cunningham has pled would have established a concrete and particularized injury-in-fact based on the Defendants' intrusion upon his rights to privacy and seclusion. Defendants suggest that, by becoming a so-called "professional plaintiff," he has forfeited those rights because the calls alleged were not truly unwanted. Insofar as *Stoops* endorses such a result, this Court disagrees. *It may be that Cunningham was not saddened or annoyed by the calls he received; it may even be that, knowing his rights under the TCPA, he is glad the calls were placed.* But allowing that fact, even if true, to negate his right to privacy and seclusion would require the Court to embrace a line of reasoning that would ultimately *undermine the rights of most, if not all, TCPA plaintiffs and plaintiffs in similar statutory schemes*.

This Court should similarly hold.

b. Plaintiff has suffered a Congressionally-authorized statutory injury.

The judicial inquiry "begins with the statutory text, and ends there as well if the text is unambiguous." *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004). A plaintiff alleging a violation under the TCPA "need not allege any additional harm beyond the one Congress has identified." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (citing *Campbell-Ewald*, 577 U.S. at 165). Here, Plaintiff's claims "satisfy the demands of Article III because his alleged injury under the TCPA constitutes a concrete harm." *Dickson*, 69 F.4th at 343. "The mere fact [Plaintiff] alleges he received unsolicited and intrusive text messages is sufficient to establish a concrete harm that Congress identified and sought to redress with the TCPA." *Deleo v. Nat'l Republican Senatorial Comm.*, No. 221CV03807BRMESK, 2021 WL 5083831, at *5 (D.N.J. Nov. 1, 2021). There can be no dispute that Mr. McGonigle has adequately pled, and discovery has revealed facts confirming, a claim under the TCPA.

Ignoring these well-reasoned authorities and the plain language of the statute, Value City

posits a unique theory of standing. It apparently has no objection to the standing of individuals who cannot be put to the trouble of suing them, but those like Mr. McGonigle, who have a track record of investing time and energy to enforce federal telemarketing law for the benefit of a class and the general public, according to Value City, should be stripped of the TCPA's protections because such conduct supposedly amounts to ongoing abuse of the federal courts and amounts to a self-described TCPA litigation "business." (MSJ at 22) (citing no one). But there is nothing abusive or untoward about the Plaintiff investigating those who called him in violation of the TCPA. Defendant ignores that courts routinely brush aside the perverse notion that one who has been the victim of several different companies' illegal calls may not bring several different suits. *Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006) (Easterbrook, J.) ("What the district judge did not explain, though, is why 'professional' is a dirty word. It implies experience, if not expertise. The district judge did not cite a single decision supporting the proposition that someone whose rights have been violated by 50 different persons may sue only a subset of the offenders."); *Cunningham*, 251 F. Supp. 3d at 1195 (M.D. Tenn. 2017) ("Nothing in the Constitution, though, requires a plaintiff to be a naïf. Litigation is not college athletics: there is no 'amateurs only' rule."); *Martin v. Bureau of Collection Recovery*, No. 10 C 7725, 2011 WL 2311869, at *4 (N.D. Ill. June 13, 2011) ("Characterizing Plaintiff as a 'professional plaintiff' does not boost [the defendant's] argument in this discovery motion or any arguments in response to Plaintiff's motion for class certification.").

Mr. McGonigle has standing because he received multiple illegal calls which violated the TCPA and resulted in the violations of privacy, and occupation of telephone lines, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving and performing other critical tasks, that the statute was designed to protect against.

Defendant points to no reason why it is entitled to judgment as a matter of law on this issue. As a result, Mr. McGonigle has suffered a cognizable injury-in-fact as a result of his receipt of the illegal calls at issue, and thus has standing.

> c.  Prudential Standing is dead. A "zone of interests" analysis is inappropriate. Even so, Mr. McGonigle clearly falls within whatever "zone of interests" the TCPA embraces.

Although Plaintiff indisputably meets the textual requirements to sue under the TCPA, Value City argues that Mr. McGonigle lacks so-called "prudential" standing, arguing that he falls outside the TCPA's "zone of interests." But Defendant cites to the wrong standard when evaluating this issue, citing the abrogated cases of *Prime Media*, *Valley Forge*, and *Clarke*. The problem with the reasoning cited by the Defendant, and *Stoops*, which relied on it, is that it was (and is) expressly precluded by a change in the Supreme Court's jurisprudence on standing. In 2014, in *Lexmark International, Inc. v. Static Control Components, Inc.*, the Supreme Court refined the prudential standing doctrine, stating that "[j]ust as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." 572 U.S. 118, 128 (2014). The Supreme Court further eroded prudential standing in *Bostock v. Clayton County*, 590 U.S. 644 (2020), where it held that, when, as here, the statutory language is clear and broad, a court may not limit the statute to its "expected applications." *Id.* at 676. Defendant's authorities predate the jurisprudential sea changes abrogating the prudential standing doctrine the High Court announced in *Lexmark* and refined in *Bostock*.

Defendant pays insufficient heed to, and fails to cite, *Lexmark*. The "zone of interests" test asks whether Mr. McGonigle is a plaintiff "whose interests fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 129. What remained of this test post-*Lexmark* "is not 'especially demanding.'" *Id.* (*quoting Match-E-Be-Nash-She-Wish Band of*

*Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). Rather, after *Lexmark*, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue," and so accordingly "the benefit of any doubt goes to the plaintiff." *Id.* at 130 (cleaned up). Plaintiff meets this test because his interests are related to those in the text of the TCPA, and he did not purchase the lines at issue solely to generate TCPA litigation.

Post-*Lexmark*, Courts across the country have instead made clear that "neither the Constitution nor penumbral principles of prudential standing license judges to disqualify plaintiffs from accessing the lawful remedies that Congress has prescribed to seek recovery for unlawful actions merely because those plaintiffs have engaged in strategically savvy efforts to preserve that access." *Gorss Motels, Inc. v. AT&T Mobility, LLC*, 490 F. Supp. 3d 476, 485 (D. Conn. 2020) (cleaned up); *see also Jawk Enters., LLC v. Greenlight Energy, Inc.*, No. 19-CV-4212-ARR-SJB, 2019 WL 5881752, at *3 (E.D.N.Y. Nov. 5, 2019) (disagreeing with *Stoops* and its progeny and calling its stringent "zone of interests" analysis "inappropriate post-*Lexmark*"). Nor do the Plaintiff's alleged pecuniary interests remove him from whatever remains of a "zone of interests" after *Lexmark*. *See Cunningham*, 251 F. Supp. 3d at 1197 (noting that a court "cannot read the TCPA and imagine that Congress intended to exclude plaintiffs such as [the one there]. If anything, it intended to recruit them, incentivizing them by offering them such sizable rewards."); *Mey v. Venture Data, LLC*, 245 F. Supp. 3d 771, 783 (N.D.W. Va. 2017). "The fact that Plaintiff derives a profit from these lawsuits is exactly what Congress intended." *Shelton v. Nat'l Gas & Elec., LLC*, No. CV 17-4063, 2019 WL 1506378, at *5 (E.D. Pa. Apr. 5, 2019).

Defendant cites to none of these aforementioned cases. Indeed, it fails to recognize that *Stoops* has been widely criticized and limited, and its reasoning has been frequently rejected, as

explained above. Taking all disputed evidence in Mr. McGonigle's favor, this Court should conclude that a reasonable jury could find that this action furthers the congressional purposes of allowing those whose lives have been disrupted, privacy invaded, and who have been annoyed and harassed by such unwanted, nonconsensual text message calls, have standing to sue under the TCPA. And, even if that is a close question, "the benefit of any doubt goes to the plaintiff." *Lexmark*, 572 U.S. at 130 (cleaned up).

Defendant's arguments should be rejected for an additional reason: applying the "zone of interests" test so narrowly that it excludes Plaintiff, despite the fact that Plaintiff meets the explicit textual requirements of the TCPA, as explained above, is barred by the Supreme Court's ruling in *Bostock v. Clayton County*, 590 U.S. 644 (2020), which was decided after both *Stoops* and *Lexmark*. In *Bostock*, the Supreme Court held that Title VII's ban on "sex discrimination" included discrimination on the basis of sexual orientation *and* gender expression because the *plain text required that result*, even though the Congress that passed the law *never intended* the law to be used so broadly.[6] *Id.* The Court's reasoning was simple: "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Id.* at 652-53.

*Every single case* on which Defendant relies for its restrictive application of the zone-of-interests test predate *Bostock*. But, after *Bostock*, a court may not attempt to divine a kind of "intent" of the TCPA, to "prevent the proliferation of intrusive, nuisance telemarketing calls to individual's homes," in Defendant's view, MSJ at 23, and then limit a plaintiff's standing on that basis. Rather, "when Congress chooses not to include any exceptions to a broad rule, courts

---

[6] The Supreme Court's holding in *Bostock* also supports Plaintiff's, and the FCC's, interpretation of the meaning of the word "call" to include text messages, even if, *arguendo*, Congress never envisioned the law to apply to such communications. *See generally* Section 1, *supra*.

apply the broad rule." *Id.* at 669. As one commentator has noted, then, "[u]nder *Bostock's* textualism, there is no room for a zone-of-interests test." Joseph S. Diedrich, *Bostock v. Lexmark: Is the Zone-of-Interests Test A Canon of Donut Holes?*, 89 U. CIN. L. REV. 814, 825 (2021). That is because, as the Court's decision in Bostock entails, "perpetuating *Lexmark's* zone-of-interests test—as well as any other rule, canon, or doctrine that permits comparatively easy injection of purpose and "gut" into statutory interpretation, thereby enabling judicial limitation of statutory language—risks undermining [a] [c]ourt's legitimacy." *Id.*

Courts have applied *Bostock* to TCPA cases and concluded that the statute means what it says and says what it means. In *Bradford*, 2024 WL 2133801, a district court found that legislators did not have immunity from suits under the TCPA for making robocalls that they authorized. *Id.* at *8. Citing *Bostock*, the court concluded that it lacked the power to create any exceptions not contained in the statute itself. *Id.* "In this case," the court noted, the "written word is the TCPA, and it could not be clearer that it applies to all calls that any individual makes using a prerecorded voice." *Id.* Although *Bradford* was subsequently reversed, its analysis of *Bostock* remains untouched and just as persuasive. *Bostock* clarifies that any "zone of interests" test for statutory standing must be firmly grounded in text and may not rely on atextual, purposive glosses like Defendant's statement that "[a] professional plaintiff's lack of standing aligns with Congress's purpose for the TCPA" (MSJ at 21).

That kind of generalized, purposive reasoning, where a court concludes that a statute was passed to protect against a "principal evil" and can be limited to plaintiffs invoking that harm despite the plain text, was expressly rejected in *Bostock*. 590 U.S. at 676-78. Thus, after *Bostock*, the "zone of interest" inquiry must be grounded in text. Here, the text confirms Mr. McGonigle's standing: the private right of action includes any "person who has received more than one

41

telephone call within any 12-month period," and the harm contemplated in the statute itself includes a violation of a person's explicit desire not to be contacting by having their number listed on the Do Not Call Registry. Because Mr. McGonigle's number was on the registry and he did not consent to receiving the calls, he is within the textual "zone of interest" and has standing to sue. The TCPA's plain text applies to all such calls placed without consent to a number on the DNC. Its text and structure make clear that text messages like the ones Plaintiff received are covered. Accordingly, Plaintiff has a cause of action under the statute.

## CONCLUSION

Value City's bid for summary judgment ought to be denied, class discovery proceed in earnest, and a jury trial scheduled posthaste.

Date: November 28, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
*Perrong Law LLC*
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

*Attorney for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

Dated: November 28, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
*Perrong Law LLC*

42